## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SOUTHERN CALIFORNIA EDISON,<br>2244 Walnut Grove Avenue<br>Rosemead, California 91770,<br><br>                    *Plaintiff,*<br>        v.<br><br>UNITED STATES POSTAL SERVICE,<br>475 L'Enfant Plaza S.W<br>Washington, D.C. 20260,<br><br>                    *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 14-cv-1041 |

## COMPLAINT

Plaintiff Southern California Edison ("SCE") sues the United States Postal Service ("Postal Service" or "USPS"), and alleges as follows:

## NATURE OF THE ACTION

1.      The USPS offers discounts on postage to induce business mailers to prepare their mailings in optional ways that save the Postal Service money.  To qualify for the discounts on First-Class Mail, mailers must, before entering a mailing in the postal system, verify within a specified period before the mailing that its addresses are accurate and current; print the addresses with a computer-readable typeface; orient the pieces facing in the same direction; "presort" (arrange) the pieces by ZIP code; bundle the pieces by ZIP code; place the bundles in mail trays by ZIP code; stack the trays on pallets; and place computer-readable barcodes on the envelopes, trays, and pallets.

2.      SCE is one such mailer.  For a number of years, SCE has done the optional preparatory work, and received the promised discounts, on the roughly 4.5 million invoices and other customer mail that it mails each month.  Indeed, SCE has in important respects performed beyond the levels required by the Postal Service—updating its address lists every 30 days, several times more frequently than required to qualify for the discounts.  SCE Amended Appeal (Nov. 21, 2011) (hereinafter "SCE Appeal") at 16, 23 n.11, 26, 27, 34.  This practice furthers SCE's independent business need to keep customer mailing addresses accurate and up-to-date so that SCE is able to get paid for the electricity it provides to consumers.

3.      In the proceedings below, however, the Postal Service ordered SCE to refund to the Postal Service the entire $7.6 million in discounts that SCE earned for its mail preparation work on the 82 million pieces of presorted First-Class Mail that SCE mailed between May 14, 2007 and November 26, 2008.  The Postal Service's theory is that (a) SCE failed to update some of its mailing addresses as required by the Postal Service's rules, and (b) this failure required the Postal Service to forward some of SCE's mail to new addresses or return some mail to SCE as undeliverable, at added cost to the Postal Service.  The USPS did not limit the revenue deficiency assessment to the subset of total SCE volume that actually had been returned to SCE or forwarded to a new address, let alone to the small subset of those forwards and returns that resulted from the three alleged forms of noncompliance identified by the Postal Service.  Nor did the USPS attempt to justify the revenue deficiency assessment to the Postal Service's own estimates of the costs it incurred from forwarding or returning undeliverable mail, or consider the economic benefits received by the Postal Service from the other preparatory work that SCE indisputably had performed on the mail, including barcoding, the use of computer-readable addresses, facing of the pieces in the same direction, bundling pieces addressed to common ZIP codes, placing the bundles in trays, and stacking the trays on pallets.  Rather, the USPS

calculated the revenue deficiency assessment as the entire difference between the rates paid and the *undiscounted* single-piece First Class rate, multiplied by *each* of the 82,452,608 pieces entered by SCE between May 14, 2007, and November 26, 2008, regardless of the accuracy and currency of its address.

4.      The resulting claim exceeds by several orders of magnitude any plausible measure of the Postal Service's alleged damages.  The record evidence shows that only a tiny fraction of SCE's mail did not have its addresses updated as required; and the $7.6 million in extra postage demanded by the Postal Service is nearly ***ten times*** the Postal Service's own estimate of the added costs it incurred from *all* forwards and returns of SCE mail *for any reason*, approximately ***176 times*** the added costs of the forwards and returns that may be attributed to the specific address updating violations alleged by the Postal Service, and an even larger multiple of the costs *properly* chargeable to actual address updating violations by SCE—assuming that SCE has any liability at all.

5.      The Postal Reorganization Act of 1970 and the Due Process Clause of the Fifth Amendment forbid the Postal Service from exacting a penalty or surcharge so disproportionate to the financial damages actually suffered by the Postal Service.  SCE asks the Court to overturn the $7.6 million assessment on this ground.

## PARTIES

6.      Plaintiff Southern California Edison ("SCE") is a public utility that provides electric power to more than 14 million customers in Southern and Central California.  SCE is incorporated in California and has its principal place of business in Rosemead, California.

7.     The United States Postal Service (the "Postal Service") is an "independent establishment of the executive branch of the Government of the United States," headquartered in Washington, D.C.  39 U.S.C. § 201.  The Postal Service may sue and be sued in its own name. 39 U.S.C. § 409.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1339.  The actions of the Postal Service are reviewable to determine whether it has acted *ultra vires* and in excess of its statutory authority or the Constitution.  *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1172–73 (D.C. Cir. 2003).

9.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

**A.     The Postal Service and Its Address Updating Requirements for Presorted First-Class Mail.**

10.     With certain exceptions not relevant here, the Postal Service has a legal monopoly over the carriage and delivery of letter mail, including First-Class Mail.  Private carriage of most letters on public roads is a crime.  The laws that establish this monopoly are commonly referred to as the Private Express Statutes.  18 U.S.C. §§ 1693–1696; 39 U.S.C. §§ 601–606.

11.     To protect the public from abuse of the Postal Service's monopoly power, Congress subjects the prices charged for monopoly mail products to maximum rate regulation. 39 U.S.C. §§ 3621(a), 3622, 3642(b)(2).  Rates for monopoly mail products may not exceed "reasonable and equitable" or "just and reasonable" levels.  39 U.S.C. §§ 404(b), 3622(b)(8); *see*

*also id.* § 3622(c)(5) (requiring that rates take into account "the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service").

12.     Within each class of monopoly letter mail, the Postal Service offers a variety of categories of service at varying prices.  The most expensive category of First-Class Mail is single-piece (or "retail") mail.  This is the category typically used by consumers for personal correspondence and bill payments.

