# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| **SOUTHERN CALIFORNIA EDISON,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 14-cv-1041 (JEB)** |
| **UNITED STATES POSTAL SERVICE,** | ) | |
| **Defendant.** | ) | |

_____

### POSTAL SERVICE'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND ITS MOTION TO DISMISS, AND IN OPPOSITION TO SCE'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Southern California Edison (SCE) seeks to mire this Court in calculations and technical but irrelevant material, yet this administrative suit in fact is straightforward.  The Court should recognize this suit for what it is:  an attempt by a bulk mailer to avoid paying the postage that became due because it did not follow the rules for its substantially discounted mailings, even though SCE had certified that it had followed them.  Caught in the act, SCE must now pay up.

Moreover, plaintiff's pleas for the Court to make its own factual findings and to substitute its judgment for the reasoned conclusions of the Postal Service (USPS) are misplaced and contravene governing law, which provides that, so long as USPS engaged in "reasoned decision-making," the Court must "exercise restraint and affirm[] the agency's action even though the court would on its own account have made different findings or adopted different standards."  *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970); *accord Sierra Club v. USPS*, 549 F.2d 1199, 1201 (9th Cir. 1976) ("scope of review is extremely limited" and there is a "strong presumption in favor of a Postal Service determination").  Here, despite SCE's apparent belief that the Postal Service should have custom-designed for this plaintiff a presently non-existent rate to fit the specific, but concededly deficient, mail handling conduct by SCE, the Service's declination to do so plainly manifested reasoned decisionmaking.  Indeed, plaintiff's request for special treatment could undermine the uniform, national system of

rates that Congress provided for and which the Postal Regulatory Commission (PRC) has developed, subject only to review in the first instance not by this Court, but by the D.C. Circuit.

The debt here at issue arose because SCE sent over 82 million pieces of mail between May 14, 2007 and November 26, 2008 at a substantially discounted "workshare" rate even though the mailings did not satisfy the rate's requirements. Workshare discounted rates require that mailpieces have addresses that have been properly updated to reflect customers' moves. This procedure saves USPS money by preventing many mailpieces from being undeliverable-as-addressed (UAA), for such misdirected mailpieces must either be returned to the sender or forwarded, which efforts impose additional costs on USPS. There is no dispute here that in many instances SCE elected to override the updated addresses and instead used old addresses on mailpieces. Because the mailpieces thus did not meet the standards for the discounted rates, SCE should have paid the higher rate applicable to non-workshare (*i.e.*, regular first-class) mail.

Following an investigation, the Postal Service sent a revenue deficiency notice to SCE for $7,551,576.28. The deficiency was calculated based on the difference between the regular, nondiscounted postage rate and the discounted workshare postage rate that SCE wrongly had claimed. SCE thereafter filed a timely appeal to the Postal Service's Pricing and Classification Service Center (PCSC), the agency's final decision maker for revenue deficiencies, which appeal ultimately was denied in a written final agency decision (FAD).

Plaintiff's complaint in this Court followed. SCE seeks a declaration that the FAD purportedly is *ultra vires* because, contrary to plaintiff's preference, it did not rest upon a specific finding of the scope of harm caused to the Postal Service by the mailings (first claim). Plaintiff also asserts that the FAD violated the Due Process Clause (second claim). The complaint further seeks to enjoin the Postal Service from collecting the postage deficiency.

With its First Amended Answer, the Postal Service also lodged a Counterclaim, which seeks a declaration by this Court that the revenue deficiency amount is due and owing, and which further seeks to collect the debt, with pre- and post-judgment interest, penalties, administrative fees, and any such further relief as the Court deems proper.

As explained herein, summary judgment should now be granted in favor of the Postal Service on its counterclaim and on all legal issues advanced by the parties, and summary judgment should be denied to SCE.  Further, the Court should dismiss for lack of subject matter jurisdiction SCE's first claim and portions of its second claim, and should dismiss for failure to state a claim the remainder of the second claim.

## I.  Statutory, Regulatory and Factual Background.

### A.  Applicable Statutes, Regulations and Standards, Including for Discounted Rates.

As an independent establishment of the executive branch of the government, 39 U.S.C. § 201, USPS provides prompt and reliable mail services at uniform postage rates throughout the nation, *id.* § 101(a), (e), (f); *id.* § 403.  To execute its functions, the Postal Service may "adopt, amend and repeal" rules and regulations.  39 U.S.C. § 401(2).  The Domestic Mail Manual (DMM) is a Postal Service regulation that sets forth mailing standards.  *See* 39 C.F.R. §§ 111.1, 211.2(a)(2).  The DMM establishes specific rules and requirements to govern the products and services described in the Mail Classification Schedule, which in turn lists and describes USPS's products and services, as well as the postage rates for each service.  *See* 39 C.F.R. §§ 3020.10, 3020.13 (describing contents of the Mail Classification Schedule).  The Mail Classification Schedule is maintained by the PRC.  39 C.F.R. Part 3020; *see also* 39 U.S.C. § 3622.

The Postal Service offers "workshare" rate discounts that are provided to mailers for the presorting, prebarcoding, handling, or transportation of mail.  *See* 39 U.S.C. § 3622(e); *accord*

Pl.'s Answer and Affirmative Defenses to Def.'s Counterclaim ("SCE Answer"), ¶ 7.  To qualify

for any workshare discounts, *all* mailpieces in a mailing must meet certain basic requirements.

These include, but are not limited to, (a) being part of a single mailing of at least 500 pieces of

First-Class Mail, and (b) bearing a delivery address that includes the correct ZIP Code and meets

the Postal Service's address quality standards.  DMM § 233.3.3;[1] SCE Answer, ¶ 7.

To qualify for the *highest* level of workshare discounts, namely the "automation rates,"

all mailpieces in a mailing must meet additional requirements.  These requirements include, but

are not limited to, (a) bearing a readable and accurate barcode, and (b) being marked, sorted, and

documented as specified by the Postal Service.  DMM § 233.5.  Within the automation rates, the

greatest discounts are for pieces that are sorted to the finest level and that meet the volume

requirements for that sort level.  *See, e.g*., DMM Rates and Fees Reference at 10 (May 2007),

A__; Price List Notice 123 at 12 (May 2008)), A__; SCE Answer, ¶ 8.

Moreover, as part of its address quality standards, since 1997 USPS has required all

addresses on mailings that receive First-Class Mail workshare discounts – regardless whether the

discount is the presorted rate or the even more generous automation rate – to undergo name and

address correction on an established periodic basis.  During 2007 and 2008, mailers were

required to perform such corrections to their mail lists every 185 days.  This requirement is

known as the Move Update standard.  DMM § 233.3.5; SCE Answer, ¶ 9

Implementation of updated addresses, as required by Move Update, reduces the cost of

UAA mail.  For UAA First-Class Mail, if a customer has moved within the prior 12 months and

provided USPS with an updated address, the basic handling of the mail piece is to forward it to

the customer's new address.  Otherwise, the UAA First-Class Mail piece should be returned to

---

[1] The DMM sections referenced herein, unless otherwise specified, are taken from the May 14,
2007 publication.  Relevant sections are included in the Deferred Appendix at A__-A__.

the sender.  SCE Answer, ¶ 10.  Move Update, by the periodic matching of a mailer's address records with customer-filed change-of-address orders received and maintained by USPS, reduces the number of mailpieces in a mailing that require forwarding or return.  DMM § 233.3.5.1.

During all times relevant here, the Postal Service offered multiple preapproved methods for meeting the Move Update standard.  One of the preapproved methods was the National Change of Address (NCOA[Link]) process.  SCE Answer, ¶ 11.  Through NCOA[Link], a mailer's computerized list of addresses is matched with a database of official Postal Service permanent Change of Address (COA) orders that have been received from individuals, families, and businesses within the past four years or the past 18 months, depending on the license acquired by the mailer.  SCE Answer, ¶ 12.  Each workshare mailer must update its address list with new addresses identified through the NCOA[Link] process.  DMM § 233.3.5.1; *see also* USPS Publication 363, Updating Address Lists Is a Smart Move, at 5 (June 2003), A__.

When a mailer processes its address list against the COA database via NCOA[Link], the mailer receives "matches" with various codes.  Based upon the code generated, the mailer may be required to take additional steps  to stay compliant with the Move Update standard.  For example, a match with Code A, Code 91 or Code 92 indicates that an address has matched a record in the COA database.  *See* NCOA[Link]® End User Licensee Performance Requirements at 10-11, A__-A__.  Code A means that the new address is available and should be used.  *Id*. at 10.  Codes 91 and 92 mean that parts of the new address, such as a suite or apartment number, are missing, and the address should be updated to include the missing parts.  *Id*. at 11.  Each address and associated occupant name used on a mailpiece in a workshare mailing must be updated via one of the USPS-approved methods within 185 days before the mailing date.  DMM § 233.3.5.  Thus, where Code A, Code 91 or Code 92 is generated, the updated address must be used.  *Id*.

In order to send mail at a discounted First-Class Mail workshare rate, the mailer must certify on the postage statement it submits for the workshare mailing that the name and corresponding address on each mailpiece in the mailing have been updated within the past 185 days.  DMM § 233.3.5.3; *see* SCE Answer, ¶ 14.  If pieces within a mailing do not comply with Move Update, the Postal Service's guidance instructs that they should be removed from the mailing.  *See* USPS Publication (Pub.) 363 at 12, A__.  To claim a workshare discount, a mailer *must* comply with Move Update.  SCE Answer, ¶ 15.

**B.   SCE's Mailings and Addressing Practices, and USPS's Investigation Thereof.**

Between May 14, 2007, and November 26, 2008, SCE submitted automation rate mailings totaling 82,452,608 mailpieces.  With each mailing, it submitted documentation that the mailing complied with the applicable standards, including Move Update.  *See* DMM § 607.1.1; SCE Answer, ¶ 16.  Specifically, SCE certified that the name and corresponding address on each mailpiece in each mailing had been updated within the past 185 days.  DMM § 233.3.5.3 ("The mailer's signature on the postage statement certifies that the Move Update standard has been met for each address in the corresponding mailing presented to the USPS."); *see* SCE Answer, ¶ 14.

Further, at all times relevant, SCE had an End User license for NCOA$^{Link}$, which matched SCE's address list with change of address orders going back 18 months.  SCE Answer, ¶ 17; USPS NCOA$^{Link}$ End User License Agreement with Southern California Edison, A__.

