**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **SOUTHERN CALIFORNIA EDISON,** ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Civil Action No. 14-cv-1041 (JEB)** |
| **UNITED STATES POSTAL SERVICE,** ) | |
| **Defendant.** ) | |

---

**DEFENDANT'S SUPPLEMENTAL APPENDIX ("DS")**[1]


VINCENT H. COHEN, JR., D.C. Bar #471489
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

PETER C. PFAFFENROTH, D.C. Bar # 496637
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2513
Email: peter.pfaffenroth@usdoj.gov

*Attorneys for Defendant/Counterclaim Plaintiff*

Of Counsel:
Nan K. McKenzie
United States Postal Service
Law Department
475 L'Enfant Plaza, SW
Washington, DC 20260-1101

---

[1] In providing this supplemental appendix as a courtesy to the Court, Defendant is not acknowledging that any materials in this supplemental appendix or in Plaintiff's supplemental appendix are properly part of the formal administrative record that is here on review.

The parties have conferred concerning the supplemental appendices, and for the sake of brevity Defendant has attempted not to duplicate materials that are cited in Plaintiff's supplemental appendix.

# TABLE OF CONTENTS

USPS Collection Letter to SCE (July 16, 2012) (*see* Counterclaim ¶ 33)......................................1

USPS Form 1902 - Certification of SCE Debt (July 29, 2013) (*see* Counterclaim ¶ 33)...............2

USPS NCOALink End User License Agreement with SCE (July 18, 2005) .................................3

NCOALink End User Licensee Performance Requirements (June 2008)....................................21

DMM Rates and Fees Reference, May 2007 (at 1, 10) .................................................53

DMM Rates and Fees Reference, May 2008 (at 1, 11) .................................................55

PRC, Admin. Practice & Proc., Postal Serv., 72 Fed. Reg. 63,662, 63,698-99 (Nov. 9, 2007) ....57

PRC, Admin. Practice & Proc., Postal Serv., Correction, 72 Fed. Reg. 64,155
    (Nov. 15, 2007) .................................................................................101

Impact of the Staggers Rail Act of 1980,
    Office of Policy, Federal Rail Admin., U.S. Dep't of Transp. (Mar. 2011) .........................102

Headquarters Finance
Revenue Assessment & Control


**UNITED STATES**
**POSTAL SERVICE**

CERTIFIED MAIL

July 16, 2012

*CERTIFIED# 7011 0470 0001 8243 0107*

Mr. David Levy
Venable LLP
575 Seventh Street NW
Washington, DC 20004-1607

*CERTIFIED# 7011 0470 0001 8243 0091*

Mr. Theodore F. Carver, Jr.
Southern California Edison
P.O. Box 800
Rosemead CA 91770

Dear Mr. Levy:

The Pricing and Classification Service Center (PCSC) rendered a final agency decision by letter dated May 30, 2012 for the revenue deficiency regarding mailings entered by your client Southern California Edison relative to non-compliance to the requirements of the USPS Move Update Standards .

**The final amount of $7,551,576.28 is now due and payable to the US Postal Service within 10 days of receipt of this letter.**

Please forward a check in the amount of the deficiency made out to the United States Postal Service and addressed to:

> U.S. Postal Service
> Attn: HQ Finance - Revenue Assessment & Control
> 4600 Mark IV Parkway, Suite 337K
> Fort Worth, TX 76161-9998

Please contact me should you have any questions.

Sincerely,

Robert L. Madrid
Management Review Specialist

Enclosure

cc: Manager Finance, Santa Ana
    Manager, Accounting, Pacific Area
    Manager, Field Remediation
    Inspector In Charge

REF:  RD# 0569392010004

4600 Mark IV Parkway, Suite 337K
Fort Worth, TX 76161-9998
817-317-3502
www.usps.com

DS1

**UNITED STATES POSTAL SERVICE®**

## Justification for Billing Accounts Receivable

### A. Installation Information

| 1. Postal Installation Name | 6. Finance Number (6 digits) | 7. Unit ID (4 digits) |
|---|---|---|
| Santa Ana BMEU | 05-6936 | 0100 |

| 2. Street Address | 8. Date Prepared | 9. Telephone Number (Include area code) |
|---|---|---|
| 3101 W Sunflower Ave | | |

| 3. City | 4. State | 5. ZIPCode™ | | |
|---|---|---|---|---|
| Santa Ana | CA | 92799  0101 | 07/29/2013 | 817-317-3502 |

### B. Debt/Debtor Information

| 1. Debtor Name | 6. Debt Amount |
|---|---|
| Southern California Edison | $                    $7551576.28 |

| 2. Street Address | 7a. Is debtor a postal employee? |
|---|---|
| P.O. Box 800 | ☐ Yes   ☑ No |

| 3. City | 4. State | 5. ZIPCode | 7b. Employee's EIN or Debtor's Tax Identification Number (TIN) |
|---|---|---|---|
| Rosemead | CA | 91770  0800 | |

### C. Circumstances of Debt (Check one box)

| | |
|---|---|
| 1. ☐ Postal Employee Suspense or Unit Expense | 3. Customer Trust Account Debt - (Requires DFM Approval) |
| AIC 636 Entry required with an offset AIC: | ☐ AIC 636 Entry required with an Offset AIC |
| a. AIC 636, Employee Receivables (Attach Form 3544) | Manager of Finance (Print Name) |
| b. Offset to AIC _____ (AIC used to clear suspense or expense) | |
| | Manager of Finance Signature |
| **NOTE:** PS Form 1902 will be returned if PS Form 3544 is not attached as supporting documentation for the AIC 636 entry. | I certify that collection efforts have been exhausted for customer trust account debt (copy of notification attached) and thereby authorize establishing an Accounts Receivable. |
| 2. ☐ Inspection Service - IM # required (No AIC 636 entry required) | 4. ☐ Property Damage, etc. (No AIC 636 Entry required) |

### D. Description (Required)

Describe the nature of debt in sufficient detail so that the debtor will not need to request further information.

"Revenue Deficiency > $100K" - An investigation of Southern California Edison's mailing records determined non-compliance to the requirements of USPS Move Update Standards. The identified revenue deficiency of $7,551,576.28 was for the period of May 14, 2007 through November 26, 2008. Additionally, USPS detected 80 pieces per day of "Forwarding Order Expired" or outdated "Return To Sender" mail endorsements and 2,000 pieces per day of "Undeliverable As Addressed" mail.

RD Number: 0569392010004    RD Date: 04/11/2009    RAL Date: 11/23/2009
Appeal Date: 01/12/2010    FAD Date: 05/30/2012    Collection Letter Date: 07/16/2012

### E. Installation Head Certification (I certify that I have officially determined that this debt is due the Postal Service)

| 1. Printed Name | 3. Title |
|---|---|
| Robert L. Madrid | Management Review Specialist |

| 2. Signature | 4. Date Signed |
|---|---|
| | 7/29/13 |

### F. This Section is Restricted for Accounting Services Only

| | A/C 13462 | A/C 13464 | A/C 13490 | A/C | A/C |
|---|---|---|---|---|---|
| Debit on Billing | | | | | |
| Credit on Billing | 13411636 | 56203647 | GLA 54911 | GLA 54913 | Other |

PS Form **1902**, February 2009 (PSN 7530-01-00-9472)                    FM 1.1.1

DS2

# UNITED STATES POSTAL SERVICE
## NCOA^Link END USER LICENSE AGREEMENT

THIS AGREEMENT LICENSES THE USE OF THE NCOA^Link PRODUCT TO AN "END USER LICENSEE" and is effective on the date signed by the United States Postal Service, by and between:(Licensee) SOUTHERN CALIFORNIA EDISON,

a )_____ [insert type of entity] registered and in good standing under the laws of the State of _____, having its principal place of business at:

(Address) 2255 WALNUT GROVE AVE _____

(City) ROSEMEAD _____ (State) CA ____ (ZIP+4) 91770-3713 , and the United States Postal Service (USPS), with offices at NCOA^Link Product Department, National Customer Support Center (NCSC), 6060 Primacy Pkwy, Suite 201, Memphis TN 38188-0001.

LICENSE AGREEMENT Number: 692301-03-NCOA-03425

In consideration of the grant and mutual covenants set forth herein, the parties agree as set forth below:

### Summary of the Agreement

- USPS has created a highly encrypted, confidential, and proprietary system for updating mailing addresses to which USPS delivers; this system is referred to herein as the "NCOA^Link Product" and is further defined below.

- USPS wants to facilitate the use of the NCOA^Link Product in commercial systems to update the address information in mailing lists used to prepare items for processing and delivery by USPS; and Licensee wishes to use the NCOA^Link Product in one of these commercial systems.

- To enable the nonexclusive use of the NCOA^Link Product, USPS has licensed to various entities the development, distribution, and use of software interface products that interact with the NCOA^Link Product; these software interface products may be either stand alone products or components of multi-application products.

- Licensee has, is developing, or is obtaining directly or indirectly through rights granted by USPS one or more software interface products for each system platform on which it proposes to use the NCOA^Link Product that it licenses from USPS. Licensee wishes to enter into a nonexclusive License with USPS to use the NCOA^Link Product.

UNITED STATES POSTAL SERVICE

NCOA$^{Link}$ END USER LICENSE AGREEMENT

## Specifics of the Agreement

1. *Definitions and Certain Limitations*

   1.1. *"Deliverables"* means letters, flats, postcards, packages, leaflets, magazines, postcards, advertisements, books, and other printed material, and any other item delivered by USPS.

   1.2. *"Entity"* means a single corporation, partnership, non-for-profit organization, or an individual person (i.e., a sole proprietorship), in good standing, licensed and registered to do business in one or more states and excludes any party or affiliation(s) of parties, that is not recognized as a legal entity by the laws of the state(s) in which it conducts business.

   1.3. *"Field of Use"* means use in mailing operations to prepare Deliverables for delivery by USPS.

   1.4. *"Intellectual Property Rights"* means the various rights and responsibilities that USPS possesses or acquires under the law in effect in the United States of America in the NCOA$^{Link}$ Product and Licensed Materials (defined below), including, but not limited to, the laws concerning privacy, copyrights, inventions, patents, trademarks, and trade secrets.

   1.5. *"Interface Product"* means a software interface product for use with the NCOA$^{Link}$ Product (defined below) to Update (defined below) Mailing Lists (defined below), which contains an interface licensed and certified by USPS and may or may not be bundled in the software product with other features, functions, applications and that a USPS-licensed Distributor packaged into a commercially available product or that Licensee may itself have developed for use with the NCOA$^{Link}$ Product.

   1.6. *"License Fee Schedule"* means the fees shown on Exhibit A, attached hereto and made a part hereof, as may be modified by USPS from time to time.

   1.7. *"Licensed Materials"* means:

      1.7.1. The NCOA$^{Link}$ Product.

      1.7.2. The test files having the features and attributes of the NCOA$^{Link}$ Product that USPS provides to Licensee for the purpose of testing the software interface products.

      1.7.3. The Licensee Performance Requirements.

      1.7.4. All whole or partial copies on any media, adaptations, improvements, modifications, translations, derivative works, compilations, partial copies within

DS4                                                                 USPIS 000433

UNITED STATES POSTAL SERVICE
NCOA<sup>Link</sup> END USER LICENSE AGREEMENT

modifications, including merges with other materials (from whatever source) and updates based on the foregoing, of the NCOA<sup>Link</sup> Product that are provided to Licensee by USPS in connection with this Agreement.

1.8. *"Licensee Performance Requirements"* refers to the most current copy of the End User Licensee Performance Requirements displayed by USPS upon its designated web site, as updated from time to time and incorporated herein by reference; under no circumstance shall USPS be responsible for Licensee's failure to possess the most current copy of the Licensee Performance Requirements.

1.9. *"Mailing List"* means a list, system, group, or other collection of at *least 100* unique names and addresses used for addressing Deliverables for *delivery by USPS*.

1.10. *"NCOA<sup>Link</sup> Product"* means the highly encrypted, confidential, and proprietary system provided by the USPS for Updating address information in Mailing Lists.

1.11. *"Platform"* means the type of computer on which a given operating system or application runs for which Licensee obtained a certified Interface Product(s).

1.12. *"Site"* means the physical location(s) identified in the application(s) submitted to and accepted by USPS, as amended from time to time.

1.13. *"Territory"* means places of business operating within the geographic boundaries of the United States, its territories, and possessions.

1.14. *"Update"* means to identify the old or out-dated information in an address on a Mailing List and to provide the current replacement information.

1.15. *"USPS Trademarks"* means the USPS-owned trademarks, NCOA<sup>Link</sup> and the USPS-owned and registered trademarks UNITED STATES POSTAL SERVICE®, POSTAL SERVICE®, US POSTAL SERVICE®, and USPS®.

2. Sole Purpose and Scope

2.1. The purpose of this Agreement is to license the NCOA<sup>Link</sup> Product and the other Licensed Materials to an Entity for use in the Field of Use at the Site(s) with the Interface Product on one or more Platforms to Update that Entity's Mailing Lists used to prepare that Entity's Deliverables for delivery by the USPS.

2.2. The scope of this License does not permit any use of information, data, software, systems, updates, or the like obtained or derived from or based on or incorporating directly or indirectly the Licensed Materials, in whole or in part, for any purpose inconsistent with this Agreement, including but not limited to creating or maintaining

USPIS 000434

UNITED STATES POSTAL SERVICE

NCOA<sup>Link</sup> END USER LICENSE AGREEMENT

any derivative products that incorporate data obtained, directly or indirectly, from the Licensed Materials, either in whole or in part other than as expressly agreed to herein

2.3. Licensee has no right to develop or use the NCOA<sup>Link</sup> Product or any NCOA<sup>Link</sup> related product, service, interface, Interface Product, or any related item or technology to compile or maintain a list or collection of names and addresses, or of addresses only, of new movers or to create other products or data bases or collections of information concerning new movers, histories of address changes, lists or histories of residents, or other informational or data sources based upon information received from or through the NCOA<sup>Link</sup> Product or related technology for the purpose of renting, selling, transferring, disclosing, making available or otherwise providing such information to an individual or entity unrelated to Licensee.

2.4. For the purposes of communicating with addressees on Licensee's Mailing Lists and for the purpose of record-keeping, however, Licensee is permitted to retain Updated addresses so long as not used in violation of Section 2.3, for individuals and entities with whom it has or has had a business relationship, in connection with which it will use the Updated address; however, these Updated addresses may only be used by Licensee and Licensee may use them only for carrying out Licensee's organizational purposes in connection with that individual or entity and may not transfer, disclose, license or distribute to, or be used by any other entity or individual *whatsoever*.

2.5. No proprietary Mailing List that contains or conveys both old and corresponding Updated address records, or any service product or system of lists that can be used to link or to convey old and corresponding Updated address records, if Updated by use of the NCOA<sup>Link</sup> Product, shall be rented, sold, transferred, disclosed, made available, or otherwise provided, in whole or in part to Licensee's customers or any other individual or entity.

3.  *The USPS Grant*

3.1. So long as exercised strictly in accordance with the terms and conditions set forth in this Agreement , USPS grants to Licensee in the Territory for the Term (unless terminated or suspended as set forth below), a non-exclusive, non-transferable, revocable license within the Scope and Purpose set forth above to use the NCOA<sup>Link</sup> Product with an Interface Product in the Field of Use on one or more Platforms at the Site(s) to Update Licensee's Mailing Lists; however, this grant is contingent upon: .

DS6

USPIS 000435

UNITED STATES POSTAL SERVICE
NCOA^Link END USER LICENSE AGREEMENT

3.1.1. Licensee maintaining its status as an Entity; and

3.1.2. compliance with the Licensee Performance Requirements, including changes or requirements made or added to them by USPS from time to time, which shall be solely within USPS' discretion and which could include but are not limited to changes to the design, function, reporting requirements, or other components.

3.2. The grant of this license does *not* include the right to sublicense, sell or otherwise publicly distribute, reproduce, publicly perform, or prepare derivative works of the Licensed Materials;

3.2.1. any efforts to do so shall be in breach of this Agreement;

3.2.2. should any rights arise out of such efforts, Licensee agrees that such rights shall belong to USPS and promises to assign such rights to USPS in writing or to take such other steps as are necessary to effect a transfer of rights; and

3.2.3. any attempt to sublicense this license shall be void;

3.3. The grant of this license does *not* grant Licensee a right to develop or use the NCOA^Link Product, the Licensed Materials, or any related technology to compile or maintain address information concerning new movers or to create other products based upon information received from or through the NCOA^Link Product technology.

4. Licensee Obligations:

4.1. Licensee acknowledges its obligation and its agreement to use the NCOA^Link Product and other Licensed Materials strictly within the Scope and Purpose of this Agreement as set forth above and in accordance with the Licensee Performance Requirements.

4.2. Licensee agrees that to use the NCOA^Link Product and other Licensed Materials outside of the Scope and Purpose breaches the terms of this Agreement.

4.3. Licensee acknowledges and agrees that this Agreement does not include any right to disassemble, reverse engineer, outsource, publicly distribute, or sublicense the NCOA^Link Product or compile data from or using the NCOA^Link Product.

4.4. Licensee alone, to the exclusion of USPS, has the responsibility to possess and/or maintain contemporaneous access to the most current copy of the Licensee Performance Requirements as well as any changes and/or new requirements made from time to time by USPS. The most current copy of the Licensee Performance Requirements shall be available upon the designated USPS web site.

USPIS 000436

UNITED STATES POSTAL SERVICE
NCOA-ᴸⁱⁿᵏ END USER LICENSE AGREEMENT

5. *Representations and Acknowledgments*

    5.1. USPS represents that it is the sole owner of the Intellectual Property Rights in the Licensed Materials and the USPS Trademarks.

    5.2. Licensee agrees and acknowledges that USPS is the sole owner of the Intellectual Property Rights in the Licensed Materials, including the NCOA$^{Link}$ Product, and any subsequent revisions thereof.

6. *Use Restrictions and Compliance Testing*

    6.1. Licensee at all times shall comply with the terms and conditions of all other License Agreements which Licensee has entered into with USPS. Licensee will properly execute and maintain as current all licenses required to use the Licensed Materials in accordance with this License Agreement and will pay all fees required under this Agreement prior to using the Licensed Materials.

    6.2. Prior to using the Licensed Materials to Update Mailing Lists, the Licensee must:

        6.2.1. permit USPS to test the performance of Licensee's systems that use the Licensed Materials to ensure compliance with the Licensee Performance Requirements.

        6.2.2. receive written notification from USPS that USPS has completed its testing of Licensee's systems and approves Licensee's use of the Licensed Materials in its systems as tested.

    6.3. USPS reserves the right to make any and all changes within the Licensed Materials as it deems necessary, including in the design, function, reporting requirements, or other components established within the Licensee Performance Requirements.

        6.3.1. Licensee shall include all changes to the Licensed Materials in its use of the NCOA$^{Link}$ Product within sixty (60) calendar days of receipt. Only those changes tested and approved in writing by USPS shall be implemented by Licensee.

    6.4. In the event Licensee modifies its systems for using the Licensed Materials for reasons unrelated to USPS change of the Licensed Materials, Licensee shall, under the direction of USPS, test the performance of Licensee's systems that use the Licensed Materials to ensure compliance with the Licensee Performance Requirements. Only those modifications tested and approved in writing by USPS shall be implemented by Licensee.

DS8          USPIS 000437

UNITED STATES POSTAL SERVICE
NCOA<sup>Link</sup> END USER LICENSE AGREEMENT

6.5.  Licensee shall, under the direction of USPS, test the performance of Licensee's
systems that use the Licensed Materials at least once during each Term of this
Agreement to ensure compliance with the Licensee Performance Requirements.  Only
those systems tested and approved in writing by USPS shall be operated by Licensee.

6.6.  In the event that USPS determines that Licensee's systems for using the Licensed
Materials do not meet USPS Licensee Performance Requirements, Licensee must
elect either to terminate this License Agreement, or remedy the inadequacies of its
system and shall, under the direction of USPS, re-test the performance of Licensee's
systems.  USPS may consider failure of Licensee to meet the Licensee Performance
Requirements after three consecutive tests to be a default under this Agreement.

6.7.  USPS may conduct any of its tests remotely or at Licensee's Site(s).  In the event that
Licensee uses the Licensed Materials with more than one Platform at a Site, USPS
shall conduct tests on all Platforms.  Licensee shall be required to pay fees for tests for
each Platform as set forth in the Licensee Fee Schedule.

6.8.  Within ten (10) calendar days of notification, Licensee shall remit payment to USPS in
accordance with the License Fee Schedule.  USPS may consider failure by Licensee
to remit such payments in a timely manner to be a default under this License
Agreement.

7.  The Term Of This Agreement

7.1.  The Term of this License Agreement shall commence on the date of execution of this
License Agreement by all parties, and continue until the following September 30th,
unless earlier terminated pursuant to Section 9.

7.2.  Provided that Licensee has received no notice of suspension, default, or termination
under this License Agreement or other License Agreement with USPS, Licensee may
elect to extend the Term of this License Agreement for an additional one-year Term,
commencing on October 1 of each year, by payment to USPS of the required annual
license fee no less than thirty (30) days prior to the expiration of this License
Agreement.

7.3.  The Term of the License agreement, as extended on an annual basis, shall not exceed
ten (10) years.

DS9

USPIS 000438

UNITED STATES POSTAL SERVICE

NCC, ᵃⁿᵏ END USER LICENSE AGREEMENT

8. *Payment*

    8.1.  In consideration for the Licensee to use the Licensed Materials, Licensee shall pay to USPS within ten (10) calendar days of the execution of this Agreement an annual License fee in the amount set forth in the License Fee Schedule. USPS may.consider failure by Licensee to pay any fees due to USPS, including test fees, under this or other License Agreement with USPS as a reason for issuing a notice of suspension or termination.

    8.2.  In consideration for the use of the Licensed Materials after the expiration of the initial one-year Term of this License Agreement, in the event Licensee elects to renew the Term of the License Agreement as set forth above, Licensee shall pay to USPS, no later than thirty days prior to the expiration of the Term of the License Agreement the annual license fee in the amount set forth in the License Fee Schedule.

    8.3.  USPS shall have the right to modify any or all fees associated with this License Agreement after the end of the first one-year Term, and at the end of any or all subsequent one-year Terms, by informing Licensee of such price modification. USPS shall inform Licensee of price increases at least ninety (90) days prior to the effective date of the price increases.

    8.4.  Licensee may elect to terminate this License Agreement upon receipt of License Fee Schedule with price increases by providing USPS written notice within thirty (30) days after receipt of License Fee Schedule with price increases. Termination of this License Agreement by Licensee subsequent to receipt of License Fee Schedule with price increases shall not relieve Licensee of any obligations under this License Agreement until the cancellation effective date.

9. *Termination and Suspension*

    9.1.  Notwithstanding the Term of the License Agreement established herein, either party may terminate this License Agreement upon sixty (60) days written notice to the other party except as provided in Section 9.2 below.

        9.1.1.  In the event that the termination effective date does not correspond with the expiration of the current Term of this License Agreement, USPS shall allow the continued use of the Licensed Materials through the termination date. Licensee shall pay all license fees set forth in this License Agreement on a pro-rated basis for the time period between the end of the Term of the current

USPIS 000439

UNITED STATES POSTAL SERVICE

NCOA<sup>Link</sup> END USER LICENSE AGREEMENT

License Agreement and the termination date specified by USPS in the event the termination date extends beyond the Term of the License Agreement.

9.2. If USPS determines that Licensee at any time during the Term of this License Agreement fails to comply with or fulfill any of the terms or conditions hereof, or the Licensee Performance Requirements, USPS may, solely at its discretion, terminate this License Agreement by sending Licensee a notice of termination. The notice shall state the reasons for the termination and provide Licensee with a period of thirty (30) days to cure all defects and avoid termination.

9.3. USPS shall incur no liability for any reason due to the termination of this Agreement.

9.4. If the Licensee at any time during the Term of this License Agreement fails to comply with any of the terms or conditions of this License Agreement or any other License Agreement with USPS, USPS may, solely at its discretion, as an interim measure in lieu of termination, suspend Licensee's right to use the Licensed Materials or the USPS Trademarks by sending Licensee a notice of suspension. Upon receiving notification of the suspension, Licensee shall cease the activities specified by USPS until authorized in writing by USPS that the activities may be resumed. USPS shall not be obligated to continue to provide the Licensed Materials to Licensee for its own use, nor shall USPS be obligated to reimburse any fees for use of the Licensed Materials.

9.5. Upon expiration or termination of the Agreement, Licensee shall immediately:

9.5.1. destroy and/or deliver to USPS the NCOA<sup>Link</sup> Product and all other Licensed Materials along with all whole or partial copies thereof; and

9.5.2. deliver to the USPS a notarized statement signed by an officer of Licensee confirming return and/or destruction of the items identified above.

9.6. Notwithstanding any such expiration or termination, Licensee shall remain obligated to abide by the confidentiality provisions of this Agreement.

9.7. No waiver by either party of a breach or a default of this Agreement shall be deemed a waiver by such party of a subsequent breach or default of a like or similar nature.

9.8. Resort by USPS to any remedies referred to in this Agreement or arising by reason of a breach of this Agreement by Licensee shall not be construed as a waiver by USPS of its right to resort to any and all other legal and equitable remedies available to USPS.

USPIS 000440

UNITED STATES POSTAL SERVICE

NCOA~nk END USER LICENSE AGREEMENT

### 10. Limitation of Liability

Other than as specifically set forth in this Agreement, USPS makes no representations or warranties, express or implied, as to merchantability, fitness for any particular purpose or otherwise with respect to the NCOA^Link Product or the other Licensed Materials, nor shall USPS be liable for any special, incidental or consequential damages even if it has been or is hereafter advised of the possibility of such damages. USPS shall not be liable for any design, performance or other fault or inadequacy of the NCOA^Link Product or the other Licensed Materials, or for damages of any kind arising out of or in any way related to or connected with such fault or inadequacy.

### 11. Indemnity

11.1. USPS agrees to hold harmless, defend and indemnify Licensee for infringement of any U.S. intellectual property rights in the Licensed Materials. The foregoing obligation shall not apply unless (1) USPS shall have been informed within ten [10] calendar days from when Licensee learned of the suit or action alleging such infringement and (2) USPS shall have been given such opportunity as is afforded by applicable laws, rules, or regulations to participate in the defense thereof.

11.2. Licensee agrees to hold harmless, defend and indemnify USPS for infringement of any U.S. intellectual property rights arising out of Licensee's modification to or development of applications, materials, software or anything else for use with the NCOA^Link Product. In addition, Licensee agrees to hold harmless, defend and indemnify USPS and its officers, agents, representatives, and employees from all claims, losses, damage, actions, causes of action, expenses, and/or liability resulting from, brought forth, or on account of any injury or damage received or sustained by any person, persons or property growing out of, occurring, or attributable to any work performed under or related to this License, resulting in whole or in part from any breach of this Agreement or from the negligence or intentional misconduct, including any unauthorized disclosure or misuse of the Licensed Materials, by Licensee, or any employee, agent, or representative of Licensee.

DS12

USPIS 000441

UNITED STATES POSTAL SERVICE

NCOA<sup>Link</sup> END USER LICENSE AGREEMENT

12. Confidentiality of the NCOA<sup>Link</sup> Product, Licensed Materials and Change of Address Information

12.1. The NCOA<sup>Link</sup> Product and the other Licensed Materials are confidential and proprietary to USPS and shall remain the property of USPS. Nothing contained in this Agreement shall give Licensee any right, title, or interest in or to the NCOA<sup>Link</sup> Product or the other Licensed Materials except as the recipient of the license granted in this Agreement.

12.2. Licensee agrees to hold all information concerning the NCOA<sup>Link</sup> Product and the other Licensed Materials in trust, to disclose said information only in accordance with the provisions of this Agreement, to take all reasonable steps (including as a minimum, but not limited to, those steps necessary to comply with Sections 12.4 and 18 of this Agreement) to safeguard the confidentiality of the NCOA<sup>Link</sup> Product and the other Licensed Materials and any or all parts thereof and to prevent unauthorized disclosure thereof by Licensee's employees, agents, representatives, and customers.

12.3. Unauthorized disclosure includes:

12.3.1. use of information, data, software, systems, updates, or the like obtained or derived from or based on or incorporating directly or indirectly the Licensed Materials, in whole or in part, for any purpose inconsistent with this Agreement, including but not limited to creating or maintaining any derivative products that incorporate data obtained, directly or indirectly, from the Licensed Materials, either in whole or in part other than as expressly agreed to herein; and

12.3.2. to develop or use the NCOA<sup>Link</sup> Product or any NCOA<sup>Link</sup> related product, service, interface, Interface Product, or any related item or technology to compile or maintain a list or collection of names and addresses, or of addresses only, of new movers or to create other products or data bases or collections of information concerning new movers, histories of address changes, lists or histories of residents, or other informational or data sources based upon information received from or through the NCOA<sup>Link</sup> Product or related technology for the purpose of renting, selling, transferring, disclosing, making available or otherwise providing such information to an individual or entity unrelated to Licensee.

12.4. Licensee agrees to provide security for all Licensed Materials and the NCOA<sup>Link</sup> Product that is equal to or greater than the level of security necessary for compliance

DS13

USPIS 000442

UNITED STATES POSTAL SERVICE

NCOA^Link END USER LICENSE AGREEMENT

with the USPS *ADP Security Handbook* (Handbook AS-805), a copy of which may be obtained from the USPS designated web site.

12.4.1. At all times, Licensee shall maintain (a) appropriate security controls to restrict access to the hardware, software (including the server and workstations), and data used in connection with the NCOA^Link Product and to ensure a secure environment for maintaining that hardware, software, and data, (b) personnel and management policies sufficient to provide reasonable assurance of the trustworthiness and competence of its employees and the satisfactory performance of their duties and in accordance with all applicable laws, rules and regulations, and (c) appropriate computer and network security controls, including the use of reasonable security procedures which are sufficient to ensure that documents, notices and other information specified in this Agreement that are electronically created, communicated, processed, stored, retained, or retrieved are authentic, accurate, reliable, complete, and confidential, and that business records and data are protected from improper access.

12.5. To ensure the confidentiality of address information in the NCOA^Link Product, Licensee shall ensure that none of its employees or any other individual or entity disclose to any third party any address information obtained through use directly or indirectly of the NCOA^Link Product.

12.6. Licensee agrees to control and restrict any access to address information in or from the NCOA^Link Product to employees or other persons who need it to perform work for Licensee under this Agreement.

12.7. Due to the sensitive nature of the confidential and proprietary information contained in the Licensed Materials, Licensee acknowledges that unauthorized use and/or disclosure of Licensed Materials will irreparably harm USPS's right to control its intellectual property. Accordingly, Licensee (a) agrees to reimburse USPS for any unauthorized use and/or disclosure at a rate of treble (3) times the current annual fee charged to Licensee under this License Agreement or treble the total revenue Licensee obtained through its used of the Licensed Materials during the period of breach, whichever amount is greater, and (b) consents to such injunctive, equitable or other monetary relief as a court of competent jurisdiction may deem proper.

DS14                                                    USPIS 000443

UNITED STATES POSTAL SERVICE
NCOA^Link END USER LICENSE AGREEMENT

### 13. Proprietary Notice

Any copies of the NCOA^Link Product or Licensed Materials produced by Licensee shall have a notice identifying the same as the confidential and proprietary property of USPS.

### 14. Audit and Inspection Rights

14.1. To the extent reasonably necessary to ensure Licensee's use of the USPS Trademarks and Licensed Materials in compliance with the Terms of this Agreement, USPS, through its employees or agents, may inspect, audit or perform reviews of Licensee's books and records, and the performance of Licensee's systems relating to the use of the NCOA^Link Product, Interface Product or the Licensed Materials. In the event USPS determines that Licensee is not complying with any USPS requirements, USPS shall have the right to require an additional inspection, audit or review at the cost and expense of Licensee or issue a notice of suspension or termination.

14.2. USPS, or its designated agents or representative, shall have the right to visit Licensee's premises and examine Licensee's computer systems, processing files, documents, and other materials relating to the use of the Licensed Materials with or without notice to Licensee. Licensee shall provide USPS or it agents access during normal business hours to the premises, books, and records that relate to the use of the Licensed Materials and the USPS Trademarks by Licensee.

14.3. Books and records that relate to the use of the NCOA^Link Product and Licensed Materials shall be retained in accordance with USPS's retention guidelines, but for no less than three (3) years after Licensee's final payment under this Agreement. USPS or its designated agents or representatives shall have the right to examine any such materials during this three-year period. Notwithstanding the foregoing, USPS may inspect, at any time, use of the USPS Trademarks on Licensee's web site.

### 15. No Partnership or Joint Venture

This Agreement does not create a partnership or joint venture between the parties and Licensee shall have no power to obligate or bind USPS in any manner whatsoever.

DS15

USPIS 000444

UNITED STATES POSTAL SERVICE
NCOA-Link END USER LICENSE AGREEMENT

### 16. Notices

All notices under this Agreement, except as set forth in the Licensee Performance Requirements for routine matters, shall be given in writing, and sent to the address of each party as set forth in this Agreement, by either U.S. Certified Mail, return receipt requested, postage paid, or by nationally-recognized overnight service. All such notices shall be effective upon receipt.

### 17. Governing Law

This Agreement shall be governed by the federal laws of the United States of America, or, when no such law is applicable, then by the laws of the State of New York as interpreted by the United States Court of Appeals for the Second Circuit.

### 18. Applicable Law Compliance

18.1. The NCOA-Link Product, in particular, the address information contained therein, are governed by the provisions of 39 U.S.C. §412, which prohibits the disclosure of address lists. Accordingly, Licensee shall take all steps necessary to secure the NCOA-Link Product in a manner that fully complies with the Section 412. Licensee shall ensure that it does not use the NCOA-Link Product for the purpose of creating or maintaining new mover mailing lists.

18.2. Licensee shall adopt all security measures identified within the Licensee Performance Requirements to detect cases where names and address records have been artificially generated and presented to the NCOA-Link Product for the apparent purpose of creating a new mover mailing list.

18.3. The NCOA-Link Product is a derivative of National Change of Address (NCOA). NCOA is a system of records as defined in subsection (a) (5) of the Privacy Act of 1974, 5 United States Code 552a (the "Act"), and is subject to the provisions of the Act, and 39 CFR 266-268. Licensee shall use the NCOA-Link Product for the preparation of Deliverables that will be submitted to the United States Postal Service for delivery and, in accordance with subsection (m) (I) of the Act, shall fully comply with the requirements of the Act while the information is in Licensee's custody. Included among these requirements are: (1) The prohibition against the disclosure or use of the information for any purpose other than to Update addresses on pre-existing address mailing lists; (2) Maintenance of an accurate accounting of all disclosures of the information in accordance with subsection (c) of the Act; and (3) Provision of rules of

USPIS 000445

UNITED STATES POSTAL SERVICI
NCOA^Link END USER LICENSE AGREEMENT

conduct and instruction for employees and institution of procedural and physical
safeguards to ensure the security of the information in accordance with subsections (e)
(9) and (e) (10) of the Act. Pursuant to subsection (m)(I) of the Act, Licensee and its
employees are subject to the criminal penalties set out in subsection (l) (1) of the Act
for any willful disclosure prohibited by the Act.

18.4. Licensee acknowledges that the export of the Licensed Materials may be subject to
compliance with the Export Administration Act Regulations of the United States
Department of Commerce, as amended, and other export controls of the United States
("Export Laws"). Licensee agrees that it will comply with such Export Laws and that it
will not export or re-export any Licensed Materials or direct products thereof in
violation of such Export Laws.

19. *Jurisdiction and Venue*

Each party submits to the exclusive jurisdiction of the United States District Court for the
Eastern District of Virginia with respect to any proceeding arising under or relating to this
Agreement and waives any objection it may have to the venue or jurisdiction of this court in
any such proceeding.

20. *Entire Agreement*

This Agreement constitutes the entire Agreement between USPS and Licensee concerning
the subject matter thereof and supersedes all previous agreements and understandings.
This Agreement may not be altered, amended, or modified except by a written instrument
signed by authorized representatives of USPS and Licensee. In the event Licensee alters
this Agreement prior to execution by USPS, this Agreement shall be null and void.

21. *Non-Transferable*

21.1. This License shall not be transferable, in whole or in part. The rights and obligations of
Licensee shall be terminated immediately in the event of the death of Licensee (if an
individual) or, dissolution, merger, buy-out, or transfer (of any kind) of the assets of
Licensee (if other than an individual). In case of an attempt to transfer this Agreement
in whole or in part, this Agreement shall be void.

21.2. Any change to the personnel, location, and/or software systems for activities involving
or relating to the NCOA^Link Product, Licensed Materials, or to the information contained
in the application materials submitted by Licensee to USPS must be reported to the

UNITED STATES POSTAL SERVICE

NCC   1t END USER LICENSE AGREEMENT

USPS immediately. USPS may consider Licensee's failure to report such changes to USPS as a default under this Agreement.

## 22. Survival Obligations

Notwithstanding the expiration or termination of this Agreement, the obligation set forth in Sections 2, 8, 9, 12, 13, 14, 15, 17, 18, and 21 shall survive such expiration or termination.

IN WITNESS THEREOF, the parties have executed this Agreement effective as of the date signed by USPS.

LICENSEE:   SOUTHERN CALIFORNIA EDISON

BY:

NAME: John W. Hackett

TITLE: EMS Mgmt ...

DATE: July 18, 2005

UNITED STATES POSTAL SERVICE:

BY:

NAME: Audrev K. Conlev

TITLE: Contracting Officer's Representative

DATE:

DS18

USPIS 000447

UNITED STATES POSTAL SERVICE
NCOA[Link] END USER LICENSE AGREEMENT

Exhibit A
License Fee Schedule

I.   Annual License Fees

A.   Initial Term (October 1 – September 30)

$7,500.00          One Site
$3,750.00          Each additional Site

B.   Initial Term License Fee Pro-Ration Schedule

USPS shall pro-rate the Initial Term License Fee if the Term commences after October
1, except as set forth in I.C., below. This pro-ration shall not apply to any Extension
Term.

| System Certified Month of: | Fee Covers Period of: | Prorated Amount: |
|---|---|---|
| October | November – September | $6,875.00 |
| November | December – September | 6,250.00 |
| December | January – September | 5,625.00 |
| January | February – September. | 5,000.00 |
| February | March – September | 4,375.00 |
| March | April – September | 3,750.00 |
| April | May – September | 3,125.00 |
| May | June – September | 2,500.00 |
| June | July – September | 1,875.00 |
| July | August – September | 1,250.00 |
| August | September | 625.00 |
| September | October – September, new license year | 7,500.00 |

C.   Initial Term Transition License Fee for Current USPS FASTforward® Licensees

The above Initial Term License Fee Pro-Ration Schedule does not apply to a
Licensee that both: (1) has a current FASTforward® Mailing List Correction (MLC)
License Agreement in good standing (Current MLC Licensee), and (2) enters into an
End User License Agreement and obtains USPS system certification prior to
September 30, 2004. A Current MLC Licensee that obtains USPS system
certification under the End User License Agreement prior to September 30, 2004
shall be required to pay the following Initial Term License Fees:

$ 2,500.00          One Site
$ 1,250.00          Each additional Site

The Initial Term Transition License Fee expires on September 30, 2004, and does
not apply to any Extension Term.

USPIS 000448

UNITED STATES POSTAL SERVICE

NCC   nk.END USER LICENSE AGREEMEN.

### II.  Each One Year Extension Term (All Licensees)

$7,500.00     One Site
$3,750.00     Each additional Site

### III.  USPS Testing and Audit Fees

$    0      a.  One USPS test prior to use at each Site

$    0      b.  One USPS test or audit at each Site during each One Year Extension Term

$    0      c.  One USPS test at each Site for each USPS modification of the Service
            Materials during any Term

$ 1,000.00  Each USPS test, re-test or audit in addition to a, b, or c, above, at each Site
            during any Term of the License Agreement

$ 1,000.00  Each USPS test or re-test for Licensee-initiated modifications

$ 1,000.00  Additional Platforms.  In the event Licensee operates more than one Platform
            at a Site, the fee for each USPS test, re-test or audit for any reason shall be
            $1,000.00.

Licensee must pay all test fees to USPS within ten (10) days after notification from USPS.

*The Fees shown on this License Fee Schedule are subject to modification by USPS
after the initial Term of this License Agreement.*

DS20

USPIS 000449

# NCOA® END USER
## LICENSEE PERFORMANCE REQUIREMENTS

### 1. *Purpose*

1.1 The purpose of these performance requirements is to establish standard criteria of performance with which USPS® requires NCOA^Link® End User Licensees to comply. The NCOA^Link Product will enable Licensees to have access to the following address list services:

- New address when a name and old address match the change of address file
- Detection of undeliverable addresses due to change of address

1.2 Licensee's matching software must adhere to specific USPS requirements regarding processing as well as to the matching rules and specifications herein. Licensees must utilize CASS Certified™ software for ZIP+4™ processing. In addition, Licensee's NCOA^Link system will be tested on a periodic basis.

### 2. *Product Description and Fulfillment*

2.1 The NCOA^Link Product utilizes what is referred to as "hash" tables. The hash tables are secure datasets that will only provide new address information when queried, through use of a software interface, with a specific algorithm of the name and old address from a mailer's address list which matches the algorithm of the information as it appears on a Change of Address form (PS 3575).

2.2 The input algorithm uses a complete name, a 9-digit ZIP+4 Code and a parsed address to obtain a match to a COA. The NCOA^Link Product cannot assign a ZIP+4 nor will it respond to a non-ZIP+4 coded address.

2.3 Licensee is responsible for obtaining all necessary software. A software interface, which must be written or purchased, will customize the type of input format, provide the desired output, and contain appropriate links with ZIP+4 matching software.

2.4 Monthly updates containing the 18-month NCOA^Link Product datasets will be provided via DVD to Licensees. Licensees shall install the current monthly NCOA^Link database upon receipt no later than the following Monday. Licensees must utilize the current CASS™ ZIP+4 product with the NCOA^Link Product updates to provide the up-to-date address. Refer to Exhibit A for acceptable use dates of the ZIP+4 product.

2.5 Monthly updates more than 45 days old shall be destroyed using common practice for disposal of sensitive materials. Examples of acceptable methods of destruction include shredding, punching, incinerating, or breaking the DVDs.

2.6   Multiple address hygiene processes may be used by End User Licensees:

2.6.1   Additional processes, such as ZIP+4, DPV® and LACS^Link®, can be run either independently or interactively with NCOA^Link processing. The software required for these processes may be bundled as a single integrated software package or provided separately for each individual process. In addition, each product may have separate licensing requirements including fees.

2.6.2   Prior to NCOA^Link processing, input addresses presented to NCOA^Link must be processed through CASS Certified matching software to obtain ZIP+4 coded, parsed addresses. The ZIP+4 coded, parsed result and the corresponding name will be used to query NCOA^Link.  If a LACS^Link match is made to the original address during CASS processing, Licensees must query the NCOA^Link Product using the LACS^Link converted address. ZIP+4 results must be obtained within the valid window for processing based on the date NCOA^Link processing is performed and the chart of valid ZIP+4 dates provided in Exhibit A.

2.6.3   The ANK^LinkTM option will be available to End User Mailer Licensees to enable mailers to make informed choices regarding a specific customer contact. If the data indicates a move, the mailer may choose to suppress the record from their list or attempt to determine the actual new address by engaging the services of an NCOA^Link Full Service Provider Licensee.

### 3.   General Requirements

3.1   Any Licensee wishing to use the NCOA^Link Product must first obtain (either by purchase or developer license) a licensed and certified Interface Product. The Interface must be reviewed, tested, and approved for use at Licensee's site(s) by USPS prior to any actual NCOA^Link processing occurring in a production environment to ensure that all license requirements are met. After review and testing, USPS will provide Licensee with written approval (in the form of a License Agreement) of their use of the certified NCOA^Link system.

3.2   Licensee, in order to utilize the NCOA^Link Product, must meet all requirements and specifications contained within the License Agreement and the most current version of the Licensee Performance Requirements, unless explicitly allowed,

**NCOA® END USER**
**LICENSEE PERFORMANCE REQUIREMENTS**

prohibited, or modified by USPS in writing. Copies of these documents, the Certification Procedures and any new updates to the documents will be posted on the RIBBS website at http://ribbs.usps.gov/files/NCOALink.

3.3    Licensee may incorporate use of the Daily Delete process into all NCOA$^{Link}$ processing. The Daily Delete file will be available from the USPS website http://ribbs.usps.gov/files/NCOALink. Instructions for use of this process must be obtained from the Licensee's software interface supplier. Use of this process is optional for End User Licensees but is recommended for optimal performance of NCOA$^{Link}$.

## 4.   *Specific Requirements*

4.1    Licensees must use USPS Certified NCOA$^{Link}$ software to access the NCOA$^{Link}$ Product.

4.2    Licensees must use USPS CASS Certified™ Address Matching software parsed, standardized output to query the NCOA$^{Link}$ Product.

4.3    Licensees must adhere to the provisions of Standards of Performance as detailed in Section 7.

4.4    Licensees must provide all specific reports as required in Section 8.

4.5    Licensee will be assigned a unique four-character Customer ID for use on reports.

4.6    Licensees must be capable of:

   a)   Updating the system with full file replacement monthly via DVD.

   b)   Updating ZIP+4 and City State Products monthly.

   c)   Obtaining Delivery Point Code Information for all input addresses that are ZIP+4 coded via ZIP+4 process and all new addresses returned as a result of a match to NCOA$^{Link}$.

   d)   Choosing appropriate processing options on basis of file content and process frequency.

   e)   Licensee shall provide USPS with access to any resource used in performance of this license and with the necessary equipment and/or reports to monitor performance at Licensee's facility.

4.7    Licensee shall establish a central email address for receipt and disbursement of USPS electronic correspondence within Licensee's organization.

**NCOA$^{Link}$ END USER**
**LICENSEE PERFORMANCE REQUIREMENTS**

### 5.  Basic NCOA$^{Link}$ Product Output

5.1   Standardized return codes have been established to provide consistency of products and facilitate USPS evaluation of customer data.

5.2   For each address submitted to the NCOA$^{Link}$ process, Licensee's software must be able to return the following output:

    a)   Each original unaltered input name and address as it was presented

    b)   The standardized address appended with the correct ZIP+4/DPC, other postal values and any other intelligence flags or footnotes that result from the CASS processing segment.

    c)   For each mailing address for which there is a match to the NCOA$^{Link}$ Product, a standardized new address with 11-digit Delivery Point Barcode (DPBC) and standard return codes as listed in Exhibit B.

    d)   When a match is made, the following elements must be returned: the move effective date, specific name and address utilized in the query that obtained the match, and the move type. The move type is determined by the Interface based on the specific name inquiry utilized to obtain the match.

    e)   For each mailing address for which there is not a match to the NCOA$^{Link}$ Product, the Interface shall return all elements as appropriate under a and b as well as any standard return codes as may be appropriate as listed in Exhibit B.

    f)   The urbanization name information, when applicable.

    g)   The carrier route information for new (updated) addresses.

    h)   Processing summary report containing information to identify the specific list and the statistics resulting from the NCOA$^{Link}$ process performed on the list.

### 6.  Quality Standards and Testing Criteria

6.1   The NCOA$^{Link}$ Product will be subject to periodic audit and evaluation of the organization's NCOA$^{Link}$ process and its adherence to the conditions of the NCOA$^{Link}$ License Agreement. Please note that the USPS audit file must be processed through the same NCOA$^{Link}$ system utilized for Mailing List processing.

6.2   The NCOA$^{Link}$ software will provide the necessary output as described in Section 5 utilizing the specific USPS format as described in Exhibit C. Upon notification of the transmission of an audit file, it can be retrieved from Licensee's specific USPS

**NCOA$^{Link}$ END USER**
# LICENSEE PERFORMANCE REQUIREMENTS

account via the internet. Licensee's output file and supporting documentation derived from the NCOA$^{Link}$ process will be posted to the same account.

6.3   The audit file will test Licensee's NCOA$^{Link}$ software with a series of known forwardable addresses and known non-forwardable addresses to validate Licensee's ability to query the NCOA$^{Link}$ Product and return the appropriate output responses.

6.4   The audit will also verify the administrative output of the process.

6.5   Auditing will be performed once annually or as specified by USPS. If necessary, subsequent audits due to failures must be completed within the annual license period to prevent suspension and/or termination.

6.6   Upon validation of the results, Licensee will receive official audit results from USPS.

6.7   The system shall provide accurately matched responses for at least 99% of the inquiries where data to support these responses are known to be in the USPS file and shall produce no unexpected matches.

  a)   The percentage of audit file input name and address records that achieve the correct result shall not be less than 99% when compared to USPS expected results.

  b)   The audit file output shall not result in a match that is not expected and would result in returning incorrect information that would eventually cause the misdirection of mail.

  c)   The audit file output must correctly provide all NCOA$^{Link}$ elements with 100% accuracy.

6.8   In the event that a problem is identified by USPS that is related to the NCOA$^{Link}$ process, USPS will, at its sole discretion, direct correction of the problem and/or exercise the suspension or termination provisions of the License, as it deems appropriate by the situation.

  6.8.1   When directed to correct deficiencies, Licensee will be given 30 days from the date of the notification in which to remedy the deficiencies and retest.

  6.8.2   If Licensee fails to remedy the deficiencies within 30 days, a suspension notice will be issued. The suspension notice will direct Licensee to cease all NCOA$^{Link}$ activities during the term of suspension and remedy all deficiencies within 60 days to regain good standing. USPS will also discontinue data fulfillment during the term of suspension.

**NCOA$^{Link®}$ END USER**
**LICENSEE PERFORMANCE REQUIREMENTS**

6.8.3   At the end of the term of suspension, the License Agreement between Licensee and USPS will be terminated if Licensee has not successfully remedied all deficiencies.

6.8.4   Any Licensee whose license is terminated, voluntarily or involuntarily, will be ineligible to obtain another NCOA$^{Link}$ License Agreement for a period of five (5) years. In the event of an elective termination, USPS may refund the unused portion of the license fee by request from Licensee within thirty (30) days of the effective date of the termination.

## 7. Standards of Performance

7.1   Licensee must maintain a service log, which will be maintained and be made available for Postal Service review for a period of 5 years. This service log shall also be kept on a computer file and shall be submitted to USPS electronically or on approved electronic media on a monthly basis (see Exhibit D for format).

7.2   Licensee shall repair or have repaired all equipment, hardware and/or software deficiencies related to the NCOA$^{Link}$ system within 30 days of identification of said deficiencies.

7.3   It shall be Licensee's responsibility to ensure that its employees understand the NCOA$^{Link}$ process and output.

7.4   Licensee is responsible for redistributing license related electronic correspondence from USPS to the appropriate personnel within Licensee's organization. Pursuant to Paragraph 4.7, all electronic correspondence will be directed to a central email address within Licensee's organization. The email address must be ncscinfo@<yourcompany>.com. In the event that this address is already assigned for some other purpose, an alternate address must be submitted to USPS for approval. Licensee will subsequently distribute all applicable USPS notifications internally to ensure receipt by the proper staff. Such correspondence will also be sent to the pertinent contacts provided during the application process but in the event of "bounce backs" successful delivery via the central email address will be considered confirmation of receipt.

## 8. *Reports*

8.1   Licensee shall produce a monthly performance report from the service log by site and/or system platform. The reports begin on the first day of the month and terminate on the last day of the month. The log must contain a record for each Mailing List processed through the NCOA$^{Link}$ system and the resultant statistics. The reports will be maintained and made available for Postal Service review for a period of five (5) years at Licensee's facility. The reports shall be submitted via electronic transmission within seven (7) calendar days of the end of the month to the National Customer Support Center, Memphis TN. The electronic report file layout is provided as Exhibit D.

8.2   The monthly performance reports will be named using a four-part eight-character identification scheme. The first character will be "C" to identify it as a Customer Service Log. Characters 2-5 will contain Licensee's USPS-assigned four-character platform identification code. The sixth character will identify the month of the report as indicated in the chart below. The last two characters will identify the year of the report by the last two digits of the calendar year.

| Month | Code |
|-----------|------|
| January | 1 |
| February | 2 |
| March | 3 |
| April | 4 |
| May | 5 |
| June | 6 |
| July | 7 |
| August | 8 |
| September | 9 |
| October | A |
| November | B |
| December | C |

8.3   NCOA$^{Link}$ is intended solely for use as a Mailing List update tool. Testing of any kind using NCOA$^{Link}$ is generally discouraged by USPS. However, USPS does acknowledge that certain testing is necessary. In an effort to obtain an accurate statistical reporting regarding addresses updated by NCOA$^{Link}$, the type of processing must be accurately and consistently recorded. Therefore, the following list of codes must be used to populate the "PROCESSING CATEGORY" field in the service log:

NCOA® END USER
LICENSEE PERFORMANCE REQUIREMENTS

| Code | Description | Disposition of Results |
|------|-------------|------------------------|
| EMP TRAIN | File processed as part of employee training. | Results discarded; no update performed or information released. |
| INT DB TST | Testing involving proprietary Licensee database. | No updates performed; results discarded after analysis. |
| NORMAL | Process mailing list for update prior to mailing. | COA information obtained and updates performed. |
| STAGE I | Test of matching performance against USPS self-test file. | Results used for internal program analysis and subsequently discarded. |
| STAGE II | Test of matching performance scored by USPS. | Output transmitted to USPS for evaluation and discarded when test results finalized. |
| SYS TEST | File processed as part of system testing such as loading of USPS file updates. | Results discarded; no updates performed or information released. |

8.4   Upon request, the Interface must be capable of producing a hardcopy report summarizing the processing of each list. The report shall be named NCOA$^{Link®}$ Processing Summary Report. The report may contain any and all information gathered to fulfill the requirements of Section 8.1. At a minimum, the processing summary must contain:

- Licensee Company Name
- Licensee ID
- File/List/Database Name
- Processing Category
- Matching Logic Applied flag
- Class of Mail
- Date NCOA$^{Link®}$ Processing Completed
- Total Number of Records Processed
- Total Number of Records Matched – NCOA$^{Link®}$
- Total Number of Records Matched – ANK$^{Link}$TM

**NCOA® END USER**
**LICENSEE PERFORMANCE REQUIREMENTS**

**Exhibit A**
**ZIP + 4® Product Use Dates**

Per the DMM®, the ZIP + 4® and City/State data must be updated within 45 days of the release date. Licensees are required to update these files on a monthly basis. The following chart is provided to assist in determining which data release is current.

| Release | Required Use Date | Last Use Date |
|---|---|---|
| | | |
| January 15 | March 1 | March 31 |
| February 15 | April 1 | April 30 |
| March 15 | May 1 | May 31 |
| April 15 | June 1 | June 30 |
| May 15 | July 1 | July 31 |
| June 15 | August 1 | August 31 |
| July 15 | September 1 | September 30 |
| August 15 | October 1 | October 31 |
| September 15 | November 1 | November 30 |
| October 15 | December 1 | December 31 |
| November 15 | January 1 | January 31 |
| December 15 | February 1 | February 28 (Feb 29 in leap year) |

**NCOA™ END USER**
**LICENSEE PERFORMANCE REQUIREMENTS**

## Exhibit B
## NCOA[Link®] Return Code Descriptions

Code = Return Code        Description = Explanation of Return code
Address = "Y" = New Address provided      How = "D" = Derived by data – returned in lieu of 11 digit
       "N" = New Address not provided        "S" = Derived by software

| Code | Description | Address | How |
|------|-------------|---------|-----|
| A | **COA Match** - The input record matched to a COA record. A new address could be furnished. | Y | D |
| 00 | **No Match** - The input record COULD NOT BE matched to a COA record. A new address could not be furnished. | N | D |
| 01 | **Found COA: Foreign Move** – The input record matched to a COA record but the new address was outside USPS delivery area. | N | D |
| 02 | **Found COA: Moved, Left No Address (MLNA)** – The input record matched to a COA record, but the new address was not provided to USPS. | N | D |
| 03 | **Found COA: Box Closed, No Order (BCNO)** – The Input record matched to a COA record containing an old address of P.O. Box™, which has been closed without a forwarding address provided. | N | D |
| 04 | **Cannot match COA: Street Address with Secondary** – In the STANDARD mode utilizing Family matching logic the input record was a potential match to a family type COA record with an old address that contained secondary information. The input record does not contain secondary information. The record is a ZIP + 4[®] street level match. This address match situation requires individual name matching logic to obtain a match and individual names do not match. | N | D |
| 05 | **Found COA: New 11-digit DPBC is Ambiguous** – The input record matched to a COA record. The new address on the COA record could not be converted to a deliverable address because the DPBC represents more than one delivery point. | N | D |
| 06 | **Cannot Match COA: Conflicting Directions: Middle Name Related** –There is more than one COA record for the match algorithm and the middle names or initials on the COAs are different. Therefore, a single match result could not be determined. | N | D |
| 07 | **Cannot Match COA: Conflicting Directions: Gender Related** –There is more than one COA record for the match algorithm and the genders of the names on the COAs are different. Therefore, a single match result could not be determined. | N | D |
| 08 | **Cannot Match COA: Other Conflicting Instructions** – The input record was a potential match to two COA records. The two records were compared and due to differences in the new addresses, a match could not be made. | N | D |
| 09 | **Cannot Match COA: High-rise Default** – The input record was a potential match to a family COA record from a High-rise address ZIP + 4 coded to the building default. This address match situation requires individual name matching logic to obtain a match and individual names do not match. | N | D |
| 10 | **Cannot Match COA: Rural Default** – The input record was a potential match to a family COA record from a Rural Route or Highway Contract Route address ZIP + 4 coded to the route default. This address situation requires individual name matching logic to obtain a match and individual names do not match. | N | D |
| 11 | **Cannot Match COA: Individual Match: Insufficient COA Name for Match** – There is a COA record with the same surname and address but there is insufficient first/middle name information on the COA record to produce a match using individual matching logic. | N | D |

NCOA<sup>Link</sup> END USER
LICENSEE PERFORMANCE REQUIREMENTS

**Exhibit B – NCOA<sup>Link</sup> Return Code Descriptions – continued**

| Code | Description | Address | How |
|------|-------------|---------|-----|
| 12 | **Cannot Match COA: Middle Name Test Failed** – The input record was a potential match to a COA record. A match cannot be made because the input name contains a conflict with the middle name or initials on the COA record. | N | S |
| 13 | **Cannot Match COA: Gender Test Failed** – The input record was a potential match to a COA record. A match cannot be made because the gender of the name on the input record conflicts with the gender of the name on the COA record. | N | S |
| 14 | **Found COA: New Address Would Not Convert at Run Time** – The input record matched to a COA record. The new address could not be converted to a deliverable address. | N | S |
| 15 | **Cannot Match COA: Individual Name Insufficient** – The input record was a potential match to a COA record that contains a first initial and middle initial/name [ex. C M Smith or C Mary Smith]. A match cannot be made because the input middle initial/name is missing or does not equal the middle initial/name on the COA. | N | S |
| 16 | **Cannot Match COA: Secondary Number Discrepancy** – The input record was a potential match to a street level COA record. However, a match is prohibited based on one of the following reasons: 1) There is conflicting secondary information on the input and COA record; 2) the input record contained secondary information and matched to a family record that does not contain secondary information. In item 2, this address match situation requires individual name matching logic to obtain a COA match and individual names do not match. | N | S |
| 17 | **Cannot Match COA: Other Insufficient Name** – The input record was a potential match to a COA record that contains a full first name and full middle name. The input middle initial/name is missing or different from the middle name on the COA. A match cannot be made because the first name on the COA was truncated (drop-n flag) and the middle names must be equal in order to make this match. | N | S |
| 18 | **Cannot Match COA:  General Delivery** – The input record was a potential match to a COA record from a General Delivery address. This address situation requires individual name matching logic to obtain a match and individual names do not match. | N | D |
| 19 | **Found COA:  New Address not ZIP + 4 coded or New address primary number not DPV confirmable** – There is a change of address on file but the new address cannot be ZIP + 4 coded and therefore there is no 11-digit DPBC to store or return, or the new address primary number cannot be confirmed on DPV. | N | D |
| 20 | **Cannot Match COA: Conflicting Directions after re-chaining** – Multiple COA records were potential matches to the input record. The COA records contained different new addresses and a single match result could not be determined. | N | D |
| 66 | **Daily Delete** – The input record matched to a business, individual or family type COA record with an old address that is present in the daily delete file. The presence of an address in the daily delete file means that a COA with this address is pending deletion from the COA master file and that <u>no</u> mail may be forwarded from this address. | N | S |
| 91 | **COA Match: Secondary Number dropped from COA** – The input record matched to a COA record. The COA record had a secondary number and the input address did not. | Y | S |
| 92 | **COA Match: Secondary Number Dropped from input address** – The input record matched to a COA record. The input address had a secondary number and the COA record did not. The record is a ZIP + 4 street level match. | Y | S |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

### Exhibit B – NCOA[Link] Return Code Descriptions – continued

**Other Return Code Descriptions**

| Code | Description | Process |
|------|-------------|---------|
| AA | Input Address ZIP+4™ match | ZIP+4 |
| A1 | Input Address ZIP+4 not matched | ZIP+4 |
| M1 | Input Address Primary Number Missing | ZIP+4 |
| M3 | Input Address Primary Number Invalid | ZIP+4 |
| P1 | Input Address Missing PO, RR, or HC Box number | ZIP+4 |
| P3 | Input Address PO, RR, or HC Box number invalid | ZIP+4 |
| BB | Input Address DPV® matched (all components) | DPV |
| RR | Input Address DPV matched to CMRA | DPV |
| CC | Input Address DPV Primary Number match, Secondary Number not Matched (secondary number present but is not DPV confirmed) | DPV |
| N1 | Input Address DPV Primary Number match, High-rise Address Missing Secondary Number | DPV |
| R1 | Input Address DPV matched to CMRA but PMB Number not Present | DPV |

*Note: These codes are all generated during the DPV process. The Process indicator of "ZIP+4" or "DPV" denotes from which portion of DPV processing the return codes was generated.

**NCOA™ END USER**
**LICENSEE PERFORMANCE REQUIREMENTS**

## Exhibit C
## Audit/Test File Layouts

<table>
<tr><td colspan="6" align="center">TEST CLIENT INPUT FILE<br>HEADER RECORD</td></tr>
<tr><td>RECORD FROM</td><td>POSITION TO</td><td>FIELD NAME</td><td></td><td>LENGTH</td><td>COBOL</td></tr>
<tr><td>1</td><td>8</td><td>NCSC AUDIT FILE CREATED DATE(YYYYMMDD)</td><td></td><td>8</td><td>9(08)</td></tr>
<tr><td>9</td><td>14</td><td>NCSC AUDIT FILE CREATED TIME(HHMMSS)</td><td></td><td>6</td><td>9(06)</td></tr>
<tr><td>15</td><td>18</td><td>NCSC AUDIT FILE NUMBER</td><td></td><td>4</td><td>9(04)</td></tr>
<tr><td>19</td><td>26</td><td>NCSC NCOA<sup>Link®</sup> RELEASE DATE</td><td></td><td>8</td><td>9(08)</td></tr>
<tr><td>27</td><td>34</td><td>NCSC ZIP+4™ RELEASE DATE</td><td></td><td>8</td><td>9(08)</td></tr>
<tr><td>35</td><td>42</td><td>NCSC DPV® RELEASE DATE</td><td></td><td>8</td><td>9(08)</td></tr>
<tr><td>43</td><td>43</td><td>NCSC TYPE (Audit, Certification, Stage)</td><td></td><td>1</td><td>X(01)</td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td>44</td><td>297</td><td>FILLER</td><td></td><td>254</td><td>X(254)</td></tr>
<tr><td>298</td><td>298</td><td>RECORD TYPE (Header/Detail) (H,D)</td><td></td><td>1</td><td>X(01)</td></tr>
<tr><td>299</td><td>300</td><td>CARRIAGE RETURN LINE FEED</td><td></td><td>2</td><td>X(02)</td></tr>
</table>

# NCOA™ END-USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | FIELD NAME | LENGTH | COBOL |
|---|---|---|---|---|
| | | **TEST CLIENT INPUT FILE** | | |
| | | **DETAIL RECORD** | | |
| 1 | 28 | INPUT CUSTOMER KEY | 28 | X(28) |
| 29 | 29 | INPUT NAME PARSED (Y,N) | 1 | X(01) |
| 30 | 95 | INPUT CUSTOMER NAME | 66 | X(66) |
| | NOTE: | The information found in the INPUT CUSTOMER NAME will be fixed length. The data contained within the field may be presented as a single field or it may be parsed. If the name is a business, then the name will start in the first position. | | |
| 30 | 35 | INPUT PREFIX TITLES | 6 | X(06) |
| 36 | 50 | INPUT CUSTOMER FIRST NAME | 15 | X(15) |
| 51 | 65 | INPUT CUSTOMER MIDDLE NAME | 15 | X(15) |
| 66 | 85 | INPUT CUSTOMER LAST NAME | 20 | X(20) |
| 86 | 91 | INPUT SUFFIX TITLES | 6 | X(06) |
| 92 | 95 | FILLER | 4 | X(04) |
| | | | | |
| 96 | 96 | INPUT ADDRESS PARSED (Y,N) | 1 | X(01) |
| 97 | 124 | INPUT CUSTOMER URBANIZATION NAME | 28 | X(28) |
| 125 | 191 | INPUT CUSTOMER ADDRESS | 67 | X(67) |
| | NOTE: | The information found in the INPUT CUSTOMER ADDRESS will be fixed length. The data contained within the field may be presented as a single field or it may be parsed. | | |
| 125 | 134 | INPUT PARSED PRIMARY NUMBER | 10 | X(10) |
| 135 | 136 | INPUT PARSED PRE-DIRECTIONAL | 2 | X(02) |
| 137 | 164 | INPUT PARSED PRIMARY NAME | 28 | X(28) |
| 165 | 168 | INPUT PARSED SUFFIX | 4 | X(04) |
| 169 | 170 | INPUT PARSED POST-DIRECTIONAL | 2 | X(02) |
| 171 | 174 | INPUT PARSED UNIT DESIGNATOR | 4 | X(04) |
| 175 | 182 | INPUT PARSED SECONDARY NUMBER | 8 | X(08) |
| 183 | 191 | FILLER | 9 | X(09) |
| | | | | |
| 192 | 192 | INPUT LAST LINE PARSED (Y,N) | 1 | X(01) |
| 193 | 234 | CUSTOMER LAST LINE | 42 | X(42) |
| | NOTE: | The information found in the INPUT CUSTOMER LAST LINE will be fixed length. The data contained within the field may be presented as a single field or it may be parsed. | | |
| 193 | 220 | INPUT CITY NAME | 28 | X(28) |
| 221 | 222 | INPUT STATE | 2 | X(02) |
| 223 | 227 | INPUT FIVE DIGIT ZIP | 5 | X(05) |
| 228 | 231 | INPUT ZIP+4 ADDON | 4 | X(04) |
| 232 | 234 | FILLER | 3 | X(03) |
| | | | | |
| 235 | 297 | FILLER | 63 | X(63) |
| 298 | 298 | RECORD TYPE (Header/Detail) (H,D) | 1 | X(01) |
| 299 | 300 | CARRIAGE RETURN LINE FEED | 2 | X(02) |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| | | TEST CLIENT OUTPUT FILE<br>HEADER RECORD | | |
|---|---|---|---|---|
| RECORD<br>FROM | POSITION<br>TO | FIELD NAME | LENGTH | COBOL |
| 1 | 8 | NCSC AUDIT FILE CREATED DATE(YYYYMMDD) | 8 | 9(08) |
| 9 | 14 | NCSC AUDIT FILE CREATED TIME(HHMMSS) | 6 | 9(06) |
| 15 | 18 | NCSC AUDIT FILE NUMBER | 4 | 9(04) |
| 19 | 26 | NCSC NCOA<sup>Link</sup> RELEASE DATE | 8 | 9(08) |
| 27 | 34 | NCSC ZIP+4 RELEASE DATE | 8 | 9(08) |
| 35 | 42 | NCSC DPV RELEASE DATE | 8 | 9(08) |
| 43 | 43 | NCSC TYPE (Audit, Certification, Stage) | 1 | X(01) |
| 44 | 298 | FILLER | 255 | X(255) |
| 299 | 306 | OUTPUT AUDIT FILE CREATED DATE(YYYYMMDD) | 8 | 9(08) |
| 307 | 312 | OUTPUT AUDIT FILE CREATED TIME(HHMMSS) | 6 | 9(06) |
| 313 | 320 | PROCESSED AGAINST NCOA<sup>Link</sup> RELEASE DATE | 8 | 9(08) |
| 321 | 328 | PROCESSED AGAINST  ZIP+4 RELEASE DATE | 8 | 9(08) |
| 329 | 336 | PROCESSED AGAINST  DPV RELEASE DATE | 8 | 9(08) |
| 337 | 340 | PROCESSED ON PLATFORM ID | 4 | X(04) |
| 341 | 997 | FILLER | 657 | X(657) |
| | | | | |
| 998 | 998 | RECORD TYPE (Header/Detail) (H,D) | 1 | X(01) |
| 999 | 1000 | CARRIAGE RETURN LINE FEED | 2 | X(02) |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | FIELD NAME | LENGTH | COBOL |
|---|---|---|---|---|
| | | **TEST CLIENT OUTPUT FILE**<br>**DETAIL RECORD (Page 1 of 2)** | | |
| 1 | 28 | INPUT CUSTOMER KEY | 28 | X(28) |
| 29 | 29 | INPUT NAME PARSED (Y,N) | 1 | X(01) |
| 30 | 95 | INPUT CUSTOMER NAME | 66 | X(66) |
| | NOTE: | The information found in the INPUT CUSTOMER NAME will be fixed length. The data contained within the field may be presented as a single field or it may be parsed. If the name is a business, then the name will start in the first position. | | |
| 30 | 35 | INPUT PREFIX TITLES | 6 | X(06) |
| 36 | 50 | INPUT CUSTOMER FIRST NAME | 15 | X(15) |
| 51 | 65 | INPUT CUSTOMER MIDDLE NAME | 15 | X(15) |
| 66 | 85 | INPUT CUSTOMER LAST NAME | 20 | X(20) |
| 86 | 91 | INPUT SUFFIX TITLES | 6 | X(06) |
| 92 | 95 | FILLER | 4 | X(04) |
| | | | | |
| 96 | 96 | INPUT ADDRESS PARSED (Y,N) | 1 | X(01) |
| 97 | 124 | INPUT CUSTOMER URBANIZATION NAME | 28 | X(28) |
| 125 | 191 | INPUT CUSTOMER ADDRESS | 67 | X(67) |
| | NOTE: | The information found in the INPUT CUSTOMER ADDRESS will be fixed length. The data contained within the field may be presented as a single field or it may be parsed. | | |
| 125 | 134 | INPUT PARSED PRIMARY NUMBER | 10 | X(10) |
| 135 | 136 | INPUT PARSED PRE-DIRECTIONAL | 2 | X(02) |
| 137 | 164 | INPUT PARSED PRIMARY NAME | 28 | X(28) |
| 165 | 168 | INPUT PARSED SUFFIX | 4 | X(04) |
| 169 | 170 | INPUT PARSED POST-DIRECTIONAL | 2 | X(02) |
| 171 | 174 | INPUT PARSED UNIT DESIGNATOR | 4 | X(04) |
| 175 | 182 | INPUT PARSED SECONDARY NUMBER | 8 | X(08) |
| 183 | 191 | FILLER | 9 | X(09) |
| | | | | |
| 192 | 192 | INPUT LAST LINE PARSED (Y,N) | 1 | X(01) |
| 193 | 234 | CUSTOMER LAST LINE | 42 | X(42) |
| | NOTE: | The information found in the INPUT CUSTOMER LAST LINE will be fixed length. The data contained within the field may be presented as a single field or it may be parsed. | | |
| 193 | 220 | INPUT CITY NAME | 28 | X(28) |
| 221 | 222 | INPUT STATE | 2 | X(02) |
| 223 | 227 | INPUT FIVE DIGIT ZIP | 5 | X(05) |
| 228 | 231 | INPUT ZIP+4 ADDON | 4 | X(04) |
| 232 | 234 | FILLER | 3 | X(03) |
| | | | | |
| 235 | 298 | FILLER | 64 | X(64) |
| | | | | |
| | NOTE: | The following fields reflect the results of input name after the utilization of a name parser. This is the final parsed name information utilized in the process which was responsible for the final result. If the name is a business, then the name will start in the first position. If no match (return code 00) then this field will be blank. | | |
| 299 | 304 | QUERY PREFIX TITLE | 6 | X(06) |
| 305 | 319 | QUERY CUSTOMER FIRST NAME | 15 | X(15) |
| 320 | 334 | QUERY CUSTOMER MIDDLE NAME | 15 | X(15) |
| 335 | 354 | QUERY CUSTOMER LAST NAME | 20 | X(20) |
| 355 | 360 | QUERY SUFFIX TITLE | 6 | X(06) |

# NCOA – END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| | | **TEST CLIENT OUTPUT FILE** | | |
|---|---|---|---|---|
| | | **DETAIL RECORD (Page 2 of 2)** | | |
| RECORD FROM | POSITION TO | FIELD NAME | LENGTH | COBOL |
| | NOTE: | The following fields reflect the results of the input address after the utilization of a certified CASS ZIP+4 system. This is the final address information that was utilized in the process which was responsible for the final result. | | |
| 361 | 388 | QUERY PARSED URBANIZATION NAME | 28 | X(28) |
| 389 | 398 | QUERY PARSED PRIMARY NUMBER | 10 | X(10) |
| 399 | 400 | QUERY PARSED PRE-DIRECTIONAL | 2 | X(02) |
| 401 | 428 | QUERY PARSED PRIMARY NAME | 28 | X(28) |
| 429 | 432 | QUERY PARSED SUFFIX | 4 | X(04) |
| 433 | 434 | QUERY PARSED POST-DIRECTIONAL | 2 | X(02) |
| 435 | 438 | QUERY PARSED UNIT DESIGNATOR | 4 | X(04) |
| 439 | 446 | QUERY PARSED SECONDARY NUMBER | 08 | X(08) |
| 447 | 474 | QUERY PARSED  CITY NAME | 28 | X(28) |
| 475 | 476 | QUERY PARSED  STATE | 2 | X(02) |
| 477 | 481 | QUERY FIVE DIGIT ZIP | 5 | X(05) |
| 482 | 485 | QUERY ZIP+4 ADDON | 4 | X(04) |
| | | | | |
| 486 | 513 | RESULT PARSED  URBANIZATION NAME | 28 | X(28) |
| 514 | 523 | RESULT PARSED PRIMARY NUMBER | 10 | X(10) |
| 524 | 525 | RESULT PARSED PRE-DIRECTIONAL | 2 | X(02) |
| 526 | 553 | RESULT PARSED PRIMARY NAME | 28 | X(28) |
| 554 | 557 | RESULT PARSED SUFFIX | 4 | X(04) |
| 558 | 559 | RESULT PARSED POST-DIRECTIONAL | 2 | X(02) |
| 560 | 563 | RESULT PARSED UNIT DESIGNATOR | 4 | X(04) |
| 564 | 571 | RESULT PARSED SECONDARY NUMBER | 08 | X(08) |
| 572 | 599 | RESULT PARSED  CITY NAME | 28 | X(28) |
| 600 | 601 | RESULT PARSED  STATE | 2 | X(02) |
| 602 | 606 | RESULT FIVE DIGIT ZIP | 5 | X(05) |
| 607 | 610 | RESULT ZIP+4 ADDON | 4 | X(04) |
| 611 | 613 | RESULT DBPC (including check digit) | 3 | X(03) |
| 614 | 617 | RESULT CARRIER RTE | 4 | X(04) |
| 618 | 618 | *RESULT DROP FLAG | 1 | X(01) |
| 619 | 619 | *RESULT DROP N FLAG | 1 | X(01) |
| 620 | 625 | RESULT MOVE EFFECTIVE DATE | 6 | X(06) |
| 626 | 627 | *RESULT MIDDLE NAME/Initials(returned from NCOA/Link) | 2 | X(02) |
| 628 | 628 | *RESULT GENDER (returned from NCOA/Link) | 1 | X(01) |
| 629 | 636 | *RESULT HINT BYTE (after expansion) | 8 | X(08) |
| 637 | 638 | RESULT NCOA LINK FOOTNOTE | 2 | X(02) |
| 639 | 640 | RESULT ZIP+4 FOOTNOTE | 2 | X(02) |
| 641 | 642 | RESULT DPV FOOTNOTE | 2 | X(02) |
| 643 | 658 | HEX VALUE OF THE EMDP (from input address) | 16 | X(16) |
| 659 | 698 | HEX VALUE OF THE SHA OF EMPD (from input address) | 40 | X(40) |
| 699 | 714 | HEX VALUE OF THE  FIRST 8 CHARACTERS OF 48 BYTE OBJECT | 16 | X(16) |
| 715 | 729 | FIRST NAME OF THE 48 BYTE OBJECT | 15 | X(15) |
| 730 | 749 | LAST NAME OF THE 48 BYTE OBJECT | 20 | X(20) |
| 750 | 754 | SUFFIX NAME OF THE 48 BYTE OBJECT | 5 | X(05) |
| 755 | 794 | HEX VALUE OF THE SHA OF 48 BYTE OBJECT | 40 | X(40) |
| 795 | 810 | HEX VALUE OF THE DATA RETRIEVED (before reorder) | 16 | X(16) |
| 811 | 827 | DECIMAL VALUE OF THE  17 DIGIT RESULT VALUE | 17 | X(17) |
| 828 | 828 | RESULT MOVE TYPE (Family, Individual, Business)(F,I,B) | 1 | X(01) |
| 829 | 836 | OPTIONAL – INTERMEDIATE RETURN CODES | 8 | X(08) |
| 837 | 838 | ANK<sup>Link</sup> RETURN CODE (77) | 2 | X(02) |
| 839 | 840 | FUTURE RETURN CODE | 2 | X(02) |
| 841 | 997 | FILLER | 157 | X(157) |
| 998 | 998 | RECORD TYPE (Header/Detail) (H,D) | 1 | X(01) |
| 999 | 1000 | CARRIAGE RETURN LINE FEED | 2 | X(02) |

**\*The following fields of returned data used for analysis must not be returned to the customer: result drop flag, result drop n flag, result middle name, result gender and result hint byte.**

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

# Exhibit D
# Report File Layouts

| RECORD FROM | POSITION TO | FIELD NAME and DESCRIPTION | LENGTH | COBOL |
|---|---|---|---|---|
| colspan="5" | NCOA<sup>Link®</sup> MONTHLY CUSTOMER SERVICE LOG<br>END USER MAILER<br>Header Record<br>(page 1 of 5) |
| 1 | 4 | CUSTOMER ID<br>Alphanumeric. Licensee ID (USPS assigned) | 4 | X(4) |
| 5 | 18 | NUMBER OF RECORDS<br>Total number of records in the Customer Service Log excluding Header Record | 14 | 9(14) |
| 19 | 70 | Filler | 52 | X(52) |
| | | | | |
| | | *The Header Record must contain file totals for all fields in the subsequent Detail Record(s). All field positions in the Header Record correspond to field positions in the Detail Record(s).* | | |
| | | | | |
| | | *Fields listed as "Optional – Filler" in the Detail Record are also optional in the Header Record. However, if data is provided in these fields in the Detail Record(s), file totals MUST appear in the Header Record for the corresponding fields.* | | |
| | | | | |
| | | **Processing Statistics Summary** | | |
| 71 | 81 | TOTAL NUMBER OF RECORDS PROCESSED | 11 | 9(11) |
| 82 | 92 | TOTAL NUMBER OF NCOA<sup>Link®</sup> QUERIES PERFORMED | 11 | 9(11) |
| 93 | 103 | TOTAL NUMBER OF RECORDS MATCHED – NCOA<sup>Link</sup><br>**NOTE:** NCOA<sup>Link</sup> matches only, exclude ANK<sup>Link</sup> matches from calculation | 11 | 9(11) |
| 104 | 114 | TOTAL NUMBER OF MATCHES REJECTED | 11 | 9(11) |
| 115 | 125 | TOTAL NUMBER OF RECORDS ZIP+4™ CODED          **OPT – FILLER** | 11 | 9(11) |
| 126 | 136 | TOTAL NUMBER OF RECORDS DPV® CONFIRMED    **OPT – FILLER** | 11 | 9(11) |
| | | | | |
| | | **Product Information** | | |
| 137 | 286 | Filler | 150 | X(150) |
| | | | | |
| | | **ZIP+4 Match Statistics** | | |
| 287 | 297 | Total matched to PO Box                    **OPTIONAL – FILLER** | 11 | 9(11) |
| 298 | 308 | Total matched to HCR Exact                 **OPTIONAL – FILLER** | 11 | 9(11) |
| 309 | 319 | Total matched to RR Default                **OPTIONAL – FILLER** | 11 | 9(11) |
| 320 | 330 | Total matched to Firm                      **OPTIONAL – FILLER** | 11 | 9(11) |
| 331 | 341 | Total matched to General Del               **OPTIONAL – FILLER** | 11 | 9(11) |
| 342 | 352 | Total matched to Highrise Default          **OPTIONAL – FILLER** | 11 | 9(11) |
| 353 | 363 | Total matched to Military                  **OPTIONAL – FILLER** | 11 | 9(11) |
| 364 | 374 | Total matched to Non-Deliverable           **OPTIONAL – FILLER** | 11 | 9(11) |
| 375 | 385 | Total matched to RR Exact                  **OPTIONAL – FILLER** | 11 | 9(11) |
| 386 | 396 | Total matched to Street                    **OPTIONAL – FILLER** | 11 | 9(11) |
| 397 | 407 | Total matched to HCR Default               **OPTIONAL – FILLER** | 11 | 9(11) |
| 408 | 418 | Total matched to Highrise Exact            **OPTIONAL – FILLER** | 11 | 9(11) |
| 419 | 429 | Total matched to Other                     **OPTIONAL – FILLER** | 11 | 9(11) |
| 430 | 440 | Total matched to Pos LACS                  **OPTIONAL – FILLER** | 11 | 9(11) |
| 441 | 451 | Total matched to EWS                       **OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **Footnote Information: Number of responses containing each footnote code:** | | |
| | | | | |
| | | **New Address Provided by NCOALink** | | |
| | | | | |
| 452 | 462 | A – Match | 11 | 9(11) |
| 463 | 473 | 91 – Match with Secondary Number Dropped on COA (Old Side) | 11 | 9(11) |

DS38

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| | | NCOA<sup>Link</sup> MONTHLY CUSTOMER SERVICE LOG<br>END USER MAILER<br>Header Record<br>(page 2 of 5) | | |
|---|---|---|---|---|
| **RECORD FROM** | **POSITION TO** | **FIELD NAME and DESCRIPTION** | **LENGTH** | **COBOL** |
| 474 | 484 | 92 – Match with Secondary Number Dropped on Input | 11 | 9(11) |
| 485 | 495 | 01 – Match – Foreign Move | 11 | 9(11) |
| 496 | 506 | 02 – Match – Moved Left No Address | 11 | 9(11) |
| 507 | 517 | 03 – Match – PO Box Closed | 11 | 9(11) |
| 518 | 528 | 04 – No Match – Family move from Street Address w/Secondary | 11 | 9(11) |
| 529 | 539 | 05 – Match – New 11 digit DPBC is ambiguous | 11 | 9(11) |
| 540 | 550 | 06 – No Match – Middle Name Related | 11 | 9(11) |
| 551 | 561 | 07 – No Match – Gender Related | 11 | 9(11) |
| 562 | 572 | 08 – No Match – Conflicting Instructions | 11 | 9(11) |
| 573 | 583 | 09 – No Match – Family move from Highrise default | 11 | 9(11) |
| 584 | 594 | 10 – No Match – Family move from Rural/HC Route default | 11 | 9(11) |
| 595 | 605 | 11 – No Match – Individual move – Insufficient name data | 11 | 9(11) |
| 606 | 616 | 18 – No Match – Family move from General Delivery | 11 | 9(11) |
| 617 | 627 | 19 – Match – New Address not ZIP+4 codeable | 11 | 9(11) |
| 628 | 638 | 20 – No Match – Multiple Response – Conflicting Directions | 11 | 9(11) |
| | | | | |
| | | **From NCOA<sup>Link</sup> File Run** | | |
| 639 | 649 | 12 – No Match – Middle Name test failed | 11 | 9(11) |
| 650 | 660 | 13 – No Match – Gender test failed | 11 | 9(11) |
| 661 | 671 | 14 – Match – New Address would not convert | 11 | 9(11) |
| 672 | 682 | 15 – No Match – Individual Name insufficient on input to match | 11 | 9(11) |
| 683 | 693 | 16 – No Match – Secondary Number discrepancy | 11 | 9(11) |
| 694 | 704 | 17 – No Match – Different First Name | 11 | 9(11) |
| | | | | |
| | | **From "Daily Delete" Process** | | |
| 705 | 715 | 66 – No Match – Input Address appears in "Daily Delete"<br>suppression file        **OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **From DPV Processing of Input Addresses** | | |
| 716 | 726 | AA – ZIP+4 Match        **OPTIONAL – FILLER** | 11 | 9(11) |
| 727 | 737 | A1 – ZIP+4 No Match        **OPTIONAL – FILLER** | 11 | 9(11) |
| 738 | 748 | M1 – Primary Number missing    **OPTIONAL – FILLER** | 11 | 9(11) |
| 749 | 759 | M3 – Primary Number invalid    **OPTIONAL – FILLER** | 11 | 9(11) |
| 760 | 770 | P1 – Missing PO, RR or HC Box number  **OPTIONAL – FILLER** | 11 | 9(11) |
| 771 | 781 | P3 – Invalid PO, RR or HC Box number  **OPTIONAL – FILLER** | 11 | 9(11) |
| 782 | 792 | BB – DPV matched (all components)  **OPTIONAL – FILLER** | 11 | 9(11) |
| 793 | 803 | RR – DPV Matched to CMRA    **OPTIONAL – FILLER** | 11 | 9(11) |
| 804 | 814 | CC – Primary Number Match – Secondary present but invalid<br>        **OPTIONAL – FILLER** | 11 | 9(11) |
| 815 | 825 | N1 – Primary Number Match – Secondary missing<br>        **OPTIONAL – FILLER** | 11 | 9(11) |
| 826 | 836 | R1 – DPV Matched to CMRA– PMB number not present<br>        **OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **Move Activity Summary**<br>Age based on month and year of process date. | | |
| 837 | 847 | ADDRESSES MATCHED MONTH 0 | 11 | 9(11) |
| 848 | 858 | ADDRESSES MATCHED MONTH 1 | 11 | 9(11) |
| 859 | 869 | ADDRESSES MATCHED MONTH 2 | 11 | 9(11) |
| 870 | 880 | ADDRESSES MATCHED MONTH 3 | 11 | 9(11) |
| 881 | 891 | ADDRESSES MATCHED MONTH 4 | 11 | 9(11) |
| 892 | 902 | ADDRESSES MATCHED MONTH 5 | 11 | 9(11) |
| 903 | 913 | ADDRESSES MATCHED MONTH 6 | 11 | 9(11) |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| | | NCOA<sup>Link</sup> MONTHLY CUSTOMER SERVICE LOG<br>END USER MAILER<br>Header Record<br>(page 3 of 5) | | |
|---|---|---|---|---|
| **RECORD FROM** | **POSITION TO** | **FIELD NAME and DESCRIPTION** | **LENGTH** | **COBOL** |
| 914 | 924 | ADDRESSES MATCHED MONTH 7 | 11 | 9(11) |
| 925 | 935 | ADDRESSES MATCHED MONTH 8 | 11 | 9(11) |
| 936 | 946 | ADDRESSES MATCHED MONTH 9 | 11 | 9(11) |
| 947 | 957 | ADDRESSES MATCHED MONTH 10 | 11 | 9(11) |
| 958 | 968 | ADDRESSES MATCHED MONTH 11 | 11 | 9(11) |
| 969 | 979 | ADDRESSES MATCHED MONTH 12 | 11 | 9(11) |
| 980 | 990 | ADDRESSES MATCHED MONTH 13 | 11 | 9(11) |
| 991 | 1001 | ADDRESSES MATCHED MONTH 14 | 11 | 9(11) |
| 1002 | 1012 | ADDRESSES MATCHED MONTH 15 | 11 | 9(11) |
| 1013 | 1023 | ADDRESSES MATCHED MONTH 16 | 11 | 9(11) |
| 1024 | 1034 | ADDRESSES MATCHED MONTH 17 | 11 | 9(11) |
| 1035 | 1045 | ADDRESSES MATCHED MONTH 18 | 11 | 9(11) |
| 1046 | 1056 | ADDRESSES MATCHED MONTH 19 | 11 | 9(11) |
| 1057 | 1067 | ADDRESSES MATCHED MONTH 20 | 11 | 9(11) |
| 1068 | 1078 | ADDRESSES MATCHED MONTH 21 | 11 | 9(11) |
| 1079 | 1089 | ADDRESSES MATCHED MONTH 22 | 11 | 9(11) |
| 1090 | 1100 | ADDRESSES MATCHED MONTH 23 | 11 | 9(11) |
| 1101 | 1111 | ADDRESSES MATCHED MONTH 24 | 11 | 9(11) |
| 1112 | 1122 | ADDRESSES MATCHED MONTH 25 | 11 | 9(11) |
| 1123 | 1133 | ADDRESSES MATCHED MONTH 26 | 11 | 9(11) |
| 1134 | 1144 | ADDRESSES MATCHED MONTH 27 | 11 | 9(11) |
| 1145 | 1155 | ADDRESSES MATCHED MONTH 28 | 11 | 9(11) |
| 1156 | 1166 | ADDRESSES MATCHED MONTH 29 | 11 | 9(11) |
| 1167 | 1177 | ADDRESSES MATCHED MONTH 30 | 11 | 9(11) |
| 1178 | 1188 | ADDRESSES MATCHED MONTH 31 | 11 | 9(11) |
| 1189 | 1199 | ADDRESSES MATCHED MONTH 32 | 11 | 9(11) |
| 1200 | 1210 | ADDRESSES MATCHED MONTH 33 | 11 | 9(11) |
| 1211 | 1221 | ADDRESSES MATCHED MONTH 34 | 11 | 9(11) |
| 1222 | 1232 | ADDRESSES MATCHED MONTH 35 | 11 | 9(11) |
| 1233 | 1243 | ADDRESSES MATCHED MONTH 36 | 11 | 9(11) |
| 1244 | 1254 | ADDRESSES MATCHED MONTH 37 | 11 | 9(11) |
| 1255 | 1265 | ADDRESSES MATCHED MONTH 38 | 11 | 9(11) |
| 1266 | 1276 | ADDRESSES MATCHED MONTH 39 | 11 | 9(11) |
| 1277 | 1287 | ADDRESSES MATCHED MONTH 40 | 11 | 9(11) |
| 1288 | 1298 | ADDRESSES MATCHED MONTH 41 | 11 | 9(11) |
| 1299 | 1309 | ADDRESSES MATCHED MONTH 42 | 11 | 9(11) |
| 1310 | 1320 | ADDRESSES MATCHED MONTH 43 | 11 | 9(11) |
| 1321 | 1331 | ADDRESSES MATCHED MONTH 44 | 11 | 9(11) |
| 1332 | 1342 | ADDRESSES MATCHED MONTH 45 | 11 | 9(11) |
| 1343 | 1353 | ADDRESSES MATCHED MONTH 46 | 11 | 9(11) |
| 1354 | 1364 | ADDRESSES MATCHED MONTH 47 | 11 | 9(11) |
| 1365 | 1375 | ADDRESSES MATCHED MONTH 48 | 11 | 9(11) |
| | | | | |
| 1376 | 1452 | Filler | 77 | X(77) |
| | | | | |
| | | **DPV Statistics**              **OPTIONAL – FILLER** | | |
| 1453 | 1463 | Street (S) Records Validated | 11 | 9(11) |
| 1464 | 1474 | CMRA Presented | 11 | 9(11) |
| 1475 | 1485 | CMRA Validated | 11 | 9(11) |
| 1486 | 1496 | High Rise (H) Records Validated | 11 | 9(11) |
| 1497 | 1507 | CMRA Presented | 11 | 9(11) |
| 1508 | 1518 | CMRA Validated | 11 | 9(11) |
| 1519 | 1529 | PO Box (P) Records Validated | 11 | 9(11) |
| 1530 | 1540 | RR/HC (R) Records Validated | 11 | 9(11) |
| 1541 | 1551 | CMRA Presented | 11 | 9(11) |
| 1552 | 1562 | CMRA Validated | 11 | 9(11) |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | NCOA^Link MONTHLY CUSTOMER SERVICE LOG<br>END USER MAILER<br>Header Record<br>(page 4 of 5) | LENGTH | COBOL |
|---|---|---|---|---|
| | | **FIELD NAME and DESCRIPTION** | | |
| 1563 | 1573 | Firm (F) Records Validated | 11 | 9(11) |
| 1574 | 1584 | CMRA Presented | 11 | 9(11) |
| 1585 | 1595 | CMRA Validated | 11 | 9(11) |
| 1596 | 1606 | General Delivery (G) Records Validated | 11 | 9(11) |
| 1607 | 1617 | Total Primary Number Error | 11 | 9(11) |
| 1618 | 1628 | Street (S) Records with Primary Number Error | 11 | 9(11) |
| 1629 | 1639 | High Rise (H) Records with Primary Number Error | 11 | 9(11) |
| 1640 | 1650 | PO Box (P) Records with Primary Number Error | 11 | 9(11) |
| 1651 | 1661 | RR/HC (R) Records with Primary Number Error | 11 | 9(11) |
| 1662 | 1672 | Firm (F) Records with Primary Number Error | 11 | 9(11) |
| 1673 | 1683 | Total Secondary Number Error | 11 | 9(11) |
| 1684 | 1694 | Street (S) Records with Secondary Number Error | 11 | 9(11) |
| 1695 | 1705 | High Rise (H) Records with Secondary Number Error | 11 | 9(11) |
| 1706 | 1716 | Firm (F) Records with Secondary Number Error | 11 | 9(11) |
| | | | | |
| 1717 | 1766 | FILLER | 50 | X(50) |
| | | | | |
| | | **LACS^Link® Return Codes** | | |
| 1767 | 1777 | A – LACS^Link Record Match          **OPTIONAL – FILLER** | 11 | 9(11) |
| 1778 | 1788 | 00 – No Match          **OPTIONAL – FILLER** | 11 | 9(11) |
| 1789 | 1799 | 14 – Match – Found LACS^Link Record – New Address would not convert          **OPTIONAL – FILLER** | 11 | 9(11) |
| 1800 | 1810 | 92 – Match with Secondary Number Dropped on Input          **OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **From DPV Processing of Input Addresses – Additional Return Codes** | | |
| 1811 | 1821 | F1 – Military          **OPTIONAL – FILLER** | 11 | 9(11) |
| 1822 | 1832 | U1 – Unique ZIP Code          **OPTIONAL – FILLER** | 11 | 9(11) |
| 1833 | 1843 | G1 – General Delivery          **OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **From NCOA^Link File Run – Additional Footnote Codes** | | |
| 1844 | 1854 | NL – New address not DPV confirmable with vendor software. (Required only when this code is returned to the customer)*** | 11 | 9(11) |
| | | | | |
| | | **ANK^Link™ and corresponding NCOA^Link Return Codes and Definition** | | |
| 1855 | 1865 | 77 – A – Match | 11 | 9(11) |
| 1866 | 1876 | 77 – 91 – Match with Secondary No. Dropped on COA (Old Side) | 11 | 9(11) |
| 1877 | 1887 | 77 – 92 – Match with Secondary Number Dropped on Input | 11 | 9(11) |
| 1888 | 1898 | 77 – 01 – Match – Foreign Move | 11 | 9(11) |
| 1899 | 1909 | 77 – 02 – Match – Moved Left No Address | 11 | 9(11) |
| 1910 | 1920 | 77 – 03 – Match – PO Box Closed | 11 | 9(11) |
| 1921 | 1931 | 77 – 04 – No Match – Family move - Street Address w/Secondary | 11 | 9(11) |
| 1932 | 1942 | 77 – 05 – Match – New 11 digit DPBC is ambiguous | 11 | 9(11) |
| 1943 | 1953 | 77 – 06 – No Match – Middle Name Related | 11 | 9(11) |
| 1954 | 1964 | 77 – 07 – No Match – Gender Related | 11 | 9(11) |
| 1965 | 1975 | 77 – 08 – No Match – Conflicting Instructions | 11 | 9(11) |
| 1976 | 1986 | 77 – 09 – No Match – Family move from Highrise default | 11 | 9(11) |
| 1987 | 1997 | 77 – 10 – No Match – Family move from Rural/HC Route default | 11 | 9(11) |
| 1998 | 2008 | 77 – 11 – No Match – Individual move – Insufficient name data | 11 | 9(11) |
| 2009 | 2019 | 77 – 18 – No Match – Family move from General Delivery | 11 | 9(11) |
| 2020 | 2030 | 77 – 19 – New Address not ZIP+4 codeable | 11 | 9(11) |
| 2031 | 2041 | 77 – 20 – No Match – Multiple Response – Conflicting Directions | 11 | 9(11) |
| 2042 | 2052 | 77 – 12 – No Match – Middle Name test failed | 11 | 9(11) |
| 2053 | 2063 | 77 – 13 – No Match – Gender test failed | 11 | 9(11) |
| 2064 | 2074 | 77 – 14 – Match – New Address would not convert | 11 | 9(11) |
| 2075 | 2085 | 77 – 15 – No Match – Individual Name insufficient on input | 11 | 9(11) |

# NCOA<sup>Link</sup> END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | NCOA<sup>Link</sup> MONTHLY CUSTOMER SERVICE LOG<br>END USER MAILER<br>Header Record<br>(page 5 of 5)<br><br>FIELD NAME and DESCRIPTION | LENGTH | COBOL |
|---|---|---|---|---|
| 2086 | 2096 | 77 – 16 – No Match – Secondary Number discrepancy | 11 | 9(11) |
| 2097 | 2107 | 77 – 17 – No Match – Different First Name | 11 | 9(11) |
| 2108 | 2118 | 77 – 66 – No Match – Input Address appears in "Daily Delete" suppression file | 11 | 9(11) |
| 2119 | 2129 | 77 – Total records matched using ANK<sup>Link</sup> | 11 | 9(11) |
| | | | | |
| | | **LACS<sup>Link</sup> Return Codes – Additional Return Code** | | |
| 2130 | 2140 | 09 – LACS<sup>Link</sup> – Old Addr Highrise Default – No New Address<br>**OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| 2141 | 2192 | FILLER | 52 | X(52) |
| | | | | |
| | | **Suite<sup>Link</sup>™ Return Codes** | | |
| 2193 | 2203 | Suite<sup>Link</sup> Return Code A – Match          **OPTIONAL – FILLER** | 11 | 9(11) |
| 2204 | 2214 | Suite<sup>Link</sup> Return Code 00 – No Match   **OPTIONAL – FILLER** | 11 | 9(11) |
| | | **NCOA<sup>Link</sup> Return Codes (continued)** | | |
| 2215 | 2225 | NCOA<sup>Link</sup> Return Code 21 – To Be Determined | 11 | 9(11) |
| 2226 | 2236 | NCOA<sup>Link</sup> Return Code 22 – To Be Determined | 11 | 9(11) |
| 2237 | 2247 | NCOA<sup>Link</sup> Return Code 23 – To Be Determined | 11 | 9(11) |
| 2248 | 2258 | NCOA<sup>Link</sup> Return Code 24 – To Be Determined | 11 | 9(11) |
| 2259 | 2269 | NCOA<sup>Link</sup> Return Code 25 – To Be Determined | 11 | 9(11) |
| 2270 | 2280 | NCOA<sup>Link</sup> Return Code 26 – To Be Determined | 11 | 9(11) |
| 2281 | 2291 | NCOA<sup>Link</sup> Return Code 27 – To Be Determined | 11 | 9(11) |
| 2292 | 2302 | NCOA<sup>Link</sup> Return Code 28 – To Be Determined | 11 | 9(11) |
| 2303 | 2313 | NCOA<sup>Link</sup> Return Code 29 – To Be Determined | 11 | 9(11) |
| 2314 | 2324 | NCOA<sup>Link</sup> Return Code 30 – To Be Determined | 11 | 9(11) |
| | | | | |
| | | **ANK<sup>Link</sup> Return Codes (continued)** | | |
| 2325 | 2335 | 77 – 21 – To Be Determined | 11 | 9(11) |
| 2336 | 2346 | 77 – 22 – To Be Determined | 11 | 9(11) |
| 2347 | 2357 | 77 – 23 – To Be Determined | 11 | 9(11) |
| 2358 | 2368 | 77 – 24 – To Be Determined | 11 | 9(11) |
| 2369 | 2379 | 77 – 25 – To Be Determined | 11 | 9(11) |
| 2380 | 2390 | 77 – 26 – To Be Determined | 11 | 9(11) |
| 2391 | 2401 | 77 – 27 – To Be Determined | 11 | 9(11) |
| 2402 | 2412 | 77 – 28 – To Be Determined | 11 | 9(11) |
| 2413 | 2423 | 77 – 29 – To Be Determined | 11 | 9(11) |
| 2424 | 2434 | 77 – 30 – To Be Determined | 11 | 9(11) |
| | | | | |
| 2435 | 2999 | FILLER | 565 | X(565) |
| | | | | |
| 3000 | 3000 | Record Type – H = Header/ D = Detail | 1 | X(1) |
| | | | | |
| | | CR/LF<br>Carriage Return/Line Feed required at end of each record. | | |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

<table>
<tr><td colspan="6" align="center"><b>NCOA<sup>Link</sup> MONTHLY CUSTOMER SERVICE LOG</b><br><b>END USER MAILER</b><br><b>Detail Record</b><br><b>(page 1 of 8)</b></td></tr>
<tr><td><b>RECORD FROM</b></td><td><b>POSITION TO</b></td><td><b>FIELD NAME and DESCRIPTION</b></td><td></td><td><b>LENGTH</b></td><td><b>COBOL</b></td></tr>
<tr><td>1</td><td>4</td><td colspan="2">LICENSEE ID<br>Platform ID assigned by USPS.</td><td>4</td><td>X(4)</td></tr>
<tr><td>5</td><td>10</td><td colspan="2">NAICS<br>North American Industry Classification System</td><td>6</td><td>9(6)</td></tr>
<tr><td>11</td><td>12</td><td colspan="2">PROCESSING FREQUENCY<br>Number of times per year list processed. If update frequency not established for a particular list, fill with "99".</td><td>2</td><td>9(2)</td></tr>
<tr><td>13</td><td>18</td><td colspan="2">FILLER</td><td>6</td><td>X(6)</td></tr>
<tr><td>19</td><td>28</td><td colspan="2">PROCESSING CATEGORY<br>Set values to identify the type of processing performed.<br>EMP TRAIN, INT DB TST, MKTG TEST, NORMAL, STAGE I, STAGE II, SYS TEST</td><td>10</td><td>X(10)</td></tr>
<tr><td>29</td><td>33</td><td colspan="2">FILLER</td><td>5</td><td>X(5)</td></tr>
<tr><td>34</td><td>34</td><td colspan="2">MATCHING LOGIC APPLIED<br>S = Standard (Business, Individual and Family matches allowed)<br>I = Individual only<br>B = Business only<br>C = Individual and Business only<br>R = Individual and Family only</td><td>1</td><td>X(1)</td></tr>
<tr><td>35</td><td>35</td><td colspan="2">FILLER</td><td>1</td><td>X(1)</td></tr>
<tr><td>36</td><td>37</td><td colspan="2">NUMBER OF MONTHS REQUESTED<br>By request of list owner, number of months for which COA data accepted</td><td>2</td><td>9(2)</td></tr>
<tr><td>38</td><td>38</td><td colspan="2">CLASS OF MAIL<br>Alphanumeric. Class of mail to be used for mailings produced from customer mailing list.<br>A = First-Class only<br>B = Periodicals only<br>C = Standard Mail only<br>D = Package Services only<br>E = First-Class & Periodicals<br>F = First-Class & Standard Mail<br>G = First-Class & Package Services<br>H = Periodicals & Standard Mail<br>I = Periodicals & Package Services<br>J = Standard Mail & Package Services<br>K = First-Class, Periodicals & Standard Mail<br>L = First-Class, Periodicals & Package Services<br>M = First-Class, Standard Mail & Package Services<br>N = Periodicals, Standard Mail & Package Services<br>O = First-Class, Periodical, Standard Mail, Package Services</td><td>1</td><td>X(1)</td></tr>
<tr><td></td><td></td><td colspan="2"><b>Processing Date Information</b></td><td></td><td></td></tr>
<tr><td>39</td><td>46</td><td></td><td>FILLER</td><td>8</td><td>9(8)</td></tr>
<tr><td>47</td><td>54</td><td></td><td>DATE NCOA<sup>Link</sup> PROCESSING BEGAN<br>Numeric. Format CCYYMMDD.</td><td>8</td><td>9(8)</td></tr>
<tr><td>55</td><td>62</td><td></td><td>DATE NCOA<sup>Link</sup> PROCESSING COMPLETED<br>Numeric. Format CCYYMMDD.</td><td>8</td><td>9(8)</td></tr>
<tr><td>63</td><td>70</td><td></td><td>FILLER</td><td>8</td><td>9(8)</td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
</table>

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | FIELD NAME and DESCRIPTION | LENGTH | COBOL |
|---|---|---|---|---|
| | | **NCOA**Link **MONTHLY CUSTOMER SERVICE LOG** **END USER MAILER** **Detail Record** **(page 2 of 8)** | | |
| | | **Processing Statistics Summary** | | |
| 71 | 81 | TOTAL NUMBER OF RECORDS PROCESSED Total number of records presented on the original input list. | 11 | 9(11) |
| 82 | 92 | TOTAL NUMBER OF NCOALink QUERIES PERFORMED Total number of all queries made into NCOALink including all variations of name and address attempted for each input record. (ie: nickname attempts; dropped secondary attempts) | 11 | 9(11) |
| 93 | 103 | TOTAL NUMBER OF RECORDS MATCHED – NCOALink Results returned indicate match: Return codes A, 91, 92, 01, 02, 03, 05, 14, 19 **NOTE:** NCOALink matches only, exclude ANKLink matches from calculation | 11 | 9(11) |
| 104 | 114 | TOTAL NUMBER OF MATCHES REJECTED Results discarded based on Move Effective Date: Return code 00 generated due to age of COA | 11 | 9(11) |
| 115 | 125 | TOTAL NUMBER OF RECORDS ZIP+4 CODED         **OPT – FILLER** | 11 | 9(11) |
| 126 | 136 | TOTAL NUMBER OF RECORDS DPV CONFIRMED    **OPT – FILLER** | 11 | 9(11) |
| | | | | |
| | | **ZIP+4 Product Information** | | |
| 137 | 166 | ZIP+4 Software Name | 30 | X(30) |
| 167 | 178 | ZIP+4 Software Version | 12 | X(12) |
| 179 | 186 | ZIP+4 Directory (Data) Release Date Numeric. Format CCYYMMDD. | 8 | 9(8) |
| | | | | |
| | | **NCOA**Link **Product Information** | | |
| 187 | 216 | NCOALink Software Name | 30 | X(30) |
| 217 | 228 | NCOALink Software Version | 12 | X(12) |
| 229 | 236 | NCOALink Data Release Date Numeric. Format CCYYMMDD. | 8 | 9(8) |
| | | | | |
| | | **DPV Product Information** | | |
| 237 | 266 | DPV Software Name | 30 | X(30) |
| 267 | 278 | DPV Software Version | 12 | X(12) |
| 279 | 286 | DPV Data Release Date Numeric. Format CCYYMMDD. | 8 | 9(8) |
| | | | | |
| | | **ZIP+4 Match Statistics** | | |
| 287 | 297 | Total matched to PO Box                 **OPTIONAL – FILLER** | 11 | 9(11) |
| 298 | 308 | Total matched to HCR Exact              **OPTIONAL – FILLER** | 11 | 9(11) |
| 309 | 319 | Total matched to RR Default             **OPTIONAL – FILLER** | 11 | 9(11) |
| 320 | 330 | Total matched to Firm                   **OPTIONAL – FILLER** | 11 | 9(11) |
| 331 | 341 | Total matched to General Del            **OPTIONAL – FILLER** | 11 | 9(11) |
| 342 | 352 | Total matched to Highrise Default       **OPTIONAL – FILLER** | 11 | 9(11) |
| 353 | 363 | Total matched to Military               **OPTIONAL – FILLER** | 11 | 9(11) |
| 364 | 374 | Total matched to Non-Deliverable        **OPTIONAL – FILLER** | 11 | 9(11) |
| 375 | 385 | Total matched to RR Exact               **OPTIONAL – FILLER** | 11 | 9(11) |
| 386 | 396 | Total matched to Street                 **OPTIONAL – FILLER** | 11 | 9(11) |
| 397 | 407 | Total matched to HCR Default            **OPTIONAL – FILLER** | 11 | 9(11) |
| 408 | 418 | Total matched to Highrise Exact         **OPTIONAL – FILLER** | 11 | 9(11) |
| 419 | 429 | Total matched to Other                  **OPTIONAL – FILLER** | 11 | 9(11) |
| 430 | 440 | Total matched to Pos LACS               **OPTIONAL – FILLER** | 11 | 9(11) |
| 441 | 451 | Total matched to EWS                    **OPTIONAL – FILLER** | 11 | 9(11) |

DS44

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | FIELD NAME and DESCRIPTION | LENGTH | COBOL |
|---|---|---|---|---|
| | | **NCOA**<sup>Link</sup> **MONTHLY CUSTOMER SERVICE LOG<br>END USER MAILER<br>Detail Record<br>(page 3 of 8)** | | |
| | | **Footnote Information: Number of responses containing each footnote code:** | | |
| | | | | |
| | | **New Address Provided by NCOA**<sup>Link</sup> | | |
| 452 | 462 | A – Match | 11 | 9(11) |
| 463 | 473 | 91 – Match with Secondary Number Dropped on COA (Old Side) | 11 | 9(11) |
| 474 | 484 | 92 – Match with Secondary Number Dropped on Input | 11 | 9(11) |
| | | | | |
| | | **From NCOA**<sup>Link</sup> **File Build** | | |
| 485 | 495 | 01 – Match – Foreign Move | 11 | 9(11) |
| 496 | 506 | 02 – Match – Moved Left No Address | 11 | 9(11) |
| 507 | 517 | 03 – Match – PO Box Closed | 11 | 9(11) |
| 518 | 528 | 04 – No Match – Family move from Street Address w/Secondary | 11 | 9(11) |
| 529 | 539 | 05 – Match – New 11 digit DPBC is ambiguous | 11 | 9(11) |
| 540 | 550 | 06 – No Match – Middle Name Related | 11 | 9(11) |
| 551 | 561 | 07 – No Match – Gender Related | 11 | 9(11) |
| 562 | 572 | 08 – No Match – Conflicting Instructions | 11 | 9(11) |
| 573 | 583 | 09 – No Match – Family move from Highrise default | 11 | 9(11) |
| 584 | 594 | 10 – No Match – Family move from Rural/HC Route default | 11 | 9(11) |
| 595 | 605 | 11 – No Match – Individual move – Insufficient name data | 11 | 9(11) |
| 606 | 616 | 18 – No Match – Family move from General Delivery | 11 | 9(11) |
| 617 | 627 | 19 – Match – New Address not ZIP+4 codeable | 11 | 9(11) |
| 628 | 638 | 20 – No Match – Multiple Response – Conflicting Directions | 11 | 9(11) |
| | | | | |
| | | **From NCOA**<sup>Link</sup> **File Run** | | |
| 639 | 649 | 12 – No Match – Middle Name test failed | 11 | 9(11) |
| 650 | 660 | 13 – No Match – Gender test failed | 11 | 9(11) |
| 661 | 671 | 14 – Match – New Address would not convert | 11 | 9(11) |
| 672 | 682 | 15 – No Match – Individual Name insufficient on input to match | 11 | 9(11) |
| 683 | 693 | 16 – No Match – Secondary Number discrepancy | 11 | 9(11) |
| 694 | 704 | 17 – No Match – Different First Name | 11 | 9(11) |
| | | | | |
| | | **From "Daily Delete" Process** | | |
| 705 | 715 | 66 – No Match – Input Address appears in "Daily Delete" suppression file          **OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **From DPV Processing of Input Addresses** | | |
| 716 | 726 | AA – ZIP+4 Match          **OPTIONAL – FILLER** | 11 | 9(11) |
| 727 | 737 | A1 – ZIP+4 No Match          **OPTIONAL – FILLER** | 11 | 9(11) |
| 738 | 748 | M1 – Primary Number missing          **OPTIONAL – FILLER** | 11 | 9(11) |
| 749 | 759 | M3 – Primary Number invalid          **OPTIONAL – FILLER** | 11 | 9(11) |
| 760 | 770 | P1 – Missing PO, RR or HC Box number          **OPTIONAL – FILLER** | 11 | 9(11) |
| 771 | 781 | P3 – Invalid PO, RR or HC Box number          **OPTIONAL – FILLER** | 11 | 9(11) |
| 782 | 792 | BB – DPV matched (all components)          **OPTIONAL – FILLER** | 11 | 9(11) |
| 793 | 803 | RR – DPV Matched to CMRA          **OPTIONAL – FILLER** | 11 | 9(11) |
| 804 | 814 | CC – Primary Number Match – Secondary present but invalid          **OPTIONAL – FILLER** | 11 | 9(11) |
| 815 | 825 | N1 – Primary Number Match – Secondary missing          **OPTIONAL – FILLER** | 11 | 9(11) |
| 826 | 836 | R1 – DPV Matched to CMRA– PMB number not present          **OPTIONAL – FILLER** | 11 | 9(11) |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | FIELD NAME and DESCRIPTION | LENGTH | COBOL |
|---|---|---|---|---|
| | | **NCOA<sup>Link</sup> MONTHLY CUSTOMER SERVICE LOG**<br>**END USER MAILER**<br>**Detail Record**<br>**(page 4 of 8)** | | |
| | | **Move Activity Summary**<br>Age based on month and year of process date. | | |
| 837 | 847 | ADDRESSES MATCHED MONTH 0<br>Total number of matches made with Move Effective Date (MED) corresponding to the process date. | 11 | 9(11) |
| 848 | 858 | ADDRESSES MATCHED MONTH 1<br>Total number of matches made with MED 1 month prior to process date. | 11 | 9(11) |
| 859 | 869 | ADDRESSES MATCHED MONTH 2<br>Total number of matches made with MED 2 months prior to process date. | 11 | 9(11) |
| 870 | 880 | ADDRESSES MATCHED MONTH 3<br>Total number of matches made with MED 3 months prior to process date. | 11 | 9(11) |
| 881 | 891 | ADDRESSES MATCHED MONTH 4<br>Total number of matches made with MED 4 months prior to process date. | 11 | 9(11) |
| 892 | 902 | ADDRESSES MATCHED MONTH 5<br>Total number of matches made with MED 5 months prior to process date. | 11 | 9(11) |
| 903 | 913 | ADDRESSES MATCHED MONTH 6<br>Total number of matches made with MED 6 months prior to process date. | 11 | 9(11) |
| 914 | 924 | ADDRESSES MATCHED MONTH 7<br>Total number of matches made with MED 7 months prior to process date. | 11 | 9(11) |
| 925 | 935 | ADDRESSES MATCHED MONTH 8<br>Total number of matches made with MED 8 months prior to process date. | 11 | 9(11) |
| 936 | 946 | ADDRESSES MATCHED MONTH 9<br>Total number of matches made with MED 9 months prior to process date. | 11 | 9(11) |
| 947 | 957 | ADDRESSES MATCHED MONTH 10<br>Total number of matches made with MED 10 months prior to process date | 11 | 9(11) |
| 958 | 968 | ADDRESSES MATCHED MONTH 11<br>Total number of matches made with MED 11 months prior to process date. | 11 | 9(11) |
| 969 | 979 | ADDRESSES MATCHED MONTH 12<br>Total number of matches made with MED 12 months prior to process date. | 11 | 9(11) |
| 980 | 990 | ADDRESSES MATCHED MONTH 13<br>Total number of matches made with MED 13 months prior to process date. | 11 | 9(11) |
| 991 | 1001 | ADDRESSES MATCHED MONTH 14<br>Total number of matches made with MED 14 months prior to process date. | 11 | 9(11) |
| 1002 | 1012 | ADDRESSES MATCHED MONTH 15<br>Total number of matches made with MED 15 months prior to process date. | 11 | 9(11) |
| 1013 | 1023 | ADDRESSES MATCHED MONTH 16<br>Total number of matches made with MED 16 months prior to process date. | 11 | 9(11) |
| 1024 | 1034 | ADDRESSES MATCHED MONTH 17<br>Total number of matches made with MED 17 months prior to process date. | 11 | 9(11) |
| 1035 | 1045 | ADDRESSES MATCHED MONTH 18<br>Total number of matches made with MED 18 months prior to process date. | 11 | 9(11) |
| 1046 | 1056 | ADDRESSES MATCHED MONTH 19<br>Total number of matches made with MED 19 months prior to process date. | 11 | 9(11) |
| 1057 | 1067 | ADDRESSES MATCHED MONTH 20<br>Total number of matches made with MED 20 months prior to process date. | 11 | 9(11) |
| 1068 | 1078 | ADDRESSES MATCHED MONTH 21<br>Total number of matches made with MED 21 months prior to process date. | 11 | 9(11) |
| 1079 | 1089 | ADDRESSES MATCHED MONTH 22<br>Total number of matches made with MED 22 months prior to process date. | 11 | 9(11) |
| 1090 | 1100 | ADDRESSES MATCHED MONTH 23<br>Total number of matches made with MED 23 months prior to process date. | 11 | 9(11) |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| | | NCOA<sup>Link</sup> MONTHLY CUSTOMER SERVICE LOG<br>END USER MAILER<br>Detail Record<br>(page 5 of 8) | | |
|---|---|---|---|---|
| **RECORD FROM** | **POSITION TO** | **FIELD NAME and DESCRIPTION** | **LENGTH** | **COBOL** |
| | | | | |
| 1101 | 1111 | ADDRESSES MATCHED MONTH 24<br>Total number of matches made with MED 24 months prior to process date. | 11 | 9(11) |
| 1112 | 1122 | ADDRESSES MATCHED MONTH 25<br>Total number of matches made with MED 25 months prior to process date. | 11 | 9(11) |
| 1123 | 1133 | ADDRESSES MATCHED MONTH 26<br>Total number of matches made with MED 26 months prior to process date. | 11 | 9(11) |
| 1134 | 1144 | ADDRESSES MATCHED MONTH 27<br>Total number of matches made with MED 27 months prior to process date. | 11 | 9(11) |
| 1145 | 1155 | ADDRESSES MATCHED MONTH 28<br>Total number of matches made with MED 28 months prior to process date. | 11 | 9(11) |
| 1156 | 1166 | ADDRESSES MATCHED MONTH 29<br>Total number of matches made with MED 29 months prior to process date. | 11 | 9(11) |
| 1167 | 1177 | ADDRESSES MATCHED MONTH 30<br>Total number of matches made with MED 30 months prior to process date. | 11 | 9(11) |
| 1178 | 1188 | ADDRESSES MATCHED MONTH 31<br>Total number of matches made with MED 31 months prior to process date. | 11 | 9(11) |
| 1189 | 1199 | ADDRESSES MATCHED MONTH 32<br>Total number of matches made with MED 32 months prior to process date. | 11 | 9(11) |
| 1200 | 1210 | ADDRESSES MATCHED MONTH 33<br>Total number of matches made with MED 33 months prior to process date. | 11 | 9(11) |
| 1211 | 1221 | ADDRESSES MATCHED MONTH 34<br>Total number of matches made with MED 34 months prior to process date. | 11 | 9(11) |
| 1222 | 1232 | ADDRESSES MATCHED MONTH 35<br>Total number of matches made with MED 35 months prior to process date. | 11 | 9(11) |
| 1233 | 1243 | ADDRESSES MATCHED MONTH 36<br>Total number of matches made with MED 36 months prior to process date. | 11 | 9(11) |
| 1244 | 1254 | ADDRESSES MATCHED MONTH 37<br>Total number of matches made with MED 37 months prior to process date. | 11 | 9(11) |
| 1255 | 1265 | ADDRESSES MATCHED MONTH 38<br>Total number of matches made with MED 38 months prior to process date. | 11 | 9(11) |
| 1266 | 1276 | ADDRESSES MATCHED MONTH 39<br>Total number of matches made with MED 39 months prior to process date. | 11 | 9(11) |
| 1277 | 1287 | ADDRESSES MATCHED MONTH 40<br>Total number of matches made with MED 40 months prior to process date. | 11 | 9(11) |
| 1288 | 1298 | ADDRESSES MATCHED MONTH 41<br>Total number of matches made with MED 41 months prior to process date. | 11 | 9(11) |
| 1299 | 1309 | ADDRESSES MATCHED MONTH 42<br>Total number of matches made with MED 42 months prior to process date. | 11 | 9(11) |
| 1310 | 1320 | ADDRESSES MATCHED MONTH 43<br>Total number of matches made with MED 43 months prior to process date. | 11 | 9(11) |
| 1321 | 1331 | ADDRESSES MATCHED MONTH 44<br>Total number of matches made with MED 44 months prior to process date. | 11 | 9(11) |
| 1332 | 1342 | ADDRESSES MATCHED MONTH 45<br>Total number of matches made with MED 45 months prior to process date. | 11 | 9(11) |
| 1343 | 1353 | ADDRESSES MATCHED MONTH 46<br>Total number of matches made with MED 46 months prior to process date. | 11 | 9(11) |
| 1354 | 1364 | ADDRESSES MATCHED MONTH 47<br>Total number of matches made with MED 47 months prior to process date. | 11 | 9(11) |
| 1365 | 1375 | ADDRESSES MATCHED MONTH 48<br>Total number of matches made with MED 48 months or more prior to process date. | 11 | 9(11) |
| | | | | |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | FIELD NAME and DESCRIPTION | LENGTH | COBOL |
|---|---|---|---|---|
| | | **NCOA<sup>Link</sup> MONTHLY CUSTOMER SERVICE LOG** <br> **END USER MAILER** <br> **Detail Record** <br> **(page 6 of 8)** | | |
| 1376 | 1422 | FILLER | 47 | X(47) |
| | | | | |
| | | **List Identification** | | |
| 1423 | 1452 | MAILING LIST NAME <br> Name of mailing list processed. NOTE: If master house list and/or list owner's only mailing list, company name is sufficient. | 30 | X(30) |
| | | | | |
| | | **DPV Statistics**                        **OPTIONAL – FILLER** | | |
| 1453 | 1463 | Street (S) Records Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1464 | 1474 | CMRA Presented        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1475 | 1485 | CMRA Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1486 | 1496 | High Rise (H) Records Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1497 | 1507 | CMRA Presented        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1508 | 1518 | CMRA Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1519 | 1529 | PO Box (P) Records Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1530 | 1540 | RR/HC (R) Records Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1541 | 1551 | CMRA Presented        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1552 | 1562 | CMRA Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1563 | 1573 | Firm (F) Records Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1574 | 1584 | CMRA Presented        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1585 | 1595 | CMRA Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1596 | 1606 | General Delivery (G) Records Validated        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1607 | 1617 | Total Primary Number Error        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1618 | 1628 | Street (S) Records with Primary Number Error   **OPT – FILLER** | 11 | 9(11) |
| 1629 | 1639 | High Rise (H) Records with Primary Number Error   **OPT – FILLER** | 11 | 9(11) |
| 1640 | 1650 | PO Box (P) Records with Primary Number Error   **OPT – FILLER** | 11 | 9(11) |
| 1651 | 1661 | RR/HC (R) Records with Primary Number Error   **OPT – FILLER** | 11 | 9(11) |
| 1662 | 1672 | Firm (F) Records with Primary Number Error      **OPT – FILLER** | 11 | 9(11) |
| 1673 | 1683 | Total Secondary Number Error        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1684 | 1694 | Street (S) Records with Secondary Number Error <br> **OPTIONAL – FILLER** | 11 | 9(11) |
| 1695 | 1705 | High Rise (H) Records with Secondary Number Error <br> **OPTIONAL - FILLER** | 11 | 9(11) |
| 1706 | 1716 | Firm (F) Records with Secondary Number Error   **OPT – FILLER** | 11 | 9(11) |
| | | | | |
| | | **LACS<sup>Link</sup> Product Information** | | |
| 1717 | 1746 | LACS<sup>Link</sup> Software Name | 30 | X(30) |
| 1747 | 1758 | LACS<sup>Link</sup> Software Version | 12 | X(12) |
| 1759 | 1766 | LACS<sup>Link</sup> Data Release Numeric. Format CCYYMMDD | 8 | 9(8) |
| | | | | |
| | | **LACS<sup>Link</sup> Return Codes** | | |
| 1767 | 1777 | A – LACS<sup>Link</sup> Record Match        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1778 | 1788 | 00 – No Match        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1789 | 1799 | 14 – Match – Found LACS<sup>Link</sup> Record – New Address would not convert <br> **OPTIONAL – FILLER** | 11 | 9(11) |
| 1800 | 1810 | 92 – Match with Secondary Number Dropped on Input <br> **OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **From DPV Processing of Input Addresses – Additional Return Codes** | | |
| 1811 | 1821 | F1 – Military        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1822 | 1832 | U1 – Unique ZIP Code        **OPTIONAL – FILLER** | 11 | 9(11) |
| 1833 | 1843 | G1 – General Delivery        **OPTIONAL – FILLER** | 11 | 9(11) |

# NCOA^Link END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | NCOA^Link MONTHLY CUSTOMER SERVICE LOG<br>END USER MAILER<br>Detail Record<br>(page 7 of 8)<br><br>FIELD NAME and DESCRIPTION | LENGTH | COBOL |
|---|---|---|---|---|
| | | | | |
| | | **From NCOA^Link File Run – Additional Footnote Codes** | | |
| 1844 | 1854 | NL – New address not DPV confirmable with vendor software. (Required only when this code is returned to the customer) | 11 | 9(11) |
| | | | | |
| | | **ANK^Link and corresponding NCOA^Link Return Codes and Definition** | | |
| 1855 | 1865 | 77 – A – Match | 11 | 9(11) |
| 1866 | 1876 | 77 – 91 – Match with Secondary No. Dropped on COA (Old Side) | 11 | 9(11) |
| 1877 | 1887 | 77 – 92 – Match with Secondary Number Dropped on Input | 11 | 9(11) |
| 1888 | 1898 | 77 – 01 – Match – Foreign Move | 11 | 9(11) |
| 1899 | 1909 | 77 – 02 – Match – Moved Left No Address | 11 | 9(11) |
| 1910 | 1920 | 77 – 03 – Match – PO Box Closed | 11 | 9(11) |
| 1921 | 1931 | 77 – 04 – No Match – Family move - Street Address w/Secondary | 11 | 9(11) |
| 1932 | 1942 | 77 – 05 – Match – New 11 digit DPBC is ambiguous | 11 | 9(11) |
| 1943 | 1953 | 77 – 06 – No Match – Middle Name Related | 11 | 9(11) |
| 1954 | 1964 | 77 – 07 – No Match – Gender Related | 11 | 9(11) |
| 1965 | 1975 | 77 – 08 – No Match – Conflicting Instructions | 11 | 9(11) |
| 1976 | 1986 | 77 – 09 – No Match – Family move from Highrise default | 11 | 9(11) |
| 1987 | 1997 | 77 – 10 – No Match – Family move from Rural/HC Route default | 11 | 9(11) |
| 1998 | 2008 | 77 – 11 – No Match – Individual move – Insufficient name data | 11 | 9(11) |
| 2009 | 2019 | 77 – 18 – No Match – Family move from General Delivery | 11 | 9(11) |
| 2020 | 2030 | 77 – 19 – No Match – New Address not ZIP+4 codeable | 11 | 9(11) |
| 2031 | 2041 | 77 – 20 – No Match – Multiple Response – Conflicting Directions | 11 | 9(11) |
| 2042 | 2052 | 77 – 12 – No Match – Middle Name test failed | 11 | 9(11) |
| 2053 | 2063 | 77 – 13 – No Match – Gender test failed | 11 | 9(11) |
| 2064 | 2074 | 77 – 14 – Match – New Address would not convert | 11 | 9(11) |
| 2075 | 2085 | 77 – 15 – No Match – Individual Name insufficient on input | 11 | 9(11) |
| 2086 | 2096 | 77 – 16 – No Match – Secondary Number discrepancy | 11 | 9(11) |
| 2097 | 2107 | 77 – 17 – No Match – Different First Name | 11 | 9(11) |
| 2108 | 2118 | 77 – 66 – No Match – Input Address appears in "Daily Delete" suppression file | 11 | 9(11) |
| 2119 | 2129 | 77 – Total records matched using ANK^Link | 11 | 9(11) |
| | | | | |
| | | **LACS^Link Return Codes – Additional Return Code** | | |
| 2130 | 2140 | 09 – LACS^Link – Old Addr Highrise Default – No New Address<br>**OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **NCOA^Link Product Version** | | |
| 2141 | 2141 | NCOA^Link Product Version | 1 | X(1) |
| | | A = 48 HASH | | |
| | | B = 48 FLAT | | |
| | | C = 18 HASH | | |
| | | D = 18 FLAT | | |
| | | E = ANK HASH | | |
| | | F = ANK FLAT | | |
| | | | | |
| 2142 | 2142 | High Match Rate Description – NCOA^Link Match Percentage greater than 20% | 1 | X(1) |
| | | A = ANK^Link Extract File (FSP only) | | |
| | | S = Stage I or Stage II File | | |
| | | R = Returned Mail File | | |
| | | | | |
| | | **Suite^Link Product Information** | | |
| 2143 | 2172 | Suite^Link Software Name | 30 | X(30) |
| 2173 | 2184 | Suite^Link Software Version | 12 | X(12) |
| 2185 | 2192 | Suite^Link Data Release Date | 8 | 9(8) |

# NCOA™ END USER
## LICENSEE PERFORMANCE REQUIREMENTS

| RECORD FROM | POSITION TO | FIELD NAME and DESCRIPTION | LENGTH | COBOL |
|---|---|---|---|---|
| | | **NCOA<sup>Link</sup> MONTHLY CUSTOMER SERVICE LOG**<br>**END USER MAILER**<br>**Detail Record**<br>**(page 8 of 8)** | | |
| | | **Suite<sup>Link</sup> Return Codes** | | |
| 2193 | 2203 | Suite<sup>Link</sup> Return Code A – Match  **OPTIONAL – FILLER** | 11 | 9(11) |
| 2204 | 2214 | Suite<sup>Link</sup> Return Code 00 – No Match  **OPTIONAL – FILLER** | 11 | 9(11) |
| | | | | |
| | | **NCOA<sup>Link</sup> Return Codes (continued)** | | |
| 2215 | 2225 | NCOA<sup>Link</sup> Return Code 21 – To Be Determined | 11 | 9(11) |
| 2226 | 2236 | NCOA<sup>Link</sup> Return Code 22 – To Be Determined | 11 | 9(11) |
| 2237 | 2247 | NCOA<sup>Link</sup> Return Code 23 – To Be Determined | 11 | 9(11) |
| 2248 | 2258 | NCOA<sup>Link</sup> Return Code 24 – To Be Determined | 11 | 9(11) |
| 2259 | 2269 | NCOA<sup>Link</sup> Return Code 25 – To Be Determined | 11 | 9(11) |
| 2270 | 2280 | NCOA<sup>Link</sup> Return Code 26 – To Be Determined | 11 | 9(11) |
| 2281 | 2291 | NCOA<sup>Link</sup> Return Code 27 – To Be Determined | 11 | 9(11) |
| 2292 | 2302 | NCOA<sup>Link</sup> Return Code 28 – To Be Determined | 11 | 9(11) |
| 2303 | 2313 | NCOA<sup>Link</sup> Return Code 29 – To Be Determined | 11 | 9(11) |
| 2314 | 2324 | NCOA<sup>Link</sup> Return Code 30 – To Be Determined | 11 | 9(11) |
| | | | | |
| | | **ANK<sup>Link</sup> Return Codes (continued)** | | |
| 2325 | 2335 | 77 – 21 – To Be Determined | 11 | 9(11) |
| 2336 | 2346 | 77 – 22 – To Be Determined | 11 | 9(11) |
| 2347 | 2357 | 77 – 23 – To Be Determined | 11 | 9(11) |
| 2358 | 2368 | 77 – 24 – To Be Determined | 11 | 9(11) |
| 2369 | 2379 | 77 – 25 – To Be Determined | 11 | 9(11) |
| 2380 | 2390 | 77 – 26 – To Be Determined | 11 | 9(11) |
| 2391 | 2401 | 77 – 27 – To Be Determined | 11 | 9(11) |
| 2402 | 2412 | 77 – 28 – To Be Determined | 11 | 9(11) |
| 2413 | 2423 | 77 – 29 – To Be Determined | 11 | 9(11) |
| 2424 | 2434 | 77 – 30 – To Be Determined | 11 | 9(11) |
| | | | | |
| 2435 | 2999 | FILLER | 565 | X(565) |
| | | | | |
| 3000 | 3000 | Record Type – H = Header/ D = Detail | 1 | X(1) |
| | | | | |
| | | CR/LF<br>Carriage Return/Line Feed required at end of each record. | | |

**Note:** All numeric fields are right justified, zero filled.
All alphanumeric fields are left justified, spaced filled.

**Note:** This file shall be submitted in standard ASCII text format and electronically transmitted to the NCSC. The file shall be named using "C," the 4-character code assigned by the NCSC, the 1-character code for the month and the year with an extension of DAT. (e.g. CNAAAC02.DAT)

DS50

**NCOA<sup>Link®</sup> END USER MAILER**
**ANK<sup>Link™</sup> LICENSEE PERFORMANCE REQUIREMENTS**

## *Introduction*

The United States Postal Service$^®$ (USPS$^®$) has developed an extended option to the 18 month version of NCOA$^{Link®}$ called ANK$^{LinkTM}$. The 18-month NCOA$^{Link}$ Product provides change-of-address data for moves that occurred in the past eighteen months. The initial version of ANK$^{Link}$ will enable NCOA$^{Link}$ Licensees to optionally acquire an additional thirty months of data. This data will not reveal the new address, but will inform mailers of customer moves that occurred in months 19 through 48, along with the date that the move took place.

### 1. *General Requirements*

1.1   ANK$^{Link}$ will be available only to users of the 18-month NCOA$^{Link}$ Product and will be a component of that product.

1.2   To initiate ANK$^{Link}$, a modified Certification process will be used for existing NCOA$^{Link}$ End User Mailer Licensees:

a.   Resubmit the Application from the Certification Procedures package indicating ANK$^{Link}$ will be a part of Licensee's processing.

b.   Obtain an Interface Product, through development or purchase, which has been certified to perform ANK$^{Link}$ processing,

c.   Request and pass a Stage II NCOA$^{Link}$ with ANK$^{Link}$ certification test when ANK$^{Link}$ Interface is completed.

1.3   NCOA$^{Link}$ with ANK$^{Link}$ application and certification procedures shall be incorporated into the NCOA$^{Link}$ application and certification procedures for End User Mailer applicants.

### 2. *Specific Requirements*

2.1   The sole purpose of the ANK$^{Link}$ option is to enable mailers to make informed choices regarding a specific customer contact. If the data indicates a move, the mailer may choose to suppress the record from their list or attempt to determine the actual new address by engaging the services of an NCOA$^{Link}$ Full Service Provider Licensee.

2.2   All laws, rules and restrictions governing the use of NCOA$^{Link}$ data pertain with regards to ANK$^{Link}$ data. Information derived from an NCOA$^{Link}$ with ANK$^{Link}$ process shall not be utilized in any way inconsistent with the terms and conditions set forth in the NCOA$^{Link}$ License Agreements.

**NCOA<sup>Link</sup>® END USER MAILER**
**ANK<sup>Link</sup>™ LICENSEE PERFORMANCE REQUIREMENTS**

### 3. Standards of Performance

3.1   NCOA<sup>Link</sup> Licensees must conform to the latest published version of the NCOA<sup>Link</sup> Licensee Performance Requirements. Any changes will be published at http://ribbs.usps.gov/files/NCOALink.

3.2   NCOA<sup>Link</sup> with ANK<sup>Link</sup> interface will be tested with an NCOA<sup>Link</sup> Stage II test file in accordance with the NCOA<sup>Link</sup> license.

### 4. Reports and Administrative Requirements

4.1   NCOA<sup>Link</sup> Licensees exercising the ANK<sup>Link</sup> option will provide USPS with a monthly electronic statistics report. The statistical information required for ANK<sup>Link</sup> is incorporated into the NCOA<sup>Link</sup> Customer Service Log.


**UNITED STATES**
**POSTAL SERVICE**®

# Rates and Fees

Effective
May 14, 2007

**RETAIL RATES**

Express Mail
Priority Mail
First-Class Mail
Media Mail
Library Mail
Parcel Post

**DISCOUNT RATES**

**Letters**
First-Class Mail
Standard Mail
**Flats**
First-Class Mail
Media Mail
Library Mail
Standard Mail
Bound Printed Matter
**Parcels**
First-Class Mail
Standard Mail
Bound Printed Matter
Parcel Post
Media Mail
Library Mail
**Periodicals**

**FEES**

Extra Services
Recipient Services
Mailer Services
Other Fees and Charges

*Postal Explorer pe.usps.com*





## First-Class Mail
DISCOUNT LETTERS & CARDS

| Weight Not Over (ounces) | Automation | | | | Nonautomation |
|---|---|---|---|---|---|
| | 5-Digit | 3-Digit | AADC | Mixed AADC | Presorted[1] |
| 1 | $0.312 | $0.334 | $0.341 | $0.360 | $0.373 |
| 2 | 0.437 | 0.459 | 0.466 | 0.485 | 0.543 |
| 3 | 0.562 | 0.584 | 0.591 | 0.610 | 0.713 |
| 3.5 | 0.687 | 0.709 | 0.716 | 0.735 | 0.883[2] |
| Card Rate[3] | 0.191 | 0.204 | 0.208 | 0.220 | 0.241 |

1. Letters that meet one or more of the nonmachinable characteristics in DMM 201.2.1 are subject to the nonmachinable surcharge.

2. The maximum weight for machinable letter preparation is 3.3 ounces.

3. The card rate applies to each single or double postcard when originally mailed; reply half of double postcard must be designed for reply mail purposes only.


**UNITED STATES**
**POSTAL SERVICE**®

# Prices and Fees

Effective
May 12, 2008

### RETAIL PRICES

Express Mail

Priority Mail

First-Class Mail

Media Mail

Library Mail

Parcel Post

### COMMERCIAL PRICES

**Priority Mail**

**Letters**

First-Class Mail

Standard Mail

**Flats**

First-Class Mail

Media Mail

Library Mail

Standard Mail

Bound Printed Matter

**Parcels**

First-Class Mail

Standard Mail

Bound Printed Matter

Parcel Select

Media Mail

Library Mail

**Periodicals**

### FEES

Extra Services

Recipient Services

Mailer Services

Other Fees and Charges

*Postal Explorer pe.usps.com*







### First-Class Mail
COMMERCIAL LETTERS & CARDS

| Weight Not Over (ounces) | Automation | | | | Nonautomation |
|---|---|---|---|---|---|
| | 5-Digit | 3-Digit | AADC | Mixed AADC | Presorted[1] |
| 1 | $0.324 | $0.346 | $0.351 | $0.369 | $0.394 |
| 2 | 0.449 | 0.471 | 0.476 | 0.494 | 0.519 |
| 3 | 0.574 | 0.596 | 0.601 | 0.619 | 0.644 |
| 3.5 | 0.699 | 0.721 | 0.726 | 0.744 | 0.769[2] |
| Postcard[3] | 0.199 | 0.210 | 0.213 | 0.223 | 0.242 |

1. Letters that meet one or more of the nonmachinable characteristics in 201.2.1 are subject to the $0.20 nonmachinable surcharge.
2. The maximum weight for machinable letter preparation is 3.3 ounces.
3. The card price applies to each single or double postcard when originally mailed; reply half of double postcard must be designed for reply mail purposes only.



**Friday,**
**November 9, 2007**

**Part II**

# Postal Regulatory Commission

**39 CFR Parts 3001, 3010, 3015 and 3020**
**Administrative Practice and Procedure,**
**Postal Service; Final Rule**

## POSTAL REGULATORY COMMISSION

### 39 CFR Parts 3001, 3010, 3015 and 3020

[Docket No. RM2007–1; Order No. 43]

### Administrative Practice and Procedure, Postal Service

**AGENCY:** Postal Regulatory Commission.

**ACTION:** Final rule.

**SUMMARY:** A recently-enacted federal law directs the Commission to develop rules to implement a new postal ratemaking system. This document responds to that directive by adopting rules addressing market dominant and competitive products, including negotiated service agreements, the regulatory calendar, and product lists. Adoption of the rules allows the Postal Service and mailers to begin to exercise its options under the new law.

**DATES:** *Effective date:* November 9, 2007.

November 20, 2007: deadline for the Postal Service to provide information necessary for further development of the Mail Classification Schedule.

**FOR FURTHER INFORMATION CONTACT:**
Stephen L. Sharfman, General Counsel, 202–789–6820 and *stephen.sharfman@prc.gov.*

**SUPPLEMENTARY INFORMATION:**

### Regulatory History

72 FR 5230, February 5, 2007
72 FR 29284, May 25, 2007
72 FR 33261, June 15, 2007
72 FR 50744, September 4, 2007

### I. Introduction

This order marks the end of the first phase of the Commission's efforts to develop the system of modern rate regulation contemplated by the Postal Accountability and Enhancement Act (PAEA), Public Law 109–435, 120 Stat. 3198, December 20, 2006. The Order adopts final rules governing market dominant products, competitive products, and product lists. It represents the Commission's initial attempt to fashion a coherent set of regulations implementing the new rate-setting process, an effort that has been guided by the PAEA's bedrock principles, namely flexibility, accountability, and transparency.

Throughout this rulemaking process, which began in January 2007, the parties' comments have been helpful, particularly in the latest round, sharpening the issues and suggesting alternative resolutions. The Commission appreciates the parties' contributions. The final rules focus particularly on

comments and reply comments received in response to Order No. 26, which included proposed rules for regulating rates and classes under the PAEA.[1]

The final rules differ from the proposed rules in ways designed to clarify the rules in response to these comments. Principal highlights of the Order and final rules include: (1) Clarifying the intent of the proposed rules by specifying the content of notices of proceedings applicable to various types of filings, in lieu of uniform reliance on existing rule 3001.17; (2) Clarifying the legal implications of Commission findings in various proceedings; (3) Reaffirming the application of the rate cap to market dominant products; (4) Adopting a transition rule concerning the calculation of the annual limitation in the event of a transitional rate filing; (5) Clarifying the content of exigent rate requests; (6) Reaffirming that each negotiated service agreement (NSA) is a separate product, but noting that functionally equivalent NSAs may, upon proper showing, be grouped as one product; and (7) Adopting initial lists of market dominant and competitive products.

The final rules are issued almost 8 months before the statutory deadline. The rules do not purport to address every issue that might arise under the PAEA. Nonetheless, the benefits of implementing the regulations on an accelerated basis outweigh potential refinements in the rules that might be possible if the full 18-month period provided by statute were used. *See* 39 U.S.C. 3622(a) and 3633(a). With experience, the rules may be modified if deemed necessary.

With the first phase of implementing the PAEA at an end, the Commission intends to turn as quickly as practicable to issuing proposed regulations on related matters under the PAEA, including those involving complaints, reporting requirements, and commercially sensitive materials. With the basic framework now in place, the Postal Service is free to utilize new flexible pricing approaches. Pending implementation of regulations on these related matters, the Commission's existing rules will continue to apply.

### II. Regulation of Market Dominant Products: Part 3010

#### A. Overview

The Commission appreciates the commenters' thoughtful review of proposed part 3010 and their reasoned observations. It concludes that there is a broad consensus that the proposal's overall direction comports with the PAEA's philosophy. However, it also acknowledges that commenters identify aspects of the initial effort that would benefit from clarification or correction.

A considered assessment of the commenters' suggestions results, in some instances, in revisions to the rules.[2] The Commission, on its own accord, also makes editorial and conforming changes to improve the clarity and readability of the rules or to conform them more closely to official publication requirements.

#### 1. Note on Due Process

Review of the comments indicates that there are two broad due process concerns. One pertains to the Commission's issuance of rules implementing only some aspects of the PAEA's new regulatory framework. The other focuses on the approach reflected in specific rules in the proposals that have been issued.

The Postal Service and most commenters addressing finalization of part 3010 recognize that this is one of the first steps the Commission is taking to implement the PAEA, and that it is developing complementary regulations on related matters, such as annual reporting requirements and complaint proceedings. The Commission appreciates that commenters are being asked to assess the advisability of certain procedures prior to issuance of a comprehensive set of regulations. However, it finds that pragmatic considerations and the interest in promptly implementing PAEA policies dictate serial issuance of new rulemaking proposals, rather than a complete set. Moreover, the Commission believes that issuance of the proposed regulations in parts 3010, 3015 and 3020 at the same time has provided commenters with an adequate basis for assessing many essential initial issues. However, as Advo observes with respect to all of the Order No. 26 proposals, " * * * the true measure of their success will come when they are applied * * * to specific issues that arise in the future." Advo Comments,

---

[1] In this proceeding, the Commission has received more than 160 comments. In response to Order No. 26 alone, 58 sets of comments were filed. The Commission has carefully reviewed these comments and, where appropriate, addresses them in this Order.

[2] Discussion focuses primarily on comments suggesting the need for changes. In instances where more than one commenter present similar suggestions, the discussion sometimes focuses mainly on one commenter's submission.

September 24, 2007, at 1. The Commission recognizes this, and intends to provide an opportunity to address concerns about conflicts, gaps, or the need for other adjustments as the need arises.

As to the specific proposals, some are concerned that the approach the Commission has adopted with respect to notices, public participation, and Commission review either is not consistent with due process considerations or does not make clear that the Commission intends to honor pertinent requirements. See, for example, Valpak Comments, September 24, 2007, at 3–16 and 20–27; Medco Comments, September 24, 2007, at 4–10; OCA Comments, September 24, 2007, at 12–15, and APWU Comments, September 25, 2007, at 1–4. In brief, the Commission believes that the rules, as proposed, are consistent with pertinent due process considerations. However, it appears that there are several areas where improvements can be made to make the Commission's intentions more clear, without imposing undue burden on the Postal Service or the Commission or compromising the PAEA's new regulatory approach. Accordingly, the Commission reconsiders its approach to several matters and revises or clarifies affected rules to reflect this decision. The Commission provides a single discussion of the matter here.

2. The Role of the Administrative Procedure Act

As the Commission has noted in Order No. 26, there is a tension in the PAEA between its goals of facilitating rapid and flexible adjustments to rates and classifications, and increasing the transparency and accountability of those processes.[3] The regulations that the Commission proposed to govern Postal Service notices of rate adjustment for market dominant products, as well as changes to the Mail Classification Schedule, were intended to afford opportunities for public participation that meet the basic guarantees of public participation provided for by the PAEA and the Administrative Procedure Act (APA) (chapter 5 of title 5 of the United States Code), either explicitly or implicitly.

With respect to Type 1 rate adjustments, the essential features of the proposed regulations were requirements that the public receive notice of the proposed rate adjustment from both the

Postal Service and the Commission (proposed rule 3010.10(a)), a 20-day period for public comment (proposed rule 3010.13(a)), and a 14-day period for the Commission to evaluate the consistency of the rates proposed with the relevant requirements of the PAEA and issue its findings (proposed rule 3010.13(c)).

*Applicability of the APA.* Medco concludes that Commission orders that determine the status of the Postal Service's rate proposals are "rulemakings" subject to section 553 of the APA. *See* 5 U.S.C. 553. It argues that rate adjustments provided for in the PAEA fall unambiguously within the applicable definition of a rule for purposes of the APA, citing 5 U.S.C. 551(4):

'[R]ule' means the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy * * * and includes the approval or prescription for the future of rates. * * *

Medco Comments, September 24, 2007, at 5.

Consequently, Medco notes, Commission review of rate adjustments, such as those provided for in 39 U.S.C. 3622(d)(1)(C)(ii), is informal "rulemaking" that is subject to the notice and comment requirements of 5 U.S.C. 553 of the APA. *Id.*

Because a "rule" can be of either "general or particular applicability," the definition covers the adjustments that the Postal Service might propose to both Type 1 (general) and Type 2 (NSA) rates. Section 503 of title 39 authorizes the Commission to make such rules as are "necessary and proper" to carry out its duties. That section states that Commission rules, are "subject to chapters 5 and 7 of title 5." (Section 553 of the APA is placed within chapter 5 of title 5.) Medco cites *National Easter Seal Society* v. *USPS,* 656 F.2d 754, 767 (D.C. Cir. 1981) as confirming this interpretation of what is now 39 U.S.C. 503. Because Commission orders that determine the status of postal rates are "rules," and are subject to the requirements of 5 U.S.C. 553, Medco explains, Commission review of the Postal Service's rate adjustment proposals must satisfy the notice and public comment requirements of section 553. *Id.,* at 3.

5 U.S.C. 553 requires that an agency:

(1) Publish notice of the proposed rule in the **Federal Register**, and that it include "either the terms or substance of the proposed rule or a description of the subjects and issues involved";

(2) "[G]ive interested persons an opportunity to participate in the rulemaking

through submission of written data, views, or arguments * * *";

(3) Consider "the relevant matter presented"; and

(4) "[I]ncorporate in the rules adopted a concise general statement of their basis and purpose."

Medco emphasizes that complying with these section 553 obligations is mandatory unless an exception can be shown to apply. *Id.* at 7.

*The public notice requirements of section 553.* With respect to Type 1 notices of rate adjustment, Order No. 26 proposed that the Commission "publish notice of the [Postal Service rate adjustment filing] in the **Federal Register**" and "post the filing on its Website." *See* proposed rule 3010.13(a)(1). The Commission intended that consistent with existing rule 3001.17(d), APA notice requirements would be satisfied.[4] This pattern was followed in the remainder of the rules proposed in Order No. 26 that address various forms of pre-implementation review by the Commission. Valpak asserts that this set of notice requirements would not have satisfied section 553 of the APA because the proposed rules did not expressly require that they include the terms of the proposal (*e.g.,* proposed rates) or any supporting detail. Valpak Reply Comments, October 9, 2007, at 9.

Although the Commission fully expected to issue notices that complied with the content requirement of section 553, it accepts that uncertainty is diminished by specifying this intention in every applicable regulation. The Commission revises its proposed regulations governing public notices to explicitly include the categories of information that section 553 requires. Under the final rules, the public can be assured that such notices will contain summaries of the Postal Service's proposed rate and classification-related changes in sufficient detail to satisfy the notice requirements of the APA. *See* final rules 3010.13(a), 3010.44(a), 3010.65(a), 3020.33, 3020.53, and 3020.73.[5]

*The public comment requirements of 5 U.S.C. 553.* The regulations proposed in Order No. 26 would have allowed the public 20 days from the filing of a proposed Type 1 rate adjustment to comment on whether the proposed rates

---

[3] *See* PRC Order No. 26, ¶¶ 3070, 3074. This tension is readily apparent from 39 U.S.C. 3622(b)(6), which simultaneously calls for reducing the administrative burden and increasing transparency relative to the system that prevailed under the Postal Reorganization Act.

[4] Order No. 26 also proposed that the Postal Service "[p]rovide public notice in a manner reasonably designed to inform the mailing community and the general public that it intends to change rates. * * *" *See* proposed rule 3010.10(a)(1). This is designed to fulfill the requirement of section 3622(d)(1)(C) of the PAEA.

[5] No party contested notice applicable to competitive products.

comply with the rate cap provisions of the Commission's proposed rules and whether they comply "with the policies of 39 U.S.C. 3622." *See* proposed rule 3010.13(b)(2). The regulations proposed in Order No. 26 did not specifically provide for public comment on proposed Type 2 rate adjustments. *See* proposed rule 3010.41.

*Commenters' positions.* Some commenters argue that the regulations proposed in Order No. 26 provided opportunities for public comment during the pre-implementation period that went beyond what the PAEA intended. Advo Reply Comments, October 9, 2007, at 3; DFS Comments, September 24, 2007, at 2–4; and PostCom Comments, September 24, 2007, at 1–3. Another group of commenters argued that these opportunities were inadequate to honor the PAEA's directive to increase transparency and accountability in the rate-setting process, and inadequate to satisfy even the minimum requirements of the APA. APWU Reply Comments, October 9, 2007, at 1–2; Medco Comments, September 24, 2007, at 2–5; McGraw-Hill Reply Comments, October 9, 2007, at 4–5; NAA Reply Comments, October 9, 2007, at 1–5; OCA Reply Comments, October 9, 2007, at 3–4; Valpak Comments, September 24, 2007, at 2–16, 20–23; and Valpak Reply Comments, October 9, 2007, at 1–34.

Advo argues that Congress did not contemplate, and the Commission should not allow, any public input prior to implementation of the Type 1 or Type 2 rates. It points out the PAEA provides for public comment during pre-implementation review of proposed Type 3 rates (those prompted by "extraordinary" circumstances), but makes no mention of them in the context of pre-implementation review of Type 1 and Type 2 rates. From this Advo infers that Congress meant to prohibit public participation in pre-implementation review wherever it did not expressly require it. Advo Reply Comments, October 9, 2007, at 1–3.

DFS contends that no issues may be commented upon or considered by the Commission at the pre-implementation stage except compliance with the rate cap. It takes the view that the objectives and factors governing postal rate setting set out in section 3622(b) and (c) are relevant only to the process by which the Commission designs a "modern system of ratemaking" for market dominant products. DFS Reply Comments, October 9, 2007, at 5–7.

PostCom and the Postal Service offer another rationale for reaching the conclusion that public comment on any compliance issue other than the rate cap

at the pre-implementation stage conflicts with the PAEA. They argue that the scope of pre-implementation review is necessarily limited by the changed role that the Commission plays in rate setting under the PAEA. They assert that it is the role of the Postal Service rather than the Commission to balance the elaborate list of largely qualitative objectives and factors that apply to the modern system of ratemaking when proposing changes in rates. They contend that Commission review is relevant only where a clear violation of one of those objectives or factors can be demonstrated. They argue that the rate cap is the only section 3622 requirement that is concrete and objective enough to be susceptible to such a finding. Therefore, in their view, compliance with the cap is the only issue upon which public comment might be relevant to Commission review.

They emphasize that the rate-setting apparatus described in 39 U.S.C. 3622(d) focuses on the rate cap and its administrative details. In particular, they note that section 3622(d) provides for a feedback mechanism to resolve only the issue of non-compliance with the rate cap. This supports the conclusion that Congress intended the rate cap and its administration to be the only concern of pre-implementation review. PostCom Reply Comments, October 9, 2007, at 1–3; and Postal Service Reply Comments, October 9, 2007, at 14–17. A number of other commenters agree that pre-implementation public comment and Commission review should be confined to the issue of rate cap compliance. *See* ANM/MPA Comments, September 24, 2007, at 2; NPPC Comments, September 24, 2007, at 2; Pitney Bowes Comments, September 24, 2007, at 7–8; and Time Warner Comments, September 24, 2007, at 4–5.

Another group of commenters take the opposing position, namely that failing to provide an opportunity for public comment before rate or classification changes take effect, or restricting the scope of the issues that such comments may address, undermines the PAEA's objective of increasing the transparency and accountability of the rate-setting system (*see* 3622(b)(6)) and violates section 553 of the APA.[6] They note that section 553(c) requires an agency to allow interested persons to "participate" in substantive rulemakings by submitting "written data, views, or arguments * * *" They

note that section 553(c) also requires an agency order adopting a rule to include " 'a concise general statement of the basis and purpose' " after considering the " 'relevant matter' " that has been presented in the course of the rulemaking. Medco Comments, September 24, 2007, at 3. These commenters acknowledge that in addressing pre-implementation procedures in 39 U.S.C. 3622(d), the PAEA emphasizes compliance with the rate cap. But, they point out, there is no language in section 3622(d) or elsewhere in chapter 36 that excludes broader pre-implementation review by the Commission. Therefore, they argue, there is no legal ground for excluding either the objectives and factors listed in section 3622, or the general policy provisions of title 39, from pre-implementation review. Valpak Reply Comments, October 9, 2007, at 12, 20; Medco Comments, September 24, 2007, at 7; and McGraw-Hill Reply Comments, October 9, 2007, at 5.

These commenters also acknowledge that expedition and flexibility in rate setting are among the PAEA's goals, and that the Commission has a good deal of discretion to set priorities with respect to which compliance issues it will focus on in the limited time it has set aside for pre-implementation review. They contend, however, that prohibiting public comment outright on statutory policies, objectives, and standards that would be affected by the rates under Commission review would not allow some compliance issues to be evaluated by APA mandated procedures. This, they suggest, would have the effect of selectively reading section 503 of title 39 (which subjects substantive Commission orders to the requirements of the APA) out of the statute. *See* Medco Comments, September 24, 2007, at 4–5, 7.

It is certain, Medco and others argue, that barring public comment altogether before adopting a substantive rule violates the notice and comment guarantee of section 553 of the APA. They note that regulations proposed in Order No. 26 do not explicitly assure an opportunity for public comment with respect to amended notices of Type 1 rate adjustments, all Type 2 rate adjustments, and significant classification changes that do not require amendments to the market dominant and competitive product lists. They argue that deferring consideration of the public's views to various *post hoc* forms such as the Commission's annual compliance report required by 39 U.S.C. 3653 or a complaint filed under 3662 does not preserve the interests protected by 5 U.S.C. 553. Those interests include

---

[6] *See generally* Medco and Valpak comments, and the reply comments of McGraw-Hill, NAA, the OCA, and Valpak.

the chance for the public to be heard before a rule has been finalized when its comments are more likely to influence the agency's rule. *See* Valpak Reply Comments, October 9, 2007, at 6, 7, and 16.

*Commission analysis.* The tension between the groups interpreting the PAEA as mandating little, if any, pre-implementation review of proposed changes in postal rates and classes, and those interpreting it as requiring that all issues are reviewable prior to implementation, is clear. It is equally clear that the Commission can interpret its responsibilities in a way that reconciles the flexibility and expedition that the PAEA requires with the public participation guarantees of the APA.

A statute should be construed "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Pennsylvania Medical Society* v. *Snider*, 29 F.3d 886, 895 (3d Cir. 1994). The court observed in *Citizens to Save Spencer County* v. *EPA:*

[i]f inconsistent provisions point generally in a common direction, it is the task of an agency with requisite authority to pursue a middle course that vitiates neither provision but implements to the fullest extent possible directives of each, * * *

600 F.2d 844, 870 (D.C. Cir. 1979). This is particularly true if a construction can be found that will give force to and preserve all the provisions of the statute. *FDA* v. *Brown and Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000). Accordingly, the Commission reconciles those provisions of the PAEA that promote flexible and expedited rate setting with those that foster transparent and accountable rate setting.

To do this, it helps to clearly identify the statutory purposes that need to be reconciled. The Commission concludes that one of Congress's main motives in enacting the PAEA was to simplify and expedite the setting of postal rates. It further concludes that Congress intended to give the Postal Service wide latitude in designing specific rates and rate relationships, expecting that the Commission would alter those decisions only where disregard of particular statutory standards is clear. Consequently, the Commission now plays a different role in reviewing proposed rates prior to their implementation than it has in the past.

The Commission also concludes that Congress expected that a modern system for regulating rates and classes would afford the public and the Commission only a limited period of pre-implementation comment and review. This finding is supported primarily by

the 45-day period of advance notice of proposed changes in rates that is referenced in section 3622(d)(1)(C). This provision indicates that Congress viewed 45 days as an adequate review period for the compliance issues that would be raised prior to implementing new rates. This implies that the pre-implementation issues with which Congress expected the Commission to deal would be few enough, or the level of scrutiny would be light enough, to allow the Commission to evaluate them adequately within 45 days. The inference is strong that Congress contemplated that complicated or subjective compliance issues would be addressed during the annual compliance review, or through the complaint procedures of section 3662.

Even though Congress intended limited pre-implementation review of postal rate changes, it must be presumed that Congress was aware of 5 U.S.C. 553 and the limits it sets on the extent to which public participation can be deferred until after a rule is finalized. That APA provision is designed to ensure that the opinion of those whose interests will be affected by an agency's rules will be heard before a rule is finalized, not after. Courts have emphasized the distinction:

The EPA overlooks, however, the crucial difference between comments before and after rule promulgation. Section 553 is designed to insure that [parties affected by an agency decision] have an opportunity to participate in and influence agency decision-making at an early stage, when the agency is more likely to give real consideration to alternative ideas.

*United States Steel Corp.* v. *EPA,* 595 F.2d 207, 214 (5th Cir. 1979), rehearing granted 598 F.2d 915.[7]

The Commission notes that neither the PAEA nor its legislative history explicitly define the scope of public input or Commission review of proposed rates prior to their implementation. It concludes that the weight of the inferences that may be drawn from the provisions of the PAEA itself indicate that Congress intended to leave room for Commission discretion in determining the degree of public input that would be afforded in the pre-implementation period, the form that it should take, and what priority the Commission would give to evaluating

the public input that it decided to elicit. Given this, the most likely and most reasonable assumption is that Congress expected the Commission to give as much consideration as it could to the issues most capable of resolution in the brief period that the PAEA provides, without violating the minimum guarantees that 5 U.S.C. 553 provides.

The Commission can give close scrutiny to only a limited number of compliance issues in the time available before rate changes are implemented, but it can not always predict in advance precisely which issues will be of highest priority. In recognition of that fact, the final rules adopted by the Commission require the Postal Service to address a broad range of relevant issues in any notice of rate adjustment, but clarify that the Commission focus must be primarily on the requirements of 39 U.S.C. chapter 36, subchapter 1. See final rules 3010.13 and 3010.14.[8]

PRC Order No. 26, ¶ 2029 commented that the Commission would not entertain comments on costing methodology during the pre-implementation period. Valpak and NNA infer from this that the Commission proposed to prohibit public comments from discussing any issue that involves attributable costs. Valpak Comments, September 24, 2007, at 5; Valpak Reply Comments, October 9, 2007, at 29–34; and NNA Comments, September 24, 2007, at 8. Valpak argues that the requirement that classes and services cover their attributable costs remains a requirement of the PAEA (*see* 39 U.S.C. 3622(c)(2)), just as it was under the Postal Reorganization Act. Valpak goes on to identify more than a dozen basic policies, objectives, and factors in title 39 that have no force unless attributable cost levels for the various classes and services are known. Valpak argues that it is inconsistent for the rules proposed in Order No. 26 to

---

[7] *See also, City of New York* v. *Diamond,* 379 F. Supp. 503, 517 (S.D.N.Y. 1974) ("Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way * * *"). *Accord, Maryland* v. *EPA,* 215, 222 (4th Cir. 1975); vacated on other grounds *sub nom. EPA* v. *Brown,* 431 U.S. 99 (1977).

[8] Within the 45-day period contemplated for pre-implementation review, the Commission is likely to be able to scrutinize and reach definitive conclusions on compliance issues that are factually clear and straightforward-such as rate cap compliance, or compliance with formulas for calculating preferred rates. Commission review of more complex or nuanced issues within that timeframe is likely to be somewhat less thorough, and any conclusions that it reaches are likely to be of a preliminary nature. For that reason, final rule 3010.13(j) distinguishes between the effect of the Commission's pre-implementation findings concerning formula-determined caps and rates, and other issues. The Commission will treat its findings concerning the former as decided on the merits for purposes of subsequent proceedings, but will not attach comparable presumptions to findings concerning the consistency of a proposed change with complex or subjective policy factors. Final rule 3010.13(j) responds to a suggestion by GCA that this dichotomy be reflected in the Commission's rules. *See* GCA Comments, September 24, 2007, at 5–6.

allow comments of section 3622 requirements generally in the pre-implementation review period, but single out costs for exclusion from consideration.

The comment in Order No. 26 of which Valpak and NNA complain may not have been adequately explained. The merits of one attribution methodology relative to another is an example of an issue that is too complex to be re-evaluated in a pre-implementation context. Cost attribution methods should be reviewed in other rulemaking proceedings. Whether rates properly reflect costs will be judged using the most recently approved attribution methodologies.

Final rule 3010.13 retains the 20-day period for public comment proposed in Order No. 26. Some commenters complain that Order No. 26 did not analyze the adequacy of this amount of time to afford a meaningful opportunity to respond to the issues that proposed rates might raise, as 5 U.S.C. 553 requires. Medco Comments, September 24, 2007, at 8; and Valpak Reply Comments, October 9, 2007, at 12. The adequacy of the 20-day comment period must be viewed in the context of the PAEA's goals. Major goals are to simplify and expedite the process by which rates are adjusted. Routinely enlarging the public comment period would reduce the time available to the Commission to evaluate the comments received, if it is to provide the expedition that Congress contemplated. Twenty days should be adequate to allow interested persons to identify and explain perceived failures to conform to the statutory requirements.

*Type 1 and Type 2 rate adjustments compared.* The notice and comment guarantees of section 553 of the APA apply to both Type 1 and Type 2 rate adjustments. The Commission's final rules, however, still distinguish between Type 1 and Type 2 review. Where the scope of public comments and Commission orders addressing Type 1 rate adjustments primarily focus on the requirements of 39 U.S.C. 3622(d), the scope of comments and orders addressing Type 2 rate adjustments focus on compliance with the requirements of 39 U.S.C. 3622(c)(10).

Similarly, where the period for public comments addressing Type 1 rate adjustments is 20 days from the Postal Service's filing, the period for public comments addressing Type 2 adjustments is 10 days from the Postal Service's filing. This reflects the narrower potential compliance issues that Type 2 rate adjustments raise, and a lesser need for review for such

adjustments. *Compare* final rule 3010.13(c) with final rule 3010.44.

*Implementation dates under the APA.* Section 553(d) of the APA states that:

The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
[A] substantive rule which grants or recognizes an exemption or relieves a restriction;
[I]nterpretative rules and statements of policy; or
[A]s otherwise provided by the agency for good cause found and published with the rule.

If one were to add the 20-day comment period to the 14-day period that the Commission will allow itself for issuing an order regarding a proposed rate adjustment, and add a 30-day waiting period before the order could take effect, the total number of days required before a proposed rate adjustment could take effect would exceed the 45 day pre-implementation period provided for in section 3622(d)(1)(C). Recognizing this possibility, DFS urges the Commission to routinely accompany its rate adjustment orders with findings that there is good cause to waive the 30-day waiting period. It argues that the Commission could base its finding of good cause on the generalized notion that the PAEA puts a high priority on allowing the Postal Service to change rates quickly. DFS Reply Comments, October 9, 2007, at 4.

Finding good cause, however, requires a showing that a 30-day waiting period is either "impractical, unnecessary, or contrary to the public interest." It is essentially an emergency procedure. *See Buschmann* v. *Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982).[9] Since the purpose of the section 553(d) waiting period is "to give affected parties a reasonable time to adjust their behavior before the final rule takes effect" (*Omnipoint* v. *FCC*, 78 F.3d 620, 630 (D.C. Cir. 1981)), it usually requires an analysis of specific interests that will be hurt and those that will be helped by waiver of the waiting period. *See, for example, American Bankers Association* v. *National Credit Union Administration*, 38 F. Supp. 2d 114, 139,140 (D.D.C. 1999); *Buschmann* v. *Schweiker. Id.* Accordingly, it would seem problematic for the Commission to require itself, by rule, to routinely determine that the factual circumstances surrounding a rate adjustment support a finding of "good cause" for waiver. The

Commission properly will consider such a finding on a case-by-case basis.

*Classification issues and the APA.* Several commenters criticize the rules proposed in Order No. 26 for failing to explicitly provide notice and public comment opportunities before changes in the Mail Classification Schedule are put into effect. They note the Commission's proposed rules allow for public comment before the Mail Classification Schedule is adopted, but make no provision for notice or public comment for major classification changes unless they involve amendments to the lists of market dominant or competitive products that the Commission is required to maintain under 39 U.S.C. 3642. *See* proposed rules 3020.33, 3020.53, and 3020.73. This, they contend, violates the notice and comment guarantees of section 553 of the APA. They also note that Order No. 26 proposed rules that would require 15 days' notice from the Postal Service prior to "updating" product descriptions in the Mail Classification Schedule, but would not have provided an opportunity for public comment on these changes. *See* proposed rules 3020.90 *et seq.* They contend that major classification changes can potentially be imposed through such updates. Medco Comments, September 24, 2007, at 9–10; OCA Comments, September 24, 2007, at 15–17; McGraw-Hill Reply Comments, October 9, 2007, at 2–3; and Valpak Comments, September 24, 2007, at 4, 15–16.

The Commission does not contemplate engaging in pre-implementation review of the merits of any classification change. However, to preserve Postal Service flexibility yet provide assurance that the Postal Service will not misuse the system for correcting the Mail Classification Schedule, additional opportunity for mailer comment is provided in the final rules. The Postal Service notices of planned classification changes will be posted on the Commission Web site and interested persons will be afforded the opportunity to comment. *See* chapter IV–B and rules 3020.91 through 3020.93.

3. Transparency Concerns

Several commenters assert that the rules proposed in Order No. 26 are inadequate to preserve, let alone increase, the transparency and accountability of postal rate setting under the PAEA relative to the regulatory regime under the Postal Reorganization Act. They make this assertion, in large part, because the Commission has not published proposed rules specifying the

[9] The need to meet tight statutory deadlines has been rejected as a justification for waiving the waiting period requirement. *U.S. Steel Corp.* v. *EPA*, 595 F.2d 207, 214 (5th Cir. 1979).

information that the Postal Service will be required to provide to the Commission as part of its periodic reporting under 39 U.S.C. 3652, and the information and issues that will be covered by the Commission's annual compliance report under 39 U.S.C. 3653. *See,* for example, Valpak Comments, September 24, 2007, at 6; and Valpak Reply Comments, October 9, 2007, at 4. NAA observes that:

[I]t is difficult to comment on * * * the proposed ratesetting rules without an understanding of how the Commission envisions the interplay between annual reporting requirements, the data submissions required to support notices of rate adjustments, and the respective roles of the reporting requirements and the complaint process.

NAA Comments, September 24, 2007, at 13.

The Commission anticipates issuing proposed rules soon after the close of this docket that specify the information that the Postal Service will provide in its periodic reporting under section 3652 to facilitate preparation of the annual compliance report that the Commission will provide pursuant to section 3653. Interested persons will have ample opportunity to identify the types of information that will best inform the Commission and the public, and assure the level of accountability and transparency contemplated by the PAEA. Data from the Postal Service's periodic reports under section 3652 will be available and provide the basis for pre-implementation analysis of the Postal Service's proposed rate adjustments, and will inform any complaints that might be filed by the public. The Commission is optimistic that the combination of pre-implementation review of rate changes, periodic reporting by the Postal Service, annual compliance reports by the Commission, and the complaint mechanism, all supported by the Commission's subpoena power, will serve to increase the level of transparency and accountability of postal rate setting under the PAEA relative to that which prevailed under the prior regulatory regime.

Ex parte communications. In PRC Order No. 26, ¶ 2026, the Commission remarked that:

[t]he Commission does not propose formal discovery, Notices of Inquiry, Presiding Officer's Information Requests, testimony, and hearings. It anticipates handling resolution of discrepancies or other matters through direct communication with the Postal Service.

Valpak criticizes these remarks, observing that:

PAEA-mandated transparency cannot be achieved by private communications, such as meetings or briefings held behind closed doors. Rather than achieving increased transparency, the result would be much-reduced transparency.

Valpak Comments, September 24, 2007, at 11–12.

Valpak misinterprets the Commission intentions for fact gathering during the pre-implementation review period. While the Commission does envision direct communications as an important method of promptly clarifying factual issues raised by the Postal Service's rate adjustment filings, it intends that the substance of those communications be made public in written memoranda placed in a public file. The Commission is aware that in formulating informal rules, which would include its orders determining compliance of proposed rate adjustments with the requirements of the PAEA, it must inform the public of the nature and substance of any exchanges with the Postal Service or other interested persons that address the merits of the proposed rate adjustment. The Commission anticipates issuing proposed rules regularizing ex parte procedures in the context of informal rulemakings soon after the conclusion of this docket. In the interim, if the Commission initiates ex parte communications concerning the merits of rate adjustment filings, including the accuracy of the data that support the filing, it will summarize the ex parte contact and place the summary in a public file shortly afterward.

**4. Complaints**

In the context of this rulemaking, several commenters have expressed their views on certain aspects of the complaint process. PostCom argues that the Commission should not hear complaints against proposed rates during the 45-day notice period before a CPI increase takes effect. PostCom also advocates limiting the hearing of complaints under section 205 of the PAEA to the time of the annual compliance review. PostCom acknowledges that the Commission will promulgate rules governing the complaint process in the near future, yet it believes that the Commission should "nevertheless take the opportunity in this proceeding to clarify this matter." PostCom Comments, September 24, 2007, at 2; *see also* MOAA Reply Comments, October 5, 2007, at 2, n.1. Other commenters oppose PostCom's proposed limitations on the filing of complaints on the grounds that they would unduly prejudice mail users or that the proposed limitations are contrary to the PAEA. GCA Reply

Comments, October 9, 2007, at 2–5; NAA Reply Comments, October 9, 2007, at 10–13.

NAA argues that the Commission should provide for expedited consideration of post-implementation complaints that allege a failure to meet the statutory conditions of 39 U.S.C. 3622(c)(10). Several commenters contend that (1) the standard for setting a complaint for proceedings should be construed generously, and (2) an expeditious complaint procedure should be adopted.[10] Other commenters believe that the complaint procedures are outside the scope of this rulemaking and these issues should be deferred to another rulemaking.[11]

These comments on the complaint process raise important policy considerations. They are, nonetheless, beyond the scope of this current rulemaking proceeding. The Commission does not find it appropriate in this proceeding to make any pronouncements on certain isolated aspects of the complaint process. The Commission will shortly initiate a separate rulemaking to consider modifications to the existing rules governing complaints, *see* 39 CFR 3001.81 *et seq.,* during which all interested persons can address all such issues. The Commission believes that the best way to make important policy decisions regarding the complaint process is by dealing with all complaint related issues together on a comprehensive basis.

In its comments, GCA asks the Commission to make it the "next item of business to propose and enact appropriate rules governing the complaint process * * *" GCA Comments, September 24, 2007, at 5. Another commenter echoes this plea. *See* Valpak Comments, September 24, 2007, at 6–7. The Commission acknowledges that the complaint process is of great importance to the PAEA's statutory scheme and will shortly issue proposed rules for public comment.

**5. Other Considerations**

Free Press and *The Nation,* in joint comments, raise concerns about the impact of the Commission's proposed implementation of a new ratemaking system on Periodicals. They say they

---

[10] GCA Comments, September 24, 2007, at 2–5 (incorporating by reference: GCA Comments, April 6, 2007; Joint Comments of ABM, GCA, and NAA, April 6, 2007; GCA Reply Comments, May 7, 2007; ABM, GCA, NAA, and NNA Joint Reply Comments, May 7, 2007); *see also* NAA Comments, September 24, 2007, at 11–12.

[11] ANM and MPA Reply Comments, October 9, 2007, at 11; Advo Reply Comments, October 9, 2007, at 10.

strongly reject the notion that the Commission should take a "light-handed" approach in pursuit of values "held by the American people that are embodied in a free press that cultivates new ideas and fosters a robust political debate." Free Press and *The Nation* Comments, September 25, 2007, at 1–2. They urge that Periodicals be considered very carefully and that rate setting reflect the unique character of publications in this subclass and their contribution to the nation. They propose that the Commission reincorporate these values into its proceeding. *Id.* at 2.[12] They also provide a summary of views on Docket No. R2006–1 to demonstrate why the Commission should "inject historical, democratic values back into its current work." *Id.* at 2–3. This summary makes clear that they consider the outcome, for Periodicals, a reversal of public policy.

Free Press and *The Nation* do not propose specific revision to the proposed rules. The Commission does not revise the rules to effect any additional preferences for Periodicals. The Commission notes that the regulatory calendar should provide publishers and other mailers with an increased degree of certainty about when changes will occur. Similarly, the annual limitation on rate increases should provide insulation from rate shock.

*B. Basic Framework for Rules on Market Dominant Products*

No commenter takes issue with the organizational structure the Commission has proposed for rules on market dominant products. The Commission has reviewed that structure, and finds it appropriate to adopt this framework without change; however, it makes two minor editorial revisions. One is a change in the caption of part 3010 from "Rules Applicable to Rate Adjustments for Market Dominant Products" to "Regulation of Rates for Market Dominant Products." The other is a change in the caption of subpart B.[13]

This entails revising the reference to "Type 1" to the more inclusive and descriptive reference to "Type 1–A and 1–B." The intention is to make it readily apparent from a reading of the caption that the text addresses both types of filings.

Accordingly, part 3010, organized into five subparts, houses the text of the final rules regulating rates for market dominant products. The Commission emphasizes that although the overall organization remains the same at the part and subpart level, the number, designation, and text within the five subparts differ in some respects from the proposal, based on revisions associated with comments, Commission decisions, or on publication requirements. For example, in subpart C as adopted, a new rule 3010.29 is added to address transitional filings. This change, and others, are identified and discussed within.

Based on the foregoing considerations, the Commission adopts the following organization and captions for the final set of regulations on market dominant products in its final rules:

Part 3010—Regulation of Rates for Market Dominant Products

Subpart A—General Provisions
Subpart B—Rules for Rate Adjustments for Rates of General Applicability (Type 1–A and 1–B Rate Adjustments)
Subpart C—Rules for Applying the Price Cap
Subpart D—Rules for Rate Adjustments for Negotiated Service Agreements (Type 2 Rate Adjustments)
Subpart E—Rules for Rate Adjustments in Exigent Circumstances (Type 3 Rate Adjustments)

*C. Subpart A—General Provisions*

1. Overview

Subpart A, as originally proposed, consists of a set of seven general provisions. These provisions include a standard statement (in rule 3010.1) noting that the rules in this subpart implement provisions in the PAEA related to market dominant products. They also provide that advance notice-and-review period for planned rate adjustments consists of a minimum of 45 days for adjustments other than those based on an exigency. They establish that exigency-based rate adjustments require the Postal Service to file a formal request with the Commission and state that they entail special procedures.

There is more detailed development of these general points in subsequent rules.

2. Issues

*Rule 3010.1.* In Order No. 26, the Commission said that the crux of the debate that had emerged over the length of time for Commission review was whether 45 days constitutes the statutory maximum or minimum. It noted that the Postal Service interpreted the language in the statute as establishing a maximum, but also had acknowledged that some changes, as a matter of good business practice, will entail considerable implementation, and that it intended to provide additional notice in these instances. PRC Order No. 26, ¶¶ 2019–21. Some commenters viewed the wording in the statute as establishing an absolute minimum, and therefore clearly authorizing the Commission to explicitly require the Postal Service to provide more notice.

The Commission concluded that the appropriate way to implement the PAEA was to require that the Postal Service provide notice of rate adjustments no later than 45 days before the intended implementation date. Rule 3010.1, as proposed, reflects this assessment.

*Commenters' positions.* Most commenters addressing this point agree with or accept the Commission's disposition.[14] Some, however, continue to express concerns about the impact of a short notice period on adjustments on mailers. The NPPC, for example, emphasizes "that the minimum notice period needed for mailers and third-party vendors to *implement* rate changes will often be considerably longer, particularly when classification changes require substantial rewriting of software." NPPC Comments, September 24, 2007, at 5. (Emphasis in original.) Similarly, MMA considers the Postal Service's promised 90 days' notice insufficient, given implementation requirements. MMA Comments, September 24, 2007, at 5. It suggests addressing this problem by limiting index and exigent rate adjustments to rate changes, and not permitting other changes, such as new mail preparation requirements and transportation requirements, to be part of the proceedings. *Id.* at 6.

*Commission analysis; final rule.* The Commission agrees that the 45 days provided in the rule and the 90 days' notice the Postal Service intends to issue allows only a brief period for

---

[12] Dow Jones opposes any revision of the rules based on the comments of Free Press and *The Nation*. It notes: "There is no place in postal ratemaking to ignore proper cost-attribution, for otherwise, inefficiencies will be encouraged, not discouraged." Dow Jones Reply Comments, October 4, 2007, at 3.

[13] Two commenters address other potential changes in terminology. NPMHU takes issue with the Commission's use of the term "exigent." NPMHU Comments, September 24, 2007, at 8–10. MOAA notes that the Service's use of "customized agreement" may be more accurate than "negotiated service agreement." MOAA Reply Comments, October 5, 2007, at 2. The Commission generally finds these points well taken, but retains the terms used in the proposed rules. They lack precision, but

have met with wide acceptance in the postal community.

[14] NNA suggests consideration be given to requiring notice in public media. NNA Comments, September 24, 2007, at 5–6.

assessing the Postal Service's notice and implementing the changes, but continues to believe that the proposed approach comports with the statutory language and strikes an appropriate initial balance between Postal Service flexibility and Commission review responsibilities. The Commission appreciates mailers' concerns in this regard, but considers revisions that would explicitly extend the period inappropriate at this time as they would reduce the flexibility the PAEA intends the Postal Service to have. Thus, MMA's suggestion is not accepted, although minor changes to improve clarity are made.

*Rules 3010.2 through 3010.6.* This series of rules codify "type" and address general aspects of the PAEA-authorized scenarios for addressing rate changes for market dominant products. As explained in Order No. 26, the rationale for assigning types to the various scenarios is to facilitate future reporting and general discussion, and the proposal generally tracks an approach that has been successfully employed for filing library references since Docket No. RM98–2. PRC Order No. 26, ¶ 2017.

*Suggested revisions.* No commenter takes issue with the overall approach in this series. However, OCA suggests, in the nature of a clarification, that the Commission revise rule 3010.2(b) by adding references to "service" and "by class of service." It suggests the inclusion of similar references in other rules for consistency.[15] OCA Comments, September 24, 2007, at 23–24. The Commission does not find that this clarification will assist administration of the new ratemaking process.

Commenters propose two revisions in proposed rule 3010.4. The Postal Service points out that the reference to "a rate" in the second sentence of paragraph (a) of this section is not consistent with the language in the relevant provision in the PAEA. It suggests that substituting the phrase "an increase for the class" for the original wording would achieve this consistency. In addition, DMA expresses concern that the Commission has not adequately addressed the limit on application of unused rate authority for Type 1–B adjustments filed within 12 months of each other, and suggests adding language that clarifies this point. DMA Comments, September 24, 2007, at 3. The Postal Service considers this concern adequately addressed by

operation of rule 3010.7. Postal Service Reply Comments, October 9, 2007, at 40.

*Commission analysis; final rule.* The Commission finds proposed rules 3010.2 and 3010.3 achieve their intended objective and adopts them without change. The Commission finds that several revisions to rule 3010.4 are warranted, based on commenters' observations. One simply reflects redesignation of proposed paragraph (b) as final paragraph (c) to accommodate a new provision. The other revisions are substantive. The first adopts the Postal Service's suggested revision to the second sentence of rule 3010.4(a). In final form, this now reads as follows: "A rate adjustment using unused rate adjustment authority may not result in an increase for the class that exceeds the applicable annual limitation plus 2 percentage points." The second change, based on DMA's suggestion, entails the addition of a new paragraph (b), which reads as follows: "Type 1–B rate adjustments filed within 12 months of each other may not apply more than 2 percentage points of unused rate authority to any class." The Commission adopts rule 3010.4 as revised and explained above.

The Commission adopts rule 3010.5 as proposed, without change, as no commenter took issue with it and it achieves the intended objective of providing a basic statement defining Type 2 rate adjustments.

*Rule 3010.6: general information about Type 3 proceedings.* This provision consists of three paragraphs. The text provides in general terms for public participation in Type 3 cases and Commission review in 90 days. Subpart E addresses Type 3 requests in considerably more detail.

*Suggested revisions.* OCA proposes revision of proposed rule 3010.6(c) to address its due process concerns and consistency with the PAEA. It suggests adding an explicit reference to notice and an opportunity for a public hearing and comment. OCA Comments, September 24, 2007, at 24–25.

*Commission analysis; final rule.* The Commission is revising other rules in subpart E of part 3010 to make clear its intentions with respect to due process. As this rule is only a general statement, the Commission does not find that OCA's proposed revision, even if modified to reflect the Commission's approach, appropriate. Accordingly, it adopts proposed rule 3010.6 without change.

*Rule 3010.7.* This proposed rule consists of six paragraphs addressing the regulatory calendar, which the Commission refers to as a schedule in the rules. The text provides, among

other things, for development, maintenance and posting of the calendar.

*Suggested revisions.* The Commission's proposed treatment of issues related to the regulatory calendar did not generate proposals for revisions, but Valpak expresses a concern about how exigent requests will mesh with the regulatory calendar and poses several potential scenarios. Valpak Comments, September 24, 2007, at 26–27.

*Commission analysis; final rule.* The Commission agrees that in the event of an exigent request, it is likely the points NNA usefully raises will need to be addressed. At the same time, the Commission notes that in the interest of getting a basic framework in place for the new system, it is not practical to attempt to address every eventuality. This is especially the case with respect to exigent requests, which the Commission (and presumably most others) hope does not materialize in the near future. Accordingly, it adopts proposed rule 3010.7 without change.

## D. Subpart B—Rules for Rate Adjustments for Rates of General Applicability (Type 1–A and 1–B Rate Adjustments)

### 1. Overview

Subpart B, as proposed, consists of five sections covering basic matters related to Type 1–A and Type 1–B rate adjustments. There was no objection to the proposed organization of this set of rules; therefore, the Commission carries it over into the final rules.

### 2. Summary

The rules in this subpart, as proposed, reflect a broad range of considerations related to rate adjustments for Type 1–A and Type 1–B filings. These include, among others, the procedures to be followed by the Postal Service and the Commission (including each agency's notice requirements), the public's role, technical matters related to limits on adjustments, and the scope of Commission review. Several rules are affected by the Commission's decision on due process considerations. The impact mainly affects the text of rule 3010.13.

### 3. Issues

*Rule 3010.10: procedures.* This rule, as proposed, consists of two paragraphs that set out the basic procedures associated with Type 1–A and Type 1–B rate adjustments. Paragraph (a) establishes the minimum requirements regarding the timing and nature of notices of these two types of adjustments, as well as the filing thereof

---

[15] OCA identifies the following rules as candidates for similar treatment: rules 3010.3(a); 3010.4(a) and (b); 3010.11(b); 3010.14(b)(4); 3010.26(b); 3010.27; 3010.28; and 3010.63(a) and (b). *Id.*

with the Commission. The notice is to be provided in a manner reasonably designed to inform the mailing community and the general public that the Postal Service intends to change rates no later than 45 days prior to the intended implementation date. Transmission of a notice of rate adjustment to the Commission is also to occur no later than 45 days prior to the intended rate implementation date.

Paragraph (b) encourages the Postal Service to provide public notice and to submit its notice of rate adjustment as far in advance of the 45-day minimum as practicable, especially in instances where the intended price changes include classification changes or operations changes likely to have material impact on mailers.

*Suggested revisions.* McGraw-Hill suggests that the Commission should allow for an extension of the 45-day review period, of its own accord, or at the request of any interested party for good cause shown to the extent reasonably necessary under the circumstances. McGraw-Hill Comments, September 24, 2007, at 5.

*Commission analysis; final rule.* The Commission has considered the suggestion that it should impose more explicit or extensive notice requirements on the Postal Service. At this point, it continues to believe that leaving the Postal Service with the flexibility to determine the most effective way to distribute information about planned rate adjustments is the more appropriate course. This approach can be revisited if there are serious shortcomings in the Postal Service's practice.

The Commission makes one minor editorial revision to rule 3010.10(a)(2). This consists of deleting the word "rate" in the phrase "intended rate implementation date." This deletion makes this reference consistent with rule 3010.10(a)(1). Accordingly, the Commission adopts rule 3010.10 as proposed, with the referenced editorial revision.

*Rule 3010.11: limit on size of rate increases.* This rule, as proposed, consists of an introductory phrase and three paragraphs. The introductory statement provides that rate increases for each class of market dominant products in any 12-month period are limited. Paragraph (a) notes that rates of general applicability are subject to an inflation-based limitation computed using the CPI–U values as detailed in section 3010.12. Paragraph (b) recognizes that the PAEA authorizes an exception to the inflation-based limitation by allowing the Postal Service to make a limited annual recapture of

unused rate adjustment authority. It further provides that the amount of unused rate authority is measured separately for each class of mail. Paragraph (c) provides that in any 12-month period the inflation-based limitation combined with the allowable recapture of unused rate authority equals the price cap applicable to each class of mail. OCA suggests revising paragraph (c) to conform it to the description of the price cap in proposed rule 3010.28. OCA Comments, September 24, 2007, at 25.

*Commission analysis; final rule.* The Commission has considered OCA's suggestion, but finds such a change unnecessary. Accordingly, it adopts the language of rule 3010.11 as proposed without change; however, it designates the introductory statement as paragraph (a) to conform the format to other rules, and redesignates the remaining paragraphs.

*Proposed addition to rate increase limitation.* Some commenters pursue the Commission's decision not to attempt to develop an adjustment to CPI–U, based on service deterioration or other considerations such as mail makeup requirements. ANM/MPA and NPPC observe that there is broad consensus among mailers that an index adjustment is necessary. They note that the principle involved is straightforward, even if a method has not been presented yet. They suggest adding to the weighted average change in rates for each class the additional costs imposed by changes in Postal Service mail preparation requirements and the diminution of economic value caused by changes in the quality of service. They assert that the magnitude of the adjustment (if any) could depend on evidence developed in a complaint or annual compliance proceeding. They recognize that fleshing out the details of an adjustment mechanism will become more practical once service standards and performance measurement systems are in place. They therefore urge that the issue be revisited as soon as possible after that occurs. ANM/MPA Comments, September 24, 2007, at 4–6; and NPPC Comments, September 24, 2007, at 7–8.

Pitney Bowes notes that in addition to the need for an adjustment factor to account for service degradation and additional mail preparation requirements, the Postal Service could also unfairly charge mailers for technological or other innovative enhancements to mail that increase its value, but impose no costs on the Postal Service. It asserts that charging for "value added" by mailers is equivalent to a tax on innovation and should be discouraged. It notes that either path

would frustrate the purpose of the annual limitation and undercut the intended discipline of the price cap on operational efficiency. Pitney Bowes Comments, September 24, 2007, at 11–12.

DMA seeks inclusion of a general, but clear, statement that the CPI number upon which annual increases will be based assumes no change in service standards, actual performance, or make-up requirements, and that any such change will result in an adjustment to that number. DMA Comments, September 24, 2007, at 8–9. McGraw-Hill also seeks an affirmative indication from the Commission, to affirm in its rules that its remedial authority after an annual compliance review extends to rolling back the price cap or any unused rate adjustment authority if and as appropriate, to mitigate any wide and sustained deterioration in service (or cost shifting to mailers). McGraw-Hill Comments, September 24, 2007, at 8–9. NNA suggests that this proposal be considered in a future service standards rulemaking. NNA Comments, September 24, 2007, at 10.

The Postal Service opposes any revision in the rules to address these concerns not only on the grounds the Commission expressed in Order No. 26 (relating to lack of a method and the need to develop rules on this issue), but also on grounds that the PAEA provides no legal foundation for such an adjustment. It urges the Commission to adhere to this position as well, and let experience determine whether additional regulations in this area prove necessary. USPS Reply Comments, October 9, 2007, at 45–46.

*Commission analysis.* The Commission recognizes that this is of conern to mailers. Nevertheless, the Commission continues to conclude that any attempt to develop an adjustment factor based on service performance could be premature at this time.

*Rule 3010.12: source of CPI–U data.* This rule, as proposed, consists of a two-sentence paragraph explaining that the source of the monthly CPI–U values for the calculation of the annual limitation is the Bureau of Labor Statistics (BLS) Consumer Price Index— All Urban Consumers, U.S. All Items, Not Seasonally Adjusted, Base Period 1982–84 = 100. It also identifies the current series identification number. No commenter suggested any revision to this rule. The Commission adopts proposed rule 3010.12 without revision.

*Rule 3010.13: Type 1–A and Type 1– B proceedings.* This rule, as proposed, consists of five paragraphs addressing proceedings for the two referenced types of adjustment filings. It addresses a

considerable range of responsibilities on the part of the Postal Service and the Commission, and identifies the rights of the public in terms of public participation.

The discussion at the outset of this order noted and addressed many commenter suggestions regarding notice and public comments. There are some additional suggestions not directly addressed in the earlier discussion. For example, OCA proposes revising rule 3010.13(b)(1) to make it clear that comments may address planned rate adjustments that exceed the annual limitation. *Id.* NAA suggests a revision in this same rule to include a reference to 39 U.S.C. 403(c). NAA Comments, September 24, 2007, at 13–15. MOAA opposes NAA's suggestion on grounds of redundancy. MOAA Reply Comments, October 5, 2007, at 4–5. The Commission does not adopt these suggestions.

*Commission analysis; final rule.* Most of the revisions in rule 3010.13 flow from the Commission's decision to make its intentions with respect to ensuring adequate due process more clear. The Commission concludes that the approach it adopts is consistent with the PAEA.

Proposed paragraph (a) provides that the Commission will establish a docket for each rate adjustment filing, promptly publish notice of the filing in the **Federal Register**, post the filing on its Web site, and allow 20 days from the date of the filing for public comment. The Commission revises this rule to make its intentions with respect to due process and related considerations more clear, based on the rationale set out previously. This paragraph, as revised and adopted, provides that the Commission's notice shall include the general nature of the proceeding; a reference to legal authority to which the proceeding is to be conducted; a concise description of the planned changes in rates, fees, and the Mail Classification Schedule; identification of an officer of the Commission to represent the interests of the general public in the docket; a period of 20 days from the date of the filing for public comment; and such other information as the Commission deems appropriate.

Rules 3010.13(b) and (c) will be discussed together. Proposed rule 3010.13(b) invites public comments on whether planned rate adjustments are consistent with the annual limitation on increases (in subpart (1)) and the policies of 39 U.S.C. 3622 (in subpart (2)). Proposed rule 3010.13(c) then provided for a Commission order on whether the planned rate adjustments were consistent with the annual

limitations on rate increases established in 39 U.S.C. 3622(d).

Consistent with the previous discussion on APA requirements, and upon consideration of the extensive arguments presented on the proper scope of public comments and Commission action under these two rules, the Commission has determined to clarify its expectations by redrafting subparts (b) and (c) of the rule. Rule 3010.13(b) now makes more clear that the primary focus of public comment should be on the mandatory requirements of the PAEA subchapter detailing provisions relating to market dominant products. The two subparts now accurately cross-reference rules implementing the two mandatory annual limitations on rate increases established in 39 U.S.C. 3622(d).

Rule 3010.13(c), as redrafted, continues to provide for a Commission decision within 14 days, and now specifies that the Commission will address the statutory requirements related to the annual limitation on rate increases, the limits on the recapture of unused rate authority, and certain statutory rate preferences codified in that subchapter.

Rule 3010.13(c) is further clarified by changing "and issue a notice and order announcing its findings" to "an order announcing its findings." An identical conforming change is made in rule 3010.13(g).

The text of new paragraph (d), which was formerly a subpart under paragraph (c), in addition to reflecting the clarified scope of the Commission's review, is also revised to provide that rate adjustments that are in compliance may take effect "pursuant to appropriate action by the Governors". *See* 39 U.S.C. 404(a). Former paragraph (d) is similarly clarified and retained as new paragraph (h).

New paragraph (f) reflects the Commission's decision to post any amended notice of rate adjustment on its Web site and allow a period of 10 days from the date of the filing for public comment. This reflects the Commission's decision to more clearly specify potential procedural processes. In paragraph (g), the text is revised to affirmatively note that the Commission will review the public comments, as well as the amended notice.

The Commission adds a new paragraph (j) to clarify that for purposes of subsequent proceedings, certain Commission conclusions with respect to the planned adjustments will be considered findings on the merits, and others provisional and subject to challenge. Conclusive findings are those related to compliance with the annual

limitation set forth in rule 3010.11; the limitations set forth in rule 3010.28; and the requirements of 39 U.S.C. 3626, 3627, and 3629. The Commission rejects the suggestion to disallow complaint filings related to the planned adjustments during the pendency of compliance reviews. This is based, in part, on the conclusion that 39 U.S.C. 3662 does not include any restriction or limitation on filing time. While a limitation may not be strictly prohibited, the Commission finds it should be hesitant to foreclose complaints. In addition, it is developing complaint rules that will provide a better forum for considering this issue. The Commission declines to adopt NAA's suggestion that an explicit reference be added in this rule to 39 U.S.C. 403(c). The same considerations are already covered in the rule.

*Rule 3010.14: contents of rate adjustment notice.* This section, as proposed, consists of three paragraphs. Paragraph (a) is a general provision requiring a Postal Service notice of rate adjustment to include a schedule of proposed rates; the planned effective date(s) of the proposed rates; a representation or evidence that public notice of the planned changes has been issued or will be issued at least 45 days before the effective date(s) for the proposed new rates; and the identity of a responsible Postal Service official who will be available to provide prompt responses to requests for clarification from the Commission.

Paragraph (b) requires and describes supporting technical information and justifications that are to accompany the notice of rate adjustment. This pertains to CPI–U calculation; a schedule showing unused rate authority available for each class of mail displayed by class and available amount for each of the preceding five years; the percentage change in rates for each class of mail calculated as required by the Commission; the amount of new unused rate authority, if any, that will be generated by the rate adjustment calculated as required by the Commission; and, if new unused rate authority will be generated for a class of mail that is not expected to cover its attributable costs, an explanation of the rationale underlying this rate adjustment.

It also requires a schedule of the workshare discounts included in the proposed rates; a companion schedule listing the avoided costs that underlie each such discount; a separate justification for all proposed workshare discounts that exceed avoided costs; identification and explanation of discounts that are set substantially

below avoided costs focusing on any relationship between discounts that are above and those that are below avoided costs; a discussion addressing how the planned rate adjustments will help achieve the objectives listed in 39 U.S.C. 3622(b) and properly take into account the factors listed in 39 U.S.C. 3622(c); and such other information as the Postal Service believes will assist the Commission to issue a timely determination of whether the requested increases are consistent with applicable statutory policies.

Proposed paragraph (c) addresses new workshare discounts. It provides that whenever the Postal Service establishes a new workshare discount rate, it must include with its filing a statement explaining its reasons for establishing the discount; all data, economic analyses, and other information believed to justify the discount; and a certification based on comprehensive, competent analyses that the discount will not adversely affect either the rates or the service levels of users of postal services who do not take advantage of the discount.

Proposed paragraph (d) addresses the type of information that is required to be provided when only Type 1–B rate adjustments are proposed. It provides that the notice of rate adjustment shall identify for each affected class how much existing unused rate authority is used in the proposed rates calculated as required by rule 3010.27. It states that all calculations are to be shown, including citations to the original sources.

*Suggested revisions.* Suggestions related to this proposal differ on the amount and type of information the Postal Service should provide in its notice of adjustment, and run in opposite directions. Some say workshare information should not be required, or language should be revised to be less sweeping. Others, based either on due process considerations or on a general interest in more information and explanation, suggest adding more requirements to rule 3010.14. One of these is a proposal to require a schedule identifying every change in the Mail Classification Schedule that will be needed to implement the planned adjustments.

OCA asserts that proposed rule 3010.14(b)(4) may not sufficiently ensure that rates will satisfy the "requirement" of 39 U.S.C. 3622(c)(2) that each class or type of mail service bear its direct and indirect attributable costs. It expresses concern that the proposed rule may allow the requirement to be "explained away[.]" It proposes that the Postal Service be

required to increase rates the full amount possible under the CPI–U cap, plus any allowable banked authority, for any class that fails to cover its attributable costs. OCA Comments, September 24, 2007, at 18–22. Valpak argues that the proposed rule should go further to require the Postal Service to provide more detail as to how the rates will move towards eliminating any cross-subsidy. Valpak Comments, September 24, 2007, at 17–20.

In contrast to its opposition to proposals that would allow 39 U.S.C. 3622(c)(2) to trump the rate cap, ANM/ MPA find OCA's proposal to require the rates for a class that is below attributable cost to increase by the maximum amount of the CPI–U cap, plus banked authority "quite reasonable." ANM/MPA Reply Comments, October 9, 2007, at 7. The Postal Service sees the styling of 39 U.S.C. 3622(c)(2) as a "requirement" as an indication that its importance is elevated above that of the other factors of 39 U.S.C. 3622(c). It concludes that "§ 3622(c)(2) should be interpreted as requiring that each 'class' of market-dominant mail cover its attributable costs." Postal Service Reply Comments, October 9, 2007, at 46–47. Time Warner discusses the issue at length and concludes that, at least for the time being, the proposed rules adequately address it. Time Warner Reply Comments, October 9, 2007, at 11–23.

APWU recommends that the Commission establish procedures for making a finding of compliance or non-compliance for workshare discounts prior to the annual compliance review. APWU acknowledges that the 45-day review period associated with notices of rate adjustments does not lend itself to an in-depth review of workshare discounts, but it recommends that the Commission "evaluate workshare discounts early in the process[.]" APWU Comments, September 25, 2007, at 5. On reply, several commenters oppose this suggestion on the grounds that it would undermine the streamlined rate-setting process contemplated in the PAEA. Advo Reply Comments, October 9, 2007, at 4; ANM/MPA Reply Comments, October 9, 2007, at 4; and NAPM Reply Comments, October 9, 2007, at 3. The Postal Service claims that additional procedures are not necessary because it intends to compare workshare discounts with cost avoidance numbers from the previous annual review and provide the required justifications. Postal Service Reply Comments, October 9, 2007, at 54–55.

*Commission analysis; final rule.* The Commission does not find it necessary to develop separate procedures at this

time. Rule 3010.14 will assure that interested persons can evaluate workshare discounts in a timely fashion, and the Postal Service has committed to preparing and providing appropriate justifications. If this system proves inadequate, the Commission will elicit specified suggested remedies.

39 U.S.C. 3622(e)(2)(B) provides that any discount above cost avoided must be phased out over time. Therefore, according to APWU, the regulations should require the Postal Service to explain how it will eliminate any passthroughs that are above 100 percent. APWU Comments, September 25, 2007, at 6. NAPM opposes this assertion, claiming that such a requirement would effectively ignore the limited exceptions allowed in 39 U.S.C. 3622(e)(2)(A)–(D). NAPM Comments, October 9, 2007, at 3. *See also* Pitney Bowes Reply Comments, October 9, 2007, at 4.

The Commission views the provisions in 39 U.S.C. 3622 as a means to foster pricing flexibility, reduce burden, and facilitate swift rate changes. Requiring the Postal Service to plan specifically how it intends to reduce excess discounts in the future is inconsistent with this purpose.

NPPC notes "the Commission should clarify that the cap on worksharing discounts established by 39 U.S.C. 3622(e)(2) has five exceptions, not just the four listed in Order No. 26 ¶ 2037 n.10." NPPC Comments, September 24, 2007, at 3. Footnote 10 of Order No. 26 was intended to summarize the four specific exceptions to 39 U.S.C. 3622(e)(2):

(2) Scope.—The Postal Regulatory Commission shall ensure that such discounts do not exceed the cost that the Postal Service avoids as a result of workshare activity, unless—

(A) the discount is—

(i) associated with a new postal service, a change to an existing postal service, or with a new work share initiative related to an existing postal service; and

(ii) necessary to induce mailer behavior that furthers the economically efficient operation of the Postal Service and the portion of the discount in excess of the cost that the Postal Service avoids as a result of the workshare activity will be phased out over a limited period of time;

(B) the amount of the discount above costs avoided—

(i) is necessary to mitigate rate shock; and

(ii) will be phased out over time;

(C) the discount is provided in connection with subclasses of mail consisting exclusively of mail matter of educational, cultural, scientific, or informational value; or

(D) reduction or elimination of the discount would impede the efficient operation of the Postal Service.

39 U.S.C. 3622(e)(2)(A)–(D).

The Commission is quite aware that 39 U.S.C. 3622(e)(3) includes a limitation on reducing worksharing discounts that are already in place. Presumably, this limitation is the fifth exception that NPPC refers to:

(3) Limitation.—Nothing in this subsection shall require that a work share discount be reduced or eliminated if the reduction or elimination of the discount would—

(A) lead to a loss of volume in the affected category or subclass of mail and reduce the aggregate contribution to the institutional costs of the Postal Service from the category or subclass subject to the discount below what it otherwise would have been if the discount had not been reduced or eliminated; or

(B) result in a further increase in the rates paid by mailers not able to take advantage of the discount.

Proposed rule 3010.14(b)(6) makes specific reference to the limitations contained in both 39 U.S.C. 3622(e)(2) and (3). No further clarification of this area is required.

Proposed rule 3010.14(b)(6) requires the Postal Service to "identify and explain discounts that are set substantially below avoided costs." Pitney Bowes suggests that the word "substantially" be removed from this section. It claims that this modification would encourage the use of efficient component pricing as a guiding principle and promote productive efficiency. Pitney Bowes also notes that the word "substantially" is open to interpretation and removing it would avoid uncertainty. Pitney Bowes Comments, September 24, 2007, at 2–3. On reply, Stamps.com concurs with Pitney Bowes while APWU and the Postal Service oppose the suggestion. Stamps.com Reply Comments, October 9, 2007, at 4; and APWU Reply Comments, October 9, 2007, at 3–6. The Postal Service explains:

[T]he Postal Service has some concerns about the Commission's proposal to require an explanation of any discounts "substantially below" avoided costs. * * * Understanding, however, that the Commission is attempting to navigate through a wide variety of competing concerns in developing an entirely new system, the Postal Service is willing [to] accept the rule as proposed as a practical compromise, which would still allow the Postal Service to achieve a workable balance for rate design purposes. If, however, the word "substantially" were removed as Pitney Bowes advocates, this balance would be upset. A system designed to presumptively lock-in all workshare passthroughs at exactly 100 percent of avoided costs would remove much of the flexibility that a price cap system is intended to achieve.

Postal Service Reply Comments, October 9, 2007, at 50.

The Commission purposefully included the word "substantially" in the rule so that the Postal Service would not be required to explain reasonable passthroughs of less than 100 percent that were due to rounding, or other similar rate design goals. Therefore, the wording will remain in the rules. If in the future the word "substantially" requires clarification, a more detailed and precise definition can be crafted.

Pitney Bowes suggests that efficient component pricing concepts should be extended to cost differences not strictly related to worksharing. It suggests that when the Postal Service departs from cost-based rate design, it should be required to explain its reasons for doing so. Pitney Bowes Comments, September 24, 2007, at 4. The Commission has used efficient component pricing as a guiding principle in rate design; however, the PAEA does not specifically require it for rate differences not related to worksharing.

NPPC suggests the Commission clarify that the term "workshare discounts" refers solely to presorting, prebarcoding, handling, and transportation. It argues that some discounts for cost saving activities performed by mailers should not be subject to worksharing rules. NPPC Comments, September 24, 2007, at 2–3. Pitney Bowes and NAPM support this suggestion. Pitney Bowes Reply Comments, October 9, 2007, at 3; and NAPM Reply Comments, October 9, 2007, at 2. APWU opposes this suggestion on the grounds that the suggestion seems to be designed to avoid appropriate scrutiny for some types of discounts. This could have detrimental effects on the Postal Service and other users of the mail. APWU Reply Comments, October 9, 2007, at 7. In its explanation of the proposed rules the Commission acknowledges that the PAEA defines worksharing as activities related to four broad areas. However, the Commission finds that it is unnecessary and premature to explicitly decide what types of justification beyond those provided for in rule 3010.14(b), if any, would be necessary to support other rate distinctions.

In rule 3010.14(c), the Commission proposes a procedure for establishing new workshare discounts. This rule directs the Postal Service to provide certain information including the reasons for establishing the new discount, analysis supporting establishment of the new discount, and certification that the discount will not adversely affect other mailers.

Section 3010.14(c)(2) requires the Postal Service to provide, "all data, economic analysis, and other information believed to justify the discount." Stamps.com Comments, September 24, 2007, at 4 finds this language to be overbroad and contends that the Postal Service should only be required to provide the data that it formally relied on in developing the discount. The Commission did not contemplate that the Postal Service would have to provide a laundry list of possible justifications. Rather, the Postal Service should provide only the information it relied on in developing the discount. The word "believed" has been changed to "relied on" to clarify the intent of this subsection.

NPPC asserts that the Postal Service should not be required to certify that the new worksharing discount will not adversely affect other mailers. In making this assertion, NPPC argues that nothing in the PAEA supports this regulation. It claims that new worksharing discounts are often designed to correct existing cross-subsidies and therefore do have negative impacts on other mailers' rates. NPPC Comments, September 24, 2007, at 4. *See also* Stamps.com Reply Comments, October 9, 2007, at 1–2. To illustrate its point, NPPC cites a discussion in the Commission's Second Opinion and Recommended Decision on Reconsideration in Docket No. R2006–1 related to the letter/flat differential. This reference is of limited value as workshare discounts, as defined in the PAEA, do not include shape-based differences.

The intent of proposed rule 3010.14(c)(3) is to ensure that the Postal Service complies with 39 U.S.C. 3622(e)(4)(C) when designing new worksharing discounts. This section requires the Postal Service to certify "that the discount will not adversely affect rates or services provided to users of postal services who do not take advantage of the discount rate." GCA correctly describes the intent of the rule:

The phrase "workshare discount," properly understood, refers to a price concession reflecting (ideally at 100 percent passthrough) cost savings to the Postal Service generated by substitution of mailer activity for *work that the Postal Service would otherwise have had to perform*. If the discount is properly designed, and does pass through 100 percent of the savings, then a mailer who does not take advantage of it is not enjoying an "internal cross-subsidy." So far as the worksharved mail is concerned, the Postal Service is shedding costs precisely equal to the revenue it gives up by reason of the discount. In other words, the Service is (as it should be under efficient component pricing) indifferent as to whether it or the mailer performs the function on which the discount is based.

GCA Reply Comments, October 9, 2007, at 6. (Footnotes omitted; emphasis in original.)

*Commission analysis; final rule.* The Commission retains rule 3010.14 largely as proposed, but makes several revisions in response to commenters' suggestions on other matters.

The first change is to rule 3010.14(b)(4). The Commission revises this provision by changing the words "should explain" in the last sentence to "must provide." As adopted in final form, the last sentence now reads: "If new unused rate authority will be generated for a class of mail that is not expected to cover its attributable costs, the Postal Service must provide the rationale underlying this adjustment." This does not precisely track OCA's suggestion that the Postal Service should be required to make an adjustment in circumstances where attributable costs are not covered, but strengthens the existing approach.

The Commission anticipates that the Postal Service will make every effort to ensure that classes of mail recover their attributable costs including, if necessary, using its full authority to increase rates under the cap. The final rule allows the Postal Service to provide an explanation should it somehow not be possible to do so.

The second change is to rule 3010.14(b)(7), where the Commission conforms the language to its decision on the scope of the compliance review. Accordingly, this paragraph, as adopted, reads as follows: "A discussion that demonstrates how the planned rate adjustments are designed to help achieve the objectives listed in 39 U.S.C. 3622(b) and properly take into account the factors listed in 39 U.S.C. 3622(c)." A related change, also consistent with the decision on scope of review, is the addition of new rule 3010.14(b)(8). This provision reads as follows: "A discussion that demonstrates the planned rate adjustments are consistent with 39 U.S.C. 3626, 3627 and 3629."

The next change is the addition of a new requirement, rule 3010.14(b)(9), that the Postal Service provide a schedule identifying every change to the Mail Classification Schedule that will be necessary to implement the planned rate adjustments. This addition responds to Valpak's suggestion.

The addition of these provisions requires redesignating proposed rule 3010.14(b)(8) as rule 3010.14(b)(10). This affects only the paragraph designation, not the text.

The Commission retains paragraph (c) largely as proposed, but revises rule 3010.14(c)(2) as discussed above.

Accordingly, the Commission adopts proposed rule 3010.14 as final, with the referenced revisions.

## E. Subpart C—Rules for Applying the Price Cap

Subpart C, as proposed, consists of nine rules focused primarily on essential aspects of price cap administration. These rules are more technical than the others in part 3010, as most involve calculations. The Commission has attempted to make the rules understandable to lay readers.

*Structure.* There was no opposition to the proposed format of this subpart. However, the Commission, in response to a suggestion, adds a new rule 3010.29 to address the possibility of a transitional filing using Postal Reorganization Act procedures.

*Rule 3010.20: test for compliance with the annual limitation.* This rule, as proposed, addresses how to calculate the statutory price cap mechanism. It resolves a debate over whether the moving average method or the point to point method should be used. The rule reflected adoption of the moving average method. It did not reflect a requested adjustment for service degradation or costs associated with mail preparation and related activities.

*Suggested revisions.* Several commenters continue to express concern about the absence of an adjustment factor to account for the impact of certain developments. See, for example, DMA Comments, September 24, 2007, at 8–9; NPPC Comments, September 24, 2007, at 6; Pitney Bowes Comments, September 24, 2007, at 11– 12; and ANM/MPA Comments, September 26, 2007, at 4–5. ANM/MPA further suggests a that could be used to make such an adjustment, thereby addressing one consideration the Commission mentioned in Order No. 26. *Id.* at 5. DMA also believes the cap should reflect any degradation in service. It proposes that the Commission state that the CPI number that forms the basis for the planned changes assumes no change in service standards, actual performance, or makeup requirements, and that any such changes will result in an adjustment to that factor. DMA Comments, September 6, 2007, at 7–8.

*Commission analysis; final rule.* The Commission continues to believe that it is not appropriate to include the requested adjustment in its rules at this time. It reiterates that the statute establishes a system of accountability through increased transparency, and that an anticipated rulemaking on annual reporting requirements will include data on service achievement. It also notes that if experience shows that additional regulations are needed to achieve the objectives of the legislation, the Commission is obligated to develop

appropriate regulations or recommend legislative changes to Congress.

*Rule 3010.21: Calculation of annual limitation.* This rule, as proposed, consists of two paragraphs explaining how the annual limitation is calculated and setting out the formula.

On behalf of Advo, Antoinette Crowder and William C. Miller present an alternative method of calculating the annual inflation cap (cap).[16] Crowder and Miller calculate the cap by first computing the percentage change in the CPI–U for each of the 12 preceding months over the same period last year (SPLY), and then take the simple average of these percentages. The Commission's proposed rule calculates the cap by first computing two sequential, 12-month simple averages of the CPI–U that are 12 months apart (referred to as Recent and Base Averages), and then takes the percentage change in these averages. *See* rule 3010.21. Both methods utilize the preceding 24 monthly values of the CPI– U. The Crowder and Miller method can be characterized as a month-SPLY method, while the Commission's method can be characterized as a year-SPLY method.

*Commission analysis.* Crowder and Miller contend that the Commission's method yields a biased measure of inflation and that their method is statistically superior to the Commission's method. Crowder and Miller at 11. The Commission does not find the criticism of Crowder and Miller sufficiently compelling to change its proposed cap calculation for the following reasons.

First, the Commission uses the same as the Bureau of Labor Statistics to calculate the annual percentage change in the CPI–U so it is officially accepted for this purpose.[17] Until the Commission finds that this method of calculating annual percentage changes in the CPI–U is faulty in some meaningful fashion, the Commission concurs with the Bureau of Labor Statistics on the appropriate method.

Second, the Commission finds the basis of the assertion by Crowder and Miller that the Commission's inflation cap calculation formula is biased to be theoretically limited. Crowder and Miller arrive at this conclusion by expressing the Commission's year-SPLY

---

[16] Statement of Antoinette Crowder and William C. Miller in Response to Commission Order No. 26, September 24, 2007 (Crowder and Miller).

[17] *See ftp://ftp.bls.gov/pub/special.requests/cpi/ cpiai.txt.* Note that the percentage change in the CPI–U in the "avg-avg" column for 2005–2006 is 3.2 percent. This is calculated as the 2006 annual average CPI–U divided by the 2005 annual average CPI–U minus 1, which is the Commission's method.

method in month-SPLY terms. In order to do this, they must multiply their own month-SPLY terms by monthly weights they have derived. Because these monthly weights are correlated with the month-SPLY inflation terms, Crowder and Miller conclude that the Commission's method yields a biased measure of inflation.[18] While it is true that the weights needed to express the Commission's formula in month-SPLY terms are correlated with those month-SPLY terms, this does not prove that the year-SPLY method is a biased measure of inflation and the month-SPLY method is not. That would be the case only if the month-SPLY method used by Crowder and Miller was an unbiased measure of inflation. Crowder and Miller attempt to show this is the case, but they are able to do this only by assuming that month-SPLY inflation is constant across months.[19] This unrealistic assumption undermines Crowder and Miller's claim that their method is unbiased and therefore superior to the Commission's method. All that can be said is that the Commission's method of calculating the annual inflation cap is not identical to the method used by Crowder and Miller.

Third, the method used by Crowder and Miller yields no material difference in the measurement of inflation compared to the Commission's method. Employing monthly CPI–U data from the Bureau of Labor Statistics from 1962 through 2006 (a total of 540 monthly CPI–U values), the Commission calculated 516 annual percentage changes in inflation using each of the two methods. The method used by Crowder and Miller yields cumulative percentage changes in inflation just over 1 percent greater than the Commission's method for the entire 43-year period. If anything, the method used by Crowder and Miller seems to favor a higher cap on average. Moreover, there is no material difference in any one of the 516 annual percentage changes calculated by the two methods. The Commission found that there was not a single month in which the absolute inflation difference between the two methods exceeded one-tenth of one percent (0.1%).[20]

The Postal Service reaches the same conclusions about the method used by Crowder and Miller. The Postal Service first states that the method used by Crowder and Miller appears to have *de minimis* practical consequences. Further, the Postal Service is unconvinced that the method used by Crowder and Miller can be considered to be statistically superior to the Commission's method. Postal Service Reply Comments, October 9, 2007, at 40, n.96.

*Final rule.* Final rule 3010.21 remains largely as initially proposed. The Commission revises the last sentence of paragraph (a) to eliminate a potential source of confusion. The revision clarifies that rounding of the percentage referred to is to one decimal place.

*Rule 3010.22: Calculation of less than annual limitation.* This rule, as proposed, consists of three paragraphs addressing situations where a calculation of a less than annual limitation is required.

*Rule 3010.23: Calculation of percentage change in rates.* This rule contains four paragraphs.

*Commenters' positions.* In discussing proposed rules 3010.22 and 3010.23, several commenters raise concerns that the proposed rules may allow the Postal Service to implement rate increases that exceed the intended limits of the cap over time. Advo Comments, September 24, 2007, at 5–6; DMA Comments, September 24, 2007, at 6–8; Pitney Bowes Comments, September 24, 2007, at 10–11; and MOAA Reply Comments, October 5, 2007, at 4. One topic of discussion is whether the cap should be applied to average revenue or to rates. DMA and Advo describe potential scenarios whereby more frequent rate increases would result in higher average revenue than what would be achieved with annual rate increases.

Advo supplements its comments with a detailed technical analysis of the Commission's proposed rule 3010.22 governing Type 1 rate adjustments filed less than one year apart. The statement interprets the purpose of the rule for a partial year limitation, demonstrates that it does not achieve that purpose, concludes that it would permit excessive increases in average revenue, and proposes an alternative formulation to achieve the perceived intent of the rule. Crowder and Miller at 2–11.

The Postal Service responds to these concerns with a discussion of the difference between a cap on average revenue and a cap on rates. Postal Service Reply Comments, October 9,

2007, at 30–35. It argues that the proposed rules appropriately identify the "percentage differences between sets of rates, and not * * * total revenue or revenue per piece for particular time periods." *Id.* at 32. It applies the same logic to address the concerns of DMA and Advo that more frequent rate increases may allow the Postal Service to collect excess revenue. The Postal Service concludes that the Commission's proposed rules correctly place the restriction on rates, rather than revenue. It also points out that proposed rule 3010.7 requires the Postal Service to provide a schedule of regular rate changes, and prevents it from deviating from the schedule without some articulated rationale. *Id.* at 35–40.

*Commission analysis.* The Commission finds that, by applying the CPI–U cap as a limitation on the percentage change in rates, its proposed rules are consistent with 39 U.S.C. 3622(d)(1)(A). While more frequent rate increases may produce higher revenue, other components of the rules and the PAEA, as well as practical operational and market considerations, constrain the frequency with which rates can be adjusted. The Commission also believes that its clarification of the treatment of rates of limited duration (*e.g.*, seasonal or temporary) in rule 3010.23 may address some of the concerns of commenters who urge the use of average revenue in the application of the cap.

Crowder and Miller's critique of the partial-year rate adjustment rule (3010.22) mistakenly assumes that the cap is based on the estimated increase in CPI–U for the next year. Crowder and Miller at 2. The historical increase in CPI–U that establishes the allowable increase is not assumed to be a forecast proxy. Accordingly, the partial-year rate adjustment rule is not designed to account for the difference between actual increases in CPI–U and those estimated at the beginning of the year. The rule is intended to give the Postal Service flexibility in the timing of rate adjustments. Therefore, the alternative calculation suggested in the statement is not adopted.

Also, the suggested alteration to the rules for applying the cap to a subsequent adjustment is unnecessary. The Commission's proposed rule 3010.22 takes into account rate adjustments (including partial-year adjustments) within the previous year to determine the allowable increase.

*Commission analysis; final rule.* The Commission makes one revision to this rule. It adds, in the last sentence of paragraph (b), the same limit on rounding that now appears in final rule 3010.21(a). The rationale is the same:

---

[18] Crowder and Miller specifically attribute the cause of the bias to the interaction in month-SPLY CPI indices and a monthly weight, because they share a common term, namely. *See* Crowder and Miller at 14.

[19] *See* Crowder and Miller at 13 where they assume that the "* * * expected value of any month-to-SPLY adjustment factor is one plus the expected value of the inflation rate, a constant (r)."

[20] The Bureau of Labor Statistics has recently started to report the CPI–U index to three decimal places. For this reason, the cap is rounded to three decimal places before being expressed as a

percentage change, and to one decimal place when expressed as a percentage change.

Eliminating a potential source of confusion.

The Commission does perceive a need for a slight modification of other proposed rules governing notices of rate adjustment filed less than a year apart. The language of rules 3010.4 and 3010.28 are clarified to better reflect 39 U.S.C. 3622(d)(2)(C)(iii)(IV).

The Commission remains sensitive to concerns that its untested rules successfully implement the requirements of the PAEA as intended. It will monitor and evaluate the effectiveness of the rules as they are utilized and consider modifications.

*Rule 3010.23: Calculation of percentage change in rates.* Several commenters found the proposed language in rule 3010.23 addressing rates of limited duration (*e.g.,* seasonal or temporary) to be potentially confusing. DMA Comments, September 24, 2007, at 7; NPPC Comments, September 24, 2007, at 6; ANM/MPA Comments, September 24, 2007, at 3–4; and GCA Reply Comments, October 9, 2007, at 12. Specifically, there is concern that the third sentence of rule 3010.23(b) may conflict with the last sentence in rule 3010.23(a) and unintentionally lead to rate increases that violate the intent of the cap. The commenters suggest either deleting the third sentence of rule 3010.23(b) or revising it to make it more clearly consistent with the last sentence in rule 3010.23(a).

In its reply comments, the Postal Service suggests an interpretation of the rules whereby the third sentence of rule 3010.23(b) creates an exception to the last sentence in rule 3010.23(a). It proposes alternative wording for the third sentence of rule 3010.23(b) that would codify an exception for rates that are not "in effect at the time of notice of proposed rate changes, and there is no expectation that [the rates] will necessarily be different again in subsequent years[.]" Postal Service Reply Comments, October 9, 2007, at 41.

*Commission analysis.* To clarify the intent of the rules, the Commission deletes the third sentence of proposed rule 3010.23(b). The Postal Service's interpretation and suggested language is not consistent with the Commission's intent for the treatment of seasonal or temporary rates. Such an interpretation could imply that the introduction of a seasonal discount would be included in the test for compliance with the cap, while the subsequent elimination of the discount might not be included (depending on the timing of the notice).

The intent of rule 3010.23(a) is for each rate that is either current (even if it is not available at the time of year of

the notice) or planned, or both, to be treated as a rate cell and thus included in the formula in rule 3010.23(c). If a seasonal or temporary rate is to be eliminated, the volume for the rate cell will be applied to the applicable planned permanent or year-round rate in the numerator of the rule 3010.23(c) formula, and the same volume will be applied to the current seasonal or temporary rate in question in the denominator. This is to be done without regard to the timing of the notice within a calendar year.

A simplified example may be helpful. Suppose a class consists of a single type of mail, with one rate (10 cents) applied from January through June and another (9 cents) applied from July through December. Further suppose that the Postal Service files a notice of rate adjustment in which the July though December rate is eliminated (making the current January through June the new year-round rate) with no other changes. Assume the volumes from the most recent available 12 months of billing determinants are 50 million pieces for each of the two rates, for a total of 100 million pieces in the class.

Regardless of the time of year of the notice, the method for calculating the percentage change in rates is the same. The first step is to sum the products of the planned rates and volumes $((50,000,000 \times .10 = 5,000,000) + (50,000,000 \times .10 = 5,000,000) = 10,000,000))$. The second step is to sum the products of the current rates and volumes $((50,000,000 \times .10 = 5,000,000) + (50,000,000 \times .09 = 4,500,000) = 9,500,000))$. The final step is to divide the results of the first step by the results of the second step and subtract 1 from the quotient $((10,000,000 \times 9,500,000 = 1.0526) - 1 = 0.0526 = 5.26\%))$. The elimination of the July through December rate would therefore result in a 5.26 percent increase in rates for the class.

*Selection of volumes for weights.* Time Warner proposes to add before-rates subscripts to the volume variable (V) in the formula in rule 3010.23(c), to clarify that a Laspeyres index will be used to test for compliance with the cap. Time Warner Comments, September 24, 2007, at 10. The Postal Service asserts that rule 3010.23(d) adequately identifies the volume weights to be used in the calculation. Postal Service Reply Comments, October 9, 2007, at 33–34.

The Commission finds that the language of rule 3010.23(d) sufficiently defines the weights to be applied. Moreover, referring to the weights as "before-rates" would not be a completely accurate description, as 3010.23(d) instructs the Postal Service

to adjust the billing determinants to account for classification changes. Using Time Warner's proposed language, if a new rate is introduced, its "before-rates" volume would be zero, and the effects of introducing it would be improperly excluded from the calculation of the percentage change in rates. For these reasons, the Commission does not incorporate the suggested modification.

*Commission analysis; final rule.* The Commission agrees that clarification is warranted. It finds this can be achieved by deleting the third sentence in paragraph (b). The Commission, on its own accord, adds the term "where," in paragraph (c) immediately after the presentation of the formula and before the key. The Commission makes no other changes in this rule.

*Rule 3010.24: Treatment of volume associated with negotiated service agreements.* This rule, as proposed, generally provides that mail volumes sent at non-tariff rates under negotiated service agreements are to be included in the calculation of percentage change in rates as though they paid the appropriate rates of general applicability. It also requires supporting explanations and the rationale for assumptions.

There were no suggested revisions to this rule. The Commission adopts the rule with one editorial change. It eliminates the superfluous term "non-tariff".

*Rule 3010.25: Limitation on unused rate adjustment authority rate adjustments.* This rule, as proposed, addresses certain limits on unused rate adjustment authority. There were no suggested revisions to this rule. The Commission adopts it as proposed.

*Rule 3010.26: Calculation of unused rate adjustment authority.* This rule, as proposed, consists of four paragraphs addressing several matters related to the calculation of unused rate adjustment authority.

*Commission analysis; final rule.* The Commission makes several clarifying revisions in rule 3010.26. In paragraph (a), it adds the words "notices of" before "Type 1 rate adjustment" to assist in determining the accrual period. In paragraph (b), it adds the words "Type 1" before rate adjustment for consistency with the previous reference. It also revises the phrase "or .22(b)" to "or 3010.22(b)" to conform to publication requirements. It makes no other revisions to this rule.

*Rule 3010.27: Application of unused rate adjustment authority.* This rule, as proposed, consists of one paragraph addressing application of unused rate

adjustment authority. The Commission adopts it as proposed.

*Rule 3010.28: Maximum size of Type 1–B adjustments.* This rule, as proposed, describes the limitations on size of the adjustment based on unused rate adjustment authority.

*Commission analysis; final rule.* The Commission makes minor editorial changes in the introductory portion of this rule to improve clarity and readability and conform to publication requirements. It now reads as follows: "Unused rate adjustment authority exercised in notices of rate adjustments for any class in any 12-month period may not exceed the applicable limitations described in rules 3010.21 or 3010.22 plus the lesser of:". The Commission makes no changes in the following two paragraphs. The Commission adopts this rule as revised.

*New rule 3010.29: Transitional filings.* New rule 3010.29 addresses the fact that 39 U.S.C. 3622(f) explicitly allows the Postal Service to file an omnibus rate case through December 19, 2007. The addition of this rule responds to OCA's apt assertion that neither the Commission's Order No. 26 discussion nor the accompanying proposed rules addressed the possibility of a Postal Service filing PAEA-type rate adjustments during an omnibus rate case, or the potential impact of another omnibus rate case on a rate adjustment filing. A transitional filing would have an impact on subsequent calculation of the annual limitation. Accordingly, the new rule provides: "If the Postal Service initial exercise of its authority to file a Type 1–A notice of rate adjustment is preceded by a transitional rate case filing under 39 U.S.C. 3622(f): (a) The annual limitation as calculated in rule 3010.21 is applicable if the notice of rate adjustment is 12 months or more after the date of the Decision of the Governors approving rate changes associated with the transitional filing; and (b) The annual limitation as calculated in rule 3010.22 is applicable if the notice of rate adjustment is less than 12 months after the date of the Decision of the Governors approving rate changes associated with the transitional filing. In such circumstances, the date of the Decision of the Governors approving rate changes associated with the transitional filing is the most recent notice of rate adjustment."

*Commission analysis; final rule.* The Commission agrees that the rules should be supplemented to address the consequences associated with a transitional filing. It adopts new rule 3010.29, as set out above, to address the

impact on key aspects of rate adjustment filings.

## F. Subpart D—Rules for Rate Adjustments for Negotiated Service Agreements (Type 2 Rate Adjustments)

In Order No. 26, the Commission proposes rules for evaluating and approving negotiated service agreements for both market dominant and competitive products. The proposed rules include procedures, filing requirements, and data collection requirements. Several parties have commented on these rules. Advo, Pitney Bowes, NPPC, and Time Warner find the filing requirements to be too stringent while Valpak, Newspaper Association of America (NAA), National Newspaper Association (NNA), APWU, and the Office of Consumer Advocate (OCA) believe more rigorous requirements are necessary.[21] These commenters offer valid and compelling arguments, often in stark contrast to one another. This highlights the need for a regulatory process that balances the divergent interests of mailers. The Commission recognizes that although its rules attempt to strike this balance, modifications may be necessary as experience under the new system is gained.

Order No. 26 classified negotiated service agreements, both market dominant and competitive, as separate products. PRC Order No. 26, ¶ 3073, n.75 and ¶ 3079. Several parties contend that negotiated service agreements should not be classified as separate products. The Postal Service and PSA claim that negotiated service agreements do not meet the definition of separate products because they will typically involve the provision of existing products. Postal Service Comments, September 24, 2007, at 11; and PSA Comments, September 24, 2007, at 10–11.

Advo, the Postal Service, and DFS contend that classifying negotiated service agreements as separate products will lengthen the review process and subject the agreements to procedural requirements beyond the specific negotiated service agreement rules in sections 3010.40 *et seq.* and 3015.5. The Postal Service claims this is unnecessary. It contends that rules 3010.4 and 3010.5 provide sufficient transparency.

DFS asserts this extra burden will discourage negotiated service agreements. It states:

It is important for the Commission to realize that the fear of * * * indeterminate pre-implementation NSA review procedures has been one of the primary factors that has scared off mailers from entering into NSA negotiations over the last several years. The overlay of rate 3642 procedures on top of the NSA procedures 3010.40–3010.43 or 3015.5 confuses and unnecessarily complicates the NSA process and has the potential to continue that chilling effect. It also creates a procedural loophole that opponents of pricing flexibility could use to impede the development of the new system and the development of NSAs.

DFS Comments, September 24, 2007, at 2–3.

Advo also argues that "[t]o the extent that the Commission's concern is that negotiated service agreements must cover attributable costs, that requirement can be achieved without designating an NSA as a separate product." Advo Comments, September 24, 2007, at 2.

On reply, several parties agree that negotiated service agreements should not be considered separate products. Valpak, however, asserts that negotiated service agreements are separate products under the definition of "product" in the PAEA. *See* 39 U.S.C. 102(6). Valpak argues that negotiated service agreements have distinct cost and market demand characteristics and are charged rates not of general applicability. Valpak Reply Comments, October 9, 2007, at 22. NAA and UPS contend that the question of whether or not a negotiated service agreement is a product should be considered on a case-by-case basis. NAA Reply Comments, October 9, 2007, at 4; and UPS Reply Comments, October 9, 2007, at 2.

*Commission analysis.* The Commission finds that negotiated service agreements meet the definition of separate products. To date, every proposed negotiated service agreement filed with the Commission was premised either on distinct market characteristics, distinct cost characteristics, or both.[22] This is true even though they were applied to existing products. In the future, it may be appropriate to group functionally equivalent negotiated service agreements as a single product if it can be shown that they have similar cost and market characteristics. However, as a starting point, it is appropriate to assume new negotiated service agreements will be separate products as defined by the PAEA.

The rules regarding negotiated service agreements, rules 3010.42 and 3015.5, are intended to operate in harmony with

---

[21] The Postal Service, Parcel Shippers Association (PSA), Discover Financial Services (DFS), and Amazon.com also provided comments on negotiated service agreement rules.

[22] International Customized Mailing Agreements have not yet been filed with the Commission.

subpart B of part 3020. A single filing, pursuant to rule 3020.31, is sufficient when the Postal Service proposes to add a new negotiated service agreement to either the market dominant or competitive product list.[23] If the Postal Service proposes changes in the rates of an existing negotiated service agreement, the filing would be made pursuant to rule 3010.42 or rule 3015.5, as appropriate. The Commission does not anticipate that the review process for new negotiated service agreements will cause implementation of such negotiated service agreements to be delayed appreciably. As stated in Order No. 26:

The primary focus of the review will be on compliance with the statutory requirements for proper categorization of the Postal Service product as either market dominant or competitive. Review of the operational parameters of the product and the financial basis of the product typically will be minimal.

PRC Order No. 26, ¶ 4026.

Pitney Bowes is concerned that the data collection and production requirements outlined in rules 3010.42 and 3010.43 will be prohibitive to small-volume mailers. It suggests that the Commission consider allowing exceptions to these requirements for small volume mailers. The data in question-mailer specific volume, cost, and revenue data—to date, have been largely compiled from billing determinants maintained by the Postal Service and budgeting and planning data held by the co-proponents. Data of this type should be readily available regardless of the company's mail volume. Allowing mailers of any size to enter into negotiated service agreements without providing this data would hinder the Commission's ability to determine compliance with the PAEA as provided for in rule 3010.40. Therefore, at the present time, the Commission will not develop procedures for granting exceptions to its rules regarding negotiated service agreements. It should be noted that the Commission has long been concerned that negotiated service agreements be available to small mailers. Consequently, it developed a model for structuring volume-based negotiated service agreements that was designed to streamline the negotiation process.[24] Persons interested in negotiated service agreements are

encouraged to explore application of this model.

Pitney Bowes also contends that "the proposed rules are incomplete insofar as they fail to address the need to protect * * * commercially sensitive information." Pitney Bowes Comments, September 24, 2007, at 13. As is currently the case, parties to negotiated service agreements may seek protective conditions where appropriate.

Time Warner requests that the Commission consider removing rule 3010.42(d)(3) from the final rule. Rule 3010.42(d) requires the projection of change in the net financial position of the Postal Service as a result of each negotiated service agreement, which includes "[a]n analysis of the effects of the negotiated service agreement on the contribution to institutional costs from mailers not party to the agreement." Rule 3010.42(d)(3).

Time Warner contends that the PAEA requires negotiated service agreements to not cause unreasonable harm to the marketplace. It argues that the PAEA does not require that no other mailer be disadvantaged as a consequence of a negotiated service agreement, as applicable under the Postal Reorganization Act. Time Warner Comments, September 24, 2007, at 11–13; *see also,* Advo Comments, September 24, 2007, at 3–4; Pitney Bowes Reply Comments, October 9, 2007, at 6–7; and Postal Service Reply Comments, October 9, 2007, at 21–22.

APWU supports retention of rule 3010.42(d)(3). APWU Reply Comments, October 9, 2007, at 3. APWU contends that the requirement to not cause unreasonable harm to the marketplace is applicable to every negotiated service agreement. It argues that individual mailers may be harmed by negotiated service agreements, and this can adversely impact the overall marketplace.

The intent of rule 3010.42(d)(3) requires clarification. Rule 3010.42(d)(3) facilitates evaluation of the 39 U.S.C. 3622(c)(10)(A)(i) factor that negotiated service agreements "improve the net financial position of the Postal Service through reducing Postal Service costs or increasing the overall contribution to the institutional costs of the Postal Service." This is one of two alternative criteria for entering into a negotiated service agreement. Rule 3010.42(d)(3) does not directly address the 39 U.S.C. 3622(c)(10)(B) factor which requires that negotiated service agreements "do not cause unreasonable harm to the marketplace." This factor is addressed separately in rule 3010.42(f).

NAA correctly explains why rule 3010.42(d)(3) allows computation of the

net financial position of the Postal Service resulting from implementation of a negotiated service agreement:

Advo and Time Warner overlook that when the Postal Service chooses to rely on the "increasing the overall contribution to the institutional costs of the Postal Service" alternative in (A)(i), the analysis necessarily must include an evaluation of lost contribution from non-parties to an NSA. This is because subsection (A)(i) refers to improving the net financial position of the Postal Service by increasing the *overall* institutional cost contribution. Ignoring the effect on contribution from other mailers would limit consideration to merely the gross effect from the NSA mailer and ignore the net impact on the Postal Service.

NAA Reply Comments, October 9, 2007, at 6–8. (Emphasis in original.)

Valpak and NAA contend that the proposed rules do not indicate that filings under subpart D will be publicly available and suggest the Commission make clear in its rules that the negotiated service agreement filings, including the terms of the agreement, will be made available to the public. Valpak Comments, September 24, 2007, at 21; and NAA Comments, September 24, 2007, at 5.

Several parties express concern that subpart D does not provide sufficient transparency or accountability. Comments fall generally into three categories: (1) Lack of explicit procedures for public comment; (2) no assurance regarding compliance with all PAEA requirements; and (3) lack of procedures if the Commission finds the negotiated service agreement is not in compliance.

Valpak, APWU, NNA, and NAA assert that the regulations should provide the opportunity for public comment. They argue that public comment would provide valuable insight into negotiated service agreement compliance with statutory requirements, particularly the provision that negotiated service agreements not cause undue harm to the marketplace. *Id.* at 8; NNA Comments, September 24, 2007, at 11; Valpak Comments, September 24, 2007, at 22; and APWU Comments, September 25, 2007, at 6.

Valpak and APWU contend that the proposed rules do not ensure that negotiated service agreements meet statutory requirements. They argue that negotiated service agreement filings should comport with all provisions of the PAEA, including the objectives and factors in sections 3622(b) and (c). Valpak Comments, September 24, 2007, at 23; and APWU Comments, September 25, 2007, at 6.

Valpak and NAA request that the Commission include procedures for

---

[23] Assuming that the Postal Service indicates a preference that the negotiated service agreement be classified as market dominant or competitive, it would comply with the filing requirements of rule 3010.42 or 3015.5, as appropriate.

[24] Docket No. MC2004–3, library reference PRC–LR–2.

dealing with negotiated service agreement filings that do not comply with the provisions of the PAEA. They maintain that such procedures are necessary to protect non-negotiated service agreement mailers and the marketplace from potentially unlawful negotiated service agreements. NAA Comments, September 24, 2007, at 10; and Valpak Comments, September 24, 2007, at 23.

On reply, many commenters oppose increased filing requirements and pre-implementation review arguing that "Congress intended that the process for considering negotiated service agreements be greatly simplified." Advo Reply Comments, October 9, 2007, at 6. *See also* NPPC Reply Comments, October 9, 2007, at 11–12; PSA Reply Comments, October 9, 2007, at 1–2; DMA Reply Comments, October 9, 2007, at 4–6; and Postal Service Reply Comments, October 9, 2007, at 22.

The focus of subpart D is to provide pricing flexibility while maintaining accountability and transparency for negotiated service agreements. *See* NPPC Comments, September 24, 2007, at 8–10. The rules outlined in rules 3010.40 *et seq.* and 3015.5 minimize the administrative and economic burden of implementing agreements and enhance the Postal Service's pricing flexibility. At the same time, rules 3010.40 *et seq.* require the co-proponents of negotiated service agreements to submit copies of the agreement, as well as specific data related to cost, revenue, volume, operational enhancements, and marketplace impacts. Filings will be publicly available unless subject to protective conditions. A period for public comment will be available.[25] In addition, it is the Commission's intent to review actual performance of these agreements in the annual compliance report. Interested persons may comment and suggest appropriate Commission findings as part of that process. Taken as a whole, rules 3010.40 *et seq.* and 3015.5 strike a reasonable, initial balance to foster pricing flexibility, transparency, and accountability.

The Commission recognizes that the 45-day review period does not lend itself to in-depth analysis; however, the complaint process will allow for further review where necessary. NAA expresses some concern about the adequacy of the complaint process to prevent irreparable harm to non-negotiated service agreement mailers and suggests that the rules provide for expedited review of complaints that aver the negotiated

service agreement does not meet statutory requirements. *See* NAA Comments, September 24, 2007, at 4. The Commission intends to initiate a rulemaking in the immediate future to allow for evaluation and improvement of the complaint process. In the meantime, it is the expectation of the Commission that the Postal Service will balance increased flexibility with increased diligence in negotiating sound agreements.

OCA proposes that the "suggested framework" outlined in library reference PRC–LR–1 of the Commission's decision in Docket No. MC2004–3 be modified to cover all negotiated service agreements—not just volume discount ones—and incorporated into section 3010.40 of the proposed rules. OCA believes that incorporating this framework would "increase Commission and public confidence that implementation of future negotiated service agreements will improve the net financial position * * * of the Postal Service." OCA Comments, September 24, 2007, at 4. The Commission initially suggested this framework in the hope it might serve as a useful tool for evaluating the financial impact of individual negotiated service agreements. However, the statute seeks to provide the Postal Service with greater pricing flexibility for negotiated service agreements coupled with enhanced transparency and accountability. Requiring a specific formula or model for evaluating agreements is contrary to that intent. Proposed rules 3010.42 and 3010.43 require pre- and post-implementation submission of mailer-specific data that the Commission, and interested parties, can use to evaluate the expected and actual performance of a negotiated service agreement. The Commission finds, at least initially, that these data should be sufficient to provide necessary transparency and accountability.

Three additional clarifications to proposed subpart D will be made by the Commission. First, APWU and NAA suggest that the word "increases" in rule 3010.42(g) be changed to reflect the fact that changes can either be upward or downward. The Commission agrees. The revised rule shall read:

Such other information as the Postal Service believes will assist the Commission to issue a timely determination of whether the requested changes are consistent with applicable statutory policies.

Second, APWU sought clarification of the sentence in rule 3010.43 which reads, "This shall include, at a

minimum, a plan for providing the following annualized information on a yearly basis within 60 days of the date of implementation of a proposed agreement." This section requires the Postal Service to provide, when it files a notice of rate adjustment, a plan for providing various types of information. The information required is to be reported each year that the agreement is in effect and is to span each 12-month period following implementation. The Postal Service will have 60 days after each anniversary date to compile the data report. The revised rule shall read:

The data report is due 60 days after each anniversary date of implementation and shall include, at a minimum, the following information for each 12-month period the agreement has been in effect.

Finally, NAA suggests that the statutory language regarding similarly situated mailers be included in rule 3010.40. NAA Comments, September 24, 2007, at 12. On reply, the Postal Service states "[i]f the Commission decides * * * to continue treating market-dominant customized agreements as being separate 'products,' then distinguishing between baseline and functionally-equivalent agreements would probably be important." Postal Service Reply Comments, October 9, 2007, at 21.

NAA also suggests that procedures similar to the existing rules regarding functionally equivalent negotiated service agreements be carried forward into the rules. The intent of the rules regarding functionally equivalent negotiated service agreements was to streamline the litigation process. Given the 45-day review contemplated in subpart D, retaining these rules seems unnecessary. Moreover, although the Commission contemplates that negotiated service agreements will be initially classified as separate products, it has not foreclosed the possibility that some functionally equivalent negotiated service agreements may be considered one product. The language from 39 U.S.C. 3622(c)(10) of the statute which reads "available on public and reasonable terms to similarly situated mailers" will be added to clarify the availability of negotiated service agreements provided by rule 3010.40.

## G. Subpart E—Rules for Rate Adjustments in Exigent Circumstances (Type 3 Rate Adjustments)

### 1. Overview

Subpart E, as proposed, addresses implementation of the PAEA's requirement, in 39 U.S.C 3622(d)(1)(E), that the modern regulatory system for market dominant products include

---

[25] For the reasons discussed above, the Commission adds rule 3010.44 to provide APA notice and a specified opportunity for comment.

**63680**   **Federal Register** / Vol. 72, No. 217 / Friday, November 9, 2007 / Rules and Regulations

procedures whereby rates may be adjusted on an expedited basis due to exceptional or extraordinary circumstances. The Commission refers to these as exigent requests and classifies them as Type 3 filings. This subpart consists of seven proposed sections. These sections, in keeping with a formal distinction in the PAEA, establish more elaborate procedures for such requests, relative to Type 1–A and Type 1–B, which follow "notice" requirements.

*Structure.* There was no opposition to the proposed format; the Commission adopts it without change. Text and designation of some paragraphs within individual sections differs in some instances from the proposal, based on revisions adopted in response to comments.

*Issues.* The Commission intends its subpart E provisions to establish a functional and flexible framework for Type 3 cases. The assumption is that the approach will accommodate associated uncertainties, such as what events might give rise to a filing and how much additional revenue the Postal Service might seek. In particular, the proposal reflects a decision to forgo attempting to identify with specificity circumstances on either side of the question of qualifying circumstances. Thus, the proposal not only excluded definitions of "triggering events" for Type 3 filings, but also excluded defining, in advance, circumstances that would not qualify. This decision, which reflected consideration of earlier comments, is the focus of suggested revisions in this round.

The Commission also proposed streamlined proceedings for Type 3 adjustments, which it viewed as consistent with the 90-day review period and due process considerations. This decision gained widespread support, but some have criticized it as either inconsistent with the APA or insufficiently clear on how the Commission intends to satisfy due process requirements. MMA, for example, generally agrees with the Commission's overall direction, but expresses reservations about the specific procedures, such as the limitation to submission of written comments. MMA Comments, September 24, 2007, at 4. *See also* APWU Comments, September 24, 2007, at 9.

*Note on use of the term "exigent".* The Commission acknowledges NPMHU's point that the use of the term exigent as shorthand or as a synonym for Type 3 filings is not precise. NPMHU Comments, September 24, 2007, at 10. However, it continues to believe that the sense of the rule is not seriously compromised by this lack of precision, and

that the term serves satisfactorily as shorthand for this type of filing. Accordingly, the Commission uses this term in its final rules.

2. Review

*Rule 3010.60: applicability.* This rule, as proposed, establishes that the Postal Service may request rate increases for market dominant products in excess of the annual limitation due to extraordinary or exceptional circumstances. It states that such requests shall be known as exigent requests.

*Suggested revisions.* Most commenters addressing this issue agree with the Commission's decision to track the language of the PAEA by referring only to "extraordinary or exceptional" circumstances, and not define the type of event or circumstances that would be deemed to justify an exigent filing, or define those that would not be deemed to qualify. *See,* for example, NPPC Comments, September 24, 2007, at 10; NPMHU Comments, September 24, 2007, at 1–2; and NAPUS Reply Comments, October 10, 2007, at 2. NNA, however, qualifies its general support for this approach by asserting that the regulations should clearly indicate that circumstances giving rise to a Type 3 filing must have taken shape outside the ambit of both management and labor, making "neither unwise investments nor excessive compensations" a rationale for exceeding the cap. NNA Comments, September 24, 2007, at 12. (Emphasis in original.)

*Commission analysis; final rule.* The Commission has considered suggestions that this rule be revised to make clear that certain events or developments will not constitute the basis for an exigent request, including NNA's specific proposal for adoption of language foreclosing unwise investments or excessive compensation as triggers. This suggestion, like others that seek more specificity, reflects understandable concern that the Postal Service will take undue advantage of its statutory authorization to seek increases beyond the annual limitation. The Commission appreciates this concern, but finds that the better solution at this time is to avoid identifying events on either side of the coin. Accordingly, the Commission declines to revise the proposed rule, and adopts it as final.

*Rule 3010.61: Contents of exigent requests.* This rule, as proposed, consists of two paragraphs addressing the contents of an exigent request. Paragraph (a) consists of eight subparagraphs detailing the contents. Paragraph (b) is a one-sentence provision requiring the Postal Service to

identify responsible officials who can reply to Commission inquiries on each topic specified in rule 3010.61(a).

Commenters' suggested revisions focus primarily on subparagraphs 6 and 7 of rule 3010.61(a). They seek clarification with respect to rescission of exigent requests and clarification of the Commission's use of the terms "foreseeable" and "avoidable." At issue in proposed rule 3010.61(a)(6) is language directing the Postal Service to explain "when, or under what circumstances, the Postal Service expects to be able to rescind the exigent increases in whole or in part." Some assert that the PAEA does not require that an exigent increase be temporary, and are therefore concerned about the wording. NPMHU, for example, asserts that to the extent this rule may be read to imply that a rate adjustment under 39 U.S.C. 3622(d)(1)(E) can only be temporary, it is without support in the statute. It asserts:

Nowhere in the PAEA is there any indication that a rate adjustment under § 3622(d)(1)(E) must be temporary. Nor is there any provision in the statute for rescind[ing] such rate adjustments. Rather, to the extent that the circumstances necessitating the rate * * * adjustment no longer exist, it is to be expected that the Postal Service would take account of these changed circumstances by foregoing, or reducing the magnitude of, subsequent rate adjustments it otherwise would have made.

NPMHU Comments, September 24, 2007, at 7.

It also suggests curing the problem by including the qualifying term "whether" in this provision. *Id.* at 8. The Postal Service endorses this revision. Postal Service Reply Comments, October 9, 2007, at 7. Others seek more specific assurance that exigent increases will be rolled back, and are concerned that the wording does not make this clear. ANM/MPA Comments, September 24, 2007, at 6–7; APWU Comments, September 25, 2007, at 9; and DMA Comments, September 24, 2007, at 9.

*Commission analysis; final rule.* The Commission agrees that the PAEA does not include a requirement that exigent increases, by definition, must be temporary. This means that adding an explicit requirement for rollback would not be fully consistent with the statute. It has considered NPMHU's suggested revision, but concludes that the original formulation is neither inaccurate nor misleading. Accordingly, the Commission adopts proposed rule 3010.61(a)(6) without change.

*Commission references to circumstances warranting an exigent request in rule 3010.61(a)(7).* NPMHU and Time Warner observe that the

Commission's Order No. 26 discussion and the proposal refer to an exigent filing in terms of unforeseeable and unavoidable events. Both briefly review the legislative history on exigent filings, and point out that although there were variations on what would constitute grounds for a Type 3 case in legislative proposals leading up to the PAEA, the legislation as enacted does not include any reference to unforeseeablity or avoidability of circumstances. NPMHU Comments, September 24, 2007, at 1–2; and Time Warner Reply Comments, September 24, 2007, at 7–11. *See also,* NAPUS Reply Comments, October 10, 2007, at 2–3.

The Commission agrees with these observations. The text of Order No. 26 and the related rule were inexact in this respect. However, the Commission continues to believe that it is reasonable to require the Postal Service to address these considerations, as the discussion is likely to shed light on matters of considerable concern to mailers. To accommodate this interest and to recognize the commenters' point, the Commission revises rule 3010.61(a)(7) essentially along the lines suggested by Time Warner to read as follows:

An analysis of the circumstances giving rise to the request, which should, where applicable, include a discussion of whether the circumstances were foreseeable or could have been avoided by reasonable prior action[.]

With the inclusion of this revision, the Commission adopts the other provisions in rule 3010.61(a).

Rule 3010.61(b) requires the Postal Service to identify one or more knowledgeable Postal Service official(s) who will be available to provide prompt responses to Commission requests for clarification related to each topic specified in rule 3010.61(a). There was no objection to this proposal. The Commission recognizes that this provision places an administrative burden on the Postal Service, but considers it slight in terms of the overall importance of ensuring ready reference to a list of officials in a position to provide prompt responses to Commission requests for clarification. This requirement will also facilitate expeditious consideration of a Type 3 request. The Commission adopts proposed rule 3010.61(b) without change.

*Rules 3010.62 through 3010.64.* Proposed rule 3010.62 provides that the Commission may require the Postal Service to clarify its request; proposed rule 3010.63 addresses how unused rate adjustment authority is to be handled; and proposed rule 3010.64 states that

the Commission's policy is to provide expeditious treatment of exigent requests, consistent with statutory requirements and procedural fairness. Specific procedures are not spelled out in this provision, but appear in rule 3010.65.

*Commission analysis; final rules.* Commenters do not suggest any specific revisions to these provisions, which cover relatively straightforward matters connected with administration of exigent cases. The Commission notes, with respect to rule 3010.62, that it intends to make public any supplemental information it requires the Postal Service to provide under this rule, to require a written response, and to ensure that the response is posted on the Commission's Web site. At this time, however, the Commission does not find it essential to include a provision detailing these points in its rules. The Postal Service has cooperated with these types of requests in the past, and it fully anticipates that this cooperation will continue under the new system. The Commission does not find any need for changes to rules 3010.63 and 3010.64. Accordingly, it adopts proposed rules 3010.62, 3010.63 and 3010.64 without change.

*Rule 3010.65: Special procedures applicable to exigent requests.* This rule, as proposed, sets out various provisions related to procedures for exigent hearings. Accordingly, it is affected by the Commission's decision to revise the rules to more fully address due process concerns.

*Suggested revisions.* Commenters asserting the need for revisions to this rule suggest changes that would expand notice, public representation, and public participation, including at the hearing stage. *See generally* Valpak Comments, September 24, 2007, at 3–16 and 20–27; Medco Comments, September 24, 2007, at 4–10; OCA Comments, September 24, 2007, at 12–15; and APWU Comments, September 25, 2007, at 1–4.

*Commission analysis; final rules.* The Commission adopts the rationale set out previously in support of its decision to revise rule 3010.65(a). The changes parallel, with only minor adaptation to reflect Type 3 filings, the language of final rule 3010.13. Thus, in place of proposed paragraph (a), which provides no detail about the contents of the Commission's notice, there are six paragraphs. One refers to identification of an officer of the Commission; another provides that the Commission will specify a period of time for comment. The last is a "catchall" provision allowing the Commission to include any other information it deems appropriate.

The Commission believes that this adds useful clarity about what the Commission will address in its notice.

The Commission appreciates the commenters' interest in more extensive opportunities to probe the Postal Service's request. However, at this time, it has decided not to revise its public comment and hearing procedures. It believes the approach it has proposed strikes an acceptable accommodation to the hearing called for under the PAEA. The statutory deadline gives cause to question the Commission's ability to complete action on the Postal Service's request if trial-type hearings and related measures were deemed the only approach consistent with due process. Furthermore, depending on circumstances, an exigent request may require action in an even more truncated timeframe. Given that the PAEA clearly commits the Commission to issuing a decision in 90 days, the Commission believes that the comment approach provides an appropriate for public participation. The Commission adopts proposed rule 3010.65, with revisions limited to paragraph (a).

*Rule 3010.66: Deadline for Commission decision.* This rule, as proposed, provides that the Commission will act expeditiously on an exigent request, will consider all written comments, and will issue its decision within 90 days of the filing of a request. The deadline is identical to the one established in 39 U.S.C. 3622(d)(1)(E). No commenter objects to the adoption of this rule. The Commission adopts the proposed rule without change.

*Additional considerations on scope of subpart E.* Several commenters seek expansion of the rates governing exigent rate increases to address specific aspects related to interpretation and administration of 39 U.S.C. 3622(d)(1)(E). ANM/MPA urges the Commission to require uniform increases, and opposes the suggestion that non-uniform increases should be used to account for revenue shortfalls in a particular class. It contends non-uniform changes could mark a return to cost-of-service ratemaking. *See* ANM/MPA Comments, September 24, 2007, at 6–7 and ANM/MPA Reply Comments, October 9, 2007, at 9–10 (citing OCA Comments, September 24, 2007, at 21 and Valpak Comments, September 24, 2007, at 19–20 and 23–26). GCA opposes the suggestion for requiring uniform application, taking issue with the assertion that non-uniform rates would mark a return to cost of service ratemaking. GCA Reply Comments, October 9, 2007, at 12–13.

ANM/MPA also ask that the Commission require rollback of exigent

increases as soon as the costs that purportedly justify the exigent increases recede or are reflected in the CPI itself. It also asks the Commission to clarify that cost increases associated with an exigent increase may not be recovered anew through a subsequent CPI index adjustment. ANM/MPA Comments, September 24, 2007, at 7–8. NPPC and DMA seek the same type of changes. NPPC Comments, September 24, 2007, at 10–11; and DMA Comments at 9.

APWU suggests there may be circumstances where exigency increases need not be rescinded, such as when inflation has caught up with the exigency. It questions whether the Postal Service must rescind an exigent increase. APWU Comments, September 24, 2007, at 9. *See also* NPMHU Comments, September 24, 2007, at 7–8, seeking clarification that exigent increases need not be temporary.

PostCom opposes revisions that would prevent double recovery. It suggests addressing this concern on a case-by-case basis. PostCom Reply Comments, October 9, at 6. DFS asserts that the question of whether exigent rate increases should be permanent or temporary should not be addressed in rules, but developed in response to concrete facts and specific requests. DFS Reply Comments, October 9, 2007, at 8. The Postal Service asserts, more broadly, that the record in this proceeding is not developed to the point where the Commission can reasonably resolve the issues that have been raised, nor does anything require that it do so at this time. Postal Service Reply Comments, October 9, 2007, at 43.

*Commission analysis.* The Commission acknowledges the interest some commenters express in resolution of several issues related to interpretation and administration of the PAEA's provision for an exigent increases, including adoption of definitive interpretations on rescission, application of increases, and impact on unused rate adjustment authority and the attributable cost floor. It declines at this time to adopt to either policy statements or specific regulations on these points. The state of the record on these issues, as the Postal Service points out, makes such actions premature.

## III. Competitive Products

In Order No. 26, the Commission, among other things, identified the initial list of competitive products and proposed regulations applicable to them. Parties commenting on these matters raise issues regarding negotiated service agreements, international mail, and modifications to the proposed rules. Several parties argue that competitive

negotiated service agreements should not be classified as separate products, contending, *inter alia,* that the proposed rules require sufficient information to demonstrate compliance with the statutory criteria and that negotiated service agreements are analogous to rate cells within products of general applicability such as Priority Mail or Parcel Select, rather than separate products themselves. *See, e.g.,* Postal Service Comments, September 24, 2007, at 5–12; PSA Comments, September 24, 2007, at 9–11, and Advo Comments, September 24, 2007, at 2–3. Similar claims are made with respect to market dominant negotiated service agreements. As discussed in chapter II–F, the Commission is not persuaded that negotiated service agreements are not separate products.

In this chapter, the Commission addresses parties' comments advocating changes to the classification of products as market dominant or competitive, an issue that largely affects international mail. In addition, the Commission addresses the relatively few suggestions that the proposed rules be modified. As discussed below, upon review of the parties' comments, the Commission has revised or otherwise clarified certain of the rules.

### A. International Mail

Under the PAEA, international mail is categorized as market dominant or competitive depending on whether it is single piece or bulk. *See* 39 U.S.C. 3621(a)(10), and 3631(a)(4). Additional competitive categories of mail include priority mail, expedited mail, and bulk parcel post. 39 U.S.C. 3631(a). In Order No. 26, the Commission classified domestic and international priority mail and expedited mail as competitive. PRC Order No. 26, August 15, 2007, ¶ 3010. In addition, the Commission defined bulk international mail by reference to bulk commercial services, including International Priority Airmail Service (IPA), International Surface Airlift Service (ISAL), direct sacks of printed matter sent to a single foreign address (M–bags), and Individual Customized Mailing Agreements (ICMs). *Id.,* ¶ 3019. The Commission distinguished between inbound and outbound international mail, suggesting that inbound international mail or a subset thereof, *i.e.,* Letter Post, may be classified as market dominant. Indicating that it lacked sufficient information to determine the proper classification for inbound international mail, the Commission requested that interested parties address the issue. *Id.,* ¶¶ 3021–22. Several parties, including the Postal Service, FedEx, XLA, and UPS, did. The

issues raised by the parties' comments are addressed below.

1. Exceptional Treatment for Inbound International Mail

The Postal Service advocates that inbound international mail not be classified as either market dominant or competitive, but rather should be treated on an exceptional basis.[26] The exceptional treatment sought is that ''inbound international mail should not be 'classified' in the [Mail Classification Schedule], and that inbound charges should not be subject to the same regulations as other Postal Service products.'' *Id.* at 22 (footnote omitted).

In support of its position, the Postal Service advances two principal arguments.[27] First, it argues that inbound services are not offered or priced by the Postal Service in the same manner as outbound products and services, concluding that prices for inbound mail are largely beyond the Postal Service's control. *Id.* at 13–15. For example, it notes that Letter Post terminal dues are set by the Universal Postal Union (UPU) Congress, and that for inbound Parcel Post, inward land rates are set pursuant to a prescribed rate-setting formula adopted by the Postal Operations Council (POC). *Id.* at 14.[28]

Second, it asserts that section 407 of title 39 ''establishes a separate scheme for transparency and oversight of inbound international mail charges,'' which warrants not classifying inbound international mail as either market dominant or competitive. *Id.* at 16. It contends that sections 407(c)(1) and (c)(2) create a unique regulatory scheme for inbound charges established through the UPU, with the State Department responsible for the development of international postal policy, while the Commission is responsible for developing and applying pricing rules.[29] Characterizing the

---

[26] Postal Service Comments, September 24, 2007, at 13–22.

[27] The Postal Service also contends that practical considerations justify exceptional treatment for inbound international mail. Its arguments, however, largely reiterate points made in support of its two principal arguments, *e.g.,* the problematic application of the price cap to inbound international mail. *Id.* at 20–22.

[28] In addition, the Postal Service contends that inbound international mail is distinguishable from outbound mail because it has no relationship with the originator of inbound mail. *Id.* at 15.

[29] *Id.* at 16–17. Section 407(c)(1) requires the Secretary of State to solicit the Commission's views prior to concluding any postal treaty, convention, or amendment establishing a rate or classification for a market dominant product. Section 407(c)(2) requires the Secretary of State to ensure that each such treaty, convention, or amendment is consistent with the Commission's views, unless the Secretary of State makes a written determination that it is not

Commission's role as one of oversight, the Postal Service further contends that the "oversight mechanism recognizes the incompatibility of applying a rate cap to inbound charges." *Id.* at 17.

In addition, the Postal Service references section 407(d), which, with certain limitations, permits the Postal Service to enter into commercial and operational contracts relating to international postal services and international delivery services. *Id.* at 18–20. The Postal Service acknowledges that the Commission has no oversight role under section 407(d), but asserts that transparency is assured because a copy of the contract must be filed with the Commission and the Secretary of State. Aside from that, the Postal Service emphasizes that reciprocity influences the outcome of bilateral contracts and thus has a considerable influence on inbound charges.[30]

For financial reporting purposes, the Postal Service proposes that the costs and revenues of single-piece inbound mail be reported as market dominant or competitive based on considerations such as the content of the mailpiece and whether the inbound charges are negotiated or not.[31] Taking these considerations into account, the Postal Service proposes that the costs and revenues for inbound single-piece international mail be recorded as follows:

Market dominant, consisting of Letter Post tendered under UPU terminal dues, Letter Post tendered under bilateral contract arrangements, and Parcel Post tendered at UPU inward land rates, and

Competitive, consisting of Parcel Post tendered at negotiated charges and EMS.

*Id.* at 23–24.[32]

*Commission analysis.* The notion that sections 407(c) and (d) create a "different system of regulation for inbound international mail" based on considerations of transparency and oversight is unsustainable. *Id.* at 19. Had Congress intended to exempt inbound international mail from the requirement that all products be categorized as either

market dominant or competitive, it would have done so explicitly, as it did by specifically exempting experimental products from the requirements of section 3642.[33] Unambiguously, the PAEA requires international mail to be classified as either market dominant or competitive. *See* FedEx Reply Comments, October 10, 2007, at 2–14.

None of the rationales offered by the Postal Service in support of its request that inbound international mail be accorded exceptional treatment, *e.g.*, that prices for inbound services are largely beyond its control or that section 407 establishes a different system of regulation for inbound mail, is persuasive. As explained in Order No. 26 in this proceeding, the Commission will, *inter alia*, identify the initial market dominant and competitive product lists required by section 3642. *See* Order No. 26, ¶¶ 3072–76. International mail is comprised of one or more postal products,[34] which depending on their characteristics may be categorized as market dominant or competitive. *See* 39 U.S.C. 3621(a) and 3631(a). By its express terms, section 3642(e) prohibits the Postal Service from offering any product, except an experimental product, involving the physical delivery of letters, printed matter, or packages that has not been assigned by the Commission to either the market dominant or competitive category of mail. This directive even extends to the provision of nonpostal services.[35] Thus, that inbound services may be priced in a manner different from outbound mail does not exempt inbound international mail from the requirement that it be categorized as a product.

Section 407 does not establish a different system of regulation for inbound mail. Rather, that section delineates, *inter alia*, the Secretary of State's responsibilities regarding international postal arrangements, the Commission's role with respect to

certain arrangements, and the Postal Service's authority to execute bilateral contracts. Nothing in sections 407(c) or (d) create an express or implied exemption for inbound international mail from the requirement that it be categorized as a market dominant or competitive product.

Nothing in section 407(c) suggests a unique regulatory scheme for inbound international mail. Section 407(c) applies only to market dominant products. It requires the Secretary of State, prior to concluding any treaty or convention establishing a rate or classification for a market dominant product, to request the Commission's views "whether such rate or classification is consistent with the standards and criteria established by the Commission under section 3622." As FedEx observes, rather than establishing a separate regulatory scheme, "§ 407(c) explicitly references the broader regulatory framework applicable to market dominant products: 'a product subject to subchapter I of chapter 36.'" FedEx Reply Comments, October 10, 2007, at 11 (emphasis omitted). The subject matter of section 407(c) concerns market dominant products, requiring, in the first instance, a determination that the product be categorized as market dominant. The Postal Service's interpretation renders the phrase "rate or classification for a product subject to subchapter I of chapter 36" largely meaningless since inbound market dominant mail would not be categorized as a product.[36] A cardinal rule of statutory construction is that each word, phrase, sentence and part of a statute be given effect.[37] The Postal Service's proposal that inbound international mail be given exceptional treatment violates this basic principle.

Section 407(d) authorizes the Postal Service to enter into bilateral contract agreements, subject to certain limitations, concerning international postal services. As the Postal Service notes, its authority extends to market dominant and competitive international postal services. Postal Service Comments, September 24, 2007, at 18. By definition, 39 U.S.C. 102(6), international postal services are products, and as such, must be categorized by the Commission as either market dominant or competitive before the Postal Service may offer the service.

---

in the foreign policy or national security interest of the United States to ensure consistency with the Commission's views.

[30] The Postal Service would exempt what it calls "specialized arrangements," which provide for the entry of mail overseas bearing domestic postage indicia, from the exceptional treatment it espouses for all other inbound international mail. *Id.* at 22, n.36.

[31] *Id.* at 22. The omission of bulk inbound mail is not explained.

[32] Pitney Bowes endorses the Postal Service's proposal to treat inbound international mail on an exceptional basis, but alternatively suggests that, if it is classified, inbound international mail be classified as competitive. Pitney Bowes Reply Comments, October 9, 2007, at 8.

[33] Because the Commission rejects the proposal that inbound international mail be treated in exceptional fashion, there is no need to address the Postal Service's related but contingent proposal to report single-piece inbound costs and revenues as market dominant or competitive based on various factors.

[34] The term "product" is defined as "a postal service with a distinct cost or market characteristic for which a rate or rates are, or may reasonably be, applied[.]" 39 U.S.C. 102(6). The term "postal service" is defined as "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto[.]" 39 U.S.C. 102(5).

[35] *See* 39 U.S.C. 404(e)(5) ("the Postal Regulatory Commission shall designate whether the [continuing nonpostal] service shall be regulated under this title as a market dominant product, a competitive product, or an experimental product.").

[36] Implicitly, the Postal Service recognizes the requirement that each product be categorized as market dominant or competitive as evidenced by its proposal to use financial data as a surrogate means for distinguishing between market dominant and competitive products.

[37] *See* 2A Sutherland Statutory Construction § 47.21 (7 thed. 2007).

39 U.S.C. 3642(e). In sum, sections 407(c) and (d) do not create a different system of regulation that exempts inbound international mail from the requirement that it be categorized as a market dominant or competitive product.

2. Outbound and Inbound International Mail

Section 3631(a) lists priority mail, expedited mail, bulk parcel post, and bulk international mail as being within the competitive category of mail. Section 3621(a) lists single-piece international mail and single-piece parcel post as being in the market dominant category of mail. The classification of these categories of mail as either market dominant or competitive would appear to be relatively straightforward. That assumption holds true for domestic mail. It is problematic for international mail, particularly inbound international mail, which is complicated by the fact that the UPU's designation of three types of service does not neatly correspond with existing Postal Service outbound services.

XLA and FedEx argue that postal services classified as competitive for outbound shipments should likewise be classified as competitive for inbound shipments. XLA is explicit, although its discussion is somewhat cryptic.[38] FedEx's discussion is more expansive; its conclusion, however, is the same. For example, it argues that the Commission's conclusion classifying outbound priority mail and expedited mail as competitive should be extended to inbound shipments as well. FedEx Comments, September 25, 2007, at 6–8. It also argues that inbound international parcel post mail should be classified as "bulk parcel post" and that inbound international letter post mail should be classified as "bulk international mail" if such mail meets the definition of "bulk" applicable to outbound international mail. *Id.* at 8–14.[39]

The Postal Service takes issue with the parties' position and, as noted above, proposes that inbound costs and revenues be used to categorize inbound shipments as market dominant or competitive based on factors such as the content of the mail and whether the charges are negotiated or not. Postal Service Comments, September 24, 2007, 22–24; Postal Service Reply Comments, October 9, 2007, at 60–64.

*Commission analysis.* The UPU identifies three types of inbound international mail: Letter Post, Parcel Post, and EMS (express mail service). Each is addressed below.

EMS is an express service for documents and merchandise. It is an optional service which postal administrations may provide. Order No. 26 classified outbound expedited mail as competitive. FedEx, XLA, and UPS argue that inbound express mail service should likewise be categorized as competitive.[40] The Postal Service agrees with the characterization of inbound EMS as competitive.[41]

EMS is a service offered by postal administrations in competition with private carriers. Although an optional service posts may offer, EMS is currently available in at least 191 countries worldwide. EMS is administered by the EMS Cooperative, which was established by the UPU's POC approximately 10 years ago. EMS postal administration charges are not established by the UPU, but instead are established through bilateral or multilateral negotiations. Outbound rates charged to customers are set by each national postal administration. The Commission concurs with the parties, concluding that inbound EMS is properly categorized as competitive.

Letter Post consists of letters, postcards, printed papers, and small packets weighing up to 2 kilograms; priority and non-priority items weighing up to 2 kilograms; literature for the blind up to 7 kilograms; and M-bags (special bags containing newspapers, periodicals, books and similar matter mailed to a single address).[42] UPU member countries are required to "ensure the acceptance, handling, conveyance and delivery of letter-post items." *Id.*

FedEx argues that inbound international Letter Post mail should be classified as "bulk international mail" if such mail meets the definition of "bulk" applicable to outbound international mail. FedEx Comments, September 25, 2007, at 12–14. In an effort to define the term "bulk," FedEx endorses, in principle, an earlier suggestion by the Postal Service that "bulk international mail" be interpreted as multi-item mailings tendered by a single mailer. FedEx argues that this definition would appear to be serviceable for inbound international Letter Post, noting that the Postal Service employed it to identify outbound bulk international Letter Post and Parcel Post mail. *Id.* at 13.[43] XLA's position is not clear, although it appears to argue that "bulk letters" should be categorized as competitive. XLA Comments, September 24, 2007, at 2.

The Postal Service opposes FedEx's proposal, arguing that determining which shipments from foreign posts would qualify as "bulk" would be problematic for several reasons, *e.g.*, inability to verify foreign posts' classifications for accuracy. Postal Service Reply Comments, October 9, 2007, at 63.[44] The Postal Service also notes that FedEx's proposal to classify inbound bulk letter mail as competitive appears to disregard the applicability of the Private Express Statutes, including the new price and weight tests applicable to letters in section 601(b) of title 39. *Id.* at 64. The Postal Service proposes that, for financial reporting purposes, Letter Post be categorized as market dominant. Postal Service Comments, September 24, 2007, at 23.

UPS agrees with the Postal Service that inbound mail subject to the letter monopoly should be classified as market dominant. UPS Reply Comments, October 9, 2007, at 7.

Letter Post items include matter subject to the Postal Service's monopoly over letter mail. It may also include items that, if mailed domestically, would qualify as Priority Mail,

---

[38] XLA Comments, September 24, 2007, at 4. XLA interprets Order No. 26 as classifying all inbound postal products as market dominant. It discusses the implications of such a finding on customs and other border-related requirements, arguing, among other things, that it would preserve preferential treatment for inbound postal products to the detriment of private carriers. *Id.* at 1–3.

[39] Preliminarily, two additional points raised by FedEx merit brief mention. In its comments, FedEx provides an extended discussion of section 407(e)(2) concerning the interplay between the Commission's findings in this proceeding and the responsibilities of other federal agencies concerning customs regulations. In addition, FedEx comments on the scope of the letter monopoly, offering its preliminary views on the Commission's responsibilities under section 601, and noting an apparent anomaly concerning the inclusion of

"bulk international mail" as a competitive category of mail (interpreted as applicable to bulk international letters) notwithstanding the letter monopoly. *Id.* at 14–29. In its reply comments, the Postal Service responds to each of these arguments. Postal Service Reply Comments, October 9, 2007, at 64–72. While the parties' comments are instructive, the Commission finds it unnecessary, for purposes of this proceeding, to address these issues substantively.

[40] *See* FedEx Comments, September 25, 2007, at 6–8; XLA Comments, September 24, 2007, at 1–4, and UPS Reply Comments, October 9, 2007, at 5–6.

[41] Postal Service Reply Comments, October 9, 2007, at 61. The Postal Service's agreement is qualified in terms of its proposed treatment of inbound costs and revenues for this mail. *Id.*, n.161.

[42] Universal Postal Union Convention, Article 12, section 2.

[43] FedEx also discusses the UPU's characterization of the term "bulk," suggesting that the Commission could adopt that standard for inbound bulk Letter Post mail. *Id.* at 13–14.

[44] The Postal Service dismisses the possibility of using the UPU's definition of "bulk" mail, arguing that the definition is designed to address concerns involving remail arbitrage, and further that no UPU post dispatches its international letters to the Postal Service using UPU's bulk mail provisions. *Id.* at 63–64.

applicable to First-Class Mail weighing more than 13 ounces. In its proposed Mail Classification Schedule, the Postal Service has classified First-Class International Mail weighing more than 13 ounces as market dominant. It indicates, however, that such mail would more appropriately be viewed as competitive. The Postal Service states its intent to seek a transfer of outbound First-Class International Mail above 13 ounces to the competitive products list, advocating that, if the transfer occurs, inbound Letter Post costs and revenues for such mail should be categorized as competitive as well. Postal Service Initial Mail Classification Schedule, September 24, 2007, at 22–23. Letter mail is subject to the Postal Service's letter monopoly. Thus, it is properly categorized as market dominant. The Postal Service's current inbound data collection system does not distinguish Letter Post items by weight or content. Thus, as a practical matter, the Postal Service could not identify mail that is not subject to the monopoly. The Postal Service's plan to transfer First-Class International Mail above 13 ounces to the competitive products list should resolve that issue. In the interim, for purposes of establishing the initial product lists, the Commission concludes that Letter Post should be classified as market dominant. Moreover, as there is no incoming bulk international Letter Post, this conclusion is consistent with section 3621(a)(10), which categorizes single-piece international mail as market dominant.

UPU member countries' duties with respect to Parcel Post include ensuring the acceptance, handling, conveyance and delivery of parcels weighing up to 20 kilograms pursuant to the UPU Convention or through bilateral agreements.[45] For financial reporting purposes, the Postal Service proposes to classify inbound Parcel Post shipments tendered by foreign posts at inward land rates set by the POC as market dominant, with inbound shipments tendered at negotiated charges classified as competitive.

FedEx makes essentially the same argument regarding inbound bulk Parcel Post as it did regarding inbound bulk international mail, i.e., that inbound international Parcel Post should be classified as "bulk parcel post" if it meets the definition of "bulk" applicable to outbound international mail. FedEx Comments, September 25,

2007, at 8–12. XLA argues that "bulk packages" should be classified as competitive. XLA Comments, September 24, 2007, at 2. UPS also argues that inbound international parcels are properly classified as competitive. UPS Reply Comments, October 9, 2007, at 6.

The Postal Service's response to FedEx's arguments is largely the same as its response to FedEx's arguments concerning "bulk international mail." Postal Service Reply Comments, October 9, 2007, at 61–62. In addition, however, the Postal Service notes that inward land rates are set by the POC, that the rates may not be cost remunerative, and that UPU member countries must provide Parcel Post service. Further, it states that no special "bulk" rate exists for inbound parcels. *Id.* at 62–63.

The parcels market is by all accounts competitive. The statute, however, distinguishes between single-piece and bulk Parcel Post. Other than Global Bulk Economy, available only by contract, the Postal Service does not offer outbound surface Parcel Post service. Pursuant to UPU requirements, it accepts both inbound surface and air Parcel Post shipments. There is no specific inbound bulk Parcel Post rate.

To give effect to the statute while recognizing the competitive realities, the Commission finds it appropriate to distinguish between the Parcel Post shipments based on two factors: The mode of transportation and whether the rate is negotiated or not. To that end, the Commission concludes that air Parcel Post shipments are appropriately classified as competitive. This classification treats air Parcel Post as equivalent to Priority Mail, a competitive category of mail, and recognizes the reality that the international air parcels market is competitive.[46]

Surface Parcel Post shipments are distinguishable by the rate paid by the shipper. Surface Parcel Post shipments tendered at UPU rates are appropriately classified as market dominant, while surface Parcel Post shipments tendered at negotiated rates are appropriately classified as competitive. This bifurcation is consistent with both section 3621(a)(5), which categorizes single-piece Parcel Post as market dominant, and section 3631(a)(3), which categorizes bulk Parcel Post as

competitive. While there may be no generally available inbound bulk Parcel Post rate, any agreements for surface Parcel Post service are likely to be for bulk quantities. Moreover, classifying surface Parcel Post shipments tendered at UPU rates as market dominant assures universal access to Parcel Post services.

### 3. Outbound Mail Is Subject to the Price Cap

In its reply comments, the Postal Service proposes a new rule regarding adjustments to the price cap for market dominant classes of outbound international mail. Postal Service Reply Comments, October 9, 2007, at 72.[47] Under the proposed rule, the Postal Service would calculate a modified cap based on a comparison of international mail cost data reported in the most recent annual compliance report with that reported in the previous year's annual compliance report. The Postal Service indicates that the modified cap is intended to reflect the change between the prior year's total unit costs and the sum of actual unit delivery costs in the most recent year "plus what all other unit costs would have been had they changed precisely by the applicable CPI–U change." Postal Service Reply Comments, October 9, 2007, at 74.

More specifically, the Postal Service would calculate the "adjusted total unit costs" by: (1) Identifying the actual "unit destination delivery charges" reported in the most recent annual compliance report; (2) identifying the "unit other costs" reported in the previous year's annual compliance report and increasing that amount by the annual limitation percentage (CPI–U) calculated pursuant to rule 3010.21; and (3) summing the results of the first two steps, yielding the "adjusted total unit costs." The "adjusted annual limitation for a class of [outbound] international mail," the modified cap, is calculated by dividing the adjusted total unit costs by the "base total unit cost" (the total unit costs reported in the previous year's annual compliance filing) and subtracting 1 from the quotient. The result, expressed as a percentage, represents the "adjusted annual limitation" which, along with any allowable recapture of unused rate authority, would equal the modified

---

[45] UPU Convention, Article 12, section 5. Higher weight limits optionally apply for certain Parcel Post items pursuant to the Parcel Post Regulations. *Id.*, section 6.

[46] The Postal Service's discussion of its bilateral contracting authority emphasizes the role of reciprocity in such negotiations. Postal Service Comments, September 24, 2007, at 18–19. That discussion, however, also acknowledges the competitive nature of the international mail market. *Id.* at 19.

[47] The Postal Service notes that it discussed its concerns regarding outbound international mail in its initial comments, indicating that it would present a proposed rule in the near term. *See* Postal Service Comments, September 24, 2007, at 20, n.35.

price cap applicable to each class of international mail.[48]

*Commission analysis.* The Postal Service takes the position that the Commission may, in its discretion, modify the price cap applicable to outbound mail because section 3622(d)(2)(A) applies only to domestic mail. *Id.* at 20, n.35. The Commission declines the invitation to exercise its discretion in this fashion. Pursuant to section 3622(d)(2)(A), the price cap applies to each class of mail listed in the Domestic Mail Classification Schedule (DMCS) in effect on the date of enactment of the PAEA. To be sure, the DMCS does not include international mail. Nonetheless, the conclusion that "§ 3622(d)(2)(A) applies only to domestic mail" does not necessarily follow. *Id.*

First, section 3622(d)(2)(A) does not preclude application of the price cap to single-piece international mail. Second, regarding international postal arrangements, section 407(c) specifically references rates and classes of market dominant products; it does not, however, exempt such arrangements from application of the price cap. When it is intended that a specific statutory provision be waived, the PAEA is explicit. *See* 39 U.S.C. 3641(a)(2), exempting experimental products from application of sections 3622, 3633, and 3642.

Finally, the PAEA creates a new system of rate regulation for market dominant products that is keyed to the price cap. The inclusion of single-piece international mail in section 3621(a) as market dominant addresses the needs of individual consumers, particularly as it relates to letter mail. Thus, for purposes of implementing the initial system of modern rate regulation, the Commission finds that the price cap is applicable to outbound single-piece international mail. The Commission notes that Letter Post is the international counterpart to First-Class Mail. Inbound Letter Post is categorized as market dominant. The PAEA classifies single-piece international mail as market dominant. As the name suggests, single-piece international mail is intended for use by individual customers, particularly for correspondence, since competitive alternatives exist for other international mail services. Consequently, for purposes of applying the price cap, the Commission concludes that it is appropriate to list single-piece

international mail as a product within First-Class Mail.[49]

The PAEA also classifies single-piece Parcel Post as market dominant. Earlier this year, however, the Postal Service consolidated its international non-express parcel services under one umbrella labeled Priority Mail International (PMI). 72 FR 16604 (April 4, 2007). PMI is an airmail service and is provided in compliance with the UPU's parcel provisions. With the change, the Postal Service discontinued offering international (outbound) single-piece surface Parcel Post service.[50] Thus, in terms of service, all PMI parcels are equivalent to air Parcel Post, which, for inbound shipments, the Commission classifies as competitive. Since the Postal Service provides no outbound single-piece surface Parcel Post service, only domestic single-piece Parcel Post is classified as market dominant.

*B. Appropriate Share of Institutional Costs*

The PAEA requires that competitive products collectively cover an "appropriate share" of the Postal Service's institutional costs. 39 U.S.C. 3633(a)(3). In Order No. 26, the Commission proposed to set the initial contribution at 5.5 percent of the Postal Service's total institutional costs. Order No. 26, ¶¶ 3049–61. Several parties address the proposed contribution level, but only one, PSA, urges its modification.

PSA recommends that proposed rule 3015.7(c) be modified in two respects. First, it proposes that the appropriate share requirement be reduced to 4.5 percent of total institutional costs, arguing that lowering the contribution would provide a margin of safety against factors unrelated to postal pricing and beyond the Postal Service's control.[51]

Second, PSA proposes that, for purposes of the Postal Service's compliance with section 3633(a)(3), the appropriate share requirement be implemented on a multi-year, as opposed to annual, basis. PSA contends that a multi-year requirement would afford the Postal Service pricing flexibility and smooth economic cycles. PSA Comments, September 24, 2007, at 7.

Recognizing "the transitional needs of the Postal Service[,]" UPS does not object to the 5.5 percent contribution level. UPS Comments, September 24, 2007, at 1. Looking to the future, it advocates that the appropriate share be established as a fixed percentage of institutional costs with the percentage reflecting competitive products' historic contribution levels over a period longer than two years.[52]

In its reply comments, the Postal Service endorses the reasonableness of the 5.5 percent contribution level, characterizing it as a challenging, but attainable, benchmark. Postal Service Reply Comments, October 9, 2007, at 55–57. Referencing Order No. 26, the Postal Service also comments that "if circumstances so require" the contribution level may be revisited. *Id.* at 56–57.

*Commission analysis.* The Commission rejects PSA's proposals to modify rule 3015.7(c). In Order No. 26, the Commission explained in detail the basis for establishing 5.5 percent as the appropriate initial contribution level. Order No. 26, ¶¶ 3052–61. PSA has not made a compelling case for lowering the contribution level.[53] PSA argues that the Postal Service's ability to achieve a specified contribution level from competitive products is, compared to a

---

[48] For a more complete discussion of the Postal Service's proposal, see id. at 72–76. Attachment A to the Postal Service's Reply Comments sets forth the proposed rule.

[49] This process should afford the Postal Service flexibility to address cost issues that may arise regarding such mail. Other options may be available as well, including bilateral or multilateral agreements. Moreover, while the Commission has declined to exercise its discretion at this time, should circumstances change the Postal Service may request that the issue be revisited.

[50] The Postal Service offers Global Bulk Economy, an outbound service for mail deposited in bulk and shipped via surface transportation, which is classified as competitive. If the Commission's understanding that the Postal Service no longer provides non-bulk surface Parcel Post service is inaccurate, the Postal Service should so advise and, if appropriate, seek to modify the product lists accordingly.

[51] PSA Comments, September 24, 2007, at 6. PSA notes that under the proposed 5.5 percent appropriate share, as contrasted with a minimum percentage markup, the contribution from competitive products is highly dependent on their volumes, particularly higher margin products. *Id.* at 3. In reply comments, DMA touches on the issue

of competitive volumes and, in a roundabout manner, appears to endorse PSA's 4.5 percent recommendation. DMA Reply Comments, October 9, 2007, at 6–8. From that apparent endorsement, DMA segues to the suggestion that the final rule should explicitly provide an opportunity to revisit the issue of appropriate share based on changed circumstances. *Id.* at 8–9. APMU also comments on PSA's recommendation, contending that the 4.5 percent "is the absolutely highest level that can be imposed on all competitive products during a transitional period." APMU Reply Comments, October 9, 2007, at 1. APMU comments on the parcels market, including contributions from competitive products, and cautions the Commission about the consequences of setting an excessive minimum contribution level. *Id.* at 2–4.

[52] *Id.* at 2–6. The Postal Service and PSA respond to UPS's vision of what the appropriate share should represent in the future. Postal Service Reply Comments, October 9, 2007, at 57–58; PSA Reply Comments, October 9, 2007, at 2–5. While it appreciates the parties' comments, the Commission finds it unnecessary to address them since what the contribution level should be in the future is not ripe for decision.

[53] UPS opposes PSA's proposal to reduce the contribution level to 4.5 percent. UPS Reply Comments, October 9, 2007, at 4.

minimum percentage markup requirement, heavily dependent on volume, which, it says, is of concern in two respects. First, PSA makes the point that competitive product volumes are dependent on exogenous factors, such as economic conditions and competitors' prices, over which the Postal Service has no control.[54] Second, although acknowledging the recent increases in Priority Mail and Express Mail volumes, PSA suggests that longer term competitive product volumes may be declining. *Id.* at 4.

PSA's first argument is that competitive markets are risky. Its solution seeks simply to reduce the Postal Service's risks without consideration of any factors relevant to establishing the contribution level at 5.5 percent.[55] Fluctuation of volumes is an inherent market risk. PSA's speculation about competitive volume trends does not take into account the regulatory changes brought about by the PAEA, which, at a minimum, afford the Postal Service substantial pricing flexibility.

PSA's proposal to calculate compliance over a three-year period is rejected. Proposed rule 3015.7(c) imposes an annual compliance requirement associated with the 5.5 percent contribution level, a standard that is fully consistent with the statute. PSA does not contend otherwise, but notes that section 3633(a)(3) "is silent as to the time period over which the appropriate share requirement be met." PSA Comments, September 24, 2007, at 7. The "omission" of any such time period in section 3633(a)(3) does not support PSA's proposal that compliance be measured over three-year periods. Rather, the "omission" supports the annual compliance requirement.

Section 3652 requires the Postal Service to file certain annual reports with the Commission. Section 3653 requires the Commission to issue annual compliance reports addressing, among other things, the Postal Service's compliance with section 3633. Plainly, compliance is to be determined on an annual basis. Had Congress intended a different standard for competitive

products, it would have stated so explicitly.

*C. Filing Requirements for Competitive Product Rate Decreases*

Proposed rule 3015.3 prescribes filing requirements for decreases in rates of general applicability. PSA requests clarification of the proposed rule, contending that it should apply only to decreases in the average rate of a product, "not when the rate in a particular rate cell will decrease." *Id.* at 8. PSA argues that the filing requirements should not apply below the product level because "the rate offered in a particular rate cell has no direct effect on compliance."[56]

PSA also contends that the rule 3015.3 filing requirements should apply only to the product subject to the decrease, not to all competitive products, because the cost coverage requirement, section 3633(a)(2), only applies to the specific product. The Postal Service agrees with PSA's interpretation on this issue. Postal Service Reply Comments, October 9, 2007, at 59.

*Commission analysis.* As proposed, rule 3015.2, concerning increases in rates of general applicability, and rule 3015.3, concerning decreases in rates of general applicability, are designed to operate in concert, *i.e.,* whenever the Postal Service changes rates of general applicability, notice must be filed pursuant to rules 3015.2 and/or 3015.3. PSA notes that rule 3015.3 is unclear regarding the circumstances which trigger the filing requirements. PSA asks whether the rule is to be invoked for any rate decrease, even a rate cell, or only when the average rate of a product decreases. PSA Comments, September 24, 2007, at 8. PSA contends that rule 3015.3 should be applied only when the average rate for a product will decrease. *Id.* PSA's request for clarification is reasonable; it is granted. Whenever the Postal Service decreases the average rate of a product, notice must be filed pursuant to rule 3015.3.[57]

To ensure that the rules continue to operate in concert as intended, this clarification requires that rule 3015.2(a) be modified to address rate changes, not merely increases.[58] Thus, whenever the Postal Service changes any competitive product rates of general applicability, notice must be filed pursuant to rule 3015.2. If, however, the average rate of a product decreases, notice must be filed pursuant to rule 3015.3.

PSA also commented on the interrelationship between rules 3015.2 and 3015.3, suggesting that a decrease in the rate of one product would trigger only rule 3015.3 filing requirements, not for all competitive products. The Commission clarifies that whenever the Postal Service changes rates of general applicability notice is to be filed pursuant to rule 3015.2. Thus, for example, if the Postal Service changes the rates of three competitive products, including decreasing the average rate of one, it would file notice of the changes pursuant to rule 3015.2 and, for the product with the average rate decrease, would file notice pursuant to rule 3015.3. Notice regarding the remaining competitive products for which rates are unchanged would not be required.

*D. Filing Requirements for Rate or Class Not of General Applicability*

Proposed rule 3015.5 governs the filing requirements when the Postal Service determines to add or change a rate or class not of general applicability, *i.e.,* competitive negotiated service agreements. PSA suggests two changes to the rule.

Proposed rule 3015.5(c)(1) requires the Postal Service to file "[s]ufficient annualized revenue and cost data to demonstrate that each affected competitive product will be in compliance with 39 U.S.C. § 3633(a)(2)." PSA interprets this provision as requiring the Postal Service to file "*total* cost and revenue data by year associated with the contract data." PSA Comments, September 24, 2007, at 11 (emphasis in original). PSA argues that this provision may hinder the Postal Service's ability to execute negotiated service agreements in instances where it is unable to estimate the contract volumes and thus could not estimate total costs and revenues. PSA suggests that unit revenue and cost data are reasonable proxies for compliance

---

[54] *Id.* PSA cites Priority Mail elasticity estimates from Docket No. R2006–1, which it says suggest "a dependency on the pricing decisions of USPS competitors that seems entirely inappropriate." *Id.* at 3–4. To the extent this conclusion has merit, PSA does not explain how its proposal would make it less so. In any event, the predicate for the conclusion appears to be problematic. The elasticity estimates from Docket No. R2006–1 predate passage of the PAEA. Thus, they do not reflect the new, flexible pricing regime under the PAEA.

[55] That solution differs from PSA's earlier comments suggesting a basis for setting the contribution level. *See* PSA Comments, June 18, 2007, at 7.

[56] *Id.* The Postal Service and Stamps.com agree that rule 3015.3 should apply only when the average rate for a competitive product decreases, not to decreases in individual rate cells. Postal Service Reply Comments, October 9, 2007, at 59; and Stamps.com Reply Comments, October 9, 2007, at 3–4.

[57] Accordingly, rule 3015.3(a) is modified as follows:

(a) When the Postal Service determines to change a rate or rates of general applicability for any competitive product that results in a decrease in the average rate of that product, it shall file notice of the change with the Commission no later than the date of publication of the decision in the **Federal Register** concerning such change, but at least 30 days before the effective date of the change.

[58] Rule 3015.2 is revised as follows: § 3015.2 Changes in rates of general applicability. (a) When the Postal Service determines to change a rate or rates of general applicability, it shall file notice of the change with the Commission no later than the date of publication of the decision in the **Federal Register** concerning such change, but at least 30 days before the effective date of the change.

with section 3633(a)(2). PSA proposes that rule 3015.5(c)(1) be revised by deleting the phrase "annualized revenues and cost" to read as follows: "[s]ufficient data to demonstrate that each affected competitive product will be in compliance with 39 U.S.C. § 3633(a)(2)."

Second, PSA proposes deleting the rule 3015.5(c)(2) requirement that the Postal Service provide a rationale explaining "why, following the change, competitive products in total will be in compliance with 39 U.S.C. §§ 3633(a)(1) and (3)." PSA argues that sections 3633(a)(1) and (3) apply to competitive products as a whole, not individual products. It contends that whether the Postal Service complies with section 3633(a)(1) and (3) will generally not depend on individual contract rates (rates not of general applicability). PSA, therefore, suggests that the provision is redundant. *Id.* at 13.

*Commission analysis.* The Commission will not adopt PSA's suggestion that rule 3015.5(c)(1) be modified. The predicate for the proposal, that the Postal Service "is unable to estimate mail volumes associated with the deal," is unrealistic. *Id.* at 2. In evaluating whether to execute a competitive negotiated service agreement, the Postal Service must have a reasonable estimate of the contract's economic value, a calculation dependent, in part, on either a reasonably reliable volume estimate or other type of annual guarantee. Moreover, PSA's suggestion that unit cost and revenue data may serve as reasonable proxies for compliance purposes is not well taken in circumstances where the negotiated service agreement involves multiple products or mail mix options. For example, if the negotiated service agreement involved Parcel Select, the costs and revenues under the agreement would be contingent on, among other things, volumes by dropship destination, *i.e.,* DBMC, DSCF, and DDU.

PSA's proposal focuses attention on proposed rule 3015.5(c)(1) and, upon reconsideration, the Commission finds it appropriate to clarify the proposed rule. The proposed rule used the phrase "annualized revenue and cost data." The term "annualized" is ambiguous and may be at odds with the annual compliance reporting requirements of sections 3652 and 3653. Thus, to clarify the filing requirements, the Commission will modify rule 3015.5(c)(1) to read as follows: "Sufficient revenue and cost data for the 12-month period following the effective date of the rate or class to demonstrate that each affected

competitive product will be in compliance with 39 U.S.C. 3633(a)(2)".[59]

The Commission will not adopt PSA's proposal that rule 3015.5(c)(2) be modified to eliminate the requirement that the Postal Service include an explanation that, following the change in the rate (or rates) not of general applicability, competitive products will be in compliance with sections 3633(a)(1) and (3). The assumption that the Postal Service's compliance with sections 3633(a)(1) and (3) will not be dependent on individual negotiated service agreements is untested and, thus, premature. International mail excepted, no competitive negotiated service agreements exist. Consequently, their impact is uncertain. The limited review contemplated by the rules is intended to provide some assurance that, at least preliminarily, the rates not of general applicability satisfy section 3633. Once experience under the PAEA is gained, including with rates not of general applicability, the rules can be revisited and modified as deemed appropriate.

*E. Parcel Select*

In Order No. 26, the Commission identified three bulk Parcel Post products, consisting of Parcel Select, Parcel Return Service, and Parcel Post mail qualifying for OBMC, BMC, and barcode discounts. Order No. 26, ¶ 3012.

The Postal Service proposes that OBMC, BMC, and barcode discounts be included as price categories within Parcel Select. Postal Service Initial Mail Classification Schedule, September 24, 2007, at 7–8. The Postal Service cites common characteristics between mailers using these rates and those using Parcel Select rates as a basis for consolidation. Both involve commercial mailers; some Parcel Select mailers also enter mail in the OBMC, BMC, and barcode discount categories. In addition, the Postal Service notes that the minimum volume requirements are the same as for Parcel Select. *Id.* at 8.

*Commission analysis.* The Commission will adopt the Postal Service's proposal, notwithstanding having some concerns about the sufficiency of the rationale offered in support of consolidation, i.e., similarities between mailers. This decision is influenced by several considerations.

First, the proposal generated no controversy, as evidenced by the fact that no party commented it. Second, consolidating the discounts with Parcel Select has a plausible basis; both involve parcels and are subject to the same volume requirements. Third, timing is not unimportant. This proceeding represents the initial attempt to develop rules implementing the modern system of rate regulation under the PAEA. Granting the Postal Service's proposal at the outset may enable the Postal Service to market Parcel Select in new ways. Experience, however, may demonstrate that Parcel Select and OMBC, BMC, and barcode discounts should be classified as separate products. Consolidation now does not preclude such a result later.

**IV. Product Lists**

*A. Subpart A—Mail Classification Schedule*

Initially, section 3020.11 required the Postal Service to propose a Mail Classification Schedule within 30 days of enactment of the final rule. At the same time, Order No. 26 requested that the Postal Service prepare a draft Mail Classification Schedule in expedited fashion. The Postal Service complied with the request for expedition and filed a draft Mail Classification Schedule on September 24, 2007.[60] Order No. 26 also requested initial comments from interested persons on the Postal Service's draft Mail Classification Schedule. Specific comments were received from Advo, APWU, Carlson, DFS, MOAA, NAPUS, OCA, Pitney Bowes, Popkin, and PostCom.

The Postal Service's commendable efforts will allow publication of a complete Mail Classification Schedule as anticipated. However, additional work remains. In this order, the Commission reaffirms that negotiated service agreements initially will be treated as individual products. To implement this finding, the Commission requests further information from the Postal Service. The Commission requests the Postal Service to develop and file with the Commission the descriptive information necessary to identify and explain each market dominant and competitive negotiated service agreement (including each International Customized Mail Agreement). For both market-dominant and competitive agreements, consideration should be given to grouping agreements with identical or very similar terms and conditions. This

---

[59] Rule 3015.3(c)(1), which used the same language concerning decreases in rates of general applicability, will also be modified similarly: "Sufficient revenue and cost data for the 12-month period following the effective date of the rate to demonstrate that each affected competitive product will be in compliance with 39 U.S.C. 3633(a)(2)".

[60] United States Postal Service Submission of Initial Mail Classification Schedule in Response to Order No. 26, September 24, 2007.

information is to be provided to the Commission by November 20, 2007.

The Commission also has integrated several international products under the classifications of their domestic counterparts. Single-piece First-Class Mail International has been subdivided into Outbound Single-piece First-Class Mail International and Inbound Single-piece First-Class Mail International, and assigned to the First-Class Mail class. International Ancillary Services, International Reply Coupon Service, and International Business Reply Mail Service have been included with Special Services. A product described as Inbound Surface Parcel Post (at UPU rates) has been assigned to the Package Services class.

Classes of Express Mail and Priority Mail have been assigned to the competitive products list. The "class" terminology within the competitive products list is used merely as an organizational aid to group products with similar characteristics and is not meant to imply ratemaking significance. The Express Mail class is to include Express Mail (Domestic), Outbound International Expedited Services, and Inbound Expedited Services. The Priority Mail class is to include Priority Mail (Domestic), Outbound Priority Mail International, and Inbound Air Parcel Post. As discussed above, DBMC, BMC, and barcode discount parcels have been consolidated with Parcel Select as one product. Parcel Return Service remains as proposed by the Postal Service. A product described as Inbound Surface Parcel Post (at non-UPU rates) has been assigned to the competitive products list international class. The above changes will either require modification to the Postal Service's proposed Mail Classification Schedule, or additional information from the Postal Service to accurately describe these products. This information is to be provided to the Commission by November 20, 2007.

While the Commission is comfortable in most instances with the Postal Service naming its own products, the Commission's preference is for product names that appropriately identify the characteristics of the products. In this respect, the term "bulk" as used in First-Class Mail "Bulk Letters/Postcards" is not helpful because large quantities of what might commonly be thought of as "bulk" mail also is mailed at single-piece rates. Furthermore, bulk mail can not be entered at Bulk Letters/Postcards rates unless it is also presorted. The Commission asks the Postal Service to consider whether another descriptive term other than bulk

might be more appropriate, such as "presorted" or "worksharred".

The Commission will develop a comprehensive Mail Classification Schedule for incorporation into its rules after thorough review of the Postal Service's proposals and the comments already provided. Notice and the opportunity for comment on the Mail Classification Schedule developed by the Commission will be provided.

The Postal Service suggests that product descriptions be omitted from the Mail Classification Schedule when published as Commission regulations in the Code of Federal Regulations. Postal Service Reply Comments, October 9, 2007, at 26–27. The Postal Service contends that since changes to provisions for existing products are made by the Postal Service in the Domestic Mail Manual, it may be confusing also to have to revise the Mail Classification Schedule. In addition, the Postal Service questions whether such treatment would conform with the Governors' ability to enact classification changes for competitive products under 39 U.S.C. 3632.

The Commission previously explained that:

The Commission is charged with maintaining accurate product lists. 39 U.S.C. § 3642. The Commission views the Mail Classification Schedule as the vehicle for presenting the product lists with necessary descriptive content. The explanatory information included with the product lists will inform participants in Commission proceedings of the nature and scope of Postal Service products and must be sufficiently detailed to allow the Commission to verify that the rates and categorization of products are in compliance with the PAEA. Thus, the Mail Classification Schedule is important in that it will provide for the transparent and accurate maintenance of the product lists.

PRC Order No. 26 at ¶ 4003.

The explanatory information performs an important function in the Commission's responsibility to establish and maintain "a modern system for regulating rates and classes for market-dominant products." *See* 39 U.S.C. 3622(a). Furthermore, the explanatory information facilitates the Commission's understanding of the Postal Service's products when reviewing service standards under 39 U.S.C. 3691.

With the Commission's role in maintaining the product lists, regulating rates and classes for market dominant products, and reviewing service standards, the explanatory information provides a baseline for the Commission in undertaking its important responsibilities. The rules require only minimal descriptive information to be included in the Mail Classification

Schedule.[61] The level of detail that the Postal Service provided in its proposed Mail Classification Schedule, with some minor adjustments, appears adequate. The rules also specify an expeditious and unburdensome approach to updating the Mail Classification Schedule that is consistent with providing the Postal Service with great flexibility to manage its products. Thus, the Postal Service's suggestion to omit the descriptive information from the CFR will not be adopted.

Initially, rule 3020.12 was written to incorporate by reference the Mail Classification Schedule into the **Federal Register**. This method of publication requires the approval of the Director of the Federal Register. At this time, the Commission has not received approval. Because the initial Mail Classification Schedule is a required component of this final rule, rule 3020.12 has been revised to publish the Mail Classification Schedule in the **Federal Register** as an appendix.

The final rule establishes an initial framework for operating under the PAEA. This requires at a minimum publication of the market dominant and competitive product lists. Section 3020.11 has been modified to provide for publication of an abbreviated Mail Classification Schedule which provides these product lists. The rule indicates that the additional descriptive material will be added in a subsequent rulemaking.

An initial Mail Classification Schedule has been prepared as Appendix A to these rules. It provides a skeleton of the Mail Classification Schedule that indicates the general format of the document and reserves space for including the individual product descriptions in the near future. The Mail Classification Schedule includes the complete market dominant and competitive product lists which allows the Postal Service and the Commission to operate under the PAEA. The product lists generally are consistent with the product lists proposed by the Postal Service in its draft Mail Classification Schedule, except for the modifications discussed in this Order.

APWU opposes the Postal Service's proposal to create separate products for Single-piece Letters/Postcards and Bulk Letters/Postcards within First-Class Mail. It expresses concern that the

---

[61] This is to be contrasted against the detailed product information provided by the Postal Service in the Domestic Mail Manual. The Postal Service has great flexibility in developing the detailed requirements in the Domestic Mail Manual, consistent with the general descriptions provided in the Mail Classification Schedule.

separation may lead to rates that violate the workshare provision of the PAEA and fail to encourage efficiency. APWU MCS Comments, October 9, 2007, at 1–4. In its comments supporting the Postal Service's proposed Mail Classification Schedule, Advo argues that the separation of single-piece and bulk letters and postcards is "imminently reasonable." Advo MCS Comments, October 9, 2007, at 2.

The Postal APWU opposes the Postal Service's proposal to create separate products for Single-piece Letters/Postcards and Bulk Letters/Postcards within First-Class Mail. It expresses concern that the separation may lead to rates that violate the workshare provision of the PAEA and fail to encourage efficiency. APWU MCS Comments, October 9, 2007, at 1–4. In its comments supporting the Postal Service's proposed Mail Classification Schedule, Advo argues that the separation of single-piece and bulk letters and postcards is "imminently reasonable." Advo MCS Comments, October 9, 2007, at 2.

The Postal Service has the flexibility to initially describe its product lines in conformance with the statutory requirements of the PAEA. A product is defined as "a postal service with a distinct cost or market characteristic for which a rate or rates are, or may reasonably be, applied." 39 U.S.C. 102(6). It is possible to apply this definition and categorize First-Class Mail postal services into products in several different ways. The selections made by the Postal Service comply with the definition, and represent postal services with distinct cost or market characteristics. The product lines are subject to adjustments in the future as conditions change. The Commission finds that the Postal Service has appropriately described product lines applicable to First-Class Mail.

The Postal Service has the flexibility to initially describe its product lines in conformance with the statutory requirements of the PAEA. A product is defined as "a postal service with a distinct cost or market characteristic for which a rate or rates are, or may reasonably be, applied." 39 U.S.C. 102(6). It is possible to apply this definition and categorize First-Class Mail postal services into products in several different ways. The selections made by the Postal Service comply with the definition, and represent postal services with distinct cost or market characteristics. The product lines are subject to adjustments in the future as conditions change. The Commission finds that the Postal Service has

appropriately described product lines applicable to First-Class Mail.

The public had an opportunity to comment on the product lists as provided in Order No. 26. OCA, and others, express opinions on the content and level of detail of the product lists. *See* OCA MCS Comments, October 10, 2007. The Commission acknowledges that these comments raise important issues applicable to many mailers. The Commission finds that the product lists specified in the initial Mail Classification Schedule provide mailers, the Postal Service, and the Commission a legally sufficient starting point for operating under the PAEA. Rules to modify the product lists are specified in this final rule, and the Commission anticipates that these rules will be put to use.

*B. Requests to Modify the Product Lists*

The Commission has identified an error in the **Federal Register** notice. Rule 3020.31(b) should read "Provide a copy of the Governor's decision supporting the request, if any;". Order No. 26 includes the correct text. The correct language is included in the final rule.

The Commission has made conforming changes to docket and notice rules 3020.33, 3020.53, and 3020.73, which make the language consistent, wherever possible, with the provisions applicable to notices of Type 1 rate adjustments for market dominant products.

*Suggested revisions.* PostCom suggests combining part 3020 subparts B, C, and D. PostCom Comments, September 24, 2007, at 7. PostCom contends that the subparts contain identical procedures for reviewing product list modifications depending on the party that initiates a request. The Commission will not adopt PostCom's suggestion. There are differences in requirements based on the filing party, and the Commission anticipates further variations as the rules develop over time.

PostCom further suggests making the requirements of part 3020 inapplicable for product list modifications associated with CPI rate increases. PostCom Comments, September 24, 2007, at 5–7. PostCom has not made a persuasive argument that there should be an exception to the requirements of 39 U.S.C. 3642 when CPI rate adjustments are made.

GCA suggests that explicit language be included in rules 3020.30, 3020.50, and 3020.70 to prohibit the transfer of products between product lists that are subject to the private express statutes. GCA Comments, September 24, 2007, at 6–7. This prohibition is specified in 39

U.S.C. 3642(b)(2). The Commission's rules as proposed require the Postal Service to demonstrate that this requirement is met. *See* rules 3020.32(e), 3020.52(e), and 3020.72(e). Thus, the rules adequately address GCA's concern.

Pitney Bowes suggests incorporating a 45-day time limit into the rules for the initial review of proposals to add, delete, or transfer products between product lists. *See* rules 3020.34, 3020.55, and 3020.75. Pitney Bowes further suggests incorporating a 90-day time limit into the rules when further proceedings are required to review these proposals. *See* rules 3020.35, 3020.56, and 3020.76. Pitney Bowes Comments, September 24, 2007, at 14–15.

The Commission will handle requests to add, delete, or transfer products between product lists in an expedient manner consistent with due process and procedural fairness. When the proposals appear to meet statutory requirements, the proposals should receive prompt approval. However, when there is a demonstration by a party submitting comments or when it is independently apparent to the Commission that there may be compliance issues with the proposal, the Commission will allow adequate time on a case-by-case basis to evaluate the issues and review statutory compliance. Establishing an artificial time constraint will not facilitate resolving identified compliance issues, and it may prolong resolution of the issues by requiring parties to initiate litigious complaint proceedings.

*Final rules.* With the exception of the changes identified at the beginning of this section, the rules for requests to modify product lists initiated by the Postal Service, users of mail, and the Commission (part 3020, subparts B, C, and D), are adopted without change.

*C. Subpart E—Requests Initiated by the Postal Service To Change the Mail Classification Schedule*

*Suggested revisions.* McGraw-Hill is concerned that the Postal Service will use part 3020 subpart E, which does not provide for Commission review or allow for public comment, to make what it considers major classification changes. McGraw-Hill Comments, September 24, 2007, at 2–5. McGraw-Hill requests prospective review and the opportunity for comment on Postal Service proposed major classification changes that do not involve modifications to the product lists. Valpak expresses similar concerns and seeks an alternative way of handling major classification changes. Valpak Comments, September 24, 2007, at 12–16.

*Commission analysis.* Commenters correctly infer that there is a continuum of possible classification changes from those only requiring the Postal Service to inform the Commission of a classification change to those triggering the requirements of 39 U.S.C. 3642. The Postal Service asserts that it will initially provide an opportunity for formal public comment on important and complex changes to its processes and products. Postal Service Reply Comments, October, 9, 2007, at 27–29. Thus, it contends, the public will have notice and an opportunity for comments on proposed changes provided by the Postal Service.

Parties also have the opportunity to utilize the Commission's complaint procedures whenever compliance with the statutory requirements becomes an issue. Further opportunities for public comment will be available during the annual compliance process, and also may be available when the Commission evaluates service standards.

The rules proposed in subparts B, C, and D establish formal procedures for classification changes triggering the requirements of 39 U.S.C. 3642. For classification changes below this level, the proposed rules provide the Postal Service with great flexibility to manage Postal Service products, as long as the products conform to the statutory requirements of the PAEA. Neither the PAEA nor sound public policy suggests that the Commission exercise pre-implementation authority at this time.

The purpose of subpart E is to keep the Mail Classification Schedule up to date when product changes are made below the 39 U.S.C. 3642 level. This facilitates the Commission's maintenance of the product lists and makes it possible for the Commission to undertake its other statutory responsibilities. Subpart E was not intended to provide an avenue for comprehensive pre-implementation review of classification changes.

The Commission will provide notice and the opportunity for comment on Mail Classification Schedule changes under subpart E. Comments can be beneficial in assuring that proposals are properly filed under the correct rules, and not inadvertently filed under subpart E. For these limited purposes, it will be sufficient to provide notice of Postal Service submissions under rule 3020.91 on the Commission's Web site and allow a period for public comment on whether the changes are inconsistent with 39 U.S.C. 3642.

A new rule, 3020.92, Public Input, is added. That rule will provide for the Commission publishing Postal Service submissions pursuant to rule 3020.91 on its Web site and give interested members of the public an opportunity to comment.

Proposed rule 3020.92, Implementation, is renumbered as rule 3020.93, and modified to reflect consideration of public comments.

No participant commented on the proposed rules in part 3020, subpart F, and they are adopted without change.

## V. Ordering Paragraphs

*It is ordered:*

1. The Postal Service shall provide the information necessary for further development of the Mail Classification Schedule as specified in chapter IV, ¶¶ 4002 through 4004 of this Order by November 20, 2007.

2. The Commission hereby adopts final rules amending the definitions of terms appearing in rule 3001.5 that follow the Secretary's signature into the Commission's Rules of Practice and Procedure appearing in 39 CFR 3001.

3. The Commission hereby adopts final rules establishing new rules applicable to Regulation of Market Dominant Products (part 3010), Competitive Products (part 3015), and Product Lists (part 3020) that follow the Secretary's signature into the Commission's Rules of Practice and Procedure to appear in 39 CFR 3010, 3015, and 3020 respectively.

4. The Commission hereby adopts final rules establishing a Mail Classification Schedule, appearing as Appendix A to subpart A of new rule 3020 that follow the Secretary's signature into the Commission's Rules of Practice and Procedure to appear in 39 CFR 3020.

5. The Secretary shall arrange for publication of this Order amending the definitions of terms, establishing rules applicable to Regulation of Market Dominant Products, Competitive Products, and Product Lists, and establishing a Mail Classification Schedule in the **Federal Register**. These changes will take effect 30 days after publication in the **Federal Register**.

6. The Secretary shall arrange for publication of this order in the **Federal Register**.

## List of Subjects

### 39 CFR Part 3001

Administrative practice and procedure; Confidential business information, Freedom of information, Sunshine Act.

### 39 CFR Part 3010

Administrative practice and procedure; Postal Service.

### 39 CFR Part 3015

Administrative practice and procedure; Postal Service.

### 39 CFR Part 3020

Administrative practice and procedure; Postal Service.

By the Commission.

**Steven W. Williams,**
*Secretary.*

■ For the reasons stated in the preamble, under the authority at 39 U.S.C. 503, the Postal Regulatory Commission amends 39 CFR chapter III as follows:

## PART 3001—RULES OF PRACTICE AND PROCEDURE

■ 1. Revise the authority citation for part 3001 to read as follows:

**Authority:** 39 U.S.C. 404(d); 503; 3622; 3633; 3661, 3652.

## Subpart A—Rules of General Applicability

■ 2. Amend § 3001.5 as follows:
■ a. Revise paragraphs (r) and (s); and
■ b. Add paragraphs (t) and (u).

## § 3001.5   Definitions.

\*      \*      \*      \*      \*

(r) *Negotiated service agreement* means a written contract, to be in effect for a defined period of time, between the Postal Service and a mailer, that provides for customer-specific rates or fees and/or terms of service in accordance with the terms and conditions of the contract. A rate associated with a negotiated service agreement is not a rate of general applicability.

(s) *Postal service* refers to the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto.

(t) *Product* means a postal service with a distinct cost or market characteristic for which a rate or rates are, or may reasonably be, applied.

(u) *Rate or class of general applicability* means a rate or class that is available to all mailers equally on the same terms and conditions.

■ 3. Add part 3010 to read as follows:

## PART 3010—REGULATION OF RULES FOR MARKET DOMINANT PRODUCTS

### Subpart A—General Provisions

Sec.
3010.1   Applicability.
3010.2   Types of rate adjustments for market dominant products.
3010.3   Type 1–A rate adjustment—in general.
3010.4   Type 1–B rate adjustment—in general.

3010.5   Type 2 rate adjustment—in general.
3010.6   Type 3 rate adjustment—in general.
3010.7   Schedule of regular rate changes.

**Subpart B—Rules for Rate Adjustments for Rates of General Applicability (Type 1–A and 1–B Rate Adjustments)**

3010.10   Procedures.
3010.11   Limit on size of rate increases.
3010.12   Source of CPI–U data for purposes of annual limitation.
3010.13   Proceedings for Type 1–A and Type 1–B rate adjustment filings.
3010.14   Contents of notice of rate adjustment.

**Subpart C—Rules for Applying the Price Cap**

3010.20   Test for compliance with the annual limitation.
3010.21   Calculation of annual limitation.
3010.22   Calculation of less than annual limitation.
3010.23   Calculation of percentage change in rates.
3010.24   Treatment of volume associated with negotiated service agreements.
3010.25   Limitation on unused rate adjustment authority rate adjustments.
3010.26   Calculation of unused rate adjustment authority.
3010.27   Application of unused rate adjustment authority.
3010.28   Maximum size of unused rate adjustment authority rate adjustments.
3010.29   Transition rule.

**Subpart D—Rules for Rate Adjustments for Negotiated Service Agreements (Type 2 Rate Adjustments)**

3010.40   Negotiated service agreements.
3010.41   Procedures.
3010.42   Contents of notice of agreement in support of a negotiated service agreement.
3010.43   Data collection plan.
3010.44   Proceedings for Type 2 rate adjustments.

**Subpart E—Rules for Rate Adjustments for Exigent Circumstances (Type 3 Rate Adjustments)**

3010.60   Applicability.
3010.61   Contents of exigent requests.
3010.62   Supplemental information.
3010.63   Treatment of unused rate adjustment authority.
3010.64   Expeditious treatment of exigent requests.
3010.65   Special procedures applicable to exigent requests.
3010.66   Deadline for Commission decision.

**Authority:** 39 U.S.C. 503; 3622.

## Subpart A—General Provisions

### § 3010.1   Applicability.

The rules in this part implement provisions in the Postal Accountability and Enhancement Act (PAEA) establishing ratesetting policies and procedures for market dominant products. With the exception of exigency-based rate adjustments, these procedures allow a minimum of 45 days for advance public notice of the Postal Service's planned rate adjustments. Exigency-based rate adjustments require the Postal Service to file a formal request with the Commission and are subject to special procedures.

### § 3010.2   Types of rate adjustments for market dominant products.

(a) There are four types of rate adjustments for market dominant products. A Type 1–A rate adjustment, authorized under 39 U.S.C. 3622(d)(1)(D), is based on the statutory annual limitation. A Type 1–B rate adjustment, authorized under 39 U.S.C. 3622(d)(2)(C), is based on an exception to the annual limitation, and is referred to as unused rate adjustment authority. A Type 2 rate adjustment, authorized under 39 U.S.C. 3622(c)(10), is based on a negotiated service agreement. A Type 3 rate adjustment, authorized under 39 U.S.C. 3622(d)(1)(E), is based on exigent circumstances.

(b) Upon the establishment of unused rate adjustment authority in any class, the Postal Service shall devise and maintain a schedule that tracks the establishment and subsequent use of unused rate adjustment authority.

(c) The Postal Service may combine Types 1–A, 1–B and 2 rate adjustments for purposes of filing with the Commission.

### § 3010.3   Type 1–A rate adjustment—in general.

(a) A Type 1–A rate adjustment represents the usual type of adjustment to rates of general applicability.

(b) A Type 1–A rate adjustment may result in a rate adjustment that is less than or equal to the annual limitation, but may not exceed the annual limitation.

(c) A Type 1–A rate adjustment for any class that is less than the applicable change in CPI–U results in unused rate adjustment authority associated with that class. Part or all of the unused rate adjustment authority may be used in a subsequent adjustment for that class, subject to the expiration terms in § 3010.26(d).

### § 3010.4   Type 1–B rate adjustment—in general.

(a) A Type 1–B rate adjustment is a rate adjustment which uses unused rate adjustment authority in whole or in part. A rate adjustment using unused rate adjustment authority may not result in an increase for the class that exceeds the applicable annual limitation plus 2 percentage points.

(b) Type 1–B rate adjustments filed within 12 months of each other may not apply more than 2 percentage points of unused rate authority to any class.

(c) Unused rate adjustment authority in each class may be applied to rate adjustments in the same class for up to 5 years.

### § 3010.5   Type 2 rate adjustment—in general.

A negotiated service agreement rate adjustment entails a rate adjustment negotiated between the Postal Service and a customer or group of customers.

### § 3010.6   Type 3 adjustment—in general.

(a) A Type 3 rate adjustment is a request for an exigency-based rate adjustment. It is authorized only when justified by exceptional or extraordinary circumstances.

(b) An exigency-based rate adjustment is not subject to the inflation-based limitation or the restrictions on the use of unused rate adjustment authority, and does not implement a negotiated service agreement.

(c) A Postal Service request for a Type 3 rate adjustment is subject to public participation and Commission review within 90 days.

### § 3010.7   Schedule of regular rate changes.

(a) The Postal Service shall maintain on file with the Commission a Schedule for Regular and Predictable Rate Changes. The Commission shall display the Schedule for Regular and Predictable Rate Changes on the Commission Web site, *http:// www.prc.gov.*

(b) The Schedule for Regular and Predictable Rate Changes shall provide mailers with estimated implementation dates for future Type 1–A rate changes for each separate class of mail, should such changes be necessary and appropriate. Rate changes will be scheduled at specified regular intervals.

(c) The Schedule for Regular and Predictable Rate Changes shall provide an explanation that will allow mailers to predict with reasonable accuracy the amounts of future scheduled rate changes.

(d) The initial Schedule for Regular and Predictable Rate Changes must be filed within 90 days of the effective date of this rule. The Postal Service should balance its financial and operational needs with the convenience of mailers of each class of mail in developing the schedule.

(e) Whenever the Postal Service deems it appropriate to change the Schedule for Regular and Predictable Rate Changes, it shall file a revised schedule and explanation with the Commission.

(f) The Postal Service may, for good cause shown, vary rate adjustments from those estimated by the Schedule

for Regular and Predictable Rate Changes. In such case, the Postal Service should provide a succinct explanation for such variation with its Type 1–A filing. No explanation is required for changes involving smaller than predicted rate adjustments.

## Subpart B—Rules for Rate Adjustments for Rates of General Applicability (Type 1–A and 1–B Rate Adjustments)

### § 3010.10   Procedures.

(a) The Postal Service, in every instance in which it determines to exercise its statutory authority to make a Type 1–A or Type 1–B rate adjustment for a market dominant postal product shall:

(1) Provide public notice in a manner reasonably designed to inform the mailing community and the general public that it intends to change rates not later than 45 days prior to the intended implementation date; and

(2) Transmit a notice of rate adjustment to the Commission no later than 45 days prior to the intended implementation date.

(b) The Postal Service is encouraged to provide public notice and to submit its notice of rate adjustment as far in advance of the 45-day minimum as practicable, especially in instances where the intended price changes include classification changes or operations changes likely to have material impact on mailers.

### § 3010.11   Limit on size of rate increases.

(a) Rate increases for each class of market dominant products in any 12-month period are limited.

(b) Rates of general applicability are subject to an inflation-based limitation computed using CPI–U values as detailed in § 3010.12.

(c) An exception to the inflation-based limitation allows a limited annual recapture of unused rate authority. The amount of unused rate authority is measured separately for each class of mail.

(d) In any 12-month period the inflation-based limitation combined with the allowable recapture of unused rate authority equals the price cap applicable to each class of mail.

### § 3010.12   Source of CPI–U data for purposes of annual limitation.

The monthly CPI–U values needed for the calculation of the annual limitation under this part shall be obtained from the Bureau of Labor Statistics (BLS) Consumer Price Index—All Urban Consumers, U.S. All Items, Not Seasonally Adjusted, Base Period 1982–

84 = 100. The current Series ID for the index is ''CUUR0000SA0.''

### § 3010.13   Proceedings for Type 1–A and Type 1–B rate adjustment filings.

(a) The Commission will establish a docket for each rate adjustment filing, promptly publish notice of the filing in the **Federal Register**, and post the filing on its Web site. The notice shall include:

(1) The general nature of the proceeding;

(2) A reference to legal authority to which the proceeding is to be conducted;

(3) A concise description of the planned for changes in rates, fees, and the Mail Classification Schedule;

(4) The identification of an officer of the Commission to represent the interests of the general public in the docket;

(5) A period of 20 days from the date of the filing for public comment; and

(6) Such other information as the Commission deems appropriate.

(b) Public comments should focus primarily on whether planned rate adjustments comply with the following mandatory requirements of 39 U.S.C. chapter 36, subchapter 1:

(1) Whether the planned rate adjustments measured using the formula established in § 3010.23(b) are at or below the annual limitation established in § 3010.11; and

(2) Whether the planned rate adjustments measured using the formula established in § 3010.23(b) are at or below the limitations established in § 3010.28.

(c) Within 14 days of the conclusion of the public comment period the Commission will determine, at a minimum, whether the planned rate adjustments are consistent with the annual limitation set forth in rule 3010.11; the limitations set forth in rule 3010.28; and 39 U.S.C. 3626, 3627, and 3629, and issue an order announcing its findings.

(d) If the planned rate adjustments are found consistent with applicable law by the Commission, they may take effect pursuant to appropriate action by the Governors.

(e) If planned rate adjustments are found inconsistent with applicable law by the Commission, the Postal Service will submit an amended notice of rate adjustment and describe the modifications to its planned rate adjustments that will bring its rate adjustments into compliance. An amended notice of rate adjustment shall be accompanied by sufficient explanatory information to show that all deficiencies identified by the Commission have been corrected.

(f) The Commission will post any amended notice of rate adjustment filing on its Web site and allow a period of 10 days from the date of the filing for public comment. Comments in the amended notice of rate adjustment should address the subjects identified in rule 3010.13(b).

(g) The Commission will review any amended notice of rate adjustment together with any comments filed for compliance and within 14 days issue an order announcing its findings.

(h) If the planned rate adjustments as amended are found to be consistent with applicable law, they may take effect pursuant to appropriate action by the Governors. However, no rate shall take effect until 45 days after the Postal Service files a notice of rate adjustment specifying that rate.

(i) If the planned rate adjustments in an amended notice of rate adjustment are found to be inconsistent with applicable law, the Commission shall explain the basis of its determination and suggest an appropriate remedy.

(j) For purposes of subsequent Commission proceedings, findings that a planned Type 1 rate adjustment is in compliance with the annual limitation set forth in § 3010.11; the limitations set forth in § 3010.28; and 39 U.S.C. 3626, 3627, and 3629 are decided on the merits. A Commission finding that a planned Type 1 rate adjustment does not contravene other policies of 39 U.S.C. chapter 36, subchapter 1 is provisional and subject to subsequent review.

### § 3010.14   Contents of notice of rate adjustment.

(a) *General.* The Postal Service notice of rate adjustment must include the following information:

(1) A schedule of the proposed rates;

(2) The planned effective date(s) of the proposed rates;

(3) A representation or evidence that public notice of the planned changes has been issued or will be issued at least 45 days before the effective date(s) for the proposed new rates; and

(4) The identity of a responsible Postal Service official who will be available to provide prompt responses to requests for clarification from the Commission.

(b) *Supporting technical information and justifications.* The notice of rate adjustment shall be accompanied by:

(1) The amount of the applicable change in CPI–U calculated as required by § 3010.21 or § 3010.22, as appropriate. This information must be supported by workpapers in which all calculations are shown, and all input values including all relevant CPI–U

values are listed with citations to the original sources;

(2) A schedule showing unused rate authority available for each class of mail displayed by class and available amount for each of the preceding 5 years. This information must be supported by workpapers in which all calculations are shown;

(3) The percentage change in rates for each class of mail calculated as required by § 3010.23. This information must be supported by workpapers in which all calculations are shown, and all input values including current rates, new rates, and billing determinants are listed with citations to the original sources;

(4) The amount of new unused rate authority, if any, that will be generated by the rate adjustment calculated as required by § 3010.26. All calculations are to be shown with citations to the original sources. If new unused rate authority will be generated for a class of mail that is not expected to cover its attributable costs, the Postal Service must provide the rationale underlying this rate adjustment;

(5) A schedule of the workshare discounts included in the proposed rates, and a companion schedule listing the avoided costs that underlie each such discount. The avoided cost figures must be developed from the most recent PRC Annual Compliance Report. This information must be supported by workpapers in which all calculations are shown, and all input values are listed with citations to the original sources;

(6) Separate justification for all proposed workshare discounts that exceed avoided costs. Each such justification shall reference applicable reasons identified in 39 U.S.C. 3622(e)(2) or (3). The Postal Service shall also identify and explain discounts that are set substantially below avoided costs and explain any relationship between discounts that are above and those that are below avoided costs;

(7) A discussion that demonstrates how the planned rate adjustments are designed to help achieve the objectives listed in 39 U.S.C. 3622(b) and properly take into account the factors listed in 39 U.S.C. 3622(c);

(8) A discussion that demonstrates the planned rate adjustments are consistent with 39 U.S.C. 3626, 3627, and 3629;

(9) A schedule identifying every change to the Mail Classification Schedule that will be necessary to implement the planned rate adjustments; and

(10) Such other information as the Postal Service believes will assist the Commission to issue a timely determination of whether the requested

increases are consistent with applicable statutory policies.

(c) *New workshare discounts.* Whenever the Postal Service establishes a new workshare discount rate, it must include with its filing:

(1) A statement explaining its reasons for establishing the discount;

(2) All data, economic analyses, and other information relied on to justify the discount; and

(3) A certification based on comprehensive, competent analyses that the discount will not adversely affect either the rates or the service levels of users of postal services who do not take advantage of the discount.

(d) *Information required only when Type 1–B rate adjustments are proposed.* The notice of rate adjustment shall identify for each affected class how much existing unused rate authority is used in the proposed rates calculated as required by § 3010.27. All calculations are to be shown, including citations to the original sources.

## Subpart C—Rules for Applying the Price Cap

### § 3010.20   Test for compliance with the annual limitation.

The appropriate annual limitation shall be applied to a measure of the rates paid by mail sent in each class for which rate adjustments are to be made to determine whether planned rates are consistent with the annual limitation.

### § 3010.21   Calculation of annual limitation.

(a) The calculation of an annual limitation involves three steps. First, a simple average CPI–U index is calculated by summing the most recently available 12 monthly CPI–U values from the date the Postal Service files its notice of rate adjustment and dividing the sum by 12 (Recent Average). Then, a second simple average CPI–U index is similarly calculated by summing the 12 monthly CPI–U values immediately preceding the Recent Average and dividing the sum by 12 (Base Average). Finally, the annual limitation is calculated by dividing the Recent Average by the Base Average and subtracting 1 from the quotient. The result is expressed as a percentage, rounded to one decimal place.

(b) The formula for calculating an annual limitation is as follows: Annual Limitation = (Recent Average/Base Average) − 1.

### § 3010.22   Calculation of less than annual limitation.

(a) If a notice of rate adjustment is filed less than 1 year after the last Type 1–A or Type 1–B notice of rate adjustment applicable to an affected

class of mail, then the annual limitation will recognize the rate increases that have occurred during the preceding 12 months. When the effects of those increases are removed, the remaining partial year limitation is the applicable restriction on rate increases.

(b) The applicable partial year limitation is calculated in two steps. First, a simple average CPI–U index is calculated by summing the 12 most recently available monthly CPI–U values from the date the Postal Service files its notice of rate adjustment and dividing the sum by 12 (Recent Average). The partial year limitation is then calculated by dividing the Recent Average by the Recent Average from the most recent previous notice of rate adjustment (Previous Recent Average) applicable to each affected class of mail and subtracting 1 from the quotient. The result is expressed as a percentage, rounded to one decimal place.

(c) The formula for calculating the partial year limitation for a notice of rate adjustment filed less than 1 year after the last notice is as follows: Partial Year Limitation = (Recent Average/Previous Recent Average) − 1.

### § 3010.23   Calculation of percentage change in rates.

(a) The term *rate cell* as applied in the test for compliance with the annual limitation shall apply to each and every separate rate identified in any applicable notice of rate adjustment for rates of general applicability. Thus, seasonal or temporary rates, for example, shall be identified and treated as rate cells separate and distinct from the corresponding non-seasonal or permanent rates.

(b) For each class of mail, the percentage change in rates is calculated in three steps. First, the volume of each rate cell in the class is multiplied by the planned rate for the respective cell and the resulting products are summed. Then, the same set of rate cell volumes are multiplied by the corresponding current rate for each cell and the resulting products are summed. Finally, the percentage change in rates is calculated by dividing the results of the first step by the results of the second step and subtracting 1 from the quotient. The result is expressed as a percentage.

(c) The formula for calculating the percentage change in rates for a class described in paragraph (b) of this section is as follows:

Percentage change in rates =

$$\left( \frac{\sum_{i=1}^{N} (R_{i,n})(V_i)}{\sum_{i=1}^{N} (R_{i,c})(V_i)} \right) - 1$$

Where,

N = number of rate cells in the class
i = denotes a rate cell (i = 1, 2, ..., N)
$R_{i,n}$ = planned rate of rate cell i
$R_{i,c}$ = current rate of rate cell i
$V_i$ = volume of rate cell i

(d) The volumes for each rate cell shall be obtained from the most recent available 12 months of Postal Service billing determinants. The Postal Service shall make reasonable adjustments to the billing determinants to account for the effects of classification changes such as the introduction, deletion, or redefinition of rate cells. Whenever possible, adjustments shall be based on known mail characteristics. The Postal Service shall identify and explain all adjustments. All information and calculations relied upon to develop the adjustments shall be provided together with an explanation of why the adjustments are appropriate.

### § 3010.24   Treatment of volume associated with negotiated service agreements.

(a) Mail volumes sent at rates under negotiated service agreements are to be included in the calculation of percentage change in rates as though they paid the appropriate rates of general applicability. Where it is impractical to identify the rates of general applicability (*e.g.*, because unique rate categories are created for a mailer), the volumes associated with the mail sent under the terms of the negotiated service agreement shall be excluded from the calculation of percentage change in rates.

(b) The Postal Service shall identify and explain all assumptions it makes with respect to the treatment of negotiated service agreements in the calculation of the percentage change in rates and provide the rationale for its assumptions.

### § 3010.25   Limitation on unused rate adjustment authority rate adjustments.

Unused rate adjustment authority rate adjustments may only be applied together with inflation-based limitation rate adjustments or when inflation-based limitation rate adjustments are not possible. Unused rate adjustment authority rate adjustments may not be used in lieu of an inflation-based limitation rate adjustment.

### § 3010.26   Calculation of unused rate adjustment authority.

(a) Unused rate adjustment authority accrues during the entire period

between notices of Type 1 rate adjustments.

(b) When notices of Type 1 rate adjustments are filed 12 months apart or less, either the annual or partial year limitation (developed pursuant to § 3010.21(a) or § 3010.22(b) respectively) is used to measure the accrued unused rate authority. In either circumstance, the new unused rate authority for each class is equal to the difference between the maximum allowable percentage change in rates under the applicable rate limitation and the actual percentage change in rates for that class.

(c) When a notice of rate adjustment is filed more than 12 months after the previous notice of rate adjustment, unused rate authority is computed in three steps:

(1) The unused rate authority for the 12 months represented by the annual limitation is computed as described in paragraph (b) of this section;

(2) The additional unused rate authority accrued is measured by dividing the Base Average applicable to the instant notice of rate adjustment (as developed pursuant to § 3010.21(a)) by the Recent Average utilized in the previous notice of rate adjustment (as developed pursuant to § 3010.21(a)) and subtracting 1 from the quotient. The result is expressed as a percentage; and

(3) The results from step 1 and step 2 are added together.

(d) Unused rate adjustment authority lapses 5 years after the date of filing of the notice of rate adjustment leading to its computation.

### § 3010.27   Application of unused rate adjustment authority.

When the percentage change in rates for a class is greater than the applicable annual limitation, then the difference between the percentage change in rates for the class and the price cap shall be subtracted from the existing unused rate authority for the class, using a first-in, first-out (FIFO) method, beginning 5 years before the instant notice.

### § 3010.28   Maximum size of unused rate adjustment authority rate adjustments.

Unused rate adjustment authority exercised in notices of rate adjustments for any class in any 12-month period may not exceed the applicable limitations described in §§ 3010.21 or 3010.22 plus the lesser of:

(a) 2 percent; or

(b) The sum of any unused rate adjustment authority for that class.

### § 3010.29   Transition rule.

If the Postal Service initial exercise of its authority to file a Type 1–A notice

of rate adjustment is preceded by a transitional rate case filing under 39 U.S.C. 3622(f):

(a) The annual limitation as calculated in § 3010.21 is applicable if the notice of rate adjustment is 12 months or more after the date of the Decision of the Governors approving rate changes associated with the transitional filing; and

(b) The annual limitation as calculated in § 3010.22 is applicable if the notice of rate adjustment is 12 months or more after the date of the Decision of the Governors approving rate changes associated with the transitional filing. In such circumstances, the date of the Decision of the Governors approving rate changes associated with the transitional filing is the most recent previous notice of rate adjustment.

## Subpart D—Rules for Rate Adjustments for Negotiated Service Agreements (Type 2 Rate Adjustments)

### § 3010.40   Negotiated service agreements.

(a) In administering this subpart, it shall be the objective of the Commission to allow implementation of negotiated service agreements that satisfy the statutory requirements of 39 U.S.C. 3622(c)(10). Negotiated service agreements must either:

(1) Improve the net financial position of the Postal Service (39 U.S.C. 3622(c)(10)(A)(i)); or

(2) Enhance the performance of operational functions (39 U.S.C. 3622(c)(10)(A)(ii)).

(b) Negotiated service agreements may not cause unreasonable harm to the marketplace (39 U.S.C. 3622(c)(10)(B)).

(c) Negotiated service agreements must be available on public and reasonable terms to similarly situated mailers.

### § 3010.41   Procedures.

The Postal Service, in every instance in which it determines to exercise its statutory authority to make a Type 2 rate adjustment for a market dominant postal product shall provide public notice in a manner reasonably designed to inform the mailing community and the general public that it intends to change rates not later than 45 days prior to the intended implementation date; and transmit a notice of agreement to the Commission no later than 45 days prior to the intended implementation date.

### § 3010.42   Contents of notice of agreement in support of a negotiated service agreement.

(a) Whenever the Postal Service proposes to establish or change rates or fees and/or the Mail Classification

Schedule based on a negotiated service agreement, the Postal Service shall file with the Commission a notice of agreement that shall include at a minimum:

(1) A copy of the negotiated service agreement;

(2) The planned effective date(s) of the proposed rates;

(3) A representation or evidence that public notice of the planned changes has been issued or will be issued at least 45 days before the effective date(s) for the proposed new rates; and

(4) The identity of a responsible Postal Service official who will be available to provide prompt responses to requests for clarification from the Commission.

(b) A statement identifying all parties to the agreement and a description clearly explaining the operative components of the agreement.

(c) Details regarding the expected improvements in the net financial position or operations of the Postal Service. The projection of change in net financial position as a result of the agreement shall include for each year of the agreement:

(1) The estimated mailer-specific costs, volumes, and revenues of the Postal Service absent the implementation of the negotiated service agreement;

(2) The estimated mailer-specific costs, volumes, and revenues of the Postal Service which result from implementation of the negotiated service agreement;

(3) An analysis of the effects of the negotiated service agreement on the contribution to institutional costs from mailers not party to the agreement; and

(4) If mailer-specific costs are not available, the source and derivation of the costs that are used shall be provided, together with a discussion of the currency and reliability of those costs and their suitability as a proxy for the mailer-specific costs.

(d) An identification of each component of the agreement expected to enhance the performance of mail preparation, processing, transportation or other functions in each year of the agreement, and a discussion of the nature and expected impact of each such enhancement.

(e) Details regarding any and all actions (performed or to be performed) to assure that the agreement will not result in unreasonable harm to the marketplace.

(f) Such other information as the Postal Service believes will assist the Commission to issue a timely determination of whether the requested changes are consistent with applicable statutory policies.

### § 3010.43   Data collection plan.

The Postal Service shall include with any notice of agreement a detailed plan for providing data or information on actual experience under the agreement sufficient to allow evaluation of whether the negotiated service agreement operates in compliance with 39 U.S.C. 3622(c)(10). The data report is due 60 days after each anniversary date of implementation and shall include, at a minimum, the following information for each 12-month period the agreement has been in effect:

(a) The change in net financial position as a result of the agreement. This calculation shall include for each year of the agreement:

(1) The actual mailer-specific costs, volumes, and revenues of the Postal Service;

(2) An analysis of the effects of the negotiated service agreement on the net overall contribution to the institutional costs of the Postal Service; and

(3) If mailer-specific costs are not available, the source and derivation of the costs that are used shall be provided, including a discussion of the currency and reliability of those costs, and their suitability as a proxy for the mailer-specific costs.

(b) A discussion of the changes in operations of the Postal Service that have resulted from the agreement. This shall include, for each year of the agreement, identification of each component of the agreement known to enhance the performance of mail preparation, processing, transportation, or other functions in each year of the agreement.

(c) An analysis of the impact of the negotiated service agreement on the marketplace, including a discussion of any and all actions taken to protect the marketplace from unreasonable harm.

### § 3010.44   Proceedings for Type 2 rate adjustments

(a) The Commission will establish a docket for each Type 2 rate adjustment filing, promptly publish notice of the filing in the **Federal Register**, and post the filing on its Web site. The notice shall include:

(1) The general nature of the proceeding;

(2) A reference to legal authority to which the proceeding is to be conducted;

(3) A concise description of the planned changes in rates, fees, and the Mail Classification Schedule;

(4) The identification of an officer of the Commission to represent the interests of the general public in the docket;

(5) A period of 10 days from the date of the filing for public comment; and

(6) Such other information as the Commission deems appropriate.

(b) The Commission shall review the planned Type 2 rate adjustments and the comments thereon, and issue an order announcing its findings. So long as such adjustments are not inconsistent with 39 U.S.C. 3622, they may take effect pursuant to appropriate action by the Governors. However, no rate shall take effect until 45 days after the Postal Service files a notice of rate adjustment specifying that rate.

(c) Commission findings that a planned Type 2 rate adjustment is not inconsistent with 39 U.S.C.3622 are provisional and subject to subsequent review.

## Subpart E—Rules for Rate Adjustments in Exigent Circumstances (Type 3 Rate Adjustments)

### § 3010.60   Applicability.

The Postal Service may request to increase rates for market dominant products in excess of the annual limitation on the percentage changes in rates described in § 3010.11(d) due to extraordinary or exceptional circumstances. Such requests will be known as exigent requests.

### § 3010.61   Contents of exigent requests.

(a) Each exigent request shall include the following:

(1) A schedule of the proposed rates;

(2) Calculations quantifying the increase for each affected product and class;

(3) A full discussion of the extraordinary or exceptional circumstance(s) giving rise to the request, and a complete explanation of how both the requested overall increase, and the specific rate increases requested, relate to those circumstances;

(4) A full discussion of why the requested increases are necessary to enable the Postal Service, under best practices of honest, efficient and economical management, to maintain and continue the development of postal services of the kind and quality adapted to the needs of the United States;

(5) A full discussion of why the requested increases are reasonable and equitable as among types of users of market dominant products;

(6) An explanation of when, or under what circumstances, the Postal Service expects to be able to rescind the exigent increases in whole or in part;

(7) An analysis of the circumstances giving rise to the request, which should,

if applicable, include a discussion of whether the circumstances were foreseeable or could have been avoided by reasonable prior action; and

(8) Such other information as the Postal Service believes will assist the Commission to issue a timely determination of whether the requested increases are consistent with applicable statutory policies.

(b) The Postal Service shall identify one or more knowledgeable Postal Service official(s) who will be available to provide prompt responses to Commission requests for clarification related to each topic specified in § 3010.61(a).

### § 3010.62   Supplemental information.

The Commission may require the Postal Service to provide clarification of its request or to provide information in addition to that called for by § 3010.61 in order to gain a better understanding of the circumstances leading to the request or the justification for the specific rate increases requested.

### § 3010.63   Treatment of unused rate adjustment authority.

(a) Each exigent request will identify the unused rate authority for each class of mail as of the date of the request.

(b) Pursuant to an exigent request, increases may use accumulated unused rate adjustment authority in amounts greater than the limitation described in § 3010.28.

(c) Exigent increases will exhaust all unused rate adjustment authority for each class of mail before imposing additional rate increases in excess of the price cap for any class of mail.

### § 3010.64   Expeditious treatment of exigent requests.

Requests under this subpart seek rate relief required by extraordinary or exceptional circumstances and will be treated with expedition at every stage. It is Commission policy to provide appropriate relief as quickly as possible consistent with statutory requirements and procedural fairness.

### § 3010.65   Special procedures applicable to exigent requests.

(a) The Commission will establish a docket for each request for exigent rate adjustments, promptly publish notice of the request in the **Federal Register**, and post the filing on its Web site. The notice shall include:

(1) The general nature of the proceeding;

(2) A reference to legal authority to which the proceeding is to be conducted;

(3) A concise description of the proposals for changes in rates, fees, and the Mail Classification Schedule;

(4) The identification of an officer of the Commission to represent the interests of the general public in the docket;

(5) A specified period for public comment; and

(6) Such other information as the Commission deems appropriate.

(b) The Commission will hold a public hearing on the Postal Service request. During the public hearing, responsible Postal Service officials will appear and respond under oath to questions from the Commissioners or their designees addressing previously identified aspects of the Postal Service's request and the supporting information provided in response to the topics specified in § 3010.61(a).

(c) Interested persons will be given an opportunity to submit to the Commission suggested relevant questions that might be posed during the public hearing. Such questions, and any explanatory materials submitted to clarify the purpose of the questions, should be filed in accordance with § 3001.9, and will become part of the administrative record of the proceeding.

(d) The timing and length of the public hearing will depend on the nature of the circumstances giving rise to the request and the clarity and completeness of the supporting materials provided with the request.

(e) If the Postal Service is unable to provide adequate explanations during the public hearing, supplementary written or oral responses may be required.

(f) Following the conclusion of the public hearings and submission of any supplementary materials interested persons will be given the opportunity to submit written comments on:

(1) The sufficiency of the justification for an exigent rate increase;

(2) The adequacy of the justification for increases in the amounts requested by the Postal Service; and

(3) Whether the specific rate adjustments requested are reasonable and equitable.

(g) An opportunity to submit written reply comments will be given to the Postal Service and other interested persons.

### § 3010.66   Deadline for Commission decision.

The Commission will act expeditiously on the Postal Service request, taking into account all written comments. In every instance a Commission decision will be issued within 90 days of a Postal Service request for an exigent rate increase.

■ 4. Add part 3015 to read as follows:

## PART 3015—REGULATION OF RATES FOR COMPETITIVE PRODUCTS

Sec.
3015.1   Scope.
3015.2   Changes in rates of general applicability.
3015.3   Decrease in rates of general applicability.
3015.4   Change in class of general applicability.
3015.5   Rate or class not of general applicability.
3015.6   Sufficiency of information.
3015.7   Standards for compliance.

**Authority:** 39 U.S.C. 503; 3633.

### § 3015.1   Scope.

Rules in this part are applicable to competitive products.

### § 3015.2   Changes in rates of general applicability.

(a) When the Postal Service determines to change a rate or rates of general applicability, it shall file notice of the change with the Commission no later than the date of publication of the decision in the **Federal Register** concerning such change, but at least 30 days before the effective date of the change.

(b) The notice filed with the Commission shall include an explanation and justification for the change, the effective date, and a schedule of the changed rates.

### § 3015.3   Decrease in rates of general applicability.

(a) When the Postal Service determines to change a rate or rates of general applicability for any competitive product that results in a decrease in the average rate of that product, it shall file notice of the change with the Commission no later than the date of publication of the decision in the **Federal Register** concerning such change, but at least 30 days before the effective date of the change.

(b) The notice filed with the Commission shall include an explanation and justification for the change, the effective date, and a schedule of the changed rates.

(c) In addition to the notice, the Postal Service shall file with the Commission:

(1) Sufficient revenue and cost data for the 12-month period following the effective date of the rate to demonstrate that each affected competitive product will be in compliance with 39 U.S.C. 3633(a)(2); and

(2) A certified statement by a representative of the Postal Service attesting to the accuracy of the data submitted, and explaining why, following the change, competitive

products in total will be in compliance with 39 U.S.C. 3633(a)(1) and (3).

### §3015.4   Change in class of general applicability.

(a) In the case of a change in class of general applicability, the Postal Service shall file notice of the change with the Commission no later than the date of publication of the decision in the **Federal Register**, but at least 30 days before the effective date of the increase.

(b) The notice filed with the Commission shall include an explanation and justification for the change, the effective date, and the record of proceedings regarding such decision.

### §3015.5   Rate or class not of general applicability.

(a) When the Postal Service determines to add or change a rate or class not of general applicability, it shall file notice of its decision with the Commission at least 15 days before the effective date of the change.

(b) The notice filed with the Commission shall include an explanation and justification for the change, the effective date, the rate and class decision, and the record of proceedings regarding such decision.

(c) In addition to the notice, the Postal Service shall file with the Commission:

(1) Sufficient revenue and cost data for the 12-month period following the effective date of the rate or class to demonstrate that each affected competitive product will be in compliance with 39 U.S.C. 3633(a)(2); and

(2) A certified statement by a representative of the Postal Service attesting to the accuracy of the data submitted, and explaining why, following the change, competitive products in total will be in compliance with 39 U.S.C. 3633(a)(1) and (3).

### §3015.6   Sufficiency of information.

If, after review of the information submitted pursuant to this part, the Commission determines additional information is necessary to enable it to evaluate whether competitive products will be in compliance with 39 U.S.C. 3633(a), it may, in its discretion, require the Postal Service to provide additional information as deemed necessary.

### §3015.7   Standards for compliance.

For purposes of determining competitive products' compliance with 39 U.S.C. 3633, the Commission will apply the following standards:

(a) Incremental costs will be used to test for cross-subsidies by market dominant products of competitive products. To the extent that incremental

cost data are unavailable, the Commission will use competitive products' attributable costs supplemented to include causally related, group-specific costs to test for cross-subsidies.

(b) Each competitive product must recover its attributable costs as defined in 39 U.S.C. 3631(b).

(c) Annually, on a fiscal year basis, the appropriate share of institutional costs to be recovered from competitive products collectively is, at a minimum, 5.5 percent of the Postal Service's total institutional costs.

■ 5. Add part 3020 to read as follows:

## PART 3020—PRODUCT LISTS

### Subpart A—Mail Classification Schedule

Sec.
3020.1   Applicability.
3020.10   General.
3020.11   Initial Mail Classification Schedule.
3020.12   Publication of the Mail Classification Schedule.
3020.13   Contents of the Mail Classification Schedule.
3020.14   Notice of change.
Appendix A to Subpart A of Part 3020—Mail Classification Schedule

### Subpart B—Requests Initiated by the Postal Service To Modify the Product Lists Described Within the Mail Classification Schedule

3020.30   General.
3020.31   Contents of a request.
3020.32   Supporting justification.
3020.33   Docket and notice.
3020.34   Review.
3020.35   Further proceedings.

### Subpart C—Requests Initiated by Users of Mail To Modify the Product Lists Described Within the Mail Classification Schedule

3020.50   General.
3020.51   Contents of a request.
3020.52   Supporting justification.
3020.53   Docket and notice.
3020.54   Postal Service notice and reply.
3020.55   Review.
3020.56   Further proceedings.

### Subpart D—Proposal of the Commission To Modify the Product Lists Described Within the Mail Classification Schedule

3020.70   General.
3020.71   Contents of a proposal.
3020.72   Supporting justification.
3020.73   Docket and notice.
3020.74   Postal Service notice and reply.
3020.75   Review.
3020.76   Further proceedings.

### Subpart E—Requests Initiated by the Postal Service To Change the Mail Classification Schedule

3020.90   General.
3020.91   Modifications.
3020.92   Public input.
3020.93   Implementation.

### Subpart F—Size and Weight Limitations for Mail Matter

3020.110   General.
3020.111   Limitations applicable to market dominant mail matter.
3020.112   Limitations applicable to competitive mail matter.

**Authority:** 39 U.S.C. 503; 3622; 3631; 3642; 3682.

## Subpart A—Mail Classification Schedule

### §3020.1   Applicability.

(a) The rules in this part provide for establishing product lists. The product lists shall categorize postal products as either market dominant or competitive. As established, the market dominant and competitive product lists will be specified in the Mail Classification Schedule and shall be consistent with the market dominant products identified in 39 U.S.C. 3621(a) and the competitive products identified in 39 U.S.C. 3631(a).

(b) Once established, the Mail Classification Schedule may be modified subject to the procedures specified in this part.

### §3020.10   General.

The Mail Classification Schedule shall consist of two parts. Part One shall specify the list of market dominant products and include the explanatory information specified in § 3020.13(a). Part Two shall specify the list of competitive products and include the explanatory information specified in § 3020.13(b).

### §3020.11   Initial Mail Classification Schedule.

The initial Mail Classification Schedule shall specify the market dominant and competitive product lists. The Mail Classification Schedule product lists shall reflect the market dominant and competitive product lists identified in 39 U.S.C. 3621(a) and 39 U.S.C. 3631(a) respectively. The explanatory detailed descriptive information specified in § 3020.13(a) and § 3020.13(b) shall be incorporated by subsequent rulemaking.

### §3020.12   Publication of the Mail Classification Schedule.

(a) The Mail Classification Schedule established in accordance with subchapters I, II, and III of chapter 36 of title 39 of the United States Code and this subpart shall appear as Appendix A to this subpart.

(b) *Availability of the Mail Classification Schedule.* Copies of the Mail Classification Schedule, both current and previous issues, are available during regular business hours

for reference and public inspection at the Postal Regulatory Commission's Reading Room located at 901 New York Avenue, NW., Suite 200, Washington, DC 20268–0001. The Mail Classification Schedule, both current and previous issues, also is available on the Internet at *http://www.prc.gov.*

### § 3020.13   Contents of the Mail Classification Schedule.

The Mail Classification Schedule shall provide:

(a) The list of market dominant products, including:

(1) The class of each market dominant product;

(2) The description of each market dominant product;

(3) A schedule listing for each market dominant product the current rates and fees;

(4) Where applicable, the identification of a product as a special classification within the meaning of 39 U.S.C. 3622(c)(10) for market dominant products;

(5) Where applicable, the identification of a product as an experimental product undergoing a market test; and

(6) Where applicable, the identification of a product as a non-postal product.

(b) The list of competitive products, including:

(1) The description of each competitive product;

(2) A schedule listing for each competitive product of general applicability the current rates and fees;

(3) The identification of each product not of general applicability within the meaning of 39 U.S.C. 3632(b)(3) for competitive products;

(4) Where applicable, the identification of a product as an experimental product undergoing a market test; and

(5) Where applicable, the identification of a product as a non-postal product.

### § 3020.14   Notice of change.

Whenever the Postal Regulatory Commission modifies the list of products in the market dominant category or the competitive category, it shall cause notice of such change to be published in the **Federal Register**. The notice shall:

(a) Include the current list of market dominant products and the current list of competitive products appearing in the Mail Classification Schedule;

(b) Indicate how and when the previous product lists have been modified; and

(c) Describe other changes to the Mail Classification Schedule as necessary.

## Appendix A to Subpart A of Part 3020—Mail Classification Schedule

Table of Contents

Part A—Market Dominant Products
Sec.
1000   Market Dominant Product List
  1001   Market Dominant Product Descriptions
1100   First-Class Mail
  1105   Single-piece Letters/Postcards
  1110   Bulk Letters/Postcards
  1115   Flats
  1120   Parcels
  1125   Outbound Single-Piece First-Class Mail International
  1130   Inbound Single-Piece First-Class Mail International
1200   Standard Mail (Regular and Nonprofit)
  1205   High Density and Saturation Letters
  1210   High Density and Saturation Flats/Parcels
  1215   Carrier Route
  1220   Letters
  1225   Flats
  1230   Non Flat-Machinables (NFMs)/Parcels
1300   Periodicals
  1305   Within County Periodicals
  1310   Outside County Periodicals
1400   Package Services
  1405   Single-Piece Parcel Post
  1410   Inbound Surface Parcel Post (at UPU rates)
  1415   Bound Printed Matter Flats
  1420   Bound Printer Matter Parcels
  1425   Media Mail/Library Mail
1500   Special Services
  1505   Ancillary Services
  1505.1   Address Correction Service
  1505.2   Applications and Mailing Permits
  1505.3   Business Reply Mail
  1505.4   Bulk Parcel Return Service
  1505.5   Certified Mail
  1505.6   Certificate of Mailing
  1505.7   Collect on Delivery
  1505.8   Delivery Confirmation
  1505.9   Insurance
  1505.10   Merchandise Return Service
  1505.11   Parcel Airlift (PAL)
  1505.12   Registered Mail
  1505.13   Return Receipt
  1505.14   Return Receipt for Merchandise
  1505.15   Restricted Delivery
  1505.16   Shipper-Paid Forwarding
  1505.17   Signature Confirmation
  1505.18   Special Handling
  1505.19   Stamped Envelopes
  1505.20   Stamped Cards
  1505.21   Premium Stamped Stationery
  1505.22   Premium Stamped Cards
  1510   International Ancillary Services
  1510.1   International Certificate of Mailing
  1510.2   International Registered Mail
  1510.3   International Return Receipt
  1510.4   International Restricted Delivery
  1515   Address List Services
  1520   Caller Service
  1525   Change-of-Address Credit Card Authentication
  1530   Confirm
  1535   International Reply Coupon Service
  1540   International Business Reply Mail Service
  1545   Money Orders
  1550   Post Office Box Service
  1555   Premium Forwarding Service (Experiment)
1600   Negotiated Service Agreements
  1605   Discover Financial Services Negotiated Service Agreement
  1610   Bank One Negotiated Service Agreement
  1615   HSBC North America Holdings Inc. Negotiated Service Agreement
  1620   Bookspan Negotiated Service Agreement
Part B—Competitive Products
Sec.
2000   Competitive Product List
  2001   Competitive Product Descriptions
2100   Express Mail
  2105   Express Mail
  2110   Outbound International Expedited Services
  2115   Inbound International Expedited Services
2200   Priority Mail
  2205   Priority Mail
  2210   Outbound Priority Mail International
  2215   Inbound Air Parcel Post
2300   Parcel Select
2400   Parcel Return Service
2500   International
  2505   International Priority Airlift (IPA)
  2510   International Surface Airlift (ISAL)
  2515   International Direct Sacks—M-Bags
  2520   Global Customized Shipping Services
  2525   Inbound Surface Parcel Post (at non-UPU rates)
  2530   International Money Transfer Service
  2535   International Ancillary Services
  2535.1   International Certificate of Mailing
  2535.2   International Registered Mail
  2535.3   International Return Receipt
  2535.4   International Restricted Delivery
  2535.5   International Insurance
2600   Negotiated Service Agreements
  2605   Domestic
  2610   Outbound International
Glossary of Terms and Conditions
Country Price Lists for International Mail
Part A—Market Dominant Products
1000   Market Dominant Product List
First-Class Mail
  Single-piece Letters/Postcards
  Bulk Letters/Postcards
  Flats
  Parcels
  Outbound Single-Piece First-Class Mail International
  Inbound Single-Piece First-Class Mail International
Standard Mail (Regular and Nonprofit)
  High Density and Saturation Letters
  High Density and Saturation Flats/Parcels
  Carrier Route
  Letters
  Flats
  Not Flat-Machinables (NFMs)/Parcels
Periodicals
  Within County Periodicals
  Outside County Periodicals
Package Services
  Single-Piece Parcel Post
  Inbound Surface Parcel Post (at UPU rates)
  Bound Printed Matter Flats
  Bound Printed Matter Parcels
  Media Mail/Library Mail

Special Services
   Ancillary Services
   International Ancillary Services
   Address List Services
   Caller Service
   Change-of-Address Credit Card
     Authentication
   Confirm
   International Reply Coupon Service
   International Business Reply Mail Service
   Money Orders
   Post Office Box Service
   Premium Forwarding Service (Experiment)
Negotiated Service Agreements
   Discover Financial Services Negotiated
     Service Agreement
   Bank One Negotiated Service Agreement
   HSBC North America Holdings Inc.
     Negotiated Service Agreement
   Bookspan Negotiated Service Agreement
   1001   Market Dominant Product
     Descriptions
Sec.
1100   First-Class Mail [Reserved for Class
   Description]
   1105   Single-Piece Letters/Postcards
     [Reserved for Product Description]
   1110   Bulk Letters/Postcards [Reserved for
     Product Description]
   1115   Flats [Reserved for Product
     Description]
   1120   Parcels [Reserved for Product
     Description]
   1125   Outbound Single-Piece First-Class
     Mail International [Reserved for Product
     Description]
   1130   Inbound Single-Piece First-Class
     Mail International [Reserved for Product
     Description]
1200   Standard Mail (Regular and Nonprofit)
   [Reserved for Class Description]
   1205   High Density and Saturation Letters
     [Reserved for Product Description]
   1210   High Density and Saturation Flats/
     Parcels [Reserved for Product
     Description]
   1215   Carrier Route [Reserved for Product
     Description]
   1220   Letters [Reserved for Product
     Description]
   1225   Flats [Reserved for Product
     Description]
   1230   Not Flat-Machinables (NFMs)/
     Parcels [Reserved for Product
     Description]
1300   Periodicals [Reserved for Class
   Description]
   1305   Within County Periodicals
     [Reserved for Product Description]
   1310   Outside County Periodicals
     [Reserved for Product Description]
1400   Package Services [Reserved for Class
   Description]
   1405   Single-Piece Parcel Post [Reserved
     for Product Description]
   1410   Inbound Surface Parcel Post (at
     UPU rates) [Reserved for Product
     Description]
   1415   Bound Printed Matter Flats
     [Reserved for Product Description]
   1420   Bound Printed Matter Parcels
     [Reserved for Product Description]
   1425   Media Mail/Library Mail [Reserved
     for Product Description]
1500   Special Services [Reserved for Class
   Description]

1505   Ancillary Services
   1505.1 Address Correction Service
     [Reserved for Product Description]
   1505.2   Applications and Mailing Permits
     [Reserved for Product Description]
   1505.3   Business Reply Mail [Reserved for
     Product Description]
   1505.4   Bulk Parcel Return Service
     [Reserved for Product Description]
   1505.5   Certified Mail [Reserved for
     Product Description]
   1505.6   Certificate of Mailing [Reserved
     for Product Description]
   1505.7   Collect on Delivery [Reserved for
     Product Description]
   1505.8   Delivery Confirmation [Reserved
     for Product Description]
   1505.9   Insurance [Reserved for Product
     Description]
   1505.10   Merchandise Return Service
     [Reserved for Product Description]
   1505.11   Parcel Airlift (PAL) [Reserved for
     Product Description]
   1505.12   Registered Mail [Reserved for
     Product Description]
   1505.13   Return Receipt [Reserved for
     Product Description]
   1505.14   Return Receipt for Merchandise
     [Reserved for Product Description]
   1505.15   Restricted Delivery [Reserved for
     Product Description]
   1505.16   Shipper-Paid Forwarding
     [Reserved for Product Description]
   1505.17   Signature Confirmation
     [Reserved for Product Description]
   1505.18   Special Handling [Reserved for
     Product Description]
   1505.19   Stamped Envelopes [Reserved for
     Product Description]
   1505.20   Stamped Cards [Reserved for
     Product Description]
   1505.21   Premium Stamped Stationery
     [Reserved for Product Description]
   1505.22   Premium Stamped Cards
     [Reserved for Product Description]
   1510   International Ancillary Services
   1510.1   International Certificate of Mailing
     [Reserved for Product Description]
   1510.2   International Registered Mail
     [Reserved for Product Description]
   1510.3   International Return Receipt
     [Reserved for Product Description]
   1510.4   International Restricted Delivery
     [Reserved for Product Description]
   1515   Address List Services [Reserved for
     Product Description]
   1520   Caller Service [Reserved for Product
     Description]
   1525   Change-of-Address Credit Card
     Authentication [Reserved for Product
     Description]
   1530   Confirm [Reserved for Product
     Description]
   1535   International Reply Coupon Service
     [Reserved for Product Description]
   1540   International Business Reply Mail
     Service [Reserved for Product
     Description]
   1545   Money Orders [Reserved for Product
     Description]
   1550   Post Office Box Service [Reserved
     for Product Description]
   1555   Premium Forwarding Service
     (Experiment) [Reserved for Product
     Description]
1600   Negotiated Service Agreements
   [Reserved for Class Description]

   1605   Discover Financial Services
     Negotiated Service Agreement [Reserved
     for Product Description]
   1610   Bank One Negotiated Service
     Agreement [Reserved for Product
     Description]
   1615   HSBC North America Holdings Inc.
     Negotiated Service Agreement [Reserved
     for Product Description]
   1620   Bookspan Negotiated Service
     Agreement [Reserved for Product
     Description]
Part B—Competitive Products
2000 Competitive Product List
Express Mail
   Express Mail
   Outbound International Expedited Services
   Inbound International Expedited Services
Priority Mail
   Priority Mail
   Outbound Priority Mail International
   Inbound Air Parcel Post
Parcel Select
Parcel Return Service
International
   International Priority Airlift (IPA)
   International Surface Airlift (ISAL)
   International Direct Sacks–M-Bags
   Global Customized Shipping Services
   Inbound Surface Parcel Post (at non-UPU
     rates)
   International Money Transfer Service
   International Ancillary Services
Negotiated Service Agreements
   Domestic
   Outbound International
2001   Competitive Product Descriptions
Sec.
   2100   Express Mail [Reserved for Group
     Description]
   2105   Express Mail [Reserved for Product
     Description]
   2110   Outbound International Expedited
     Services [Reserved for Product
     Description]
   2115   Inbound International Expedited
     Services
   2200   Priority [Reserved for Product
     Description]
   2205   Priority Mail [Reserved for Product
     Description]
   2210   Outbound Priority Mail
     International [Reserved for Product
     Description]
   2215   Inbound Air Parcel Post [Reserved
     for Product Description]
   2300   Parcel Select [Reserved for Group
     Description]
   2400   Parcel Return Service [Reserved for
     Group Description]
   2500   International [Reserved for Group
     Description]
   2505   International Priority Airlift (IPA)
     [Reserved for Product Description]
   2510   International Surface Airlift (ISAL)
     [Reserved for Product Description]
   2515   International Direct Sacks—M-Bags
   2520   Global Customized Shipping
     Services [Reserved for Product
     Description]
   2525   International Money Transfer
     Service [Reserved for Product
     Description]
   2530   Inbound Surface Parcel Post (at non-
     UPU rates) [Reserved for Product
     Description]

2535   International Ancillary Services [Reserved for Product Description]
2535.1   International Certificate of Mailing [Reserved for Product Description]
2535.2   International Registered Mail [Reserved for Product Description]
2535.3   International Return Receipt [Reserved for Product Description]
2535.4   International Restricted Delivery [Reserved for Product Description]
2535.5   International Insurance [Reserved for Product Description]
2600   Negotiated Service Agreements [Reserved for Group Description]
2605   Domestic [Reserved for Product Description]
2610   Outbound International [Reserved for Group Description]
Glossary of Terms and Conditions [Reserved]
Country Price Lists for International Mail [Reserved]

## Subpart B—Requests Initiated by the Postal Service To Modify the Product Lists Described Within the Mail Classification Schedule

### § 3020.30   General.

The Postal Service, by filing a request with the Commission, may propose a modification to the market dominant product list or the competitive product list appearing in the Mail Classification Schedule. For purposes of this part, modification shall be defined as adding a product to a list, removing a product from a list, or moving a product from one list to the other list.

### § 3020.31   Contents of a request.

A request to modify the market dominant product list or the competitive product list shall:

(a) Provide the name, and class if applicable, of each product that is the subject of the request;

(b) Provide a copy of the Governor's decision supporting the request, if any;

(c) Indicate whether the request proposes to add a product to the market dominant list or the competitive list, remove a product from the market dominant list or the competitive list, or transfer a product from the market dominant list to the competitive list or from the competitive list to the market dominant list;

(d) Indicate whether each product that is the subject of the request is:

(1) A special classification within the meaning of 39 U.S.C. 3622(c)(10) for market dominant products;

(2) A product not of general applicability within the meaning of 39 U.S.C. 3632(b)(3) for competitive products; or

(3) A non-postal product.

(e) Provide all supporting justification upon which the Postal Service proposes to rely; and

(f) Include a copy of the applicable sections of the Mail Classification Schedule and the proposed changes therein in legislative format.

### § 3020.32   Supporting justification.

Supporting justification shall be in the form of a statement from one or more knowledgeable Postal Service official(s) who sponsors the request and attests to the accuracy of the information contained within the statement. The justification shall:

(a) Demonstrate why the change is in accordance with the policies and the applicable criteria of chapter 36 of title 39 of the United States Code;

(b) Explain why, as to market dominant products, the change is not inconsistent with each requirement of 39 U.S.C. 3622(d), and that it advances the objectives of 39 U.S.C. 3622(b), taking into account the factors of 39 U.S.C. 3622(c);

(c) Explain why, as to competitive products, the addition, deletion, or transfer will not result in the violation of any of the standards of 39 U.S.C. 3633;

(d) Verify that the change does not classify as competitive a product over which the Postal Service exercises sufficient market power that it can, without risk of losing a significant level of business to other firms offering similar products:

(1) Set the price of such product substantially above costs;

(2) Raise prices significantly;

(3) Decrease quality; or

(4) Decrease output.

(e) Explain whether or not each product that is the subject of the request is covered by the postal monopoly as reserved to the Postal Service under 18 U.S.C. 1696 subject to the exceptions set forth in 39 U.S.C. 601;

(f) Provide a description of the availability and nature of enterprises in the private sector engaged in the delivery of the product;

(g) Provide any information available on the views of those who use the product on the appropriateness of the proposed modification;

(h) Provide a description of the likely impact of the proposed modification on small business concerns; and

(i) Include such information and data, and such statements of reasons and bases, as are necessary and appropriate to fully inform the Commission of the nature, scope, significance, and impact of the proposed modification.

### § 3020.33   Docket and notice.

The Commission will establish a docket for each request to modify the market dominant list or the competitive product list, promptly publish notice of the request in the **Federal Register**, and post the filing on its Web site. The notice shall include:

(a) The general nature of the proceeding;

(b) A reference to legal authority to which the proceeding is to be conducted;

(c) A concise description of the proposals for changes in the Mail Classification Schedule;

(d) The identification of an officer of the Commission to represent the interests of the general public in the docket;

(e) A specified period for public comment; and

(f) Such other information as the Commission deems appropriate.

### § 3020.34   Review.

The Commission shall review the request and responsive comments. The Commission shall either:

(a) Approve the request to modify the market dominant and competitive product lists;

(b) Institute further proceedings to consider all or part of the request if it finds that there is substantial likelihood that the modification is inconsistent with statutory policies or Commission rules, and explain its reasons for not approving the request to modify the market dominant and competitive product lists;

(c) Provide an opportunity for the Postal Service to modify its request; or

(d) Direct other action as the Commission may consider appropriate.

### § 3020.35   Further proceedings.

If the Commission determines that further proceedings are necessary, a conference shall be scheduled to consider the concerns expressed by the Commission. Written statements commenting on the Commission's concerns shall be requested, to be filed 7 days prior to the conference. Upon conclusion of the conference, the Commission shall promptly issue a ruling to:

(a) Provide for a period of discovery to obtain further information;

(b) Schedule a hearing on the record for further consideration of the request;

(c) Explain the reasons for not going forward with additional proceedings and approve the request to modify the market dominant and competitive product lists; or

(d) Direct other action as the Commission may consider appropriate.

## Subpart C—Requests Initiated by Users of the Mail To Modify the Product Lists Described Within the Mail Classification Schedule

### §3020.50   General.

Users of the mail, by filing a request with the Commission, may propose a modification to the market dominant product list or the competitive product list appearing in the Mail Classification Schedule. For purposes of this part, modification shall be defined as adding a product to a list, removing a product from a list, or transferring a product from one list to the other list.

### §3020.51   Contents of a request.

A request to modify the market dominant product list or the competitive product list shall:

(a) Provide the name, and class if applicable, of each product that is the subject of the request;

(b) Indicate whether the request proposes to add a product to the market dominant list or the competitive list, remove a product from the market dominant list or the competitive list, or move a product from the market dominant list to the competitive list or from the competitive list to the market dominant list;

(c) Indicate whether each product that is the subject of the request is:

(1) A special classification within the meaning of 39 U.S.C. 3622(c)(10) for market dominant products;

(2) A product not of general applicability within the meaning of 39 U.S.C. 3632(b) for competitive products; or

(3) A non-postal product.

(d) Provide all supporting justification upon which the proponent of the request proposes to rely; and

(e) Include a copy of the applicable sections of the Mail Classification Schedule and the proposed changes therein in legislative format.

### §3020.52   Supporting justification.

Supporting justification shall be in the form of a statement from a knowledgeable proponent of the request who attests to the accuracy of the information contained within the statement. The justification shall:

(a) Demonstrate why the change is in accordance with the policies and the applicable criteria of chapter 36 of 39 U.S.C.;

(b) Explain why, as to market dominant products, the change is not inconsistent with each requirement of 39 U.S.C. 3622(d), and that it advances the objectives of 39 U.S.C. 3622(b), taking into account the factors of 39 U.S.C. 3622(c);

(c) Explain why, as to competitive products, the addition, deletion, or transfer will not result in the violation of any of the standards of 39 U.S.C. 3633.

(d) Verify that the change does not classify as competitive a product over which the Postal Service exercises sufficient market power that it can, without risk of losing a significant level of business to other firms offering similar products:

(1) Set the price of such product substantially above costs;

(2) Raise prices significantly;

(3) Decrease quality; or

(4) Decrease output.

(e) Explain whether or not each product that is the subject of the request is covered by the postal monopoly, as reserved to the Postal Service under 18 U.S.C. 1696 subject to the exceptions set forth in 39 U.S.C. 601;

(f) Provide a description of the availability and nature of enterprises in the private sector engaged in the delivery of the product;

(g) Provide any information available on the views of those who use the product on the appropriateness of the proposed modification;

(h) Provide a description of the likely impact of the proposed modification on small business concerns; and

(i) Include such information and data, and such statements of reasons and bases, as are necessary and appropriate to fully inform the Commission of the nature, scope, significance, and impact of the proposed modification.

### §3020.53   Docket and notice.

The Commission will establish a docket for each request to modify the market dominant list or the competitive product list, promptly publish notice of the request in the **Federal Register**, and post the filing on its Web site. The notice shall include:

(a) The general nature of the proceeding;

(b) A reference to legal authority to which the proceeding is to be conducted;

(c) A concise description of the proposals for changes in the Mail Classification Schedule;

(d) The identification of an Office of the Commission to represent the interests of the general public in the docket;

(e) A specified period for public comment; and

(f) Such other information as the Commission deems appropriate.

### §3020.54   Postal Service notice and reply.

The Secretary of the Commission shall forward to the Postal Service a copy of the request. Within 28 days of the filing of the request, the Postal Service shall provide its preliminary views in regard to the request. The Postal Service may include suggestions for appropriate Commission action in response to the request.

### §3020.55   Review.

The Commission shall review the request, the Postal Service reply, and any public comment to determine whether the proposed modification to the market dominant and competitive product lists complies with applicable statutory requirements and the Commission's rules, and whether the proposed modification is consistent with the position of the Postal Service as expressed in its reply. The Commission shall either:

(a) Approve the request to modify the market dominant and competitive product lists, but only to the extent the modification is consistent with the position of the Postal Service;

(b) Reject the request;

(c) Institute further proceedings to consider the request to modify the market dominant and competitive product lists; or

(d) Direct other action as the Commission may consider appropriate.

### §3020.56   Further proceedings.

If the Commission determines that further proceedings are necessary, a conference shall be scheduled to consider the merits of going forward with the request. Upon conclusion of the conference, the Commission shall promptly issue a ruling to:

(a) Provide for a period of discovery to obtain further information;

(b) Schedule a hearing on the record for further consideration of the request;

(c) Explain the reasons for not going forward with formal proceedings; or

(d) Direct other action as the Commission may consider appropriate.

## Subpart D—Proposal of the Commission To Modify the Product Lists Described Within the Mail Classification Schedule

### §3020.70   General.

The Commission, of its own initiative, may propose a modification to the market dominant product list or the competitive product list provided within the Mail Classification Schedule. For purposes of this part, modification shall be defined as adding a product to a list, removing a product from a list, or transferring a product from one list to the other list.

## § 3020.71   Contents of a proposal.

A proposal to modify the market dominant product list or the competitive product list shall:

(a) Provide the name, and class if applicable, of each product that is the subject of the proposal;

(b) Indicate whether the proposal would add a product to the market dominant list or the competitive list, remove a product from the market dominant list or the competitive list, or move a product from the market dominant list to the competitive list or from the competitive list to the market dominant list;

(c) Indicate whether each product that is the subject of the proposal is:

(1) A special classification within the meaning of 39 U.S.C. 3622(c)(10) for market dominant products;

(2) A product not of general applicability within the meaning of 39 U.S.C. 3632(b) for competitive products; or

(3) A non-postal product.

(d) Provide justification supporting the proposal; and

(e) Include a copy of the applicable sections of the Mail Classification Schedule and the proposed changes therein in legislative format.

## § 3020.72   Supporting justification.

Supporting justification shall:

(a) Provide an explanation for initiating the docket;

(b) Explain why, as to market dominant products, the change is not inconsistent with each requirement of 39 U.S.C. 3622(d), and that it advances the objectives of 39 U.S.C. 3622(b), taking into account the factors of 39 U.S.C. 3622(c);

(c) Explain why, as to competitive products, the addition, subtraction, or transfer will not result in the violation of any of the standards of 39 U.S.C. 3633;

(d) Verify that the change does not classify as competitive a product over which the Postal Service exercises sufficient market power that it can, without risk of losing a significant level of business to other firms offering similar products:

(1) Set the price of such product substantially above costs;

(2) Raise prices significantly;

(3) Decrease quality; or

(4) Decrease output.

(e) Explain whether or not each product that is the subject of the request is covered by the postal monopoly as reserved to the Postal Service under 18 U.S.C. 1696 subject to the exceptions set forth in 39 U.S.C. 601;

(f) Provide a description of the availability and nature of enterprises in the private sector engaged in the delivery of the product;

(g) Provide any information available on the views of those who use the product involved on the appropriateness of the proposed modification;

(h) Provide a description of the likely impact of the proposed modification on small business concerns; and

(i) Include such information and data, and such statements of reasons and bases, as are necessary and appropriate to fully inform the Postal Service and users of the mail of the nature, scope, significance, and impact of the proposed modification.

## § 3020.73   Docket and notice.

The Commission will establish a docket for each request to modify the market dominant list or the competitive product list, promptly publish notice of the request in the **Federal Register**, and post the filing on its Web site. The notice shall include:

(a) The general nature of the proceeding;

(b) A reference to legal authority to which the proceeding is to be conducted;

(c) A concise description of the proposals for changes in the Mail Classification Schedule;

(d) The identification of an officer of the Commission to represent the interests of the general public in the docket;

(e) A specified period for public comment; and

(f) Such other information as the Commission deems appropriate.

## § 3020.74   Postal Service notice and reply.

The Secretary of the Commission shall forward to the Postal Service a copy of the notice of proposal. Within 28 days of the filing of the proposal, the Postal Service shall provide its preliminary views in regard to the proposal. The Postal Service may include suggestions for appropriate further procedural steps.

## § 3020.75   Review.

The Commission shall review the Postal Service reply and public comment. The Commission shall either:

(a) Approve the proposal to modify the market dominant and competitive product lists, but only to the extent the modification is consistent with the position of the Postal Service;

(b) Withdraw the proposal;

(c) Institute further proceedings to consider the proposal, identifying relevant issues that may require further development; or

(d) Direct other action as the Commission may consider appropriate.

## § 3020.76   Further proceedings.

If the Commission determines that further proceedings are appropriate, a conference shall be scheduled to consider the merits of going forward with the proposal. Upon conclusion of the conference, the Commission shall promptly issue a ruling to:

(a) Provide for a period of discovery to obtain further information;

(b) Schedule a hearing on the record for further consideration of the proposal;

(c) Explain the reasons for not going forward with formal proceedings; or

(d) Direct other action as the Commission may consider appropriate.

## Subpart E—Requests Initiated by the Postal Service to Change the Mail Classification Schedule

### § 3020.90   General.

The Postal Service shall assure that product descriptions in the Mail Classification Schedule accurately represent the current offerings of Postal Service products and services.

### § 3020.91   Modification.

The Postal Service shall submit corrections to product descriptions in the Mail Classification Schedule that do not constitute a proposal to modify the market dominant product list or the competitive product list as defined in § 3020.30 by filing notice of the proposed change with the Commission no later than 30 days prior to the effective date of the proposed change.

### § 3020.92   Public input.

The Commission shall publish Postal Service submissions pursuant to § 3020.91 on its Web site and provide interested persons with an opportunity to comment on whether the planned changes are inconsistent with 39 U.S.C. 3642.

### § 3020.93   Implementation.

(a) The Commission shall review the proposed changes to product descriptions, and the comments thereon. So long as such changes are not inconsistent with 39 U.S.C. 3642, the Commission shall, subject to editorial corrections, change the Mail Classification Schedule to coincide with the effective date of the proposed change.

(b) The Commission's finding that changes to the market dominant product descriptions are not inconsistent with 39 U.S.C. 3642 is provisional and subject to subsequent review.

**Subpart F—Size and Weight Limitations for Mail Matter**

**§ 3020.110   General.**

Applicable size and weight limitations for mail matter shall appear in the Mail Classification Schedule as part of the description of each product.

**§ 3020.111   Limitations applicable to market dominant mail matter.**

(a) The Postal Service shall inform the Commission of updates to size and weight limitations for market dominant mail matter by filing notice with the Commission 45 days prior to the effective date of the proposed update. The notice shall include a copy of the applicable sections of the Mail Classification Schedule and the proposed updates therein in legislative format.

(b) The Commission shall provide notice of the proposed update in the **Federal Register** and seek public comment on whether the proposed update is in accordance with the policies and the applicable criteria of chapter 36 of title 39 of the United States Code.

(c) If the Commission finds the proposed update in accordance with the policies and the applicable criteria of chapter 36 of 39 U.S.C., the Commission shall review the proposed Mail Classification Schedule language for formatting and conformance with the structure of the Mail Classification Schedule, and subject to editorial changes, shall change the Mail Classification Schedule to coincide with the effective date of the proposed update.

(d) If the Commission finds the proposed update not in accordance with the policies and the applicable criteria of chapter 36 of title 39 of the United States Code, the Commission may direct other action as deemed appropriate.

**§ 3020.112   Limitations applicable to competitive mail matter.**

The Postal Service shall notify the Commission of updates to size and weight limitations for competitive mail matter pursuant to subpart E of this part.

[FR Doc. E7–21596 Filed 11–8–07; 8:45 am]

**BILLING CODE 7710–FW–P**

implications. This rule is not a major rule as defined in 5 U.S.C. Chapter 8, Congressional Review of Agency Rulemaking.

**List of Subjects in 36 CFR Part 1228**

Archives and Records.

■ For the reasons set forth in the preamble, NARA amends part 1228 of title 36, Code of Federal Regulations, as follows:

## PART 1228—DISPOSITION OF FEDERAL RECORDS

■ 1. The authority citation for part 1228 continues to read as follows:

**Authority:** 44 U.S.C. chs. 21, 29, and 33.

■ 2. Amend § 1228.24 by redesignating paragraphs (b)(3) and (b)(4) as paragraphs (b)(4) and (b)(5) respectively, and adding new paragraph (b)(3) to read as follows:

### § 1228.24   Formulation of agency records schedules.

(b) * * *

(3) Records schedules submitted to NARA for approval on or after [the effective date of the final rule] are media neutral, i.e., the disposition instructions apply to the described records in all media, unless the schedule identifies a specific medium for a specific series.

*        *        *        *        *

■ 3. Add § 1228.31 to read as follows:

### § 1228. 31   Applying previously approved schedules to electronic records.

(a) *When must an agency submit a new schedule for electronic versions of previously scheduled hard copy records?* Agencies must submit a new schedule to NARA for electronic versions of previously scheduled records if:

(1) The content and function of the records have changed significantly (e.g., the electronic records contain information that is substantially different from the information included in the hard copy series or are used for different purposes).

(2) The previously approved schedule explicitly excludes electronic records.

(3) The electronic records consist of program records maintained on an agency web site.

(4) The electronic records consist of program records maintained in a format other than scanned image AND the previously approved schedule is not media neutral.

(b) *When can an agency apply a previously approved schedule to electronic versions of the records?* If the conditions specified in paragraph (a) of this section do not apply, the conditions in paragraph (b) apply:

(1) *Permanent records.* (i) The agency may apply a previously approved schedule for hard copy records to electronic versions of the permanent records when the electronic records system replaces a single series of hard copy permanent records or the electronic records consist of information drawn from multiple previously scheduled permanent series. Agencies must notify NARA (NWM) in writing of records that have been previously scheduled as permanent in hard copy form, including special media records as described in 36 CFR 1228.266 and 36 CFR 1228.268. The notification must be submitted within 90 days of when the electronic recordkeeping system becomes operational and must contain the:

(A) Name of agency;

(B) Name of the electronic system;

(C) Organizational unit(s) or agency program which records support;

(D) Current disposition authority reference; and

(E) Format of the records (e.g., database, scanned images, digital photographs, etc.).

(ii) If the electronic records include information drawn from both temporary and permanent hard copy series, an agency either may apply a previously approved permanent disposition authority, after submitting the notification required by paragraph (b)(1)(i) or may submit a new schedule if the agency believes the electronic records do not warrant permanent retention.

(2) *Temporary still pictures, sound recordings, motion picture film, and video recordings.* The agency must apply the previously approved schedule to digital versions. If changes in the approved schedule are required, follow § 1228.32.

(3) *Scanned images of temporary records, including temporary program records.* The agency must apply the previously approved schedule. If changes in the approved schedule are required, follow § 1228.32.

(4) *Other temporary records maintained in an electronic format other than scanned images.* (i) For temporary records that are covered by an item in a General Records Schedule or an agency-specific schedule that pertains to administrative/housekeeping activities, apply the previously approved schedule. If the electronic records consist of information drawn from multiple hard copy series, apply the previously approved schedule item with the longest retention period.

(ii) For temporary program records covered by a NARA-approved media neutral schedule item (*i.e.,* the item

appears on a schedule approved before December 17, 2007 that is explicitly stated to be media neutral, or it appears on any schedule approved on or after December 17, 2007 that is not explicitly limited to a specific recordkeeping medium), apply the previously approved schedule.

Dated: September 27, 2007.

**Allen Weinstein,**

*Archivist of the United States.*

[FR Doc. E7–22376 Filed 11–14–07; 8:45 am]

**BILLING CODE 7515–01–P**

## POSTAL REGULATORY COMMISSION

### 39 CFR Part 301, 3010, 3015 and 3020

**[Docket No. RM2007–1; Order No. 43]**

### Administrative Practice and Procedure, Postal Service; Correction

**AGENCY:** Postal Regulatory Commission.

**ACTION:** Final rule; correction.

**SUMMARY:** The Postal Regulatory Commission published a final rule in the **Federal Register** of November 9, 2007 implementing certain provisions in the Postal Accountability and Enhancement Act. The effective date should have read December 10, 2007, rather than November 9, 2007.

**DATES:** The effective date for FR Doc. E7–21596, published on November 9, 2007 (72 FR 63662) is corrected to December 10, 2007.

**FOR FURTHER INFORMATION CONTACT:**
Stephen L. Sharfman, General Counsel, 202–789–6820 and
*stephen.sharfman@prc.gov.*

**SUPPLEMENTARY INFORMATION:** In the **Federal Register** of November 9, 2007, page 72 FR 63662, in the first column in the ''Dates'' entry, correct the reference ''*Effective date:* November 9, 2007'' to read ''*Effective date:* December 10, 2007.''

**Steven W. Williams,**

*Secretary.*

[FR Doc. 07–5683 Filed 11–9–07; 12:24 pm]

**BILLING CODE 7710–FW–M**

Joel Palley 202-493-6409

Office of Policy

Office of Rail Policy and Development

Federal Railroad Administration

March 2011

## IMPACT OF THE STAGGERS RAIL ACT OF 1980

With the passage of the Staggers rail Act of 1980 and its implementation by the Interstate Commerce Commission (ICC, now the Surface Transportation Board (STB)), many regulatory restraints on the railroad industry were removed, providing the industry increased flexibility to adjust their rates and tailor services to meet shipper needs and their own revenue requirements.  As a result, 30 years after deregulation, the railroad industry's financial health has improved significantly, service to rail customers has improved while overall rates have decreased, and rail safety, regardless of the measure, has improved.

**Background:**  Prior to 1980, economic regulation prevented railroads from any flexibility in pricing needed to meet both intra as well as intermodal competition.  Regulation also prohibited carriers from restructuring their systems, including abandoning redundant and light density lines, a necessity for controlling cost.  Added to these problems was the industry's inability to cover inflation due to the regulatory time lag in rate adjustments.  As a consequence, nine carriers were bankrupt, the industry had a low return on investment and was unable to raise capital, and faced a steady decline in market share.

The effects that Staggers had on the industry have been substantial.  In the 30-year period before 1980, railroad market share measured in revenue ton-miles declined by 33 percent, from 56.1 to 37.5 percent.  Market share in the post-Staggers era became stable and has increased to over 40 percent.  Other measures show similar improvement.  Return on investment has averaged nearly 8 percent between 1990 and 2009, up from a 2 percent average in the 1970s.  And with the industry's improved financial condition, railroads have invested over $6 billion a year in roadway, structures, and equipment since the mid-1990s. Between 1981 and 2009, the railroads have expended $511 billion in capital improvements and maintenance of track and equipment.  Prior to 1980, the rail plant was in poor repair.  The industry also showed remarkable safety improvements since Staggers with train accident rates declining by 65 percent (1981—2009).

The Staggers Rail Act of 1980 limited the authority of the ICC, now the STB, to regulate rates only for traffic where competition is not effective to protect shippers.  The STB estimates that roughly 20 percent of traffic is still regulated.  Approximately half of all traffic on a revenue basis is exempt from regulation.  Traffic is considered exempt from regulation, where rates are not regulated when competition keeps them at levels below the statutory threshold (where the ratio of the revenue to regulatory variable cost of the move is less than 1.8), when a class of traffic has been specifically exempted (for example, all traffic moving in boxcars or trailers or containers on flatcars was exempted in the early 1980s), or when traffic moves under contract.

The Staggers Act legalized railroad-shipper contracts.  These contracts represent privately negotiated agreements between railroads and shippers over rates, service levels, equipment, and minimum annual volume of traffic, just to name a few.  According to the STB, approximately one-third of all traffic on a revenue basis moves under contract.  Contracts enable railroads to improve asset utilization through better planning of their freight cars.

Since Staggers, shippers have seen a significant decline in rates.  Freight rates adjusted for inflation have declined 0.5 percent a year since the passage of the Staggers Act, compared to an increase of nearly 3 percent per year in the 5 years prior to 1980.

In 1996, oversight of rail transportation contracts was limited to agricultural products by the ICC Termination Act of 1995 (P.L. No. 104-88, 109 Stat. 803 (1995) (ICCTA) which abolished the ICC and transferred the responsibility for regulating rail transportation to the STB.  The Act, intended to streamline the remaining economic regulation of the railroads, also shortened time limits for proceedings in a number of areas, such as mergers and rate cases, and has eliminated the tariff filing requirement for railroads.