PRICING AND CLASSIFICATION SERVICE CENTER


**UNITED STATES**
**POSTAL SERVICE**

May 30, 2012

David M. Levy
Venable LLP
575 Seventh Street N.W.
Washington, DC 20004-1607

Dear Mr. Levy:

I cannot uphold your appeal on behalf of your client, Southern California Edison (SCE), concerning the
revenue deficiency of $7,551,576.28 assessed by the US Postal Service. The letter you received from
the Santa Ana District, Manager of Business Mail Entry, dated November 23, 2009 charged a postage
deficiency of $7,551,576.28 for the period of May 14, 2007 through May 11, 2008 and May 12, 2008
through November 26, 2008.

An investigation of SCE's mailing records determined that they were out of compliance to the
requirements of the United States Postal Service's (USPS) Move Update Standards.

The Move Update Standards is a means of reducing the number of mailpieces in a mailing that require
forwarding or return by the periodic matching of a mailer's address records with customer filed change
of address orders received and maintained by the USPS.

All addresses on mailings that receive discounts for First-Class and Standard Mail services, whether
Presorted or Automation rate, must undergo name and address correction within 95 days of mailing
(*Domestic Mail Manual* (DMM) 233.3.5.1). Prior to November 23, 2008, the minimum frequency of
Move Update processing was 185 days prior to mailing.

The Postal Service offers four pre-approved methods and an alternative updating method specific to a
mailer. The following are the methods authorized for meeting the Move Update standard:
- Address Change Service (ACS).
- National Change of Address Linkage System (NCOA$^{Link}$).
- FASTforward MLOCR
- Mailer Move Update Process Certification and USPS-approved alternative methods.
- Ancillary service endorsements, except "Forwarding Service Requested." (DMM 233.3.5.2)

A significant volume of return to sender mail for SCE prompted Inspector Kelly Shen of the Postal
Inspection Service to conduct an investigation into SCE's compliance with the MOVE Update
standards. Subsequently interviews were conducted with Juliann Lee, Business Analyst for SCE. The
purpose of the interviews was to ascertain the method of Move Update used by SCE. On July 11,
2008, Ms. Lee explained to Inspector Shen that SCE was not updating return codes 91 and 92. Ms.
Lee also was unable to answer additional questions posed by Inspector Shen regarding how
undeliverable as addressed (UAA) mail were updated.

You based your appeal on three arguments:

The first is that the facts underlying the decision have never been disclosed to SCE. Our office found
that SCE was provided a detailed explanation of the deficiency in the assessment letter of November

90 CHURCH STREET, SUITE 3100
NEW YORK NY 10007-2951
TEL: 212-330-5300
FAX: 212-330-5320
WWW.USPS.COM

**USPS-SCE 0001**

**JA0001**

23, 2009. In addition, the Postal Inspection Service communicated with SCE via email, telephone, and personal interviews, which are documented in the case file. Among the people the Inspection Service contacted were Julian Lee, Greg Austin, Denise Lopez, and Gilbert Segarra.

Secondly, you claimed that the information provided is insufficient to support the deficiency and that undeliverable mailpieces were not caused by SCE noncompliance but by errors in the NCOA Link data supplied by the Postal Service. Rates of return are not the deciding factor in compliance with the MOVE Update standard and are only an indication that the standard may not have been met. You do not dispute the fact that SCE failed to update many of the NCOA matches, but rather you referred to them as innocent mistakes.

The assessment of the revenue deficiency was not based upon a willful intent by SCE to deceive the Postal Service, but a failure of SCE to comply with mandatory MOVE Update requirements, therefore, the mailings were ineligible for the prices claimed.

Your third point is that the Postal Service has erred in using the single piece First-Class Mail price as the appropriate price for calculating the additional postage due. Postal Service policy, since the inception of the MOVE Update address quality standards, has been to access single piece prices for ineligible mailings. This price eligibility requirement has been supported by the Postal Rate Commission.

In your subsequent amended appeal of November 21, 2011, you argue that the detection, by the Inspection Service, of 80 pieces per day of forwarding order expired or outdated return to sender endorsements, and 2,000 pieces per day of UAA mail, is an insignificant amount compared to the volume that SCE sends out. The assessment of additional postage was due to the fact that SCE's process for updating addresses was not in compliance and, therefore, not eligible for the automation discounts claimed.

An administrative subpoena was served on Leon Bass, Attorney for SCE, for complete documentation which they were required to provide per its NCOALink End User Agreement. The records SCE produced found that SCE conducted an internal review of its return to sender mail and they themselves found what they deemed a high volume of return to sender mail. Also, in an SCE document Ms. Lee was advised that SCE's interface system had not been updating customer's that had a fraction in their address.

You also questioned the decision to access a period of longer than one year. Both the former Management Instruction DM140-2008-1, *Assessing and Collection Deficiencies in Postage and Fees*, and the current DM140-2010-1, *Assessing and Collection Deficiencies in Postage and Fees*, generally restrict the deficiency assessments to a 12 month look back period from the date the deficiency was identified. However, a look forward period is allowed if the deficiency was not corrected when identified.