13.     The Postal Service also offers discount categories of First-Class Mail to business mailers in exchange for additional preparation of the mail in ways that save the Postal Service money.  Mailers are entitled to varying levels of discounts for presorting their mail (i.e., arranging it by ZIP Code or address before entering it in the postal system) or placing computer-readable barcodes on the envelopes.  The "worksharing" activities required to qualify for the rate discounts include printing the addresses on the envelopes in a computer-readable type face; entering the pieces in trays or other containers, with all facing the same way and oriented in the same direction; bundling the pieces within each tray by ZIP code; sequencing the pieces in the bundles by ZIP code, in the order of the street carrier's delivery route; verifying before entering the mail that the addresses on the envelopes correspond to actual geographic addresses; and verifying, within a specified period before each mailing, that the addresses in the mailing are current and accurate.

14.     The discounts offered to the mailers for this preparatory work are designed to approximate the cost savings that the Postal Service obtains from the work.  As of June 1, 2008, for example, the postage rate for a one-ounce letter sent as a single-piece First-Class piece was 41 cents, while discounted rates for a one-ounce piece of First-Class mail ranged from 31.2 to

37.3 cents per piece, depending upon how much optional preparation work the mailer did before entering the mail. Rates today, although escalated to reflect inflation since 2008, have a similar relationship.

15. The particular mail preparation requirement at issue in this case involves the updating of addresses by the mailer. First-Class Mail that is undeliverable as addressed ("UAA") is entitled to be forwarded to the addressee's new address (if the Postal Service has a new address for the recipient) or returned to the sender (if the Postal Service lacks a new address) at no extra charge to the sender. Forwarding and returning UAA mail imposes costs on the Postal Service. For the period covered by this lawsuit, the Postal Service estimated that forwarding a piece of mail to a new address cost the Postal Service about $0.51 per piece, and that returning a piece to its sender cost the Postal Service about $0.18 per piece. November 23, 2009 Santa Ana District Initial Decision (hereinafter "November 2009 Decision"), at 5.

16. To reduce the incidence of presorted First-Class Mail that must be forwarded or returned to the sender as undeliverable, the Postal Service requires senders of Presorted First-Class Mail (unlike senders of Single-Piece First-Class Mail) to update the addresses in a mailing within 95 days before entering the mailing in the postal system. (In 2007–2008, the required updating period was 185 days). This requirement is known as the Move Update requirement.

17. The Postal Service's rules allow mailers to comply with the Move Update requirement in several ways. One method is the NCOA$^{Link}$ process. This involves using a computer to match the mailing list against the Postal Service's National Change of Address database, which contains over 160 million Change-of-Address ("COA") records compiled from change-of-address forms submitted by households and businesses within the last 48 months.

18.    The Postal Service's databases of address changes are not error free.  SCE Appeal at 8–9, 11–12, 33.  For example, consumers do not always submit change of address forms when they move.  This problem was especially acute for SCE during 2007 and 2008, which coincided with the collapse of the residential real estate bubble and the onset of the foreclosure crisis in much of southern California.  Consumers who have lost their jobs, defaulted on their mortgages, or moved to escape their creditors often do not submit a change-of-address form to the Postal Service.  *Id.*

19.    Second, the Postal Service does not always record accurately the new address information it receives.  Inaccuracies are particularly common when only part of a household moves (e.g., a couple divorce, a child goes off to college), or the owner of a house or commercial building moves out but wants the bills to continue to be sent to the same address so that the new tenant can pay them.  *Id.* at 8.

20.    Third, the Postal Service's databases deal poorly with address changes involving common Hispanic surnames, a system limitation with particular significance in southern California.  *Id.* at 8.

21.    As the Postal Service has admitted, the result of these and other factors is that the Postal Service's address change databases are not completely accurate.  *Id.* at 8, 12–14.  The NCOA[Link] database, for example, has an error rate of at least one percent.  *Id.* at 8–9.

22.    Another permissible method of Move Update compliance is for the mailer to verify an address directly with the addressee.  This method is known as the "directly acquired address" method of Move Update compliance.  *Id.* at 23 n.11; USPS Guide to Move Update (Jan. 2013) at 11.

**B.      SCE and Its Mailing Practices.**

23.      SCE mails about 4.5 million pieces of First-Class Mail per month.  Most of these pieces are communications with customers of SCE, and most of the communications are monthly bills or account statements.  During 2007 and 2008, SCE mailed nearly all of this volume as presorted First-Class Mail.

24.      Keeping customer mailing addresses accurate and up-to-date is an independent business imperative for electric utilities like SCE as well as the Postal Service.  Undelivered utility bills can quickly lead to account receivables that are large, growing and uncollectable. Accordingly, SCE has strong incentives to keep its customer mailing lists current so that it may obtain payment for the electricity it has provided customers.  SCE Appeal at 21–22.

25.      In 2007 and 2008, SCE used two redundant methods for updating its customer address lists.  First, it used the NCOA$^{Link}$ process to update its mailing list against the database of Postal Service change-of-address forms.  Postal Service regulations at the time required a mailer of Presorted First-Class Mail to update its mailing list against the NCOA$^{Link}$ database every 185 days.  SCE updated its mailing list against this database every 30 days, or six times the minimum required frequency.  *Id.* at 16, 23 n.11, 26, 27, 34.

26.      As noted above, however, the NCOA$^{Link}$ database has an error rate of at least one percent.  For SCE's monthly mail volume of approximately 4.5 million pieces, this error rate translates to at least 45,000 pieces per month of mail that must be forwarded or returned to the SCE, despite full compliance with the NCOA$^{Link}$ method of address updating.

27.      Because of the limitations of NCOA$^{Link}$, SCE maintained at its own expense a second and independent address correction operation, through which employees could manually

override address changes indicated by the NCOA<sup>Link</sup> database. This override policy applied when (1) a customer of SCE *specifically directed* the billing and customer offices of the utility to enter a different address than the one indicated by the NCOA<sup>Link</sup> database, and (2) SCE's address verification department determined that the customer-supplied address was more reliable than the address indicated by the NCOA<sup>Link</sup> data, and that use of the customer-supplied address would increase the likelihood that the bill would reach the addressee and that the invoice would be paid. *Id.* at 21–22.