In 2008, the United States Postal Inspection Service conducted a nationwide review of UAA mail found via letter sorting equipment.  Between March 2008 and May 2008, the Inspection Service observed that SCE's mail had a significant number of UAA pieces.  *See* SCE Answer, ¶ 18.  As a result of this observation, the Inspection Service began an audit of SCE's

mailings.  On May 28, 2008, Postal Inspectors met with SCE to discuss SCE's compliance with the Move Update standard.  *See* Administrative Record (AR) at 109 (A__ hereto).

At the May 28, 2008 meeting with SCE, the Inspectors raised a number of issues.  One was that a preliminary review of SCE's April 2008 NCOA$^{Link}$ End User report indicated that at least 6,500 addresses in SCE's address list generated matches with the COA database with Codes A, 91, and 92, and thus should have been updated, yet in fact had not been updated.  *Id.* at 53 (A__); *see* SCE Answer, ¶ 19.  As further explained below, SCE began updating addresses with COA matches of Codes 91 and 92 (*i.e.*, incomplete addresses) shortly after this meeting, but failed to update COA matches with Code A (*i.e.*, new addresses) for almost 20 months.

Over the next two months in 2008, the Inspectors made at least four requests for documents and information on a number of issues related to SCE's Move Update compliance.  One of these requests concerned "how NCOA$^{Link}$ COA records are actually being updated" when the NCOA$^{Link}$ generated matches with Codes A, 91, or 92.  AR 52-67 (A__-A__); SCE Answer, ¶ 20.  However, SCE did not provide all the requested documents.  *See* AR 52-67 (A__-A__).

SCE's End User license for NCOA$^{Link}$ specifically requires that a licensee must comply with requests for documentation.  SCE Answer, ¶ 21; SCE's End User License (EUL), ¶ 14 ("Audit and Inspection Rights"), A__.  Further, SCE's NCOA$^{Link}$ EUL specifically provides that USPS may perform reviews and audits of a licensee's books and records.  *See* EUL, ¶ 14 (A__).

On July 11, 2008, an SCE employee told USPS that SCE erroneously had not updated addresses that generated Codes 91 and 92.  On September 4, 2008, SCE notified USPS that SCE had corrected that error for its May 30, 2008, NCOA$^{Link}$ processing.  SCE Answer, ¶ 22.

On October 31, 2008, the Inspection Service served SCE with an administrative subpoena for documents.  SCE Answer, ¶ 23.  One of the documents SCE provided in response was an

SCE internal report dated May 16, 2008, entitled <u>Return Mail Project Update</u> (A__).  That SCE

internal report reviewed SCE's return mail process.  In response to the subpoena, SCE also

provided additional internal documents concerning SCE's return mail.  SCE Answer, ¶ 24.

On May 26, 2009, the Inspection Service issued an investigative memorandum for its

audit of SCE's compliance with Move Update.  Based upon an analysis of SCE's documents as

well as calculations in SCE's May 2008 <u>Return Mail Project Update</u> internal report, the memo

calculated SCE's return to sender mail volume for 2006 to 2008 as 1.8 *million* pieces.  *See* AR

109-10 (A__-A__).  Another SCE document indicated that 45% of SCE's return to sender mail

could be attributed to the Call Center, which, according to a third document, overrode Move

Update changes.  *Id*. at 211-12 (A__-A__).[2]

Similarly, an SCE document dated June 6, 2008, stated:  "Move Forward changes being

overridden.  This is a compliance issue with the USPS."  AR at 9 (A__).  In an August 15, 2008,

SCE document entitled <u>Move Forward Override</u>, the background section acknowledged that:

"To ensure that we receive our complete postal discount, we must comply with USPS

requirements surrounding the Move Update process."  AR at 219 (A__).  That August 15, 2008

SCE document recognized that in many cases "SCE representatives are overriding the mailing

correction and placing our annual postal discount of approximately $5M in jeopardy."  *Id*.  That

document was shared with an SCE employee, Ms. Jennifer Olivares-Brown, whose title was

listed as CCO Regulatory Compliance Project Manager.  AR at 216-219 (A__-A__).

According to SCE, in January 2010, it failed to stop manually overriding address updates

prescribed by NCOA[Link] until January 2010,  SCE Compl., ¶ 80; SCE Answer, ¶ 28,  even though

SCE had external notice from the Postal Inspectors on May 28, 2008 and internal reports from

---

[2] SCE does not contest the authenticity of the documents in the AR.  SCE Answer ¶¶ 25, 26.

May and June 2008 that had identified the failure to update SCE's lists as required by Move

Update.  In other words, plaintiff waited almost 20 months before correcting the deficiency.

### C.  Issuance of Revenue Deficiency and Final Agency Decision.

On November 23, 2009, based upon the Inspection Service's audit of SCE's Move

Update practices, the Postal Service issued a revenue deficiency of $7,551,576.28 to SCE for the

mailing of a total of 82,452,608 mailpieces sent between May 14, 2007 and November 26, 2008.

SCE Answer, ¶ 6; AR 47-97 (A__-A__).  That decision found that, because the mailings did not

comply with the Move Update requirements, they did not qualify for the discounted workshare

rates that SCE had paid, and that instead the non-discounted regular postage rate applied; the

Postal Service calculated the revenue deficiency owed based on the difference between the

discounted workshare rates and the regular non-discounted rates.  The final agency decision

demanded payment of that debt.  SCE Answer, ¶ 6; AR at 51 (A__).

Unless an exception applies, USPS has a policy of limiting revenue deficiencies to a 12

month period.  The limitation does not apply, however, if the mailing history reveals evidence of

repeated noncompliance with mailing standards.  *See* Management Instruction DM-140-2008-1,

A__.  Here, the Postal Service issued a decision covering an 18 month period because USPS

found that SCE's ongoing noncompliance met that exception.  *See* AR at 2.

SCE appealed to the PCSC on January 10, 2010.  *See* DMM § 604.10.1.2.  SCE filed an

amended appeal on November 21, 2011.  SCE Answer, ¶ 31; AR 47-97 (A__-A__).

On May 30, 2012, the PCSC issued the final agency decision denying SCE's appeal and

upholding the deficiency of $7,551,576.28.  SCE Answer, ¶ 32; AR at 1-3 (A__-A__).  The

PCSC based its decision on the administrative record, which it found demonstrated that SCE was

not in  compliance with Move Update.  Among other issues, the PCSC  found that the revenue

deficiency was based on SCE's failure to update addresses as required, rather than the volume or percentage of returned mail. *Id.* Moreover, SCE did not dispute that it had failed to update many addresses, or that SCE's own internal review had concluded the utility had "a high volume of return to sender mail." AR at 2 (A__). As for SCE's contention that assessment of the non-discounted regular postage rate was improper, the "Postal Service policy, since the inception of the MOVE Update address quality standards, has been to access single piece prices for ineligible mailings. This price eligibility requirement has been supported by the Postal Rate Commission." *Id.* at 2. The FAD stated further that, as "the deficiency was not corrected when identified," assessing a deficiency for more than 12 months was proper. *Id.*

Thereafter, the Postal Service sent a collection letter to SCE on July 16, 2012. On July 29, 2013, the Postal Service certified that a debt of $7,551,576.28 was due and owing to the Postal Service by SCE due to SCE's failure to comply with Move Update requirements. A__.

## II. Summary Judgment Should Be Granted to the Postal Service.

### A. Standard of Review.

Because the entire case presents a question of law, courts routinely resolve via summary judgment motions cases, such as this one, that seek judicial review of administrative agency action. *See Am. Bioscience Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001). In such cases, the standard set forth in Rule 56 does not apply, and the District Court sits as an appellate tribunal reviewing the underlying decision. *See Baltimore v. Clinton*, 900 F. Supp. 2d 21, 25 (D.D.C. 2012). Thus, "[t]he entire case on review is a question of law, and only a question of law," and can be resolved on the administrative record in the context of a motion for summary judgment. *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see Univ. Med. Ctr. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999). Accordingly, a District

Court generally does not resolve factual issues or duplicate agency fact-finding efforts. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996). For this reason, the normal Rule 56 standard of review, which requires a court to decide if there is any "genuine issue of material fact," *see* Fed. R. Civ. P. 56(c), does not apply. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006); *see* LCvR 7(h)(2) (statement of undisputed material facts not required for cases "in which judicial review is based solely on the administrative record"; only "a statement of facts with references to the administrative record" is required). Rather, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Judicial review of a final agency decision is highly deferential. When reviewing a final decision issued by USPS applying its mailing regulations, the question before the Court is whether the Postal Service has engaged in "'reasoned decision-making.'" *Reese Bros., Inc. v. USPS*, 905 F. Supp. 2d 223, 254-55 (D.D.C. 2012) (quoting *Greater Boston*, 444 F.2d at 851). This standard is limited and "far less intrusive than is required under the APA [Administrative Procedure Act]." *Id*. (citing *Sierra Club v. USPS*, 549 F.2d 1199, 1201 (9th Cir. 1976)).

USPS has engaged in "reasoned decision-making" if it has "given reasoned consideration to all the material facts and issues." *Greater Boston*, 444 F.2d at 851. This standard is narrow and the Court may not simply substitute its judgment for that of USPS. *Bates & Guild Co. v. Payne*, 194 U.S. 106, 109 (1904). Instead, the Court's must determine whether USPS considered relevant factors and whether there has been a clear error of judgment. *Id*. at 109-10.

**B.   SCE Does Not Dispute That Its Mailings Did Not Conform to Regulations.**

SCE conspicuously has not asserted that its mailings complied with the Move Update standard. In fact, an SCE internal document conceded that SCE's practice of overriding address

matches violated Move Update requirements and acknowledged that "[t]o ensure that we receive our complete postal discount, we must comply with USPS requirements surrounding the Move Update process."  AR at 219, A__.  The internal document further recognized that SCE's override practice put postage discounts worth approximately $5 million per year at risk.  *Id.*

Moreover, as expressed in the Postal Service's FAD, SCE's mailings at issue did not conform to postal regulations for the postage rates claimed:

> An investigation of SCE's mailing records determined that they were out of compliance to the requirements of the United States Postal Service's (USPS) Move Update Standards. . . .  All addresses on mailings that receive discounts for First-Class and Standard Mail services, whether Presorted or Automation rate, must undergo name and address correction within 95 days of mailing (*Domestic Mail Manual* (DMM) 233.3.5.1). Prior to November 23, 2008, the minimum frequency of Move Update processing was 185 days prior to mailing. . . .
>
> The assessment of additional postage was due to the fact that SCE's process for updating addresses was not in compliance and, therefore, not eligible for the automation discounts claimed.

AR at 1, 2 (A__, A__).