The role of the Pricing and Classification Service Center in adjudicating revenue deficiencies is to determine whether or not the deficiency exists and if the amount was calculated correctly. My office's review of this case finds that the Manager, Business Mail Entry in Santa Ana, California, was correct in assessing this deficiency.

I have forwarded a copy of the file to Mr. Robert Madrid, HQ Finance, Management Review Specialist, who is responsible for the collection process. Please direct any future inquiries concerning the collection to the HQ Finance, Management Review Specialist. His address is 4600 Mark IV Parkway – Suite 337K, Fort Worth, Texas 76161-9998.

**USPS-SCE 0002**

- 3 -

This is a final agency decision and concludes the appeal process.

Sincerely,

Gregory A. Hall
Manager

cc:  HQ Finance, Management Review Specialist

Manager, Business Mail Entry
Santa District

Manager, Finance
Santa Ana District

Mailing Standards

Manager, Business Mail Acceptance

Inspector In Charge

PCSC:pjp:942652

**USPS-SCE 0003**

# Routing Slip

| To | Dept., Office or Room No. | |
|---|---|---|
| | | ___ Approval |
| | | ___ Signature |
| 1.<br>File | | ___ Comment |
| | | ___ See Me |
| 2.<br>Southern California Edison | | ___ As Requested |
| | | ___ Information |
| 3. | | ___ Read and Return |
| | | ___ Read and File |
| 4. | | ___ Necessary Action |
| | | ___ Investigate |
| 5. | | ___ Recommendation |
| 6. | | ___ Prepare Reply |

| From: | Extension |
|---|---|
| | Room No. |
| Date: | |

**Remarks**

The underlying point that we have to make is not the fact that the IS found only 8- pieces per day of forwarding order issues and an additional 2000 piece of UAA mail, it is the fact that when the IS went back to SCE and looked at their process, it was flawed.

Item 0-13, August 1976

FF 1.1

**USPS-SCE 0004**

BEFORE THE
UNITED STATES POSTAL SERVICE
PRICING AND CLASSIFICATION SERVICE CENTER
NEW YORK, NY 10007-2951

Southern California Edison—Revenue )
Deficiency Of $7,551,576.28 For Alleged )
Noncompliance With Move Update )
Requirements )

**AMENDED APPEAL OF
SOUTHERN CALIFORNIA EDISON
FROM DECISION OF SANTA ANA DISTRICT**

David M. Levy
Matthew D. Field
VENABLE LLP
575 Seventh Street, N.W.
Washington DC   20004
(202) 344-4000
dlevy@venable.com
mfield@venable.com

*Counsel for Southern California Edison*

November 21, 2011

**USPS-SCE 0005**

**AMENDED APPEAL OF**
**SOUTHERN CALIFORNIA EDISON**
**FROM DECISION OF SANTA ANA DISTRICT**

Pursuant to Section 604.10.1.2 of the Domestic Mail Manual ("DMM"), Southern California Edison ("SCE") respectfully appeals from the November 23, 2009, letter decision of Scott Jones, Manager, Business Mail, Santa Ana District ("November 2009 Decision"), assessing a revenue deficiency of $7,551,576.28 against SCE.[1]

## BACKGROUND

On November 23, 2009, Southern California Edison ("SCE") received a letter decision from Scott Jones, Manager, Business Mail, Santa Ana district, assessing a revenue deficiency of $7,551,576.28 for alleged noncompliance with Move Update requirements from May 14, 2007 through November 26, 2008 (the "November 2009 Decision"). The mailings at issue were monthly bills and notices that SCE sent to its customers at discounted First-Class rates from May 14, 2007 through November 26, 2008. The theory of the revenue deficiency was that SCE had failed to update its address lists in compliance with Move Update requirements, and therefore should have paid single-piece First Class postage for the mailings.

By letter dated January 12, 2010, SCE requested from the Pricing and Classification Service Center ("PCSC") a variety of supporting documentation that were necessary to understand the alleged bases for the revenue deficiency, but which had not been produced by the Postal Service.[2] SCE requested the information because the company could not determine from

---

[1] Letter decision dated November 23, 2009, from Scott Jones to Leon Bass, Senior Attorney, Southern California Edison ("November 2009 Decision") (attached at Exhibit A).

[2] Letter from David M. Levy to Scott Jones (January 12, 2010) (attached as Exhibit B).

**USPS-SCE 0006**

the November 2009 Decision what information the Postal Service had relied on in determining that SCE was not Move Update compliant, or even what particular standards SCE was alleged to have violated. SCE's information requests focused mainly on the bases for the Postal Service's allegation that SCE failed to update its mailing addresses with addresses supplied by NCOA^Link, and the link, if any, between the alleged deficiencies in SCE's Move Update compliance and what the USPIS characterized as a high volume of Undeliverable as Addressed ("UAA") and Return to Sender ("RTS") mail.