28.     SCE received empirical confirmation that its manual overrides did not increase UAA mail: the vast majority of invoices sent to the override addresses were paid, which meant that the bills had been successfully delivered to the account holder. *Id.* at 23.

**C.     The Revenue Deficiency Assessment of the Santa Ana District (November 2009).**

29.     In early 2008, someone within the Postal Service apparently decided that the volume of mail being returned to SCE because the mail was undeliverable as addressed seemed excessive. Acting on the suspicion that SCE might not have been updating its address lists as often as required by the Move Update rules, the Postal Inspection Service began an investigation of SCE's Move Update compliance practices. *Id.* at 6.

30.     On November 23, 2009, Scott Jones, the Manager of Business Mail for the Santa Ana (California) "Performance Cluster" (i.e., district) sent SCE a letter-decision assessing a revenue deficiency—i.e., a demand for additional postage—in the amount of $7,551,576.28 on the mailings that SCE had entered between May 14, 2007, and November 26, 2008.

31.    The November 2009 Decision was based largely on a report issued by the Postal Inspection Service in May 2009.  The report and the November 2009 Decision alleged that SCE had not complied with the Postal Service's address updating requirements during the period; and that every one of the 82 million pieces of mail entered by SCE between May 14, 2007 and November 26, 2008, at presorted First-Class rates therefore must be re-rated as undiscounted single-piece First-Class Mail.  The additional postage amounted to about 9.1 cents per piece. Multiplying that amount by the 82,452,608 pieces of presorted First-Class Mail entered by SCE during the period produced a total deficiency assessment of $7,551,576.28.  November 2009 Decision at 1, 5–6; Investigative Report.

32.    In support of this claim, the November 2009 Decision, like the May 2009 Postal Inspection Service report, relied largely on the volume of mail that the postal inspectors observed being returned to SCE as undeliverable.  This volume of returned mail, according to the May 2009 report, consisted of approximately 2,000 pieces per day that were returned because the Postal Service was unable to forward the mail, and another 80 pieces per day that the Postal Service did not forward because the forwarding order had expired or was outdated.  In addition, the November 2009 Decision found that up to 37 percent of the address changes matches reported by NCOA[Link] were more than 185 days old.  November 2009 Decision at 1–3; *see also id.* at 6, 15.  Neither the May 2009 report nor the November 2009 Decision cited any evidence, however, that the cited return rates, and the percentage of NCOA[Link] matches that were more than 185 days old, exceeded the volumes that one would expect from the 4.5 million pieces that SCE mailed each month and the inherent error rate of the NCOA[Link] database.  In fact, the volume of undeliverable mail and the other performance data noted in the November 2009 Decision were not abnormally high.  The authors of the decision simply misinterpreted the data. *Id.* at 7–18.

33.     In an attempt to buttress the Postal Service's allegations with evidence of actual process violations, the November 2009 Decision also offered evidence that SCE had (1) manually overridden some of the address changes indicated by the NCOA$^{\text{Link}}$ reports, (2) failed to implement address changes involving "code 91" or "code 92" address change codes (i.e., codes in which the apartment or suite number was missing from either the new or old address), and (3) failed to implement address changes involving fractional street numbers (e.g., 29½ Elm Street).   The decision also criticized SCE for failing to respond as quickly as the Postal Inspection Service wanted to its information requests.   November 2009 Decision at 3–5.

34.     The November 2009 Decision did not limit the revenue deficiency assessment to the subset of total SCE volume that actually had been returned to SCE or forwarded to a new address, let alone to the small subset of those forwards and returns that actually involved any of the three categories of unimplemented address changes described in the previous paragraph.   Nor did the November 2009 Decision attempt to justify the revenue deficiency assessment to the Postal Service's own estimates of the costs it incurred from forwarding or returning undeliverable mail, or consider the economic benefits received by the Postal Service from the other preparatory work that SCE indisputably had performed on the mail, including barcoding, the use of computer-readable addresses, facing of the pieces in the same direction, bundling pieces addressed to common ZIP codes, placing the bundles in trays, and stacking the trays on pallets.   Instead, the November 2009 Decision calculated the revenue deficiency assessment as the *entire* difference between the rates paid and the *undiscounted* single-piece First Class rate, multiplied by *every one of* the 82,452,608 pieces entered by SCE between May 14, 2007, and November 26, 2008, regardless of the accuracy and currency of its address.   *Id.* at 5–6.

### D.   SCE's Administrative Appeal (November 2011).

35.   With the consent of the Postal Service, SCE filed an administrative appeal from the decision on January 10, 2010.   Many of the documents and workpapers underlying the November 2009 Decision were missing, however, and SCE reserved the right to supplement its appeal after the Postal Service supplied the missing documents.   SCE Appeal at 7.   The Postal Service produced some, but not all, of the missing information on October 3, 2011.   SCE filed an amended appeal on November 21, 2011.

36.   The SCE appeal challenged the November 2009 Decision on several grounds. The most important challenges may be summarized as follows:

37.   The November 2009 Decision assessed a revenue deficiency against SCE primarily on the ground that the volume of Forwarding Order Expired ("FOE"), Return to Sender ("RTS"), and Undeliverable as Addressed mail being returned to SCE at postal facilities in southern California was suspiciously high.   The decision also noted that some of this mail had change-of-address orders more than 185 days old.   These two observations were insufficient without more to justify the ultimate decision to assess a revenue deficiency.   *Id.* at 6–15.

38.   First, the percentage of mail returned to SCE as undeliverable was only about one percent of total SCE volume, well within the normal range for properly updated address lists and the inherent error rate of the Postal Service's own Move Update databases.   *Id.* at 6–11.   The increase in the volume of UAA mail between 2006 and 2008 also provides no evidence that SCE was failing to update its address lists as the rules required.   A more plausible explanation is the upsurge of unemployment, bankruptcies, foreclosures and mortgage defaults that occurred in SCE's service area during that period.   *Id.* at 11–12.   Nor may a breakdown of address updating practices be inferred from the vintage of change-of-address matches generated by NCOA[Link] for

SCE mailing lists.  This phenomenon can have multiple innocuous causes, none of which were ruled out by the November 2009 Decision.  In particular, not all match codes generated by the NCOA[Link] database required SCE to update the address or suppress it from future mailings sent at discounted First Class rates.  *Id.* at 12–15.