As explained, to receive the automation discounts, mailings must comply with the Move Update regulation, which is key to reducing the significant costs that result from forwarding or returning mail when customers move.  DMM § 233.3.5.  The method that SCE used for Move Update was the National Change of Address Linkage System.  SCE Answer, ¶ 21; *see* DMM § 233.3.5.2.  Under this method, SCE compared its address list for its automation mailings against the NCOA$^{Link}$ database to receive updated addresses, which SCE internally called "matches."  SCE chose to override many of the matches, however, and instead used addresses that were not updated.  AR at 216-19, A__-A__.  By failing to update the addresses as required, the Postal Service incurred unnecessary costs forwarding or returning mail.  AR at 250, A___.

Here, there is no dispute about what the regulations require to qualify for the automation discounts—they plainly require adherence to the Move Update standard, as they have since

1997.  Administrative regulations are to be construed by examining their plain language and

purpose.  *Trinity Broad. of Florida, Inc. v. FCC*, 211 F.3d 618, 625 (D.C. Cir. 2000).  Moreover,

SCE does not, and cannot, identify another established postage rate that should have been used,

aside from the regular non-discounted First-Class postage rate, to which Move Update does not

apply.  As the FAD noted (A__), longstanding USPS policy is to assess single piece prices for

workshare mailings that do not satisfy the Move Update requirements.  *See Decker v. Nw. Envtl.*

*Def. Ctr.*, 133 S. Ct. 1326, 1337-38 (2013) (agency's interpretation of its regulations is accorded

deference, particularly where it is consistent with its prior views).  Moreover, the final agency

decision further observed that this price eligibility requirement has been supported by the PRC.

AR at 2, A__.[3]  To accept SCE's arguments that its non-compliance with Move Update does not

affect its entitlement to automation discounts would, as a practical matter, effectively nullify the

Move Update regulation and inappropriately substitute the Court's views on eligibility criteria

for automation rates in place of those of the expert regulatory agency.  *See Chevron, U.S.A., Inc.*

*v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984) (courts must respect the reasonable

policy choices of agencies to which Congress has delegated policy making responsibilities); *cf.*

*Hibbs v. Winn,* 542 U.S. 88, 101 (2004) ("'A statute should be construed so that effect is given to

all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'").

Such a functional revocation of the regulation not only would be improper, but would call into

question the future availability of the substantial workshare discounts provided to bulk mailers.

  The final agency decision concluded:

> [The PCRC] cannot uphold your appeal on behalf of your client . . . SCE[], concerning the
> revenue deficiency of $7,551.576.28 assessed by the US Postal Service. The letter you
> received from the Santa Ana District, Manager of Business Mail Entry, dated November

---

[3] Section III *infra* addresses in greater detail the jurisdictional implications of the role Congress
has assigned to the postal regulatory body, now named the Postal Regulatory Commission.

23, 2009 charged a postage deficiency of $7,551,576.28 for the period of May 14, 2007
through May 11, 2008 and May 12, 2008 through November 26, 2008.

An investigation of SCE's mailing records determined that they were out of compliance to
the requirements of the United States Postal Service's (USPS) Move Update Standards.
AR at 1.

That conclusion is correct, well-reasoned, and should not be disturbed by this Court. *See
Greater Boston*, 444 F.2d at 851 (court should "exercise restraint and affirm[] the agency's
action even though the court would on its own account have made different findings or adopted
different standards"). SCE has not denied it violated the Move Update regulation, and moreover,
its internal documents acknowledged that its non-compliance placed the discounts at risk.
Finally, SCE principally challenged the FAD on the ground that it should pay an individualized
rate tailored to its particular form of noncompliance. The FAD did just that, appropriately
finding that the nondiscounted rate was the proper rate because no workshare discount applies if
Move Update requirements are not followed. Further, the FAD reasonably upheld the deficiency
for an 18 month period, rather than just one year, because "the deficiency was not corrected
when identified," AR at 2, A__, and thus a longer period was permitted under applicable
regulations. For these reasons, USPS's motion for summary judgment should be granted.

### C. Debt Collection, Unjust Enrichment and Declaratory Relief.

The Federal Debt Collection Improvement Act, 31 U.S.C. § 3701(b)(1), in conjunction
with the Federal Debt Collection Procedure Act (FDCPA), 28 U.S.C. §§ 3001 *et seq.*, enables the
United States to recover a judgment on a debt. *Id.* § 3001. "[D]ebt" is defined as "an amount
that is owing to the United States" due to *inter alia* a fee, service, restitution, damages, "or other
source of indebtedness to the United States." *Id.* § 3002(3); *see also* 31 U.S.C. § 3701(b)(1)
(defining debts statutorily recoverable by the United States); 31 C.F.R. § 900.2(a) ("[T]he terms
'claim' and 'debt' are synonymous and interchangeable. They refer to an amount of money,

funds, or property that has been determined by an agency official to be due the United States

from any person, organization, or entity, except another Federal agency").  As shown, the FAD is

well-reasoned, and the debt has been appropriately certified as due and owing.  Thus, the Court

should grant USPS's motion for summary judgment on its counterclaim to recover the debt owed

to it and order SCE to pay the unpaid postage, with pre- and post-judgment interest, and any

penalties, administrative fees, and other proper relief, including the 10-percent surcharge.  *See*

*Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 602 (D.C. Cir. 2002) ("[T]he U.S. government 'is

entitled to recover a 10% surcharge of the amount of the recovered debt in connection with

recovery of the debt.'  28 U.S.C. § 3011(a)."); *see also United States v. Raymond & Whitcomb*

*Co.*, 53 F. Supp. 2d 436, 443 (S.D.N.Y. 1999) (unpaid postage recoverable via FDCPA).

Similarly, SCE has been unjustly enriched by at least $7,551,576.28, plus interest

accruing from the date of each underpayment, that should have been paid to USPS.  As shown,

USPS has not been properly paid for the service of delivering the mailpieces in question, which

did not conform to the requirements for the discounted workshare rate that SCE paid.  The Postal

Service provided its services to SCE in good faith.  SCE accepted the provision of those services

according to USPS's established rates by placing the mailpieces into the mail system.  SCE

certified that these pieces complied with the Move Update requirement.  USPS properly expected

to be paid the appropriate rate for delivering SCE's mail.  Under these circumstances it is unjust

for SCE to retain the benefit of having paid a discounted rate for which its mailings did not

qualify.  *See Raymond & Whitcomb Co.*, 53 F. Supp. 2d at 443 ("The Postal Service's provision

of mailing services for [the mailer], without proper payment, satisfies all quantum meruit

elements."); *see also, e.g., Berry Law PLLC v. Kraft Foods Group, Inc.*, No. 14-7001, __ F.3d

__, 2015 U.S. App. LEXIS 1488, *5 (D.C. Cir. Jan. 30, 2015) ("To state such a claim, otherwise

known as an unjust enrichment claim, [plaintiff] must plausibly allege that [it] conferred a

benefit on [defendant], that [defendant] retained the benefit, and that [defendant's] retention of

the benefit is unjust under the circumstances.").  Thus, USPS is entitled to recover from SCE the

full revenue deficiency, plus interest accruing from the date of each underpayment.

Finally, to the extent SCE alleges that the Postal Service's interpretation of its own

regulations is *ultra vires*, the Postal Service seeks a declaration from this Court pursuant to the

Declaratory Judgment Act, 28 U.S.C. § 2201, that SCE owes $7,551,576.28, plus interest

accruing from the date of each underpayment and any penalties and administrative fees, to USPS

for failure to pay what it was legally obligated to pay for postal services, and that SCE's

noncompliance with applicable law and regulations is impermissible.

### III. Plaintiff's Complaint Should be Dismissed for Lack of Subject Matter Jurisdiction and for Failure to State a Claim.

### A. Standard of Review.

#### 1. Rule 12(b)(1) Standard.

Pursuant to Rule 12(b)(1), a court must dismiss a claim when it lacks subject matter

jurisdiction.  Determining whether the Court possesses jurisdiction to entertain a claim is a

"threshold" inquiry to be resolved before proceeding to the merits.  *See Steel Co. v. Citizens for a*

*Better Env't*, 523 U.S. 83, 88-89 (1998).  Plaintiff must carry the burden of establishing subject

matter jurisdiction by a preponderance of the evidence.  *Thompson v. Capitol Police Bd.*, 120 F.

Supp. 2d 78, 81 (D.D.C. 2001).  When reviewing a Rule 12(b)(1) motion to dismiss, "the court

must accept the complaint's well-pled factual allegations as true and draw all reasonable

inference in the plaintiff's favor."  *Id*.  At the same time, "[t]he court is not required, however, to

accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual

allegations."  *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), *aff'd*, 346 F.3d 192 (D.C.

Cir. 2003).  "[T]he District Court may in appropriate cases dispose of a motion to dismiss for

lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint standing

alone."  *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).  The Court also,

however, may look beyond the allegations of the complaint, consider affidavits and other

extrinsic information, and ultimately weigh the conflicting evidence.  *Id.*

### 2. **Rule 12(b)(6) Standard.**

Rule 12(b)(6) provides that a party may move to dismiss if the complaint "fail[s] to state

a claim upon which relief can be granted."  To survive a Rule 12(b)(6) motion to dismiss,

> "a complaint must contain sufficient factual matter, accepted as true, to state a
> claim to relief that is plausible on its face . . . .  A claim has facial plausibility
> when the plaintiff pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for the misconduct alleged."

*Munro v. LaHood*, 839 F. Supp. 2d 354, 359 (D.D.C. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009), and citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In considering such a motion, the Court "must assume all the allegations in the complaint

are true (even if doubtful in fact), and the court must give the plaintiff the benefit of all

reasonable inferences derived from the facts alleged."  *Aktieselskabet AF 21. November 2001 v.*

*Fame Jeans, Inc.*, 525 F.3d 8, 18 (D.C. Cir. 2008) (internal quotation marks and citations

omitted).  The Court, however, "need not accept inferences drawn by the plaintiff if such

inferences are unsupported by the facts set out in the complaint.  Moreover, the court is not

bound to accept as true a legal conclusion couched as a factual allegation." *Jack's Canoes &*

*Kayaks, LLC v. Nat'l Park Serv.*, 937 F. Supp. 2d 18, 27 (D.D.C. 2013) (internal quotation marks

and citations omitted).  While detailed factual allegations are not necessary to withstand a Rule

12(b)(6) motion to dismiss, the plausibility pleading standard demands more than a sheer

possibility that the defendant has acted unlawfully.  *Iqbal*, 556 U.S. at 678.  As a result, a

complaint that offers "'labels and conclusions,'" "'a formulaic recitation of the elements of a cause of action,'" or "pleads facts that are 'merely consistent with' a defendant's liability, [] 'stops short of the line between possibility and plausibility of "entitlement to relief,"'" and does not withstand a Rule 12(b)(6) motion to dismiss.  *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).