The Postal Service agreed to extend the deadline for SCE's appeal until January 22, 2010, but did not produce any of the requested documents before the extended deadline. Consequently, SCE submitted its appeal on January 22, 2010, based solely on the information contained in the November 2009 decision.

On October 3, 2011, 17 months after SCE submitted its information requests, counsel for SCE received a letter from the PCSC ostensibly responding to SCE's information requests.[3] In answer to 8 of SCE's 12 requests, the letter simply referred, without further explanation or specific citation, to the "Investigative Memorandum and Exhibits enclosed."

The Postal Service's response, while failing to provide much additional information, at least clarified that the Postal Service is not relying on any documents or evidence, other than the Investigative Memorandum, that had not previously been disclosed to SCE. In light of this clarification, SCE submits this revised appeal.

---

[3] Letter dated September 27, 2011, from Gregory A. Hall to David M. Levy (reproduced at Exhibit C); Investigative Memorandum (reproduced at Exhibit D).

-2-

**USPS-SCE 0007**

## SUMMARY OF ARGUMENT

The Postal Service has not justified the imposition of a revenue deficiency against SCE. Not for 18 months; not for one year; not for any period of time. Not for $7,551,576.28 million; not for any amount. Put simply, the Postal Service has not put forth any evidence that SCE violated Move Update standards in any material fashion.

The authors of the November 2009 decision assessed a revenue deficiency against SCE mainly because they thought that they were observing an unusual volume of Forwarding Order Expired ("FOE"), Return to Sender ("RTS"), and Undeliverable as Addressed ("UAA") mail being returned to SCE at postal facilities in southern California. The authors of the decision further observed that some portion of this mail was associated with change-of-address orders more than 185 days old. These two observations were arguably enough to justify an investigation into SCE's Move Update compliance. Absent further evidence, however, these observations were not sufficient to justify a revenue deficiency assessment for failure to comply with the Move Update standards. No further evidence is cited in the November 2009 decision or the limited supporting documentation produced by the PCSC, and none appears in the record.

First, the percentage of mail returned to SCE as undeliverable was only about one percent of total SCE volume, well within the normal range for properly updated address lists and the inherent error rate of the Postal Service's own Move Update databases. The increase in the volume of UAA mail between 2006 and 2008 provides no evidence that proper updating was not occurring; a more plausible explanation is the explosion of unemployment, bankruptcies, foreclosures and mortgage defaults that occurred in SCE's service area during that period. Nor

-3-

**USPS-SCE 0008**

**JA0008**

may a breakdown of address updating practices be inferred from the vintage of change-of-address matches generated by NCOA$^{Link}$ for SCE mailing lists. This phenomenon can have multiple innocuous causes, none of which were ruled out by the November 2009 Decision. In particular, not all match codes generated by the NCOA$^{Link}$ database required SCE to update the address or suppress it from future mailings sent at discounted First Class rates.

Second, none of the handful of Move Update process errors alleged by the November 2009 decision rises to the level of justifying a revenue deficiency. These alleged errors cannot account for more than a tiny fraction of the NCOA$^{Link}$ address matches or UAA mail volume during this period. Manually overriding the address changes supplied by NCOA$^{Link}$ was as likely to have reduced UAA rates as increased them, and was undertaken by SCE in a belief (confirmed in writing by a Postal Service mail preparation expert in Memphis) that the manual overrides were permitted by the Move Update rules. SCE's failure to update addresses with NCOA$^{Link}$ match codes 91 and 92, and to implement changes involving fractional street numbers, also involved only a small fraction of SCE addresses. Moreover, analysis of the 60-piece sample draft by the Postal Inspection Service confirms that the challenged practices were not responsible for the UAA pieces returned to SCE.

Third, nothing in the record indicates that SCE acted in bad faith. In fact, the evidence produced by the Postal Service indicates that SCE diligently complied with Move Update standards. SCE updated its addresses with NCOA$^{Link}$ every thirty days—six times the frequency required by the Move Update rules. When the postal inspectors advised SCE that certain of its address management practices violated the Move Update rules, SCE changed the practices

-4-

**USPS-SCE 0009**

promptly—even when, as with the addresses provided directly by SCE's customers, SCE knew that the customer-supplied addresses were more current and reliable than the addresses provided by the Postal Service through NCOA[Link]. SCE's good faith is a defense to any Move Update revenue deficiency. PRC Docket No. R2010-1, *Notice of Price Adjustment And Classification Changes Relating To Move Update Assessments*, Order No. 348 (Nov. 25, 2009) at 13 (finding that a Move Update-based revenue deficiency may be imposed only on mailers "who demonstrate a lack of good faith effort to comply with Move Update requirements").

Finally, even if (contrary to fact) some revenue deficiency were warranted, the amount assessed is grossly unreasonable. The per-piece rate additive assessed by the Postal Service may not exceed the damages suffered by the Postal Service; and the damages resulting from the mailing practices at issue are minimal if not nonexistent. Moreover, the record provides no basis for assessing any revenue deficiencies on mailings before March 13, 2008, the date of the first sample of returned SCE mailpieces drawn by the Postal Service. The record also provides no basis for assessing any revenue deficiency on mailings entered after May 2008, when SCE learned that the Postal Inspection Service regarded certain of SCE's address management practices were noncompliant, and SCE moved quickly to change them. In addition, the record provides no basis for a look-back period longer than 12 months before May 26, 2008, when the Postal Inspection Service issued its Investigative Memorandum. The theories advanced in the November 2009 decision for enforcing a longer look-back period are unsupported by, and inconsistent with, Management Instruction DM-140-2008-1.