39.   Second, none of the handful of Move Update process errors alleged by the November 2009 Decision was material enough to justify the revenue deficiency.  These alleged errors cannot account for more than a miniscule fraction of the NCOA[Link] address matches or UAA mail volume during this period.  Manually overriding the address changes supplied by NCOA[Link] was as likely to have reduced UAA rates as increased them, and was undertaken by SCE in a belief (confirmed in writing by a Postal Service mail preparation expert in Memphis) that the manual overrides were permitted by the Move Update rules.  *Id.* at 19–25.  SCE's failure to update addresses with NCOA[Link] match codes 91 and 92, and to implement changes involving fractional street numbers, also involved only a small fraction of SCE addresses.  *Id.* at 15–27.  Moreover, analysis of the 60-piece sample of returned pieces submitted by the Postal Inspection Service for an explanation from SCE confirmed that the challenged practices were not responsible for the UAA pieces returned to SCE.  *Id.* at 28–29.

40.   Third, SCE argued, nothing in the record indicates that SCE acted in bad faith.  In fact, SCE voluntarily updated its addresses with NCOA[Link] every thirty days—*six times* the frequency required by the Move Update rules—throughout the period at issue.  *Id.* at 16, 23 n.11, 26, 27, 34.  Likewise, when the postal inspectors advised SCE that certain of its address management practices violated the Move Update rules, SCE changed the practices promptly— even when, as with the addresses provided directly by SCE's customers, SCE knew that the customer-supplied addresses were more current and reliable than the addresses provided by the

Postal Service through NCOA[Link]. *Id.* at 24. SCE's good faith is a defense to any Move Update revenue deficiency. Postal Regulatory Commission Docket No. R2010-1, *Notice of Price Adjustment and Classification Changes Relating To Move Update Assessments*, Order No. 348 (Nov. 25, 2009) at 13 (finding that a Move Update-based revenue deficiency may be imposed only on mailers "who demonstrate a lack of good faith effort to comply with Move Update requirements"). SCE Appeal at 24–25.

41.     SCE also argued that, even if some revenue deficiency were warranted, the amount assessed is grossly unreasonable. The legal requirement that rates on monopoly postal services must be just and reasonable limits the per-piece rate additives that the Postal Service may lawfully assess to a reasonable measure of the damages (if any) actually suffered by the Postal Service. The damages resulting from the mailing practices at issue here are minimal if not nonexistent. *Id.* at 30–32.

42.     SCE also argued that the record provides no basis for assessing any revenue deficiencies on mailings before March 13, 2008, the date of the first sample of returned SCE mail pieces drawn by the Postal Service. *Id.* at 36–37. SCE also argued that the record also provides no basis for assessing any revenue deficiency on mailings entered after May 2009, when SCE learned that the Postal Inspection Service regarded certain of SCE's address management practices were noncompliant, and SCE moved quickly to change them. *Id.* at 24, 26–27.

43.     Finally, SCE argued that the record provides no basis for a look-back period longer than 12 months before May 26, 2008, when the Postal Inspection Service issued its Investigative Memorandum. The theories advanced in the November 2009 Decision for enforcing a longer look-back period are unsupported by, and inconsistent with, a management

policy published by the Postal Service limiting the look-back period for revenue deficiencies to 12 months ("Management Instruction DM-140-2008-1").   SCE Appeal at 36–39.

### E.   The Postal Service's Final Decision (May 2012).

44.   On May 30, 2012, the Pricing and Classification Service Center ("PCSC") of the Postal Service issued a three-page decision denying SCE's Appeal and upholding the Revenue Deficiency in the full amount of $7,551,576.28 ("May 2012 Decision").

45.   The May 2012 Decision disavowed the apparent assumption of the November 2009 Decision that the volume of undeliverable mail returned to SCE was sufficient to support a revenue deficiency.   Instead, the Decision asserted that the revenue deficiency assessment rested on proof of certain specific "process" violations by SCE:

> [In your appeal], you claimed that the information provided [in support of the November 2009 Decision] is insufficient to support the deficiency and that undeliverable mailpieces were not caused by SCE noncompliance but by errors in the NCOA Link data supplied by the Postal Service.  Rates of return are not the deciding factor in compliance with the MOVE Update standard and are only an indication that the standard may not have been met. . . .
>
> In your subsequent amended appeal of November 21, 2011, you argue that the detection, by the Inspection Service, of 80 pieces per day of forwarding order expired or outdated return to sender endorsements, and 2,000 pieces per day of UAA mail, is an insignificant amount compared to the volume that SCE sends out.  The assessment of additional postage was due to the fact that SCE's process for updating addresses was not in compliance and, therefore, not eligible for the automation discounts claimed.

May 2012 Decision at 2.

46.   The three categories of process violations found by the May 2012 Decision to have occurred were (1) SCE's policy of manually overriding address changes supplied by

NCOA$^{Link}$ when SCE's customer tracing department believed that a different address was more current and accurate, (2) SCE's failure to implement address changes involving codes 91 and 92 (i.e., missing apartment or suit numbers), and (3) SCE's failure to implement address changes involving fractional address numbers.

47.    The May 2012 Decision made no attempt, however, to relate the amount of the $7.5 million revenue deficiency to the number of pieces affected by the specific process violations alleged. Instead, the May 2012 Decision asserted that *any* violation of Move Update process requirements, no matter how few pieces were affected, justified assessing a revenue deficiency against *all* 82 million pieces mailed at presort First-Class rates during the period at issue. *Id.* at 2 ("The assessment of additional postage was due to the fact that SCE's process for updating addresses was not in compliance and, therefore, not eligible for the automation discounts claimed.").