On a motion to dismiss under Rule 12(b)(6), the Court may consider, in addition to the facts alleged in the complaint, documents either attached to or incorporated into the complaint by reference, *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997), as well as matters of which it may take judicial notice, such as publicly-available government records.  *Veg-Mix, Inc. v. USDA*, 832 F.2d 601, 607 (D.C. Cir. 1987).

### B. This Court Lacks Subject Matter Jurisdiction To Determine Matters Within the Purview of the Postal Regulatory Commission.

39 U.S.C. § 409(a) provides for, but also limits, the jurisdiction of district courts as to suits against the Postal Service.  *See* 39 U.S.C. § 409(a) (jurisdiction lies "[e]xcept as otherwise provided in this title").  Specifically, Title 39 provides that claims dealing with postage rates and service standards must first be presented to the Postal Regulatory Commission ("PRC"), *id.* § 3662, and then if a party is not satisfied with a decision obtained from the PRC, that party may appeal the PRC's decision to the D.C. Circuit.  *Id.* § 3663.

As explained below, substantial portions of SCE's claims lie beyond this Court's jurisdiction, because they constitute frontal assaults against nationwide rates that now lie within the sole purview of the PRC, the D.C. Circuit, and the Supreme Court.  SCE's first claim challenges the propriety of the underlying postage rate because it supposedly does not conform to 39 U.S.C. §§ 404(b), 3622(b)(8), and 3622(c)(5).  SCE Compl. ¶ 83.  Those sections, however, do not deal with a challenge to a final agency decision as to a debt arising from underpayment for a specific mailing, as is the case here.  On the contrary, those sections concern

the establishment of uniform postage rates and qualifications or standards that determine what postage rates should be throughout the nation.  Similarly, part of SCE's second claim alleges that application of the non-discounted regular First-Class rate to it violated the Due Process Clause of the Fifth Amendment because the rate purportedly exceeds USPS's actual damages.  To the extent that that argument challenges the underlying rate, the same jurisdictional arguments below apply to that claim, as well.  Put simply, SCE's Complaint impermissibly attempts to do an end run around the jurisdictional limitations imposed by § 409(a).  This should not be countenanced, and instead the aforementioned claims should be dismissed under Rule 12(b)(1).

### 1.  This Court Lacks Subject Matter Jurisdiction over SCE's First Claim.

In the final agency decision, the Postal Service found that SCE should have paid the nondiscounted letter postage rate because its mailings did not comply with the Move Update standards, which are a prerequisite for any mailer nationwide that seeks to use the discounted workshare postage rates.  AR at 1 (A__).  Because of this significant deficiency, the Postal Service appropriately charged the nondiscounted First-Class letter rate (with credit for the discounted letter rate paid) using the standards in effect at the time of mailing.  *Id.*

SCE's first claim alleges that the final agency decision is *ultra vires* and unlawful because the rates charged violated the just and reasonable rates standards found in 39 U.S.C. §§ 404(b), 3622(b)(8), and 3622(c)(5).  Compl. ¶ 83.  Further, it alleges that the assessment of the revenue deficiency is unjust and unreasonable because it exceeds actual damages.  *Id.* ¶ 86. SCE asserts that even though the PCSC applied the nationally-applicable rates set forth in the Domestic Mail Manual, the "filed rate doctrine does not shield rates and classifications from challenge on the ground that they are unjust or unreasonable."  Compl. ¶ 87.  In essence, SCE's first claim requests that this Court declare that the FAD's application of the nondiscounted,

regular First-Class mail rate in accordance with the applicable nationwide mailing standards is
unjust and unreasonable.  This Court, however, lacks jurisdiction to hear SCE's broad challenge
to the reasonableness of postal rates and the associated requirements for those rates.

### a.  Statutory provisions for administrative and judicial review of rates.

Since 1970, Congress has clearly provided that any judicial challenge to postage rates
may only be brought in the federal Courts of Appeals.  This requirement was first established in
the Postal Reorganization Act (PRA), which created a method for shared ratemaking authority
between the Postal Board of Governors and the newly-established Postal Rate Commission.  *See,
e.g.,* 39 U.S.C §§ 3621-3625 (1970).  The Governors would make a final decision to issue rates
based upon a recommended decision of the Rate Commission.  *Id.* § 3625; *see, e.g.*, *Nat'l Ass'n
of Greeting Card Publishers v. USPS*, 462 U.S. 810, 813-814 (1983) (explaining the various
roles of the Rate Commission and the Board of Governors).  The PRA further provided that
review of the Governors' decision may be undertaken in any Court of Appeals.  *Id.* at 814 (citing
39 U.S.C. § 3628 (since repealed)).  Such appeals had to be lodged within 15 days of the Public
Printer's publication of the Postal Rate Commission's decision.  39 U.S.C. § 3628 (1970).

In 2006, Congress passed the Postal Accountability and Enhancement Act (PAEA).  That
law changed the Governors' ratemaking responsibilities and renamed the Rate Commission the
Postal Regulatory Commission (PRC); now PRC had final approval for rates, and its complaint
jurisdiction was broadened.  *See, e.g.*, 39 U.S.C. § 3622.  Since PAEA's enactment, the PRC's
final decisions may only be reviewed in the United States Court of Appeals for the District of
Columbia if proceedings are instituted within 30 days of a final decision of the PRC.  *Id.* § 3663.

Both the PRA and PAEA are relevant here.  The rates for SCE mailings from May 14,
2007, to May 11, 2008, were established by the PRC as a result of PRC Docket R2006-1, which

was rendered in accordance with the PRA.[4]  The rates for the remaining mailings, from May 12, 2008, to November 26, 2008, were established via PRC Docket No. R2008-1, which was rendered in accordance with the PAEA.[5]  SCE did not timely seek review before the PRC or in any Court of Appeals of any of the rates here at issue.

### b.  SCE failed to administratively exhaust its rate challenge before the PRC.

To the extent that SCE's specific allegations challenge the mailing standards that govern eligibility for the workshare rates, the jurisdiction to hear such a claim would lie with the PRC, with judicial review in the D.C. Circuit, if such claim were timely brought.  SCE claims that the FAD is unlawful because it purportedly fails to accord with requirements in Chapter 36.  *See* Compl. ¶¶ 11, 83 (citing 39 U.S.C. § 3622(b)(8) (rate system shall "be designed to achieve the following [nine] objectives," including "establish[ing] and maintain[ing] a just and reasonable schedule for rates and classifications, however the objective under this paragraph shall not be construed to prohibit the Postal Service from making changes of unequal magnitude within, between, or among classes of mail") and § 3622(c)(5) (rate system shall take into account 14 factors, including "the degree of preparation of mail" and the corresponding impact on costs)).  Such challenges should be heard in the first instance by the PRC, which has jurisdiction over complaints that USPS failed to operate in conformity *inter alia* with Chapter 36 ("postal rates, classes and services").

Should the PRC find that a complaint is justified, it can order the Postal Service to take action to achieve compliance, 39 U.S.C. § 3662(c), and the PRC's final decision then would be subject to review by the D.C. Circuit.  *Id.* § 3663.  But because Title 39 provides an exclusive

---

[4] PRC Op. & Recommended Decision, R2006-1 (Feb. 26, 2007), *at* http://www.prc.gov/docs/55/55901/Vol1R2006-1Op.pdf

[5] PRC Order No. 66 (Mar. 17, 2008), *at* http://www.prc.gov/docs/59/59312/R2008-1FINAL.pdf

jurisdictional scheme for determining postage rates and the regulations that govern whether a mailing qualifies for a given rate, it must be adhered to, and such a claim cannot be brought in the first instance in this forum.  Doing so would "den[y] to the expert ratesetting agency [the opportunity to] exercis[e] its reasonable judgment [and] the authority to decide which methods" to employ.  *Greeting Card Publishers*, 462 U.S. at 827.  *Accord Telecomms. Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute").  Thus, this Court may not entertain plaintiff's Complaint insofar as it challenges as *ultra vires* the adequacy of postage rates and regulations that determine whether mail qualifies for a particular postage rate.  *See FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) ("Litigants may not evade these [exclusivity] provisions by requesting the district court to enjoin action that is the outcome of the agency's order.") (holding that district court lacked subject matter jurisdiction to challenge as *ultra vires* a final agency action, because exclusive jurisdiction lay in the Court of Appeals, and reversing 699 F.2d 1219, 1230 (D.C. Cir. 1983), which had held that "the *ultra vires* count requires scrutiny of conduct occurring outside the formal administrative process" and thus under a concurrent jurisdiction theory it could proceed in the District Court).

As 39 U.S.C. §§ 3662 and 3663 set forth a precisely drawn, exclusive statutory remedy for the issues presented by SCE in its first claim for relief, the general jurisdiction grants in 39 U.S.C. § 409 and 28 U.S.C. § 1331 do not apply here.  *See Brown v. GSA*, 425 U.S. 820, 834 (1976) (general provisions do not provide District Court jurisdiction when "precisely drawn" statutes preempt general remedies); *Anselma Crossing, L.P. v. USPS*, 637 F.3d 238, 246 (3d Cir. 2011) (Contract Disputes Act (CDA) "bars district court jurisdiction, despite the jurisdictional grant in § 409(a)," because CDA's provisions governing jurisdiction were "both more recently

and more precisely drawn than the terms of the PRA").  Other courts considering the appropriate

fora for § 3662 claims likewise have decided that jurisdiction rests exclusively with the PRC.

*See Foster v. Pitney Bowes*, 549 Fed. Appx. 982, 986 (Fed. Cir. 2013) ("[T]he district court

correctly determined that it lacked subject matter jurisdiction to consider claims arising under

§ 404a."); *Erickson v. U.S. Post Office*, 250 Fed. Appx. 757, 757-58 (8th Cir. 2007) ("[W]e

conclude that the district court properly dismissed Erickson's complaint for lack of subject-

matter jurisdiction because the Postal Regulatory Commission has exclusive jurisdiction over

Erickson's claims regarding postal rates and services."); *Nolen v. USPS*, 2013 WL 660153, at *8

(D. Vt. Feb. 22, 2013); *Richards v. Great W. Ins. Co.*, 2012 WL 718715, at *4 (D. Minn. Mar. 5,

2012); *McDermott v. Potter*, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009).

### c. *Lutherans* does not obviate the administrative exhaustion requirement.

Plaintiff cites *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003),

as providing for jurisdiction in this Court as to whether the Postal Service "acted *ultra vires* and

in excess of its statutory authority or the Constitution."  Compl. ¶ 8.  That decision rejected the

Postal Service's argument, namely that its administrative decisions were not subject to judicial

review in any forum because 39 U.S.C. § 410(a) exempts many USPS decision from the APA.