-5-

## ARGUMENT

### I.   THE NOVEMBER 2009 DECISION FAILS TO JUSTIFY ANY REVENUE DEFICIENCY AT ALL.

The finding of liability in this case was based on a mistaken observation in search of a legal theory. The postal inspectors, and the Santa Ana district, mistakenly thought that an abnormally large volume of mail was being returned to SCE because the forwarding order had expired, the return-to-sender endorsement was outdated, or the piece was undeliverable as addressed. Beginning with this mistaken premise, the postal inspectors and the Santa Ana district embarked on a search for some evidence of noncompliance with the Move Update rules that might explain the (nonexistent) excessive volume of returned pieces. Both premises for the finding of liability are unfounded. We discuss each in turn.

### A.   The Empirical Data On The Volume Of UAA Mail Returned To SCE, And The Existence And Vintage Of NCOA[Link] Match Codes Was Not Evidence Of Move Update Violations.

The search for a Move Update violation began with the postal inspectors' observations that (1) "several thousand pieces a day of 'UAA' mail" were being returned to SCE with "Forwarding Order Expired," "Return to Sender" and "Nixie" mail markings in March, April, and May 2008; (2) an asserted large share of these pieces had old forwarding orders; and (3) the volume of returned mail was rising. November 2009 Decision at 2-3. In fact, the volume of UAA mail, and the other performance data noted in the Santa Ana decision, were not abnormally high. The postal inspectors, and the Santa Ana district, simply misinterpreted the data.

-6-

**USPS-SCE 0011**

**1. The percentage of SCE mail volume returned to SCE as undeliverable fell within a normal range for properly updated address lists.**

According to the November 2009 Decision, the Postal Inspection Service found an average of "over 80 pieces per day bearing forwarded order expired or outdated return to sender endorsements" and "over 2,000 pieces per day" of UAA mail, or a monthly average of approximately 50,000 pieces of return-to-sender ("RTS") mail. *Id.* at 1-3. These figures, however, were a normal percentage of SCE's total outbound mail volume. The sheer magnitude of the total mail volumes of large public utilities such as SCE and PG&E means that even a small return rate will produce a large absolute volume of returned mail.

SCE is one of the nation's largest electric utilities. It serves a population of more than 13 million people via 4.8 million customer accounts in a 50,000-square-mile service area within central, coastal and southern California.[4] SCE entered approximately 4.5 million billing statements and related communications to its customers at discounted First-Class rates each month during the relevant period.[5] Compared with this total volume, the "80 pieces per day"—or approximately 2,400 pieces per month—returned to SCE as undeliverable equated to barely *1/20th of one percent* of the volume that SCE mailed each month. Even the higher figure of "2,000 pieces per day"—or 50,000 pieces per month—amounted to little more than one percent of SCE's outbound mail volume. Similarly, as the November 2009 Decision concedes, only 60,385 addresses, or only about 3/4 of one percent of the average of 8,083,641 addresses processed by SCE through NCOA$^{Link}$ each month between December 2007 and May 2008, matched a Change of Address ("COA") record. November 2009 Decision at 4.

[4] Southern California Edison 2008 Annual Report (inside front cover).

[5] *See* November 2009 Decision at 1 & 5 (stating mail volume over 12-month period).

These return rates are also within the range of return rates experienced by other large electric utilities. *See* USPIS 000310 (reports of bills returned to utility companies as undeliverable in 2006) and USPIS 000316 (same, by percentage of bills mailed).

Error rates of this magnitude are also consistent with the embedded error rates of the Postal Service's own address updating databases and protocols. It is well known—and undisputed by the Postal Service—that NCOA[Link], like other USPS change-of-address databases, has an embedded error rate. It is also well known that this error rate is approximately one percent—very close to the error rate in SCE's addresses implied by the mailpiece return rates cited above. The errors in the Postal Service's change-of-address databases result, *inter alia*, from errors in the change-of-address information supplied by households and businesses to the Postal Service; errors in the transcription or entry of the information into the Postal Service's databases; misapplication of accurate change-of-address information for individuals to entire households (and *vice versa*); failure to record the return of individuals or families to a previous residence address; the failure to match abbreviations with complete names (and *vice versa*); the omission of middle initials or suffixes such as "Jr." or "Sr."; and the confusion of unrelated individuals with common surnames such as "Smith" or "Gonzales."[6] The resulting error rate in

---

[6] On May 4, 2009, for example, the Postal Service notified all of its NCOA[Link] licensees that the Postal Service was adding to the NCOALink database approximately "two million additional address change records" that had previously been "excluded from the NCOALink product" because the change of address "was deemed ambiguous" when originally received by the Postal Service. Email sent by NCOALINK@usps.gov on May 4, 2009. Continued use of the old addresses by mailers during the period when the two million change-of-address records were deliberately withheld from the NCOA[Link] database undoubtedly caused a substantial volume of mail to be sent to a stale address and ultimately returned to the sender as UAA.