48.    The May 2012 Decision also made no attempt to justify the full difference between the rates paid and the single-piece First-Class rate as the per-piece deficiency assessment. In response to the extensive judicial and agency precedent cited by SCE for the proposition that a just and reasonable penalty or rate additive for violation of a mail preparation requirement or similar classification rule may not exceed a reasonable estimate of the damages thereby suffered by the carrier, SCE Appeal at 30–32, the May 2012 Decision simply asserted, without any citations or other support, that "Postal Service policy, since the inception of the Move Update address quality standards, has been to access single piece prices for ineligible mailings," May 2012 Decision at 2. The Decision also asserted—again without any citations to precedent or other support—that "[t]his price eligibility requirement has been supported by the Postal Rate Commission." *Id.*

49.     The May 2012 Decision conceded that under Management Instruction DM140-2008-1, *Assessing and Collection Deficiencies in Postage and Fees,* the Postal Service policy is to restrict "deficiency assessments to a 12 month look-back period from the date the deficiency was identified." *Id.* The May 2012 Decision asserted that a longer look-back period was appropriate in this case because "the deficiency allegedly was not corrected when identified." *Id.* The decision did not dispute, however, that SCE had begun implementing address changes involving codes 91 and 92 and fraction addresses, quickly after the Postal Inspection Service flagged the issues in 2008, and had stopped overriding address changes supplied by NCOA[Link] shortly after the November 2009 Decision ruled that the practice violated Move Update.  SCE Appeal at 5, 24, 26, 27.

50.     The May 2012 Decision stated that "This is a final agency decision and concludes the appeal process."  May 2012 Decision at 3; *accord*, Domestic Mail Manual § 604.10.1.2.b.

## GENERAL ALLEGATIONS

51.     The most obvious problem with the revenue deficiency is the enormous disparity between the $7.6 million assessment demanded by the Postal Service and its actual—or even alleged—damages.  $7.6 million is nearly ***ten times*** $774,960, the Postal Service's own estimate of the added costs incurred by the Postal Service from *all* forwards and returns of SCE mail during the period *for any reason*.  Stated otherwise, the $7.6 million revenue deficiency assessment exceeded by an order of magnitude even a generous estimate of the Postal Service's damages.

52.     The $7.6 million revenue deficiency is approximately *176 times* $42,313—the costs of the *subset* of those forwards and returns that the Postal Service attributed to the address updating violations alleged by the Postal Service.

53.     Even the $42,313 figure is overstated for a variety of reasons.  Indeed, the vast majority of the specific process violations alleged by the Postal Service were in fact authorized by its own rules and the specific written advice of the director of the Postal Service's national Customer Support Center.  Moreover, no revenue deficiency may be assessed absent a showing of bad faith (which the Postal Service has not alleged).

**A.      The $7.6 Million Revenue Deficiency Upheld By the Postal Service Exceeds By a Factor of 10 Even the Postal Service's Own Estimate of Its Actual Damages.**

54.     The $7.6 million revenue deficiency exceeded by a factor of 10 even the Postal Service's extravagant claims of its own injury.

55.     The November 2009 Decision found that SCE generated about one million pieces of return-to-sender mail during the revenue deficiency period (May 14, 2007, to November 26, 2008), and that the average cost of returning each such piece to the sender was about $0.51 per piece.  November 2009 Decision at 3, 5.

56.     Multiplying one million pieces by $0.51 yields a total cost of $510,000 for the returned pieces.

57.     The Postal Service has further estimated that the volume of forwarded mail from bad addresses is, on average, about 1.472 times the volume of returns.  *See* Domestic Mail Manual 343.14.2, 507.1.5.3; Quick Service Guide at 230a, 507 n.4.

58.     The November 2009 Decision estimated that the average cost of forwarding a piece that is undeliverable as addressed is about $0.18 per piece.  November 2009 Decision at 5.

59.     Multiplying 1,472,000 pieces by $0.18 yields a total cost of $264,960 for the forwarded pieces.

60.     Hence, *by the Postal Service's own figures*, the total costs of SCE's forwards and returns during the revenue deficiency period therefore equaled about $774,960 (the sum of $510,000 plus $264,960)—*barely one tenth of the revenue deficiency assessed.*

61.     The discrepancy between the $7.6 million assessment and the Postal Service's actual damages may be restated in terms of the mail preparation work that SCE did perform.  The Postal Service does not dispute that most of the 82 million pieces at issue had addresses that were current and accurate.  Nor could the Postal Service dispute this fact, given the undisputed evidence that SCE verified the addresses used in its mailings every month—six times the minimum required frequency.  SCE Appeal at 16, 23 n.11, 26, 27, 34.  The Postal Service also does not dispute that it received substantial operational and financial benefits from the other preparatory work performed by SCE—including the facing, presorting, barcoding, bundling, traying and palletizing of the mailings—that SCE performed, and that would have been unnecessary if SCE had entered its pieces at the higher rates charged for single-piece First-Class Mail.  *Id.* at 30.  By demanding that SCE pay for 82 million pieces of mail at single-piece rates, the revenue deficiency effectively assumes that this additional preparatory work was not performed, or had no economic value to the Postal Service at all.

B.    **The $7.6 Million Revenue Deficiency Upheld By the Postal Service Exceeds By Even a Larger Multiple the Costs of Forwarding and Returning to SCE the Mail That Was Arguably Undeliverable Because of the Three Classes of Process Violations Found By the Postal Service.**

62.    The $774,960 figure computed in the previous subsection is itself grossly inflated. The figure assumes that *all* of the SCE mailpieces that the Postal Service forwarded or returned to SCE during the 2007–2008 damage period were undeliverable as addressed because of Move Update violations by SCE, rather than (1) the embedded error rate of the NCOA$^{Link}$ database, (2) the lapse of time (as many as 30 days) between the date when SCE checked its address list against the current NCOA$^{Link}$ database of the mailing, and (3) other factors for which SCE had no responsibility under the Move Update rules.   In fact, the specific practices that the Postal Service found to be process violations—manual overrides of code A matches, and failure to implement matches involving codes 91 or 92 (i.e., secondary address elements) or fractional street numbers—involved only about 3300 addresses per month, or only about *5.46 percent* of the approximately 60,385 change-of-address matches that SCE received from NCOA$^{Link}$ each month during the damage period.   SCE Appeal at 19.   Specifically:

- SCE averaged 400–500 manual overrides per month and had 511 overrides in the month with the greatest number of overrides.