*See* 321 F.3d at 1172.  The D.C. Circuit noted that "[t]he Postal Service assumes that any right

that appellees have to judicial review must arise under the APA.  This assumption is mistaken."

*Id.*  The Circuit went on to hold that judicial review of USPS actions that "'exceeded its statutory

authority,'" *i.e.*, "[w]hen an executive acts *ultra vires*," was permissible.  *Id.* at 1173.

The D.C. Circuit, however, never considered the question whether exclusive jurisdiction

lies in the Court of Appeals, rather than this Court, and accordingly *Lutherans* does not, contrary

to plaintiff's view, establish that this Court has jurisdiction over SCE's claims.  It nowhere even

cites to 39 U.S.C. § 3662 or the then-applicable appellate review provision, *id.* § 3628 (2003) (a

PRC decision "may be appealed to any court of appeals"), and the issue whether rate complaints

must proceed in the first instance through the PRC before proceeding to a Court of Appeals was

not decided in that case.  Moreover, after *Lutherans* was decided in 2003, Congress in 2006

substantially altered the judicial review provision by repealing § 3628 and enacting § 3663:  now

the law expressly vests judicial review *solely* in the D.C. Circuit, and not *any* other court (other

than the Supreme Court upon review of a D.C. Circuit decision).  Thus, the exclusivity of

judicial review in the D.C. Circuit is substantially clearer now than it was when *Lutherans* was

decided, had the D.C. Circuit even considered the issue at that time, which it did not.[6]

      In any event, the D.C. Circuit, citing the Supreme Court's decision in *ITT World*

*Commc'ns*, 466 U.S. at 468, has rejected arguments similar to SCE's alleging the need for

District Court review of a case such as this one, and instead has held that, "even where Congress

has not expressly stated that statutory jurisdiction is 'exclusive,'" the D.C. Circuit is the sole

judicial forum available, because the statute "vest[ed] jurisdiction in [that] particular court."

*Telecomms. Res. & Action Ctr.*, 750 F.2d at 77-78.  The Circuit pointed to "compelling policy

reasons for holding that the jurisdiction of the Court of Appeals is exclusive.  Appellate courts

develop an expertise concerning the agencies assigned them for review.  Exclusive jurisdiction

promotes judicial economy and fairness to the litigants by taking advantage of that expertise.  In

addition, exclusive jurisdiction eliminates duplicative and potentially conflicting review, and the

---

[6] SCE's reliance upon *Lutherans* is also misplaced because the complaint jurisdiction of the PRC
has changed since *Lutherans* was litigated.  In 2006, Congress enacted the PAEA and
specifically provided *inter alia* that the PRC has jurisdiction over complaints asserting that USPS
had adopted "rules and regulations" not consistent with Title 39.  *See* 39 U.S.C. § 3662(a) (citing
*id.* § 401(2)).  Had *Lutherans* been filed under the PAEA, the District Court plainly would have
lacked jurisdiction due to the plaintiff's failure to exhaust administrative remedies, as Congress
now specifically has provided that the PRC is the entity with jurisdiction to hear complaints
about regulations related to rates.

delay and expense incidental thereto." *Id.* at 78 (citation omitted).  In sum, *Lutherans* did not reach the question of whether this Court is an appropriate forum for an *ultra vires* claim, and this Court in fact does not have such jurisdiction.  Instead, SCE could have presented a timely complaint to the PRC, and then could have sought review in the D.C. Circuit.  That it did not do.

The statutory scheme applicable here is a common one in administrative law.  Congress has vested a single entity, the PRC, with primary jurisdiction to hear challenges to the propriety of postage rates and standards, with appellate review solely in the D.C. Circuit.  That scheme allows for uniform, nationwide postage rates, as well as the adoption of the regulations that govern particular postage rates, such as the workshare rates (for which Congress also specifically provided by statute, *see* 39 U.S.C. § 3622(e)).  Otherwise, District Courts and Circuit Courts throughout the nation might render conflicting decisions on postal rates and the regulations for applying them, which could result in a disjointed system of rates that might vary from place to place and which would be at odds with numerous objectives and factors for rates that Congress carefully laid out.  *See, e.g.*, 39 U.S.C. § 3622(b)(2) ("To create predictability and stability in rates"); *id.* at (4) ("To provide the Postal Service pricing flexibility"); *id.* at (6) ("To reduce the administrative burden and increase the transparency of the ratemaking process").  Thus, this Court should not expand jurisdiction beyond that for which Congress explicitly has provided. *See Reader's Digest Ass'n v. USPS*, 501 F. Supp. 126, 128-29 (D.D.C. 1980) (dismissing publisher's action for lack of subject matter jurisdiction, because deciding the case before it "would draw the Court into territory reserved exclusively to the Court of Appeals").

> ### d.  SCE's cited decisions involving different regulated industries do not show that this Court has jurisdiction to decide rate issues.

In its first claim, SCE cites extensively to railway and gas pipeline regulatory decisions from the Interstate Commerce Commission (ICC) and the Federal Energy Regulatory

Commission (FERC).  *See* Compl. ¶¶ 85, 87.  Its brief further cites to various state public utility

commission decisions.  SCE MSJ at 23 n.9.  The Complaint asserts that USPS has effectively

applied the filed rate doctrine without also applying an exception providing that the filed rate is

not enforceable if unreasonable. Compl. ¶ 87. Yet nowhere does SCE identify any valid authority

establishing that the doctrine applies to USPS, nor that the aforementioned exception applies, nor

that these decisions establish that this Court, notwithstanding the PRC's and D.C. Circuit's

exclusive jurisdiction over rate matters, somehow possesses jurisdiction to decide plaintiff's rate

challenges, nor that the statutory and regulatory structures in which plaintiff's cited decisions

arose are applicable in the discrete postal sphere.  Indeed, Plaintiff's Complaint all but admits as

much through its silence on the jurisdictional issue and through SCE's noting that its cited cases

"all" arose in "regulated industries in which the filed rate doctrine is recognized," *id.*, thereby

acknowledging that the doctrine has *not* been recognized in the separate postal arena.

Further, some of plaintiff's citations do not withstand scrutiny.  For instance, although it

expressed concerns, the Ninth Circuit did not, as SCE suggests, hold that a railway penalty was

excessive.  Instead, it held that the ICC had primary jurisdiction and thus remanded the case for

further proceedings to consider whether the rate was unreasonable.  *Union Pac. R. Co. v. Bay

Area Shippers Consolidating Ass'n, Inc.,* 594 F.2d 1291, 1294 (9th Cir. 1979).  This approach

accords with USPS's argument that the PRC should decide rate questions in the first instance.

Thus, these gas, railroad, and public utility administrative decisions have no bearing here.

Plaintiff's inability to identify any similar decision involving the Postal Service is telling.  It also

is unsurprising, given the unique and special statutory mission of the Postal Service

> as a basic and fundamental service provided to the people by the Government of the
> United States, authorized by the Constitution, created by Act of Congress, and supported
> by the people.  The Postal Service shall have as its basic function the obligation to
> provide postal services to bind the Nation together through the personal, educational,

literary, and business correspondence of the people.  It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities.  The costs of establishing and maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people.

39 U.S.C. § 101.  Thus, by Congressional and regulatory design, and in contrast to many other regulated industries, USPS provides a set of nationwide rates with well-established requirements for each type of mail.  Further, as the Supreme Court has made clear, postal ratesetters have substantial discretion, *Greeting Card Publishers*, 462 U.S. at 822, which is different in kind than that applicable in various other industries.

Moreover, a principal purpose for postal rates is to "remove undue price discrimination." *Id.*  To the extent that plaintiff seeks special treatment – *i.e.*, an exemption from the burden of complying with Move Update standards that apply to *all* bulk mailers that receive workshare discounts – doing so would effect price discrimination against all other mailers that *do* comply. *See* 39 U.S.C. 403(c) ("except as specifically authorized in this title, [USPS shall not] make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user").  To grant SCE an exemption from the regulatory compliance requirement and to allow it nonetheless to pay the discounted rate for which it did not in fact qualify would increase the marginal amount that all other mailers must pay, and thus would not be "just and reasonable" to the mailing community at large.  39 U.S.C. § 3622(b)(8); *see UPS, Inc. v. USPS*, 604 F.2d 1370, 1372, 1377 (3d Cir. 1979) (per § 403(c), USPS may not create special mailing rate with different requirements than those generally applicable if "less than all members of the public [a]re entitled to benefits stemming from such changes").  Further, such a mailer-specific rate would contradict Congress's directive that rates assure the "simplicity of [the rate] structure for the *entire* schedule and [provide for] simple, identifiable relationships between the rates or fees charged the various classes of mail for postal services."  39 U.S.C.

§ 3622(c)(6) (emphasis added); *accord id.* at (b)(2) (objective "[t]o create predictability and stability in rates").  Thus, regardless of any merit that the pipeline, railway, and public utility decisions may have in their own arenas, plaintiff has not shown that they are controlling for the postal sector or that they demonstrate this Court's subject matter jurisdiction over SCE's claims.

> **e.   General language in § 404(b) does not create District Court jurisdiction over rates, because more "precisely drawn" provisions control.**

Nor does SCE's artful pleading under 39 U.S.C. § 404(b) (*see* Compl. ¶¶ 11, 83) permit it to avoid PRC jurisdiction and create subject matter jurisdiction in a District Court over any rate that a mailer contends is not "just."  Plaintiff cites § 404(b) (as well as § 3622(b)(8), although any challenge to a rate under § 3622 plainly must be presented first to the PRC, *see id.* § 3662(a)), to support its contention that the District Court may determine in the first instance whether it was just and reasonable to apply to SCE a rate that was not limited to proven losses arising from its particular breach of the regulatory requirements for the workshare rate.  Section 404(b) states:  "Except as otherwise provided, the Governors are authorized to establish reasonable and equitable classes of mail and reasonable and equitable rates of postage and fees for postal services *in accordance with the provisions of chapter 36*."  *Id.* § 404(b) (emphasis added).  Tellingly, SCE does not allege that the Governors' establishment of the rate was procedurally defective, nor does plaintiff assert any other specific violation of § 404(b).