-8-

**USPS-SCE 0013**

the NCOA$^{Link}$ database, widely recognized to be near one percent, could account for nearly all of the UAA mail experienced by SCE.

The November 2009 Decision made no attempt whatsoever to net out the errors generated by NCOA$^{Link}$ from the total volume of returned pieces. Indeed, the Decision failed even to acknowledge that the problem exists. Likewise, the Investigative Memorandum indicated that Postal Inspectors did not consider this problem in reaching their conclusion. And the documents produced by the PCSC on September 27, 2011, in response to SCE's January 12, 2010, information requests confirm the Postal Service's utter failure to rule out errors in the Postal Service's own databases as a cause of SCE's UAA mail volume. Item 11 asked the Postal Service to "state the error rates of the NCOALink service, including the typical rates of false matches, missed COA's, and/or any other error that could cause an address on a mailing list to fail to match with change-of-address information in the NCOA database." The response of the PCSC to this question was only "See Investigative Memorandum and Exhibits enclosed." But the referenced documents contain nothing responsive to the question.

In a further attempt to show that SCE's actual UAA rate was higher than normal, the November 2009 Decision asserted that SCE's actual change-of-address match rate exceeded one percent between December 2007 and May 2008 as a percentage of the 4,360,000 pieces actually mailed by SCE per month in this period. According to the Decision, the 60,385 address matches identified by the Postal Inspection Service for this period amounted to 1.38 percent of the smaller denominator. Even this higher percentage, however, is still close to only one percent. Moreover, the 1.38 figure is inflated by an obvious error of statistical inference.

-9-

The 60,385 matches were produced by running NCOA[Link] against SCE's *entire* list of eight million active and inactive customer addresses, not the 4.5 million subset of addresses to which SCE actually sent mail each month.  Comparing the 60,385 matches with the 4.5 million-name active address list, rather than the eight million-name list that actually generated the 60,385 matches, is an obvious mismatch, since the Move Update rules do not require updating of addresses that are not used in a mailing.  In fact, it is likely that a disproportionate share of the 60,385 matches were for addresses that did not receive service from SCE or owed SCE nothing for service in past periods (and therefore received no mail from SCE at discounted First-Class rates during the period studied).  It is therefore likely that these former and inactive customers represent a higher proportion of change-of-address matches than would the active customers to whom SCE mails. At any rate, there is no reason to assume that the match rate on the 4.5 million addresses to which SCE actually mailed would be any higher than the match rate on the full 8 million address list.

The decision gains nothing by claiming that that SCE "did not purge closed account address records from its mailing list."  November 2009 Decision at 4.  This claim is both irrelevant and unfounded.    It is irrelevant because, as noted above, the Move Update requirements apply only if an address is actually used in a mailing.  It is also untrue.  As SCE explained to the Postal Service in Document USPIS 000638, SCE runs "NCOALink at the end of each month" to update the address records of any inactive accounts still receiving billing notices. *Accord*, Investigative Memorandum at P 9 (quoting an email from counsel for SCE stating that "SCE utilizes its Move Update-compliant mailing list for addressing mail to inactive accounts").

-10-

**USPS-SCE 0015**

If a customer's change of address was not reflected in SCE's address records, the obvious reason is that no change of address appeared in the Postal Service's NCOA$^{Lmk}$ database.

The claim to the contrary in the November 2009 Decision is completely unsupported. SCE's document requests of January 12, 2010 specifically asked the Postal Service to produce the documents relied on to support its claim that SCE did not purge closed account records from the address lists used in mailings. Document Request, Item 5. The response of the PCSC to this item on September 27, 2011, was only: "See Investigative Memorandum and Exhibit enclosed." The referenced documents provide no further support for the claim. The Investigative Memorandum is little more than a first draft of the November 2009 Decision, and contains no further supporting detail on this point.

SCE also asked the Postal Service to provide the basis for its assumption that "all of the closed accounts in SCE's records had change of address[es] submitted." Document Request, Item 6. The response of the PCSC to this item on September 27, 2011, was only: "See Investigative Memorandum and Exhibit enclosed." The referenced documents provide no further support on this point.

> 2. **The 26 percent increase in UAA volume between 2006 and 2008 was not evidence of Move Update violations.**

The November 2009 Decision also pointed to a 26 percent increase in the volume of mail returned to SCE as undeliverable between 2006 and 2008 as further evidence of an address updating problem. November 2009 Decision at 3 (table). An obvious explanation for the increase in return-to-sender volume between 2006 and 2008, however, was the collapse of the

-11-

real estate market in SCE's service territory during the same period. Southern and central California have been hard hit by the bursting of the real estate bubble and the ensuing rise in unemployment, foreclosures, bankruptcies, and mortgage defaults. SCE 2008 Annual Report at 7. In fact, Riverside and San Bernardino Counties, two counties that are a major part of SCE's service territory and are often referred to as California's "Inland Empire," have been called "the poster child for the foreclosure crisis." http://kcet.org/socal/2008/09/foreclosure-alley.html. SCE suffered a 10 percent increase in customer disconnects in 2008 alone. SCE 2008 Annual Report at 7.