- SCE received an average of only 1365 addresses per month under Match Codes 91 and 92, and a maximum of 2,000 in the highest month.   Even the higher of these two numbers represented only approximately 1/22 of one percent of the outbound SCE mail volume.

- Fractional street address returns involved only a tiny share of address matches – an average of 677 per month, and a maximum of 797 in the highest month.

63.     The $774,960 damage figure computed in the previous section, multiplied by 5.46

percent, yields a more realistic damage estimate of approximately $42,313, barely *one-half of*

*one percent* of the $7.6 million revenue deficiency assessment.

> **C.     Assessment of any Revenue Deficiency is Barred By the Postal Service's Own Rules and the Written Advice of the Head of the Postal Service's National Customer Service Center.**

>> **1.     The Postal Service ignored that the manual overrides satisfied the "directly acquired address" method of Move Update compliance.**

64.     The $42,313 damage figure is still overstated.  First, it assumes that all of SCE's

manual overrides violated Move Update.   In fact, the overrides satisfy the Move Update

requirements because the addresses substituted by SCE were directly acquired from its

customers, and were substituted at their request.  SCE Appeal at 22–24.

>> **2.     The Postal Service assumed without any foundation that SCE's manual overrides increased the volume of mail that needed to be forwarded or returned to SCE.**

65.     The $42,313 damage figure is overstated for the further reason that it assumes that

SCE's manual overrides of address changes recommended by NCOA[Link] in fact caused an

increase in the Postal Service's volume of forwarded and returned mail.  In fact, the opposite is

likely, because the overrides were based on customer-supplied information that was likely to be

more accurate and current than the Postal Service's own address change data.  SCE Appeal at

19–23.

3.   **The Postal Service's treatment of manual overrides as a process violation ignored the advice to the contrary by the head of the Postal Service's National Customer Support Center in 2008.**

66.   The $42,313 damage figure is overstated for the further reason that manual overrides of NCOA$^{Link}$ address change information were specifically authorized in writing by James D. Wilson, the Manager—Address Management at the Postal Service's National Customer Support Center ("NCSC") in Memphis.   In August 2008, Mr. Wilson advised a representative of the Major Mailers Association, a trade association of large business mailers such as SCE, that manual overrides in the circumstances contemplated by SCE "would comply with both the spirit and the intent of the Move Update requirement."  Mr. Wilson explained:

> The USPS has previously stated that a mailer is allowed to use a reasoned and reasonable business practice in the decision whether to accept and apply a change-of-address update to their address list.  For example, if a change-of-address update is received by a mailer that indicates a customer had moved 12 months previously from address A to address B, but the mailer has more recent information that indicates the customer is currently at address C, *then accepting and applying the USPS-provided change of address would not be required*.  There are obviously other situations that may cause a mailer to disregard a USPS-provided address update.

SCE Appeal at 22–24; USPIS 000357 (reproduced at Exhibit H to SCE Appeal) (emphasis added).

67.   Mr. Wilson added that manual overrides would be allowed as a "reasonable business practice" if properly documented as a "business practice rule":

> Where a mailer chooses to disregard a USPS-provided change-of-address update under a business practice rule, the mailer should maintain written documentation that describes their business rules for not applying address updates.   This documentation should be dated to show when the business rules were implemented and would need to be available for USPS review in the event a mailer is asked to show why they have not updated an address and continue to mail to the old address beyond the expected 'update' period.

SCE Appeal at 22–24; USPIS 000357 (reproduced at Exhibit H to SCE Appeal).

68. The continued receipt of payments of invoices sent to the resulting address satisfied Mr. Wilson's caveat that "[i]f a mailer chooses to disregard a USPS-supplied address update, the mailer cannot continue to use the original address on a mailpiece within a discounted mailing 95 days following the initial provision of the address update notice without a compelling reason and justification." USPIS 000357 (reproduced at Exhibit H to SCE Appeal). The continued receipt of payments of invoices sent to a manually-implemented address amounted to a continuing confirmation, acquired directly by SCE from the customer, that the address remained the appropriate one. Moreover, ensuring that SCE's customers received their bills at the correct address to avoid service interruptions constitutes a "compelling reason and justification" for overriding Postal Service change-of-address notices. SCE Appeal at 22–24.

> 4. **The Postal Service assumed without foundation that SCE's failure to implement all code 91 and 92 address changes, and address changes involving fractional street numbers, required an additional forward or return for each unimplemented change.**

69. The $42,313 figure is also inflated by its assumption that all of the unimplemented code 91 and 92 changes, and all of the unimplemented changes involving fractional street addresses, required the forwarding or return to SCE of every mailpiece affected by these omissions. In fact, this assumption overstates the Postal Service's damages, since the new and old addresses of many of the affected pieces were in the same multi-unit building, or in adjacent single-family residences, and thus were delivered with little or no additional work by the Postal Service (which commonly delivers mail to apartments and other multi-occupant building at a common mailroom, without sorting to the individual addresses within the building). Domestic Mail Manual §§ 508.1.5, 508.1.6.

5. **The revenue deficiency is unsupported by any finding that the Move Update implementation issues cited by the Postal Service were the result of bad faith by SCE.**

70. The Postal Regulatory Commission has held that a Move Update-based revenue deficiency may be imposed only on mailers "who demonstrate a lack of good faith effort to comply with Move Update requirements." PRC Docket No. R2010-1, *Notice of Price Adjustment And Classification Changes Relating To Move Update Assessments*, Order No. 348 at 13 (Nov. 25, 2009). This ruling establishes a good faith defense to the entire revenue deficiency. SCE Appeal at 22–25.

71. As noted above, the head of the Postal Service's National Customer Support Center specifically advised mailers in writing in 2008 that address overrides in the circumstances present here were permissible under Move Update. Whether or not the Postal Service now chooses to adhere to the policies as represented by Mr. Wilson, his public communications establish a defense of good faith reliance on the Move Update policies stated by the Postal Service during the period of the mailings at issue.