Though § 404(b) is not listed in § 3662 as a provision subject to review by the PRC, § 404(b) is simply a general provision directing the Governors to establish rates and classes that conform to the requirements of chapter 36, which are enumerated principally in § 3622, which as noted is expressly subject to review by the PRC.  That is, §§ 3662 and 3663 set forth the specific, "precisely drawn," *Brown*, 425 U.S. at 834, procedures for adjudicating claims that rates and classes fail to conform to the objectives and factors required in establishing postal rates and

regulations, *see* 39 U.S.C. § 3622(b), (c), including whether a rate is "just and reasonable," *id.* at (b)(8).  Thus, § 404(b) does not override those specific predicate expert regulatory review provisions by instead providing a general right of review in the first instance in any District Court without first requiring administrative exhaustion of a claim that a rate is not "just and reasonable."  *See Brown*, 425 U.S. at 834-35 ("permitting such challenges to be brought under the general . . . statute, where exhaustion is not required, would undermine the strong policy requiring exhaustion").  In short, SCE cannot avoid the PRC's exclusive jurisdiction through artful pleading.  *See LeMay v. USPS*, 450 F.3d 797, 801 (8th Cir. 2006) ("artful pleading" does not avoid PRC's exclusive jurisdiction); *id.* at 799 ("Congress removed the district courts' jurisdiction over claims regarding postal rates and services" (citing *Brown* & 39 U.S.C. § 3662)).

### f.   USPS's prior incorrect interpretation of § 404(b) jurisdiction is not binding on this Court.

Finally, SCE argues that the Postal Service has somehow consented to the subject matter jurisdiction of the District Courts to hear rate disputes under 39 U.S.C. § 404(b) because it once moved to dismiss a complaint filed under § 404(b) before the PRC.  SCE reasons that if the Postal Service once argued (unsuccessfully) that the PRC lacked complaint jurisdiction under 39 U.S.C. § 404(b), then *ipso facto* USPS somehow has conceded that a District Court instead must have jurisdiction.  MSJ at 33-34.  This argument does not follow and fails for several reasons.

As a threshold matter, USPS cannot consent to a court's subject matter jurisdiction, so any prior, erroneous jurisdictional arguments would be without moment.  *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 173-180 (1803).  Moreover, nowhere does USPS's administrative motion to dismiss assert that, because the Postal Service believed at the time that the PRC did not have jurisdiction under § 404(b), USPS instead believed that *District Courts* had such jurisdiction. *See* http://www.prc.gov/Docs/63/63257/Motion_To_Dismiss_404b.pdf.  In any event, contrary

to SCE's contention, MSJ at 33, USPS was *not* successful in its argument before the PRC. Instead, the Commission denied USPS's motion to dismiss and instituted a complaint proceeding under § 3662 because the pleadings had adequately pled issues of both law and fact within the PRC's complaint jurisdiction.  *See* PRC Order denying USPS's Mot. to Dismiss, A__.  Thus, the arguments herein accord with USPS's *current* understanding of the state of the law governing jurisdiction over rate matters; that a litigant once espoused a different view of the law that has now been rejected does not mean that the litigant is bound to that erroneous view in perpetuity.

In sum, this Court lacks subject matter jurisdiction to consider SCE's argument that it was unreasonable for USPS to apply its existing, approved, nationwide rates and regulations to SCE's mailings that did not meet the workshare standards, or for USPS not to adopt plaintiff's argument that the only amount that can be charged for mail that fails to comply with Move Update is USPS's proven actual damages. Thus, SCE's first claim for relief should be dismissed.

## 2. This Court Lacks Subject Matter Jurisdiction Over the Portion of the Second Claim that Challenges the Underlying Postage Rate.

SCE's second claim provides dual bases for the relief it seeks.  On the one hand, the second claim seeks judicial review of the PCSC's FAD on the calculation of the amount of the revenue deficiency.  *See* Compl. ¶ 91.  USPS agrees that the Court has subject matter jurisdiction to review the FAD's calculation as such to consider, for instance, if the FAD was unreasonable because it contained a mathematical error.  SCE, however, does not allege such an error.

The bulk of the second claim, however, alleges a violation of the Due Process Clause of the Fifth Amendment that purportedly arises because "the amount of the deficiency exceeds the amount of the Postal Service's actual costs resulting from SCE's noncompliance with the Move Update standards . . . ."  Compl. ¶¶ 91-93.  Defendant does not dispute that, were plaintiff alleging a true Fifth Amendment violation, such as a contention that its procedural due process

rights were violated because it lacked notice of the applicable regulations, this Court would have jurisdiction over such a claim.  Defendant likewise does not contest that, if plaintiff had alleged a violation of substantive due process that "shocks the contemporary conscience," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998), the Court also would have jurisdiction.  But that is not what plaintiff's second claim asserts.  On the contrary, it improperly presents as a constitutional claim what is in actuality a back-door challenge to the underlying postage rate and the regulatory qualifications for the rate, both of which formed the basis of the revenue deficiency.  This kind of collateral attack on postage rates under the guise of a due process challenge cannot circumvent the exclusive jurisdiction of the PRC over matters relating to rates.

As noted above, SCE did not challenge the rates when they were issued by timely seeking PRC review.  Moreover, to the extent that the second claim presents a challenge to the postal rate structure and mailing standards governing the eligibility for the rates, the D.C. Circuit has acknowledged the PRC's expertise over rates.  *Cf. Nat'l Ass'n of Greeting Card Publishers v. USPS*, 569 F.2d 570, 597 (D.C. Cir. 1976), *vacated on other grounds by USPS v. Associated Third Class Mail Users*, 434 U.S. 884 (1977) (recognizing PRC expertise "in the setting of rates and fees that are fair and equitable, and its authority therefore reasonably extends to all aspects of such decisions, including review of budget estimates, allocation of postal costs, establishment of rates for postage"); *see also Foster*, 549 Fed. Appx. at 986 (Fed. Cir. 2013) (under PAEA, "the PRC has exclusive jurisdiction").  As stated in the discussion of the first claim, SCE cannot avoid the PRC's exclusive jurisdiction through artful pleading, *see LeMay*, 450 F.3d at 801, even by asserting a constitutional claim.  Thus, as provided by Congress, jurisdiction lies exclusively with the PRC, subject to review only in the D.C. Circuit, *see* 39 U.S.C. §§ 3662, 3663, to

determine whether the postage rate charged was unlawful, and the Court accordingly lacks subject matter jurisdiction over this facet of SCE's second claim.  *See* Fed. R. Civ. P. 12(b)(1).

### C.  The Remainder of Plaintiff's Second Claim Fails to State a Claim.

USPS further moves per Fed. R. Civ. P. 12(b)(6) to dismiss the balance of SCE's second claim because it does not contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.  SCE alleges that the revenue deficiency violates due process because it "exceeds the Postal Service's actual damages."  Compl. ¶ 93.  This is not a valid basis for a Fifth Amendment procedural due process claim, the essential requirement for which is the opportunity to be heard "at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  Nor does it present a substantive due process claim by asserting official conduct "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Estate of Phillips v. D.C.*, 455 F.3d 397, 403 (D.C. Cir. 2006) (quoting *Lewis*, 523 U.S. at 847 n.8).

Moreover, SCE's reliance upon *BMW of North America, Inc., v. Gore*, 517 U.S. 559 (1996), is misplaced.  That case involved the Fourteenth Amendment, not the Fifth, and the due process violation there arose when a State court awarded excessive punitive damages that exceeded elementary notions of fairness due to lack of notice of the severity of the punitive damages penalty that a State may impose.  *Id*. at 574.  Here, the Fourteenth Amendment does not apply to the Postal Service, a federal entity.  Further, in contrast to *BMW*, here there is no question about whether SCE received notice that Move Update compliance was a requirement to qualify for the discounted postage rates.  DMM § 233.3.5; SCE Answer, ¶ 20; AR at 174, A__.

SCE has failed even to allege that there was any lack of notice or an opportunity to be heard, and its procedural due process claim thus fails the plausibility analysis.  Indeed, its own

internal documents confirm that it had actual notice of its lack of compliance with the published regulations and the attendant ramifications of its non-compliance.  AR at 212, 219 (A__, A__).

Similarly, SCE has not plausibly alleged USPS conduct that was so "genuinely drastic" as to implicate substantive due process.  *See Tri Cnty. Indus., Inc. v. D.C.*, 104 F.3d 455, 459-60 (D.C. Cir. 1997).  "Inadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress."  *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988). In this case, USPS properly and fairly applied the regulations, and in all events, even if USPS erred, SCE has not adequately alleged any conduct that "shocks the conscience."

Thus, the balance of the second claim also should be dismissed under Rule 12(b)(6), because it fails to offer anything beyond "labels and conclusions," and it stops far "short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678.

### IV. SCE's Motion for Summary Judgment Should Be Denied.

The omissions in SCE's motion for summary judgment are more telling than any argument it asserts.  Stunningly, SCE fails even to quote the regulations at issue here.  It does not contest the content of the regulations that bar access to the discounted postage rates for bulk mailings unless there is compliance with the Move Update standards.  SCE does not challenge the FAD's statement that since the 1997 inception of the Move Update standards, the Postal Service has uniformly assessed the single piece rate for mailings that are ineligible for discounted postage rates when a mailer has failed to adhere to those standards.  SCE does not argue that it satisfied the Move Update standards.  Nor does it explain why its noncompliance continued for almost 20 months after the Postal Service provided actual notice of the violation.

Rather, as explained in further detail below, SCE attempts to side step these regulatory hard truths and instead challenges the legality of applying the single piece, regular First-Class

Mail rate to its mailings and charging a revenue deficiency based on the difference between the discounted rates paid and the nondiscounted (single piece) rates that should have been paid. SCE's argument relies on a deep misunderstanding of the deficiency assessed against it.  Plaintiff mischaracterizes the deficiency as a "penalty," but it is nothing of the sort.  On the contrary, the revenue deficiency is "'strictly remedial,'" and "the bare fact that the government is the plaintiff does not automatically convert a proceeding into an action for a 'penalty'[.]"  *Johnson v. SEC*, 87 F.3d 484, 487-88 & n.4 (D.C. Cir. 1996) (quoting *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 423 (1915)).  USPS's claim is "essentially private in nature."  *Id.* at 487.  It seeks "'a private remedy to a person injured by the wrong,'" *id.* (quoting *Huntington v. Attrill*, 146 U.S. 657, 673 (1892)), and is in some respects akin to an action in contract.  *Id.* at 488 (quoting *Peerless Cas. Co. v. U.S.*, 344 F.2d 495, 496 (D.C. Cir. 1964)).  All the Postal Service seeks is to have the mailer pay the established postage rate it was obligated to pay, given the mail it actually sent.