Consumers who move because they have lost their jobs or their homes (or both) often owe money to multiple creditors. These consumers tend not to provide their new mailing addresses to creditors—or the Postal Service. The high volume of foreclosures in central and southern California meant that SCE's customers were moving out of their homes at unprecedented rates and in short time frames, often leaving no forwarding address. The surge in mail returned to SCE from 2006 to 2008 corresponds with the rise in foreclosures during the same period.

### 3. The vintage of change-of-address matches generated by NCOA[Link] did not indicate a breakdown of address updating practices.

The November 2009 Decision also offered as evidence of abnormal address updating practice the observations that "of the monthly average of 60,385 [COA matches], there were 22,728 matches greater than 185 days old," and roughly 1700 matches were 18 months old. November 2009 Decision at 4. Like the absolute volume of return-to-sender mail, these figures prove nothing. They are a tiny fraction of total SCE outbound mail. More fundamentally, the

-12-

number and vintage of change-of-address matches reported by NCOALink cannot, without more, establish that the mailer failed to comply with Move Update requirements.

This is true for several reasons. First, old COA matches would result if the Postal Service failed to incorporate more recent change-of-address information in the NCOA$^{Link}$ database. This could occur, for example, if a customer moved from address A to address B, and then back to address A, but the NCOA$^{Link}$ address records captured only the first move and not the second, or the records erroneously recorded an individual move as a family move, or *vice versa*.

Second, not all NCOA$^{Link}$ match codes, even if correct, required corrective action by the mailer. During the period at issue, the Postal Service's Move Update regulations required mailers to update only those addresses returning a match code of A, 91, or 92—*i.e.*, the codes for NCOA$^{Link}$ matches that provided mailers with update addresses. For the return codes that did not supply a new address, the Postal Service provided no guidance as to how mailers should handle these addresses. Consequently, SCE did not violate Move Update standards when it failed to update addresses associated with NCOA$^{Link}$ return codes other than A, 91, or 92.

Two examples of NCOA$^{Link}$ match codes that did not require SCE to implement changes were NCOA$^{Link}$ codes 02 (Moved Left No Address) and 03 (Box Closed No Order). Neither of these types of NCOA matches return an updated address. In an email to Inspector Shen, SCE clearly stated that it was not updating addresses returning such codes. *See* USPIS 000639-640 (reproduced at Exhibit E). As Postal Service policy at the time did not clearly require these

-13-

**USPS-SCE 0018**

addresses to be updated or suppressed from discounted mailings,[7] the November 2009 decision rightly did not rely on this practice in assessing the deficiency. The decision should have, however, recognized that such addresses could result in RTS mail associated with forwarding orders more than 180 days old, as SCE pointed out to Inspector Shen. See USPIS 000639-640.

UAA and RTS mail can also be generated by NCOA[Link] code 00. The current Guide to Move Update specifically states that such addresses are "Move Update compliant." Guide to Move Update at 52. Yet these addresses are obviously associated with RTS and UAA mail. The error in this case most likely lies within the systems and databases of the Postal Service, not SCE. Nevertheless, the November 2009 Decision puts the financial responsibility for this error on SCE. Again, the November 2009 Decision failed to recognize that addresses returning an NCOA[Link] match can nevertheless be fully compliant with Move Update standards even if that address is ultimately associated with RTS or UAA mail.

The November 2009 Decision ignored these distinctions. In attaching significance to the volume of mail returned to SCE with "forwarded order expired," "outdated return to sender" or

---

[7] The status of MLNA and BCNO addresses is still in dispute even today. While the current Guide to Move Update states that these addresses should be suppressed from discounted mailings, Publication 363, which was in effect at the time of this investigation, contained no such requirement. Further, the Postal Service has since recognized that requiring mailers to suppress these addresses from discount mailings is a change in policy; the Postal Service has twice proposed then withdrawn rules that would require mailers to suppress these addresses. *Cf.* Proposed Rule, Address Correction Notices for Letters and Flats Qualifying for Full-Service Intelligent Mail and Changes to Move Update Standards, 75 Fed. Reg. 57410, 57411 (Sept. 21, 2010) (claiming that the notice "clarifies" that "mailers must refrain from mailing to [MLNA and BCNO] addresses once the effective date of the COA is older than 95 days") *with* Proposed Rule, revised, Changes to Move Update Standards, 76 Fed. Reg. 40844, 40845 (July 12, 2011) ("to comply with the *new* standards, mailers must not include pieces in presorted mailings to [MLNA and BCNO] addresses once the effective date of the COA is older than 95 days" (emphasis added)).