72. The Postal Service has disclaimed any finding that SCE's failure to implement code 91 and 92 match codes, or address changes involving fractional address numbers, resulted from bad faith. May 2012 Decision at 2 ("The assessment of the revenue deficiency was not based upon a willful intent by SCE to deceive the Postal Service, but a failure of SCE to comply with mandatory MOVE Update requirements, therefore, the mailings were ineligible for the prices claimed.").

73. SCE's good faith is also demonstrated by, among other things, its comparison of its address lists against the NCOA[Link] database six times more frequently than required by the

Move Update Standards; the existence of a good faith business justification for manually updating addresses when directed to do so by customers and with confirmation by subsequent bill paying histories that this practice reduced the number of letters that were undeliverable as addressed; its prompt termination of the prior practice of manual overrides shortly after the Postal Service issued its November 2009 Decision concluding that this practice violated the Move Update Standards; and its immediate change in policy upon notification by the Postal Service of its non-compliance with the Move Update Standards for failure to update address lists based on Match Codes 91 and 92 and on fractional address numbers. SCE Appeal at 24, 26–27.

74.     Under these circumstances, SCE's demonstrated good faith bars imposition of any revenue deficiency.

**6.     The revenue deficiency is based on an overly-long damage period.**

75.     The revenue deficiency assessment is further overstated by the Postal Service's use of an overly-long damage period—from May 14, 2007 to November 26, 2008. The Postal Service has long adhered to a management policy of not collecting Revenue Deficiencies over a look-back period of more than 12 months "before the date the deficiency was discovered"—i.e., the "date of the revenue deficiency report" by the investigator. Management Instruction DM-140-2008-1 at 2; Postal Bulletin 22240 (Aug. 28, 2008) at 10. The November 2009 Decision, however, assessed a revenue deficiency on all mailings between May 24, 2007 and November 26, 2008, a period exceeding 18 months. The U.S. Postal Inspection Service issued its Investigative Memorandum on May 26, 2009. Thus, the look-back period excluded mailings entered before May 26, 2008, and the revenue deficiency is unlawful insofar as it applies to prior mailings. The amount of the deficiency assumes that, notwithstanding Management Instruction DM-140-2008-1, the Postal Service could properly collect damages on mailings entered more

than 12 months before May 26, 2009, the date of the Postal Inspection Service investigative memorandum to the Postal Service. This assumption is incorrect. SCE Appeal at 37–39.

76.     The USPS used a sample of mailings entered on five days in March through May 2009 to justify a revenue deficiency assessment going back to May 14, 2007, almost two years earlier. The November 2009 Decision effectively admitted that the 18-month deficiency was extrapolated from mailings drawn from those later samples. November 2009 Decision at 1–2. Accordingly, there is no evidence to support imposition of a Revenue Deficiency for mailings before March 13, 2008, and the Revenue Deficiency is unlawful insofar as it applies to earlier mailings. *Id.* at 36–37.

77.     The Postal Service assumed that a revenue deficiency could properly be assessed *after* March 31, 2008, when SCE began implementing NCOA$^{Link}$ address change data involving match codes 91 and 92, thereby eliminating the primary issue relied on by the November 2009 Decision as the basis for the deficiency. This assumption is unfounded.

78.     Upon being informed of the alleged process error involving match codes 91 and 92, SCE immediately began updating its address lists to incorporate those match codes, beginning with the very first mailing after May 30, 2008, the first mailing made after the Postal Service had informed the company of the issue. USPIS 000639 (attached as Exhibit E to SCE's administrative appeal) (explaining that the Match Code 91 and 92 issue "was corrected for the 5/30/08 processing of NCOA$^{Link}$ and all future monthly updates.").

79.     SCE, on being informed in October 2009 that the company was not implementing address change information from NCOA$^{Link}$ that involved fractional street address number,

immediately adopted a fix to its address updating software to correct the problem starting with the mailing that sent on October 28, 2009.  SCE Appeal at 37.

80.     SCE stopped manually overriding NCOA$^{Link}$ addresses in January 2010, shortly after the Postal Service issued its November 2009 Decision concluding that SCE's manual overrides violated the Move Update Standards.  *Id.*

### FIRST CLAIM FOR RELIEF
### Violation of the Postal Statutes

81.     Plaintiff incorporates the allegations in ¶¶ 1 to 80 by reference.

82.     The revenue deficiency assessed by the Postal Service is *ultra vires* because the assessment violates the Postal Reorganization Act and, in particular, its requirement that rates on market-dominant categories of mail be just and reasonable.

83.     Under the governing statutes, the rates charged by the Postal Service on its monopoly classes of mail must be just and reasonable.  *See* 39 U.S.C. §§ 404(b) (rates must be reasonable and equitable), 3622(b)(8) (same), 3622(c)(5) (rates be set to take into account "the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service").

84.     The just-and-reasonable limit on maximum rates also applies to penalty charges, rate additives, and other amounts that the Postal Service may charge for failure to comply with the mail preparation requirements for discounted rates.  *See* U.S. Postal Service Office of Inspector General Audit Report SR-AR-10-001, *Move Update Program and Investigations* (May 12, 2010) at 2 (a mailer's liability in a revenue deficiency case is limited to the Postal

Service's "actual damages"; a "multi-million dollar revenue deficiency" assessment against "all mailings mailed within a 12-month period" was reduced to a "fraction of the original assessment during the settlement process because the actual damage to the Postal Service was significantly lower than the amount assessed during the investigation").