The bulk of SCE's brief is devoted to a protracted and complicated discussion of damage calculations, many unsupported by facts in the record, by which plaintiff attempts to support its view that the revenue deficiency must not be directed to ensuring full payment of the nationally uniform, legally-established postage rate, but rather to some quantification – to be established not by the expert regulatory agency, but instead by this Court – of the specific costs incurred by the Postal Service for handling SCE's deficient mailings here at issue.

Aside from the likelihood that this Court is ill-equipped to make such a determination in the first instance on the basis of the administrative record in this case, such a particularized mailing-centric view is at odds with general administrative law principles for uniformly-applicable regulations.  It also defies the reality of our national, constitutionally-established postal system that charges the same rate to all mail that complies with the requirements for a

given class, regardless of the fact that it may cost the Postal Service far more to transport, for instance, a letter sent across the nation to a remote Aleutian island than it does to deliver an otherwise identical letter across the street.  If SCE's theory were accepted, the mailer of the across-the-street letter might demand that he be charged only what his specific letter had cost USPS to transport, notwithstanding the fact that the postal rates even for such local services are set at a level that can bear the costs of a system able to deliver *both* locally and to the most remote corners of the nation.  *See, e.g.*, 39 U.S.C. § 101(a) ("[USPS] shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities.  The costs of establishing and maintaining the Postal Service shall not be apportioned to impair the over-all value of such service to the people."); *id.* at (b) ("The Postal Service shall provide a maximum degree of effective and regular postal services to rural areas, communities, and small towns where post offices are not self-sustaining.  No small post office shall be closed solely for operating at a deficit, it being the specific intent of the Congress that effective postal services be insured to residents of both urban and rural communities.").  A decision to change the Postal Service's entire rate structure or to determine rates on a mailing-by-mailing basis should issue from Congress and federal regulators, not from this Court.

SCE further maintains that a failure to limit the "penalty" to the Postal Service's actual mailing-specific costs somehow violated the Due Process Clause of the Fifth Amendment.  As explained, however, SCE had both notice of the revenue deficiency and an adequate opportunity to be heard.  And issuing a revenue deficiency for postage due in order to recover the correct, lawfully-established, nationally-applicable postage rate is far from an unconstitutional "penalty" that "must surely 'raise a suspicious judicial eyebrow.'"  *BMW*, 517 U.S. at 583 (citation omitted) (rejecting punitive damages award that was "a breathtaking 500" times greater than the

compensatory damages); *compare Johnson*, 87 F.3d at 487-88 (defining "penalty"). Here – where SCE has conceded its violations of the mailing standards for the rates it paid, AR 216, 219 (A__, A__); SCE Answer, ¶¶ 22, 28; Compl., ¶ 80 – plaintiff's assertion that the FAD should be deemed unlawful and USPS denied the opportunity to recover the postage due, notwithstanding the deference due that decision, strains credulity. *See Greater Boston*, 444 F.2d at 851.

Thus, as demonstrated in the preceding Parts of this brief and as further shown below, SCE's arguments are deeply flawed at multiple levels and should be rejected. As already argued, the Court lacks subject matter jurisdiction over SCE's first claim and part of the second claim, and as to the balance of the second count SCE has failed to state a claim and thus it should be dismissed. Moreover, SCE misapprehends the nature of this proceeding – it is not a *de novo* proceeding to determine whether the amount of the revenue deficiency is lawful; rather, it is a highly deferential judicial review of the final agency decision. Plaintiff's motion for summary judgment accordingly should be denied.

### A.  The Final Agency Decision is Appropriately Based Upon the Postage Rates Applicable to SCE's Mailings and is Lawful.

Postal Service regulations define a "revenue deficiency" as "a shortage or underpayment of postage or fees." DMM § 604.10.1. SCE's appeal of its revenue deficiency appropriately was sent to the PCSC for a final agency decision. PCSC's role in adjudicating revenue deficiencies is to determine whether a deficiency exists and if the amount was calculated correctly. *See* AR at 2 (A__). As discussed, the PCSC found that SCE's mailings did not comply with Move Update standards – a point that SCE has admitted. SCE MSJ at 15; *see, e.g.,* AR at 216-219, A__-A__. Indeed, internal documents show that SCE knew that its noncompliance put $5 million per year in discounts at risk. AR at 219 (A__). Thus, PCSC appropriately found that a shortage existed and applied the properly applicable postage rates:  the nondiscounted, regular postage rates.

Contrary to SCE's contention, the nondiscounted postage rates are not a penalty or surcharge. Rather, they are simply the correct postage that SCE should have paid. *See Johnson*, 87 F.3d 487-88. Further, SCE fails to cite any authority showing that USPS may issue a revenue deficiency based upon any rate other than the nondiscounted postage rates, much less that it may custom-design a rate solely applicable to a mailer's particular circumstances. As noted in the FAD: "Postal Service policy, since the inception of the MOVE Update address quality standards, has been to access single piece prices for ineligible mailings. This price eligibility requirement has been supported by the Postal Rate Commission." AR at 2 (A__)

The crux of SCE's argument is that "[r]equiring SCE to pay single-piece First-Class rates on every piece of mail in the mailings that contained any of the allegedly non-compliant mailpieces violates the requirement of 39 U.S.C. § 404(b) that the prices charged for market-dominant mail be reasonable and equitable." SCE MSJ at 20. It then attempts to buttress its argument by asserting that the revenue deficiency greatly exceeds the damages that arose from non-compliance.

Those flawed arguments disregard the undisputed fact that the applicable postage rates and the requirements for them have been approved by the PRC on a uniform, nationwide basis. The nationwide, uniform statutory ratemaking scheme does not contemplate different rates for different mailers depending on the cost profiles of particular mailings, and indeed the Supreme Court has recognized that Congress has provided that modern postal rates must be designed to "remove undue price discrimination," *Greeting Card Publishers*, 462 U.S. at 822. Giving SCE an exemption from complying with Move Update, even as other bulk mailers bore the cost of doing so, could effectuate such unlawful price discrimination and give SCE an unfair advantage. *See* 39 U.S.C. § 403(c) ("In providing services and in establishing classifications, rates, and fees

under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, *nor shall it grant any undue or unreasonable preferences to any such user*.") (emphasis added).

In fact, the D.C. Circuit rejected as inadequately justified and likely violative of the antidiscrimination provision a USPS program that benefited only certain third-class mailers that were "performing the same worksharing functions" as other third-class mailers, whose work likewise might "save the Postal Service an equal amount of time and money and may incur the same costs associated with presorting." *Nat'l Easter Seal Soc'y v. USPS*, 656 F.2d 754, 761 (D.C. Cir. 1981). The Third Circuit similarly held that USPS violated the antidiscrimination provision by creating a special mailing rate with different requirements than those that are generally applicable and which rate only was available to a small number of commercial mailers. *UPS, Inc.*, 604 F.2d at 1372, 1377. The court held that § 403(c) "specifically proscribed" USPS from "permit[ting] unregulated changes in rates and mail classification at any time and under any circumstances whereby less than all members of the public were entitled to benefits stemming from such changes." *Id.* at 1377. USPS simply could not invent a rate to fit SCE's particular circumstances, whereby plaintiff had done certain presorting, labeling, etc., while admittedly not complying with Move Update, as was required for the workshare discounts it claimed.

In any event, USPS regulations do not require that it prove its "injury" before it may apply the correct postage rate. To require a rate to be custom-tailored and based upon the particularized mailing practices of each mailer would interfere with the rate structure envisioned by Congress and regulated by the PRC. The Supreme Court rejected similar arguments. *E.g.*, *Hegeman Farms Corp. v. Baldwin*, 293 U.S. 163, 170-171 (1934) (rejecting milk wholesaler's argument that rate for minimum prices must be changed because, as applied to him, it deprived

38

him of a profit; "[t]his is not enough to subject administrative rulings to revision by the Court");

*Permian Basin Area Rate Cases*, 390 U.S. 747, 769 (1968) ("This Court has repeatedly

recognized that legislatures and administrative agencies may calculate rates for a regulated class

without first evaluating the separate financial position of each member of the class.").

The final agency decision rightly rejected SCE's arguments that the rates of returned mail

were relevant.  On the contrary, its "assessment of additional postage was due to the fact that

SCE's process for updating addresses was not in compliance and, therefore, not eligible for the

automation discounts claimed."  AR at 2 (A-___).  In the end, this is a simple case of requiring a

mailer to pay the established postage rate that became applicable because the mailer had failed to

follow the rules for the rate it paid and with which it had falsely certified that it had complied.

### B.      SCE Fails to Establish That Its Cited Utility Cases Apply to Postal Rates.

SCE's heavy reliance upon railroad, natural gas, and public utility cases for the

proposition that the revenue deficiency is unlawful because rates applied must be reasonable and

equitable is misplaced, and even undermines its arguments.  First, the sole federal court decision

SCE cites in asserting that it may enforce in this forum a purported general "requirement that

rates not exceed maximum reasonable levels" establishes no such thing.  SCE MSJ at 21.  SCE

characterizes *Union Pac. R. Co.* as "expressing concern that penalty charges that more than

tripled the applicable shipment rates could be excessive, especially when the railroad could not

'suggest a rational relationship between the costs that misdelivery of a manifest may impose on

the carrier and the apparently severe consequences that it visits on the shipper.'"  *Id*.  The Ninth

Circuit did not, however, adjudicate the rates; instead, it found that it then lacked jurisdiction:

> The claim is, however, one within the [Interstate Commerce] Commission's primary
> jurisdiction.  "Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly
> discriminatory, there must be preliminary resort to the Commission."  *Great Northern R.
> Co. v. Merchants Elevator Co*., 259 U.S. 285, 291 (1922).

*Union Pac. R. Co.*, 594 F.2d at 1294.  Second, the other cases cited are decisions by regulatory commissions for railroads, gas pipelines, and state public utilities, none of which SCE has shown to be relevant to postal rates.  Rather, as explained above, the postal context is governed by its own statutory and regulatory structure, and, further, cases about "penalties" in other regulatory spheres do not apply here, because assessing the established applicable postage rate and collecting the resulting postage due is not a penalty.  *Johnson*, 87 F.3d at 487-88.

Indeed, rather than supporting SCE's argument, all of these regulatory cases accord with USPS's showing that the proper arbiter of the reasonableness of rates is the regulatory agency statutorily designated to make those decisions, subject only to review in the appropriate court, generally a court of appeals.  Thus, rather than making cross-industry generalizations, as SCE does, one needs to evaluate the particular statutory and regulatory scheme at issue.  For postal rates, the responsible entity is the PRC, which is responsible for establishing a "modern system for regulating rates" that is "designed to achieve" nine objectives, 14 factors, and numerous other requirements when setting postage rates for market dominant products, which include the rates applied here.  *See* 39 U.S.C. § 3622.  If SCE wanted to challenge whether the postage rates and the regulations they incorporate satisfy the statutory principle of reasonableness, it should have filed a complaint under 39 U.S.C. § 3662 before the PRC.  *See supra* at 21-23.