-14-

**USPS-SCE 0019**

UAA markings, or the volume of relatively old matches in the NCOA$^{Link}$ database, the decision simply assumed that these volumes resulted from a failure to implement changes of address in code categories A, 91 and 92—and that the failure to implement the addresses resulted from SCE's failure to update its mailing lists with correct address change information supplied by the Postal Service through NCOA$^{Link}$, rather than the Postal Service's failure to incorporate address change information fully and accurately in the NCOA$^{Link}$ database.

Because of the importance of these distinctions, the document requests submitted by SCE on January 10, 2010, included several questions concerning these points. *See* SCE Data Requests 1, 2, 7 and 8. The requests, however, failed to elicit any meaningful information from the Postal Service. The response to each request provided by the PCSC on September 27, 2011 was the same: "See Investigative Memorandum and Exhibits enclosed." None of the referenced materials, however, discloses: (1) the number of UAA pieces that were undeliverable because the change-of-address notice had been submitted by a customer more than 18 months before the date of mailing; (2) correlates this projected growth in UAA mail with the actual growth in UAA mail observed; (3) proves that the NCOA$^{Link}$ involved a match code that obligated SCE to update the address, or (4) links any of these 1700 records to actual examples of UAA mail.

### B.   None Of The Specific Address Updating Errors Alleged By The Postal Service Disqualified SCE's Mailings For Discounted First-Class Rates.

Even if (contrary to fact) the volume of mail returned to SCE, or the volume of relatively old change-of-address matches in the NCOA$^{Link}$ database, were abnormally high, these values could not by themselves prove noncompliance with Move Update. Except for the 99 Percent Test method—on which SCE has not relied—compliance with Move Update standards is

-15-

determined by adherence to specified processes, not the attainment of minimum address list performance levels. Although high UAA rates certainly may warrant further investigation, UAA rates are not dispositive. Without a credible showing that a mailer has failed to follow the requisite Move Update processes, the existence of even an abnormally large volume of UAA mail or old NCOA$^{Link}$ matches is insufficient without more to establish a Move Update violation.

The authors of the November 2009 Decision, however, displayed a startling indifference to this issue. Paragraph 15 of the Investigative Memorandum, for example, asserted that the postal inspector's failure to review NCOA$^{Link}$ reports to determine whether SCE was actually updating its addresses was harmless because such a review would not have been useful. Why not? Because "SCE did not monitor and update their mailing lists in strict compliance to Move Update standards." *Id.* In other words, the authors of the November 2009 Decision declined to review NCOA$^{Link}$ reports to determine whether SCE was monitoring and updating its mailing lists according to Move Update standards because the authors of the Decision believed that SCE was not monitoring an updating its mailing lists according to Move Update standards. This is circular reasoning. In fact, as explained throughout this appeal, the evidence SCE provided to the Postal Service indicates that SCE was monitoring and updating its mailing lists, and the Postal Service has not put forth any evidence to the contrary. All of the evidence of record indicates that SCE ran all of its customer addresses against NCOA$^{Link}$ every 30 days and updated these addresses accordingly.[8]

---

[8] Paragraph 15 of the Investigative Memorandum extended this circularity of reason to the possibility that the NCOA$^{Link}$ match percentage might be small. A "small match percentage," the memorandum asserted, "may actually be a strong indicator of habitual *non-compliance* with required Move Update standards." *Id.* (emphasis added). In the hermetic world of this case, either a high match percentage or a low match percentage was proof of a Move Update violation.

**USPS-SCE 0021**

**JA0021**

Likewise, paragraph 16 of the Investigative Memorandum claimed that "Investigative consideration was also given to attempting to determine the actual volume of RTS UAA and returned FOE mail received by SCE arising as a result of their noncompliance with move update standards." Investigative Memorandum at P 16. The rest of this paragraph, however, only recited statistics about the absolute volume of RTS UAA mail—not mail "received by SCE as a result of their noncompliance." The authors of the Investigative Memorandum obviously made no effort to link the returned mail with Move Update violations, but simply assumed that *all* of the RTS UAA and returned FOE mail observed by the postal inspectors resulted from noncompliance with Move Update standards.

In light of these statements, the notion that "[d]uring the investigation, an analysis was completed of Edison's NCOALink Processing Summary Reports for a 6 month period between December 2007 and May 2008" (November 2009 Decision at 4) cannot be taken seriously. Any doubt on this score was dispelled by the non-responsive response of the PCSC to SCE's request for documentation of the supposed analysis (SCE document request 7):

> The decision states that "[d]uring the investigation, an analysis was completed of Edison's NCOA[Link] Processing Summary Reports for a 6 month period between December 2007 and May 2008." Please identify who conducted this analysis, and produce the records (or identify them if they were produced by SCE).