85.     The limitation of penalty charges, rate additives and similar items to the Postal Service's actual damages is consistent with traditional standards of common carrier and public utility regulation. *Union Pac. R.R. Co. v. Bay Area Shippers Consolidating Ass'n, Inc.*, 594 F.2d 1291, 1294 (9th Cir. 1979); *Petition for Declaratory Order of Lehigh Valley R.R. Co.*, 353 I.C.C. 518, 526–527 (1977); *Penalty Charge on Eggs Not Packed in Standard Carriers Between Points in Western Trunk-Line Territory*, 74 I.C.C. 726 (1922) (railroad tariff that assessed surcharge for improperly packed shipments of eggs was unjust and unreasonable to the extent the surcharge was applied to an entire shipment when only a small portion of the shipment was improperly packed); *El Paso Natural Gas Co.*, 114 FERC (CCH) P61,305 (2006) at ¶¶ 126–128, 130 & n.77 (a proposed pipeline tariff that computed penalties for "overruns"—i.e., taking delivery of more natural gas during a given period than authorized by the shipper's contract—was unjust and unreasonable to the extent that the penalties were computed by assuming that the highest overrun in any hour of the day occurred during every hour of the 24-hour day, even if the shipper's volume consumption was equal or below the contract volume commitment during the other 23 hours; this would "impose penalties that exaggerate the actual costs of shipper behavior"); *Enbridge Pipelines (N.D.) LLC*, 138 FERC (CCH) P61,087 (2012) at ¶¶ 4, 20–21 (proposed tariff provision that would have imposed a rate surcharge on shipments on petroleum with sulfur content, API Gravity, and or basic sediment and water content that exceeded maximum levels specified in the tariff was unjust, unreasonable, and unduly discriminatory absent evidence of "the resulting damage to the pipeline or to other shippers [from impurity levels exceeding the

allowed thresholds and] the *actual costs to the pipeline of such events*") (emphasis added); *see generally* SCE Appeal 5, 30–33 (discussing precedent).

86.     As explained above, the Postal Service's $7.6 million revenue deficiency assessed by the Postal Service exceeds any plausible measure of actual damages by several orders of magnitude. This punitive assessment is therefore unjust and unreasonable, and hence *ultra vires* and contrary to Title 39.

87.     The May 2012 Decision defends this punitive over recovery on the ground that the rate and classification rules of the Domestic Mail Manual dictate this outcome, and left the Postal Service with no discretion to excuse any of the amount calculated by ministerial application of the DMM provisions. May 2012 Decision at 2 ("The role of the Pricing and Classification Service Center in adjudicating revenue deficiencies is to determine whether or not the deficiency exists and if the amount was calculated correctly."). This argument is essentially a restatement of the filed rate doctrine—the common-law rule that requires regulated common carriers and public utilities to adhere to the rates and terms of service published in the companies' tariffs. But the filed rate doctrine does not shield rates and classifications from challenge on the ground that they are unjust and unreasonable. The doctrine "contains an important caveat": the filed rate is not enforceable if unreasonable. *Ariz. Grocery Co. v. Atchison, T. & S.F. Ry. Co.*, 284 U.S. 370, 384 (1932); *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 128 (1990); *Reiter v. Cooper*, 507 U.S. 258, 265–66 (1993). Significantly, all of the cases cited in paragraph 85, *supra*—most of which were cited on pages 31–32 of SCE's Appeal—involved regulated industries in which the filed rate doctrine is recognized.

88.     The unreasonableness of revenue deficiency claim is underscored by comparing this ratio with the maximum recovery that the Postal Service can obtain against mailers under the False Claims Act, 31 U.S.C. §§ 3729–3733.  The False Claims Act allows the Postal Service to recover multiple damages for violations of the mail preparation and classification rules that are knowing or reckless.  Violation of the Act exposes the mailer to potential liability no greater than *three* times the Postal Service's actual damages, plus a civil penalty ranging from approximately $5500 to $11,000 per violation.  31 U.S.C. § 3729(a)(7); *United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436 (S.D.N.Y. 1999).

89.     Moreover, obtaining even treble damages or civil penalties under the False Claims Act requires proof that the violation was knowing or reckless.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007).  Without satisfying this *scienter* requirement, the Postal Service may not recover more than its actual damages.  *See Raymond & Whitcomb Co.*, 53 F. Supp. 2d at 446. Here, the Postal Service concedes that the "assessment of the revenue deficiency was not based upon a willful intent by SCE to deceive the Postal Service," May 2012 Decision at 2.

**SECOND CLAIM FOR RELIEF**
**Violation of the Due Process Clause of the Fifth Amendment**

90.     Plaintiff incorporates the allegations in ¶¶ 1 to 89 by reference.

91.     This Complaint seeks judicial review of the amount of the revenue deficiency assessed by the Postal Service in this final agency action, on the ground that the amount imposed by the agency is excessive in violation of the Due Process Clause of the Fifth Amendment.

92.     The Postal Service's decision violates the Due Process Clause of the Fifth Amendment.  The amount of the revenue deficiency exceeds the amount of the agency's actual

out-of-pocket costs resulting from SCE's non-compliance with the Move Update Standards by several orders of magnitude.   The assessment is grossly excessive in relation to the Postal Service's legitimate interests in punishing non-compliant conduct and deterring its repetition. Moreover, the harm SCE inflicted on the Postal Service was *de minimis*, both in absolute terms and relative to the size of SCE's mailings; was entirely economic in nature; and did not have any degree of reprehensibility.   The assessment was based solely on SCE's asserted failure to comply with three technical address updating requirements, and SCE changed its operating procedures promptly after the Postal Service advised SCE of the alleged noncompliance.

93.     A revenue deficiency that exceeds the Postal Service's actual damages by a factor of 10-to-1, 179-to-1, or more violates the Due Process Clause of the Fifth Amendment.   *See BMW of N. Am., Inc. v. Gore,* 517 U.S. 559 (1996).

## RELIEF REQUESTED

WHEREFORE, Plaintiff Southern California Edison respectfully requests that this Court:

1.      Declare the Postal Service's Revenue Deficiency Assessment to be unlawful, unconstitutional, and unenforceable;

2.      Enjoin the Postal Service or any person acting on its behalf from collecting the revenue deficiency assessment; and

3.      Grant SCE such further relief as the Court deems just, proper, and equitable.

Respectfully submitted,

David M. Levy (Bar No. 293407)
John F. Cooney (Bar No. 936336)
Moxila A. Upadhyaya (Bar No. 494373)
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004
Phone: (202) 344-4000
Facsimile: (202) 344-8300

*Attorneys for Plaintiff*
*Southern California Edison*

June 18, 2014