C.  **SCE's Purported Damage Calculations Are Incorrect And Irrelevant.**

Contrary to Congress's designation of the PRC as the expert authority on ratemaking, SCE's lengthy discussion of damage calculations urges the Court to undertake a *de novo* determination of the appropriate amount of damages for its noncompliance and to establish the corresponding SCE-specific rate that should apply.  The Court need not and should not assume that role, especially not in the administrative law context applicable here.  *See Marshall County*,

988 F.2d at 1226-27 ("[c]hallengers to agency action are not, however, ordinarily entitled to augment the agency's record . . . the district court is not engaged in ordinary fact-finding"). The FAD reasonably determined that SCE's mailings were ineligible for a discounted workshare rate, which means that SCE should have paid the regular, nondiscounted postage rate. The FAD also found that the rates of returned mail and other indicators of potential harm could not yield a more appropriate rate that should have been assessed. *See* AR at 1, 2, A__-A__.

SCE's citation to internal documents in an attempt to establish undisputed facts is also misleading. For example, it states that the PCSC's FAD "did not dispute that the volume of SCE mail that was undeliverable as addressed was 'an insignificant amount compared to the volume that SCE sends out.'" SCE MSJ at 23. The decision did not quantify the amount of UAA mail, however, because such a figure was irrelevant; "the assessment of additional postage was due to the fact that SCE's process for updating addresses was not in compliance and, therefore, not eligible for the automation discounts claims." A__. That the FAD restated SCE's argument just before the aforementioned sentence in no way shows that the PCSC agreed with SCE that the figure – whatever it might be – was correct, much less that it mattered.[7]

---

[7] In addition, many of the calculations SCE offers are problematic or unsupported. For example, SCE uses a number (MSJ at 24) that applies to a fee for forwarding Standard Mail, which is a mail class not at issue here. Further, the number is incorrect—it should be 2.472. *See* DMM § 507.1.5.3. Similarly, the calculations based upon the "undisputed" "inherent error rate" of the postal database (MSJ at 24) cite to SCE's own appeal brief and to a postal email that, contrary to SCE's contention, *denies* the characterization of "errors." A__. In addition, the average monthly volume of SCE overrides (MSJ at 25) cites not to a careful calculation or to a spreadsheet, much less an admissible, reliable record prepared in the ordinary course of its business, *see* Fed. R. Evid. 803(6); *see also* Fed. R. Civ. P. 56(c)(2) (party may object to inadmissible summary judgment evidence), but to a cryptic handwritten note. AR at 120, A__. Likewise, plaintiff's discussion of the 60 piece sample (MSJ at 26) cites SCE's own brief below and documents that do not in fact support SCE's conclusions. *Compare* AR 131-166 *with* MSJ at 26. Moreover, there are numerous documents that indicate a higher volume of UAA mail than SCE calculates.

This list of problems is not exhaustive because the Court need not determine damages in this case. The PCSC appropriately considered SCE's arguments about the rates of returns and

SCE also uses its damage calculations in an attempt to raise an issue that was never raised at the administrative level and instead was raised for the first time before this Court. *See* SCE MSJ at 27. Plaintiff states that the amount of damages is overstated because some of its pieces complied with an exception to the Move Update standards for "newly acquired addresses." This position was not taken before the PCSC and was thus waived. *See Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 358 n.8 (D.C. Cir. 2005).[8]

In a further attempt to support its damage calculation argument, SCE seeks to justify some of its overrides by mischaracterizing a USPS communication on when a USPS-provided change of address update may be disregarded. The communication in fact states that if a mailer disregards an update, the mailer cannot use the address unless there is a compelling reason and justification. A__. The mailer then must keep written documentation that describes both the business's rules for such overrides and how such rules were implemented for each specific override. *Id.* SCE, however, does not indicate that it had any of the required documentation, or even how many overrides this practice allegedly impacted. Instead, it merely states that since SCE's invoices were paid, the address used was correct. Relatedly, SCE alleges that it overrode matches when it received an address from a customer even though it differed from the Change of Address information in the USPS database. *See* MSJ at 10. The fallacy of these arguments is that, because the USPS uses its COA database to process mail, defendant may well have

---

alleged "harmless" errors and nonetheless determined that SCE's noncompliance rendered its mailings ineligible for the discounted rates. AR 1-2. That finding should not be disturbed.

[8] SCE misstates the name of the exception as "directly acquired," which wrongly to implies that a bulk mailer may override a Move Update match if a customer has provided the mailer a different address. In fact, in the SCE context, the "newly acquired" exception for Move Update would be for a customer who newly requests services and as a result of the request is added to the mailing list. Pub. 363 at 10 (A__). The main problem here, however, was that SCE was overriding Move Update information for *current* customers who move, *not* that it was failing to check the NCOA database for new customers. *See* AR at 219 (A__).

forwarded the piece or incurred other handling costs that are what resulted in getting the mailpiece to the recipient.  Of course, these are the very costs Move Update seeks to avoid.

Curiously, once the Postal Service notified SCE of its concerns about Move Update violations, SCE did not act promptly to rectify the situation.  Postal Inspectors first met with SCE on May 28, 2008.  An internal SCE document issued shortly thereafter (June 6, 2008) shows that SCE understood that the overrides were a violation and put plaintiff's discounts in jeopardy.  *See supra* at 12, 36.  Yet SCE continued to override the Move Update matches and until January 10, 2010 included those pieces in the discounted mailings it repeatedly certified as compliant with the workshare rates' requirements.  SCE Answer ¶¶ 14, 16, 28.  Fully aware of USPS's serious concerns about SCE's Move Update noncompliance and the Postal Service's continuing investigation, SCE persisted in including in its workshare rate mailings mailpieces where the address had been overridden, thereby contaminating the entire bulk mailing and rendering false the certification that each such workshare mailing complied with the applicable regulations. Pub. 363 at 1, 5, 12 (A__-A__); DMM § 233.3.5 (A__).

> **D.      The OIG Report Does Not Support SCE's Position.**

Plaintiff's motion should also be denied insofar as it relies on a misunderstanding of an audit by the USPS Office of Inspector General in an attempt by SCE to support its assertion that a revenue deficiency must be limited to actual damages.  First, as a threshold matter, the report does *not* reflect the views of the Postal Service, which disagreed with many of the OIG findings, and which in USPS's view reflected certain misapprehensions of Move Update and how investigations of deviations from it are undertaken.  USPS Office of Inspector General Audit Report SR-AR-10-001, Move Update Program and Investigations (May 12, 2010) at 2, 27-37, *at* http://www.uspsoig.gov/sites/default/files/document-library-files/2013/SA-AR-10-001.pdf.

For instance, the USPS's response made clear that "[t]he Postal Service does not expect or demand perfection by a mailer in his *mail preparation*. . . .  On the other hand, the Postal Service does expect and demand that a mailer engage in one of the Move Update processes that have been a pre-requisite for any discounted mailing price since 1997.  There is an important factual and legal distinction that must be made between a mailer who has engaged in a good faith effort to meet the Move Update Standard but nonetheless has change of address inaccuracies in its final mail product and the mailer who *falsely certifies* that the mailing was prepared pursuant to the Move Update Standards."  *Id.* at 31-32 (emphases added).

Second, contrary to SCE's claim, the OIG report does not state that liability for a revenue deficiency case is limited to USPS's "actual damages."  Instead, it merely recounts during a settlement process the scope of such damages has been one factor among many that was considered and that in one instance, after a mailer showed that most of its mail in fact *did* comply with the applicable mailing list standards, a deficiency was substantially reduced in part because the "actual damage" (*i.e.*, the non-compliant mail preparation) was less than USPS's earlier assessment had determined.  OIG Report at 2, 17 ("if a mailer enters into settlement negotiations with the Postal Service, other items are considered in determining final liability, including actual damages, mailer intent, and goodwill"), 18 (revenue deficiency reduced after further examination found that "mailer used an alternative address format for the majority of their mailings, which were exempt from Move Update requirements").  Of course settlements, both inside and outside the postal arena, sometimes consider factors that would not be directly at issue in litigation, and "actual damages" was but one such factor in a settlement the OIG report evaluated.

Third, contrary to plaintiffs' assertion, in no event does this OIG report establish as a matter of law that "assessments for noncompliance that bear no reasonable relationship to any

damages incurred by the regulated monopoly are considered unreasonable, and hence unlawful." MSJ at 4.  The OIG report contains no categorical statement to that effect, and merely notes that actual damages in certain contexts for that specific regulation (which substantially differs from the regulations here at issue) may, in the OIG's view, have been incorrectly evaluated. Moreover, the only other authority plaintiffs provide for this assertion, *Union Pac. R. Co.*, 594 F.2d at 1294, as shown above likewise does not contain any such holding, nor do they cite any other federal court decision in support of this proposition elsewhere in their brief, nor do they identify any authority whatsoever applying such a broad, unqualified rule in the postal context.

Third, SCE's reliance on the OIG report, which is not part of the administrative record, is misplaced.  *See Decker*, 133 S. Ct. at 1335 (refusing to consider matter not raised below, as it is "a court of review, not first view"); *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) ("It is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time the decision was made."); *Duckworth v. U.S. ex rel. Locke*, 705 F. Supp. 2d 30, 50 (D.D.C. 2010) (disregarding an OIG report as extra-record evidence and because it came years after the conduct in question).

For all these reasons and those in the preceding Parts, SCE's motion should be denied.

## V.     Conclusion

SCE's claims should be dismissed for lack of subject matter jurisdiction and for failure to state a claim, as explained herein, and SCE's motion for summary judgment should be denied. The Postal Service's motion for summary judgment on its counterclaim should be granted, and this Court should declare that the revenue deficiency is due and owing and SCE should further be ordered to pay such sum, with pre- and post-judgment interest, penalties, administrative fees, and any such further relief as the Court deems proper.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

By:   /s/_____
      PETER C. PFAFFENROTH, D.C. Bar # 496637
      Assistant United States Attorney
      555 Fourth St., N.W.
      Washington, D.C. 20530
      Phone: (202) 252-2513
      Email: peter.pfaffenroth@usdoj.gov

      *Attorneys for Defendant/Counterclaim Plaintiff*

         Of Counsel:
         Nan K. McKenzie
         United States Postal Service
         Law Department
         475 L'Enfant Plaza, SW
         Washington, DC 20260-1101