The sole response of the Postal Service to this request was "See Investigative Memorandum and Exhibits enclosed." PCSC letter dated Sept. 27, 2011, at 2 (item 7). Since neither the "Investigative Memorandum" nor the "Exhibits enclosed" answered the questions, the content of the analysis (if it ever existed at all), the identity of who conducted it, and the records that were

-17-

**USPS-SCE 0022**

the basis for it, remain undisclosed.  As SCE previously noted, a revenue deficiency based on such a secret foundation violates even the most rudimentary notions of due process.[9]

The November 2009 Decision did find that SCE had violated the Move Update process requirements in a handful of specific ways:  through manual overrides of code A matches by SCE customer service representatives, failure to update addresses with match codes 91 and 92, and failure to implement address changes involving fractional address numbers.  None of these alleged violations support the revenue deficiency assessment.

First, even if the November 2009 Decision were correct in characterizing them as Move Update violations, they cannot account for more than a tiny fraction of SCE's total address matches and UAA mail.  The highest monthly incidence of manual overrides during the assessment period was 511, in May 2008.  *See* USPIS 000290 (reproduced at Exhibit F).  SCE received, at the high end, 2,000 matches with match codes 91 or 92 per month.  And even fewer NCOA[Link] address updates involved fractional address numbers.  These three areas account for only about five percent of the 60,385 addresses matches reported to SCE by NCOA[Link] each

---

[9] "Those who are brought into a contest with the Government in a quasi-judicial proceeding are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command."  *Morgan v. United States*, 304 U.S. 1, 18-19 (1938).  When "governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."  *Greene v. McElroy*, 360 U.S. 474, 496 (1959).  "Due process includes "the right to know what evidence is being used against one and the opportunity to rebut it."  *Robbins v. United States R.R. Retirement Bd.*, 594 F.2d 448, 452 (5th Cir. 1979).  "Notice remains a fundamental element of procedural due process, and trial by ambush is no[t] . . . favored . . . ."  *Jimenez v. Tuna Vessel "Granada"*, 652 F.2d 415, 420 (5th Cir. 1981) (quoted in *Conair Corp. v. NLRB*, 721 F.2d 1355, 1372 n. 60 (D.C. Cir. 1983)).  Hence, the Postal Service is required to disclose the grounds upon which it acts, and "must make plain its course of inquiry, its analysis, and its reasoning."  *Olenhouse v. Commodity Credit Corp.*, 42 F. 3d 1560, 1575 (4th Cir. 1994).

-18-

**USPS-SCE 0023**

month. If SCE mailed to all these addresses, and all of the resulting letters were returned to SCE, approximately 3,000 pieces of returned mail per month would result. A monthly volume of this magnitude would amount to only about *five percent* of the roughly 57,000 return-to-sender pieces received by SCE each month. *Compare* November 2009 Decision at 3. Again, other factors must be at work.

Second, and regardless of the resulting volume, none of the process errors alleged in the November 2009 decision rise to the level of a Move Update violation sufficient to support a revenue deficiency. With the limited exceptions of customer-requested overrides of code A matches, code 91 and 92 matches, and address changes involving fractional numbers, SCE updated the addresses it was required to update. The exceptions did not involve bad faith, and in any event those practices have been terminated. The November 2009 Decision's conclusion to the contrary is arbitrary, unsupported, does not comport with the Move Update standards established by the Postal Service.

1.    **SCE's Manual Overrides of NCOA$^{Link}$ Updates Were Harmless To The Postal Service And Implemented In Good Faith.**

The first Move Update process violation alleged in the November 2009 Decision involves SCE's policy of overriding the change-of-address information received from NCOA$^{Link}$ in certain circumstances when SCE's billing and customer offices determined that a different address was more reliable.

As SCE has indicated, SCE Customer Service Representatives ("CSRs") were instructed to enter the address specified by an SCE customer as the mailing address, rather than the address

-19-

**USPS-SCE 0024**

indicated by the NCOA$^{Link}$ database, when the customer specifically so requested. The CSR would flag the account file to prevent the address from being updated with the address supplied by NCOA$^{Link}$. These circumstances, however, were rare, consistent with Postal Service guidance on the issue, and not responsible for any increase in UAA mail.

A handful of situations generated virtually all such override requests. One situation sometimes arose when members of a family split into two or more households. Sometimes, for example, a named account holder would vacate an address and submit a forwarding order to the Postal Service, but other members of the family remained at the original address. In this situation, the named account holder sometimes requested that SCE continue mailing bills to the old address, so that the remaining family members could pay the bills. If the account holder had filed a family move change of address with the Postal Service, however, a conflict would arise between the COA on file with the Postal Service and the account holder's request to SCE. To ensure that the bill would be delivered per the customer's request, SCE would give priority to the direct request from the named account holder over the address change information from NCOA$^{Link}$.

These manual overrides cannot support the revenue deficiency. First, they involved only a fraction of SCE's overall monthly mail volume. SCE made only about 400 to 500 manual overrides per month, and the highest override count in any month was 511, in May 2008. USPIS 000290 (reproduced at Exhibit F). The volume of overrides thus represented less than one percent of the total change of address matches returned by NCOA$^{Link}$ each month (an average of 60,385 per month), and barely 1/100 of one percent of the approximately 4.5 million pieces

-20-

**USPS-SCE 0025**