## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SOUTHERN CALIFORNIA EDISON,**<br><br>**Plaintiff,**<br><br>v.<br><br>**UNITED STATES POSTAL SERVICE,**<br><br>**Defendant.** | **Civil Action No. 14-1041 (JEB)** |

### MEMORANDUM OPINION

The United States Postal Service has established discounted rates for bulk mailers who take steps to ensure their address lists are accurate.  USPS here claims that one of its customers, Plaintiff Southern California Edison, wrongfully availed itself of these rates while sending millions of mailpieces to customers at incorrect addresses.  As a consequence, USPS slapped Plaintiff with a $7 million revenue-deficiency assessment, which precipitated this suit.  At the core of the dispute is the question of what penalty should come from the fact that Plaintiff's procedures for verifying customer addresses — a requirement for discounted postal rates — fell short of USPS's standards.  While neither party contests that SCE was in <u>partial</u> noncompliance, the parties duel over the extent, significance, and consequences that follow from such failure.

In prior administrative proceedings, SCE opposed USPS's $7 million assessment, which the agency upheld on appeal.  As in many lawsuits challenging administrative adjudications, the parties here preliminarily dispute whether jurisdiction is proper in this Court, whether Plaintiff has failed to exhaust its administrative remedies, and what standard of review this Court should adopt.  In response to SCE's lawsuit, moreover, USPS filed a counterclaim of its own, seeking

the $7 million as a collection of debts and restitution for unjust enrichment under the Federal

Debt Collection Procedure Act, as well as a declaratory judgment under the Declaratory

Judgment Act.  In now considering the parties' Cross-Motions for Summary Judgment, the Court

finds that jurisdiction is proper, and that, even under the deferential "reasoned decisionmaking"

standard of judicial review, USPS cannot support a revenue-deficiency assessment of the size

entered here.  Yet because Plaintiff acknowledges its noncompliance — and the costs that has

imposed on Defendant — the Court believes some reduced assessment is appropriate.  It

accordingly remands to the Postal Service's appeals body to determine a more reasonable sum.

**I.**     **Background**

Because the dispute between the parties flows from SCE's noncompliance with USPS's

complex regulatory scheme governing discounted postal rates for bulk mailing, the Court will,

after introducing the parties to the suit, explain that scheme in some detail before turning to the

events that led us here.

**A.  Parties**

Plaintiff Southern California Edison is a public utility incorporated in California that

provides electric power to more than 14 million customers in the southern and central parts of the

state.  See Compl., ¶ 6.  Defendant is the United States Postal Service, an "independent

establishment of the executive branch of the Government of the United States."  Id., ¶ 7 (quoting

39 U.S.C. § 201).  The Postal Service is headquartered in Washington, D.C., and may sue or be

sued in its own name.  See 39 U.S.C. § 401.

**B.  USPS Move-Update Discounts**

With limited exceptions, the Postal Service possesses a legal monopoly over the carriage

and delivery of letter mail, including First-Class Mail — services which are termed "market

dominant." See 18 U.S.C. §§ 1693-1696; 39 U.S.C. §§ 601-606.  To this end, Congress has

delegated to the Postal Regulatory Commission (PRC) — a unit of USPS — the task of

establishing "a modern system for regulating rates and classes for market-dominant products."

39 U.S.C. § 3622(a).  Congress has limited the rates and fees PRC may set for market-dominant

mail services to those that are "reasonable and equitable." Id. § 404(b).  PRC establishes

regulatory rates in its Domestic Mail Manual (DMM), which also sets forth specific rules and

requirements for USPS's various products, services, and postage rates.  See 39 C.F.R. §§ 111.1,

3020.10, 3020.13.  Specific rates and discounts are stipulated in the Mail Classification

Schedule, which is also maintained by the PRC.  See id. § 3020 et seq.; 39 U.S.C. § 3622.

Among the discounted rates Defendant offers is a "workshare" discount for mailers who

ease USPS's receipt and delivery of bulk mail by presorting, prebarcoding, handling, and

transporting mail before it reaches USPS.  See 39 U.S.C. § 3622(e).  To qualify for such

discounts, mailers must comply with a number of requirements, one of which is the "Move

Update" standard, which ensures "address quality standards."  DMM § 233.3.3 (May 14, 2007)

(Supp. App. 00260).  Move Update requires "periodic matching of a mailer's address records

with customer-filed change-of-address orders received and maintained by USPS." Id.

§ 233.3.5.1 (Supp. App. 00260).  Compliance with Move Update "saves USPS money by

preventing many mailpieces from being undeliverable-as-addressed (UAA), for such misdirected

mailpieces must either be returned to the sender or forwarded," efforts that impose additional

costs on Defendant.  See Def. MTD/MSJ at 2.  At the time of the relevant events, mailers like

SCE were required to perform such corrections at least every 185 days.  See DMM § 233.3.5.1

(Supp. App. 00260).

Mailers may meet the Move Update standard through several methods, one of which is by comparing their customer addresses with USPS's National Change of Address Linkage System (NCOA[Link]) database.  See id. § 233.3.5.2 (Supp. App. 00260).  NCOA[Link] incorporates the Postal Service's Change of Address (COA) orders that have been received from individuals, families, and businesses.  See Def. MTD/MSJ at 5.  When a mailer checks its addresses against the NCOA[Link] database, it receives specific codes indicating when there is a conflict between the address in its database and in the NCOA[Link] database.  See id.  Of relevance to this dispute, a Code A address error means that a newer COA address is available and should be used.  See NCOA[Link] End User Licensee Performance Requirements, Exhibit B (NCOA[Link] Return Code Descriptions) at 10 (DS30).  A Code 91 error indicates that the address in the NCOA[Link] database has "a secondary number and the input address" does not, and a Code 92 error indicates that "the input address ha[s] a secondary number" that the NCOA[Link] address does not.  See id. at 11 (DS31).  For example, one address may contain an apartment number that is missing from the other.  Where a Code A, Code 91, or Code 92 address error is generated, the Move Update standard requires that a mailer use the updated NCOA[Link] COA address in place of the one in its database.  See Def. MTD/MSJ at 5.

C.  SCE's Noncompliance

Elvis Presley once sang, "I write, 'I'm sorry but my letter keeps coming back.' / So then I dropped it in the mailbox / And sent it special D. / Bright and early next morning, it came right back to me."  "Return to Sender," RCA Records (1962).  In contrast to Elvis, SCE was apparently not quite so careful when addressing its mail, as USPS found that thousands of mailpieces per day were being returned to sender.  Both sides agree that Plaintiff paid reduced workshare rates for its mailpieces and sought to comply with Move Update's requirements by

means of the NCOA[Link] database, which it licensed from Defendant.  See United States Postal Service NCOA[Link] End User License Agreement with Southern California Edison (DS3).  They further agree that, during the relevant period of this dispute — between May 14, 2007, and November 26, 2008 — SCE submitted 82,452,608 mailpieces at automated (and reduced) workshare rates.  See Pl. MSJ at 3; Def. MTD/MSJ at 6.  The parties also concur that some of SCE's address-updating practices during the relevant period were not in compliance with the Move Update standard, although they disagree about the number, reasons for, and significance of the noncompliant mailpieces.

The dispute began when the U.S. Postal Inspection Service conducted a nationwide review of undeliverable-as-addressed mail and observed that between March and May 2008, a significant number of mailpieces sent by SCE were undeliverable as addressed.  See Def. MTD/MSJ at 6-7.  Although USPS never identified the precise number of mailpieces in noncompliance, in the revenue-deficiency letter it sent to SCE, it cited "large volumes" of mail — "approximately 80 pieces per day of forwarding order expired mail" and "over 2,000 pieces per day of Undeliverable As Addressed (UAA) mail."  Letter from Scott Jones, Manager, Business Mail, Santa Ana District, to Leon Bass, Senior Attorney, Southern California Edison at 1-2 (Nov. 23, 2009) (JA0246-47) ["Revenue Deficiency Letter"].  Assuming this rate was constant between May 14, 2007, and November 26, 2008 — 562 days in total — the Court calculates that this would constitute at most roughly 1,179,000 mailpieces out of SCE's total of 82,452,608 mailpieces sent at workshare rates during this period, or about 1.4%. (Assuming USPS's daily estimates were for actual mail-delivery days, the true figure would be lower, as this calculation does not exclude non-delivery days such as Sundays and federal holidays.)

Although the <u>number</u> of UAA mailpieces was what drew the attention of the Postal Inspection Service, USPS based its revenue-deficiency assessment against SCE on its Move Update <u>practices</u>, which the Service concluded were noncompliant with the Move Update standard.  To the best of the Court's understanding — having combed through thousands of pages of the parties' briefs and the administrative record — USPS has nowhere identified a threshold percentage of UAA mailpieces that establishes a *per se* violation of the Move Update requirements.

Instead, in its revenue-deficiency letter dated November 23, 2009, the Postal Service identified two failures that warranted the revenue-deficiency assessment: first, Plaintiff's practices justified the assessment "<u>because</u> SCE did not update its mailing list using code 91 or 92 addresses provided from the NCOA<sup>Link</sup> product." <u>Id.</u> at 5 (JA0250) (emphasis added).  In other words, although a "large volume" of UAA mail motivated USPS's investigation into SCE's Move Update practices, <u>see id.</u> at 1 (JA0246), the basis for the revenue-deficiency determination rested <u>solely</u> on Plaintiff's failure to update its mailing list when the NCOA<sup>Link</sup> database yielded Code 91 or 92 address errors.  Second, USPS found that "address overrides conducted by employees of SCE have resulted in a cumulative and ongoing increase in [return-to-sender undeliverable-as-addressed] mail as COA orders age." <u>Id.</u> at 5 (JA0250).  In other words, these addresses yielded Code A address errors that were not being corrected by SCE.

USPS calculated the costs of these errors at $0.62 for each piece of mail that was returned to sender and $0.29 for each piece of mail that was forwarded, but it did not limit its revenue-deficiency assessment to actual costs incurred by USPS.  Although only a fraction of SCE's mailpieces were returned as UAA (as the Court calculated *supra*, at most 1.18 million, or 1.4% of SCE's total mailpieces sent at the reduced-workshare rate), USPS calculated that SCE should

nonetheless be liable for the difference "between the discounted workshare rates and the regular non-discounted rates" for all mailpieces sent at the reduced price.  See Def. MTD/MSJ at 9.

Not only did USPS assess the full revenue deficiency for noncompliance, but it also extended the relevant assessment period.  Although deficiency assessments are generally limited to the twelve-month period immediately preceding the date a deficiency is identified, see Management Instruction Assessing and Collecting Deficiencies in Postage or Fees, DM140-2008-1 (JA0002) ["Management Instruction"], "because SCE's noncompliance was ongoing, Inspectors . . . included a period beyond the 12 month revenue deficiency period."  Revenue Deficiency Letter at 5 (JA0250).  Deeming Plaintiff noncompliant, USPS sought the entirety of the difference between SCE's claimed workshare rate and the standard non-workshare First Class rate for the eighteen-month-plus period between May 14, 2007, and November 26, 2008.  This figure came to $7,551,576.28, the difference between the discounted price and the First Class rate for the 82,452,608 workshare-discounted mailpieces sent by SCE during this time.  Defendant requested that SCE remit payment to Carol Bentley, Finance Manager for the "US Postal Serrive [sic]."  Id. at 6 (JA0251).

SCE had the right to appeal the decision to the Service's Pricing & Classification Service Center (PCSC), see DMM § 604.10.1.2(a) (PS 3268-69), and it filed an amended appeal on November 21, 2011.  See Am. Appeal of Southern California Edison from Decision of Santa Ana District (Nov. 21, 2011) (JA0005-06) ["Am. Appeal"].  SCE's challenge failed, and on May 30, 2012, Gregory A. Hall, PCSC Manager, upheld the revenue deficiency.  See Final Agency Decision of the PCSC (May 30, 2012) (JA0001) [ "Final Agency Decision"].  Closing his letter, he noted that "[t]his is a final agency decision and concludes the appeal process."  Id. at 2

SCE subsequently filed suit in this court, alleging that USPS had violated the postal statutes by acting "*ultra vires* because the assessment violates the Postal Reorganization Act['s] . . . requirement that rates on market-dominant categories of mail be just and reasonable." Compl., ¶ 82.  In addition, Plaintiff also alleged that the amount imposed by Defendant "is excessive in violation of the Due Process Clause of the Fifth Amendment."  Id., ¶ 91.  In its Amended Answer, the Service denied that this Court properly has jurisdiction over SCE's claim, arguing that it must first "exhaust its administrative remedies" by presenting its claim to the Postal Regulatory Commission.  See Def. Am. Answer at 1.  Curiously, USPS then filed a Counterclaim — over which it must believe this Court has jurisdiction — seeking to collect the $7 million as an alleged debt or as restitution for unjust enrichment, as well as to obtain declaratory relief under the Federal Debt Collection Procedure Act and the Declaratory Judgment Act.  See Def. Countercl., ¶¶ 35, 49.  The parties subsequently filed Cross-Motions for Summary Judgment and a joint appendix (containing the administrative record), and each party also submitted its own supplemental appendices.  Plaintiff additionally sought to supplement the administrative record with several additional documents, which Defendant opposed.

Because the Court must first ensure it has jurisdiction over the claims before proceeding to the merits, it begins by considering USPS's arguments on this point.  Once satisfied it possesses jurisdiction over the dispute, the Court then addresses the merits questions after briefly considering the appropriate scope of judicial review of the agency's decisionmaking.

## II.     Jurisdiction

Because the Court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001), it begins by addressing Defendant's argument that the Court

lacks jurisdiction over Plaintiff's claims.  SCE alleges that the PCSC's Final Agency Decision was *ultra vires* and unlawful because the rates charged violate the just-and-reasonable-rate standards required by 39 U.S.C. § 404(b), and thus that it can bring suit in federal district court. USPS rejoins that — at least since Congress's passage of the Postal Accountability and Enhancement Act (PAEA) in 2006 — because the PRC establishes the rates over which Plaintiff complains, it has exclusive jurisdiction over SCE's complaint.  See Def. MTD/MSJ at 20-21; see also 39 U.S.C. § 3662(a).  While the Court first addresses Defendant's claim that Section 3662 conveys exclusive jurisdiction over SCE's claim, it does not stop there.  This is because the Postal Service also filed a Counterclaim, and so the Court considers its jurisdiction on this basis as well.

A.   Jurisdiction over Plaintiff's Claim

District courts are conveyed general jurisdiction over suits brought against USPS under both the Postal Codes, see 39 U.S.C. § 409(a) ("Except as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service."), and under the Judiciary and Judicial Procedure Code. See 28 U.S.C. § 1339 ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service.").  Although Defendant acknowledges these general grants of jurisdiction, it argues that 39 U.S.C. § 3662(a) conveys more specific — and exclusive — jurisdiction to the PRC over Plaintiff's complaint.  See Def. MTD/MSJ at 21 ("Such challenges should be heard in the first instance by the PRC, which has jurisdiction over complaints that USPS failed to operate in conformity inter alia with Chapter 36 . . . .").  The relevant section provides:

> Any interested person . . . who believes the Postal Service is not
> operating in conformance with the requirements of the provisions of

> sections 101(d), 401(2), 403(c), 404a, or 601, or this chapter [*i.e.*, 39 U.S.C. § 3621 *et seq.*] (or regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission in such form and manner as the Commission may prescribe.

39 U.S.C. § 3662(a).

The plain language of section 3662(a), *contra* Defendant's portrayal, does not necessarily grant <u>exclusive</u> jurisdiction to the PRC. <u>Compare id.</u> ("Any interested person . . . <u>may</u> lodge a complaint with the Postal Regulatory Commission . . . .") (emphasis added), <u>with</u> Def. MTD/MSJ at 22 ("39 U.S.C. §§ 3662 and 3663 set forth a precisely drawn, <u>exclusive</u> statutory remedy . . . .") (emphasis added).  Although a number of courts have interpreted this jurisdictional grant to be exclusive, none of those courts adjudicated the type of claim brought here — namely, a challenge to a revenue-deficiency assessment that was appealed to the PCSC and yielded a "Final Agency Decision."  <u>See, e.g.</u>, <u>Ahmad v. United States</u>, No. 14-2906, 2015 WL 4528142, at *2 (D. Colo. July 6, 2015) (complaint of lost green card); <u>Nat'l Post Office Collaborative v. Donahoe</u>, No. 13-1406, 2014 WL 4544094, at *4 (D. Conn. Sept. 12, 2014) (challenge to sale of Post Office property); <u>Price v. U.S. Postal Serv.</u>, No. 13-1194, 2014 WL 3704286, at *2 (W.D. Mich. July 24, 2014); (complaint of failure to deliver items to the Philippines); <u>McDermott v. Potter</u>, No. 09-776, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009) (challenge to alleged closure of postal facility); <u>Murphy v. U.S. Postal Serv.</u>, No. 14-2156, 2014 WL 4437731, at *1 (N.D. Cal. Sept. 9, 2014) (denial of service claim); <u>Foster v. Pitney Bowes Inc.</u>, No. 11-7303, 2012 WL 2997810, at *1, *5 (E.D. Pa. July 23, 2012) (patent dispute with USPS).

At least one court, conversely, has held that the PRC was <u>not</u> granted jurisdiction over constitutional claims, including one arising under the Fifth Amendment in that action.  <u>See City</u>

& Cnty. of San Francisco v. U.S. Postal Serv., No. 09-1964, 2009 WL 3756005, at *3 (N.D. Cal.

Nov. 5, 2009) (rejecting defendant's argument that plaintiff's constitutional claims arose under

Section 403(c) and recognizing that "[b]y its terms, Section 3662 applies only to violations of the

statute or the regulations promulgated pursuant to the statute").  And, most relevant to the instant

case, one court in this district has adjudicated to resolution a challenge to the PCSC's upholding

of a revenue-deficiency assessment.  See Reese Bros., Inc. v. U.S. Postal Serv., 905 F. Supp. 2d

223 (D.D.C. 2012).  Yet, at the end of the day, the Court need not resolve this question.

B.  Jurisdiction over Defendant's Counterclaim

This is because USPS has thwarted its own jurisdictional cause by filing a Counterclaim.

In this Counterclaim, the Service treats the revenue-deficiency assessment as a "debt" owed by

SCE, and it seeks payment on the debt, as well as restitution for unjust enrichment, and

declaratory relief.  See Def. Countercl., ¶¶ 35, 49.  It states that the Court has jurisdiction under

the Federal Debt Collection Procedure Act, 28 U.S.C. § 3001 et seq., which provides the

exclusive civil means to adjudicate claims by the United States to "recover a judgment on a

debt."  Id. § 3001; see also Def. Countercl., ¶ 35.  At least one court has indeed found claims for

unpaid postage to be among the FDCPA "debts" that USPS may seek to recover in federal

district court.  See United States v. Raymond & Whitcomb Co., 53 F. Supp. 2d 436, 443

(S.D.N.Y. 1999) ("Unpaid postage supports a claim under the FDCPA, which defines eligible

'debt' as 'an amount that is owing to the United States on account of . . . a fine, assessment,

penalty, restitution, . . . or other source of indebtedness to the United States.'") (quoting 28

U.S.C. §§ 3002(3)(A)-(B)).

Defendant's properly pled Counterclaim definitively resolves the jurisdictional question

here.  Where a counterclaim — even a compulsory one — is properly supported by independent

jurisdiction, "the counterclaim must be allowed to proceed without regard to the fate of the

original claim." Nat'l Research Bureau, Inc. v. Bartholomew, 482 F.2d 386, 388-89 (3d Cir.

1973); see also Isenberg v. Biddle, 125 F.2d 741, 743 (D.C. Cir. 1941) (holding that where court

has "independent basis" to possess jurisdiction over counterclaim, "when the counterclaim seeks

affirmative relief, it is sustainable without regard to what happens to the original complaint"); 6

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1414 (3d ed. 2004).

Although this alone settles the question of jurisdiction here, Defendant also pleads that

this Court has jurisdiction under 39 U.S.C. § 409(a), which, as stated above, grants "original but

not exclusive jurisdiction over all actions brought by or against the Postal Service." This is an

odd position for USPS to take, since it argues elsewhere in its First Amended Answer — which

accompanies its Counterclaim — that this Court "lacks subject matter jurisdiction over postal

rate and regulation disputes . . . ." Def. Am. Answer at 1. Defendant appears to want to have its

cake and eat it too: it argues that when Plaintiff seeks redress it may only appeal to the PRC,

while USPS has the option to file its claim in federal district court. Such a position casts further

doubt on the Service's assertion that the PRC has exclusive jurisdiction over SCE's claim. For

the purposes of this case, however, the point is moot. The Court properly has jurisdiction over

the Counterclaim and so retains jurisdiction over the dispute between the parties, because the

Complaint and Counterclaim both implicate the same underlying disagreement about SCE's

liability to USPS.

## III.   Legal Standard

In the typical case, summary judgment may be granted if "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48

(1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.

Although styled Motions for Summary Judgment, the pleadings in this case more accurately seek the Court's review of an administrative decision, as both parties acknowledge. See Pl. MSJ at 35-36; Def. MSJ/Opp. at 10-11.  Indeed, even with regard to Defendant's Counterclaim, both parties have moved for the Court to adjudicate the dispute on the basis of the agency's record.  Because federal courts play a limited role in reviewing administrative decisions, the typical Rule 56 summary-judgment standard does not apply to parties' dueling motions on administrative claims.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006).  In such cases, "the function of the district court is to determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal citations omitted).  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and is otherwise consistent with the appropriate standard of review.  See Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

In contrast to many cases that come before this Court, the standard of review here is not governed by the Administrative Procedure Act.  This is because — with a few exceptions not relevant here — "the Postal Service's actions are exempt from the APA's general mandate of judicial review of agency actions."  Reese Bros., 905 F. Supp. 2d at 251 (citing 39 U.S.C. § 410(a)); see also Northern Air Cargo v. U.S. Postal Serv., 674 F.3d 852, 858 (D.C. Cir. 2012).

Courts should nevertheless remain cautious before determining the nonreviewability of agency actions, as "nonreviewability is not to be casually inferred.  The case against judicial scrutiny of an agency's exercise of discretion must be a compelling one."  Nat'l Ass'n of Postal Sup'rs v. U.S. Postal Serv., 602 F.2d 420, 430 (D.C. Cir. 1979) (citing Ass'n of Data Processing Servs. Orgs., Inc. v. Camp, 397 U.S. 150, 156-57 (1970)).

Fortunately, this area of law is not entirely unsettled.  As stated *supra*, another court in this district has already considered judicial review of a USPS final agency decision upholding a revenue-deficiency assessment.  There, Judge Ellen Huvelle concluded that "it is not apparent that allowing limited judicial review of a deficiency assessment that has been the subject of an administrative appeal and issued as a final agency decision would undermine" Congress's desire for the Postal Service to be "freed from some of the constraints that apply to a typical administrative agency action in order to allow it to operate more like a business."  Reese Bros., 905 F. Supp. 2d at 253.  To the degree USPS seeks a remedy before this tribunal for alleged debts and unjust enrichment, furthermore, judicial review of agency determinations sounding in a quasi-contract dispute seems eminently appropriate.  As in Reese Bros., "the 'nature of the administrative action'—the issuance of a final agency decision assessing a deficiency in excess of . . . [several] million [dollars]—requires the Court tread cautiously in deciding to foreclose judicial review."  Id.  In Reese Bros., Judge Huvelle evaluated the structure of the Postal Code's statutory scheme, its objectives, its legislative history, the nature of the administrative action involved, and the capacity of the court to resolve the issues presented, and concluded that it was "not convinced that Congress clearly intended to entirely preclude judicial review of a Postal Service final agency decision assessing a deficiency."  Id. at 254.

Satisfied that this Court may review USPS's actions here, the second question, then, is the extent of judicial review warranted. Once more, Judge Huvelle's approach is instructive. In Reese Bros., she determined that the appropriate standard of judicial review was whether the "administrative agency engage[d] in 'reasoned decision-making.'" Id. (quoting Greater Boston Television Corp. v. FCC, 444 F.2d 841 (D.C. Cir. 1970)). The reasoned decisionmaking standard "combines judicial supervision with a salutary principle of judicial restraint." Greater Boston, 444 F.2d at 851. The D.C. Circuit has indicated that such a standard of review

> underlines the court's rigorous insistence on the need for conjunction of articulated standards and reflective findings, in furtherance of evenhanded application of law, rather than impermissible whim, improper influence, or misplaced zeal. Reasoned decision[making] promotes results in the public interest by requiring the agency to focus on the values served by its decision, and hence releasing the clutch of unconscious preference and irrelevant prejudice. It furthers the broad public interest of enabling the public to repose confidence in the process as well as the judgments of its decision-makers.

Id. (footnotes and citations omitted). The Court is persuaded that such standards — verifying evenhanded application of law rather than impermissible whim — should guide its review of USPS's final agency decision here and so applies the same "reasoned decisionmaking" standard of judicial review applied by Judge Huvelle in Reese Bros.

## IV.  Analysis

Having resolved the jurisdictional and standard-of-review issues, the Court may now finally turn to the merits. To determine if USPS acted with reasoned decisionmaking, the Court carefully examines the Postal Service's Revenue Deficiency Letter, the Final Agency Decision that affirmed it, evidence in the administrative record, and the conclusions drawn from the record that justified the $7,551,576.28 revenue-deficiency assessment. Ultimately concluding that neither the Revenue Deficiency Letter nor the Final Agency Decision withstands even that

15

deferential standard of review, the Court last discusses remand and the constitutional issues presented.

A.  Revenue-Deficiency Assessment

On November 23, 2009, USPS issued its seven-page revenue-deficiency decision to SCE. See Revenue Deficiency Letter (JA0246-0252).  In that decision, it stated that Plaintiff's actions "resulted in a revenue deficiency of $7,551,576.28 because SCE did not update its mailing list using code 91 and 92 addresses provided from the NCOALink product . . . [, and] address overrides conducted by employees of SCE have resulted in a cumulative and ongoing increase in RTS UAA mail as COA orders age." Id. at 5 (JA0250) (emphasis added).  Although the letter pointed to other steps taken by SCE that seemed to trouble USPS, these two actions — the non-updating of Code 91 and 92 addresses and the manual overrides — were cited as the sole reasons for the revenue-deficiency decision.  The Court separately considers each.  In addition, as USPS applied the assessment to over eighteen months of workshare-reduced rates — as opposed to the typical twelve months — the Court next addresses that determination.  It concludes by examining USPS's position that it may issue a full revenue deficiency for any form of noncompliance with the Move Update standard.

1.  *Code 91 and 92 Address Errors*

The first reason offered by USPS to justify the revenue-deficiency assessment was the alleged failure of SCE to update its mailing list when it received Code 91 and 92 address errors from the NCOA[Link] database.  To remind the reader, a Code 91 or 92 error occurs when there is a discrepancy in the secondary number of an address between SCE's address and the address in USPS's NCOA[Link] database.  As was explained in the Revenue Deficiency Letter: "[An employee of SCE] reported to Inspectors that they found SCE was not updating return codes 91

and 92 in error." Id. at 3 (JA0248).  Although the parties' Joint Appendix seems to cut off the

exhibit in which this statement was made, see Revenue Deficiency Letter, Exh. 4 (Pricing and

Classification Service Center Correspondence dated September 27, 2011, to Counsel for SCE)

(JA0185), the Court believes this document is replicated as Exhibit I of SCE's Amended Appeal.

See Am. Appeal, Exh. I at 1-2 (JA0129-30).  There, the relevant portion of SCE's

communications with inspectors stated as follows: "We discovered during our research that we

were not updating return codes 91 and 92 in error and have since included those in our monthly

updates." Id. at 2 (JA0130).  This statement was dated July 11, 2008. Id. at 1 (JA129).

According to the Revenue Deficiency Letter, USPS first contacted Plaintiff two months earlier,

on May 8, 2008, as it began its investigation into SCE's conformity with Move Update

standards.  See Revenue Deficiency Letter at 2 (JA0247).

      Assuming Plaintiff did in fact begin updating addresses yielding Code 91 and 92 errors in

the time frame stated — something USPS never contests — then the Service has effectively

punished SCE for accidental nonconformance that was swiftly rectified within two months'

notification of the problem.  To nonetheless issue a revenue deficiency for the entirety of

Plaintiff's discounted-workshare rate for eighteen months is so disproportionate that it can hardly

qualify as reasoned decisionmaking.  As Plaintiff notes, "The report offered no evidence . . . that

. . . alleged violations caused more than a trivial share of the total volume of undeliverable mail"

sent by SCE.  See Pl. MSJ at 12.  In fact, Plaintiff pointed out in its Amended Appeal that its

manual overrides and failure to update Code 91 and 92 address errors accounted for "only about

five percent of the roughly 57,000 return-to-sender pieces received by SCE each month."  Am.

Appeal at 19-20 (JA0024-25).  It seems uncontested by the parties that SCE's failure to update

addresses with Code 91 and 92 errors was the cause of, at most, a trivial number of SCE's returned mailpieces.

> 2. *Manual Overrides*

The second reason USPS provided in its Revenue Deficiency Letter was that "address overrides conducted by employees of SCE have resulted in a cumulative and ongoing increase in RTS UAA mail as COA orders age."  Revenue Deficiency Letter at 5 (JA0250). This justification is problematic for several reasons: it is not supported by evidence in the administrative record; it contravenes logic, since SCE's manual overrides were made in order to correct wrong customer addresses; and, most egregious of all, USPS had previously instructed SCE that such manual overrides were in compliance with the Move Update standard.  The Court addresses each concern in turn.

First, neither the Revenue Deficiency Letter nor the Final Agency Decision provides any evidence attributing SCE's "RTS UAA" mail to its manual-address-override practices.  USPS simply stated that address overrides were a cause of an increase in the volume of RTS UAA mail without providing any evidence this was so.  As Plaintiff noted in its Amended Appeal, moreover, "SCE made only about 400 to 500 manual overrides per month," representing "less than one percent of the total change of address matches returned by NCOA[Link] each month . . . ." Am. Appeal at 20 (JA0025).  If anything, SCE "had empirical confirmation that its manual overrides did not generate UAA mail: utility bills sent to the addresses . . . [that were] manually overridden were paid, which means that the bills were successfully delivered at the requested address." Id. at 22 (JA0027) (emphasis added).  Regardless of how persuasive the latter explanation may be, the PCSC ignored these points entirely in its Final Agency Decision, never once addressing SCE's explanation for the manual overrides.  As a result, USPS never rebutted

SCE's evidence that the manual overrides did not generate <u>any</u> additional RTS UAA mail.  <u>See</u>

Final Agency Decision at 1-2 (JA0001-JA0002).

Second, as Plaintiff asserted in its Amended Appeal, "SCE ha[d] independent business

reasons of its own — reasons that are far stronger than those of the Postal Service — to make

sure that SCE customer bills are sent to the most current and accurate addresses possible" — to

collect payment on its bills.  <u>See</u> Am. Appeal at 21 (JA0026).  SCE only manually overrode

Postal Service change-of-address information "when SCE had good reason to believe that the

override would make the customer <u>more</u> likely to receive the mail" — *i.e.*, "when requested by

the customer."  <u>Id.</u> (emphasis added).  This seems entirely sensible, as it would be an incoherent

business practice for SCE to <u>refuse</u> to update a customer's address at the customer's own request

simply because USPS had an outdated and conflicting address in its NCOA$^{Link}$ database.

Yet such a practice was precisely what USPS required, and despite the incomprehensible

nature of this expectation, SCE recognized that its manual-override practices were in violation of

the Move Update standard.  As Plaintiff pointed out in an internal memorandum, this led to the

absurd consequence that "[c]ustomers that want to override the mailing address must discuss the

details with the USPS directly and we cannot take action until the USPS notifies us through the

monthly update process."  Move Forward Override (Aug. 15, 2008) (JA0219).  Recognizing the

Kafkaesque situation customers could find themselves in, the SCE memorandum also stated,

"[W]e need to develop some responses to use when customers inquire about our inability to

comply with their requests."  <u>Id.</u>  Such inability to accommodate customers' requests could

potentially raise new problems for those people who — despite affirmatively contacting SCE to

update their mailing address — would be unable to obtain billing statements in a timely fashion.

Having to deal with the USPS change-of-address system and wait for the Service to notify SCE

"through the monthly update process" could even risk customers' getting stuck with late fees and potential harm to credit reports if their bills were delayed in delivery through no fault of their own.

Third, this reason for USPS's revenue deficiency is even more dubious given that it had previously told SCE that its manual-override practice <u>was</u> in compliance with the Move Update standard. Although neither the Revenue Deficiency Letter nor the Final Agency Decision mentions it, SCE noted in its Amended Appeal that a USPS representative informed SCE in 2008 that the manual overrides "would not violate Move Update." Am. Appeal at 22 (JA0027). Sure enough, in an email from a representative of USPS's National Customer Service Center, SCE was told that "[t]he USPS has previously stated that a mailer is allowed to use a reasoned and reasonable business practice in the decision whether to accept and apply a change-of-address update to their address list." Am. Appeal, Exh. H (Email from James D. Wilson to Sharon J. Harrison (Aug. 22, 2008)) at 2 (JA0126). That email went on to indicate that when a "mailer has more recent information that indicates the customer is currently at . . . [a newer address], then accepting and applying the USPS-provided change-of-address would not be required." <u>Id.</u> at 2 (JA0126).

Countering this, USPS observes that the very same email also stipulates that the mailer "must keep written documentation that describes both the business's rules for such overrides and how such rules were implemented for each specific override." Def. MTD/MSJ at 42. Defendant protests that SCE has not clearly indicated anywhere that it had the required documentation and instead "merely states that since SCE's invoices were paid, the address used was correct." <u>Id.</u> The existence of such evidence is beside the point because in neither its Revenue Deficiency Letter nor its Final Agency Decision did USPS ever bother to address the email or whether SCE

might have had a case that its manual overrides were deemed by USPS to be permissible deviations from the Move Update standard.  SCE can hardly be faulted for failing to provide additional evidence of compliance with alternative approved practices when USPS never gave a hearing to SCE's argument in the first place.  At a minimum, Defendant's conflicting instructions to Plaintiff certainly might account for SCE's delay in terminating its manual-override practices.   This makes USPS's decision to extend the deficiency period to eighteen months, discussed next, all the more galling.

### 3.  *Eighteen-Month Revenue-Deficiency Period*

In addition to challenging the justifications for the revenue-deficiency assessment, Plaintiff also contests USPS's decision to extend the revenue-deficiency period to over eighteen months — from May 14, 2007, to November 26, 2008.  See Pl. MSJ at 29.  USPS assessed a revenue deficiency for the entirety of SCE's discounted-workshare rate and then extended it beyond the twelve-month "look back" period, despite USPS's own Management Instruction stating that it "may look back no more than 12 months before the date the deficiency was discovered."  Management Instruction at 2 (JA0227).  In its Revenue Deficiency Letter, USPS justified this decision by stating simply that "SCE's noncompliance was ongoing."  Revenue Deficiency Letter at 5 (JA0250).  It neither clearly identified the exception to the Management Instruction's plain twelve-month limitation nor established how SCE's noncompliance was "ongoing."  The Final Agency Decision stated only that "a look forward period is allowed if the deficiency was not corrected when identified," again without citing the provision that permits this or identifying the evidence showing that SCE did not correct its deficiencies.  See Final Agency Decision at 2 (JA0002).

Although it did not do so in its Final Agency Decision, USPS in its Motion for Summary Judgment points to language that states that the twelve-month limit "do[es] not apply if . . . [m]ailing history discloses evidence of repeated noncompliance with mailing standards." Management Instruction at 2 (JA0227); see Def. MTD/MSJ at 9.  In the Court's view, this language is not necessarily in accord with USPS's interpretation that "a look forward period is allowed if the deficiency was not corrected when identified."  Final Agency Decision at 2 (JA0002) (emphasis added).  The Management Instruction references "mailing history," which logically must refer to a past period, not a "forward period."  Considering that the other exceptions are in instances of "[f]raud or misrepresentation" or when "[n]o postage or fees were paid for the service rendered," Management Instruction at 2 (JA0227), the Court believes "repeated noncompliance" is more reasonably understood as persistent noncompliance of the kind akin to fraud, misrepresentation, or total nonpayment, rather than noncompliance while USPS and the mailer communicate back and forth regarding a mailer's compliance with the Move Update standard.  "Repeated noncompliance," furthermore, does not necessarily mean the same thing as "ongoing," as referenced in the Revenue Deficiency Letter — "ongoing" is an insufficiently vague period of time that could mean as little as a couple of days, whereas "repeated" connotes persistent and willful noncompliance.

The longer period assessed by the Service is even more troubling given that it has nowhere provided a reasoned basis to extend beyond the typical twelve-month limit.  In its Motion for Summary Judgment, Defendant states that Plaintiff "failed to stop manually overriding address updates prescribed by NCOA[Link] until January 2010."  Def. MTD/MSJ at 8.  Yet this explanation is not logical given USPS's choice to extend the deficiency period to November 26, 2008, a date that does not correspond to the time period during which SCE

applied manual address overrides.  USPS sent its Revenue Deficiency Letter in November 2009,

and in that letter extended the revenue-deficiency period from May 12, 2008, to November 26,

2008.  See Revenue Deficiency Letter at 1, 5-6 (JA0246, JA0250-51).  If USPS seeks to justify

its revenue-deficiency assessment beyond the twelve-month limitation imposed by the

Management Instruction, it has nowhere provided an explanation for cutting this date off at

November 26, 2008, instead of "January 2010," when it claims SCE finally stopped manually

overriding address updates.  Having mined the pages of the exhibits relied upon by USPS in its

Revenue Deficiency Letter of November 23, 2009, the Court cannot find any indication of if —

or when — SCE terminated the manual-override practice.  True, SCE later conceded that it did

not "discontinue[] the practice of implementing manual overrides" until January 2010, see Am.

Appeal at 37 (JA0042), but in any case, November 26, 2008, appears to be an entirely arbitrary

date, as it was neither the end of a twelve-month range nor the end of SCE's noncompliance.  It

can hardly be said to be a date chosen with reasoned decisionmaking, especially when SCE's

other form of noncompliance — failure to update addresses in response to Code 91 and Code 92

errors — was corrected in July 2008, months before November 26, 2008.

### 4.   *USPS's Position on Noncompliance*

In the absence of evidence linking SCE's practices to its volume of return-to-sender

mailpieces, USPS instead leans heavily on the fact that "[r]ates of return are not the deciding

factor in compliance with the MOVE Update standard and are only an indication that the

standard may not have been met."  Final Agency Decision at 2 (JA0002) (emphasis added).

USPS has maintained that because the manual overrides and failure to correct Code 91 and 92

address errors are forms of *per se* noncompliance with the Move Update standard, SCE was not

eligible for workshare-rate discounts for any of its mailings, however justifiable its override

practices might have been.  See Def. MTD/MSJ at 12-13.  Yet here, too, USPS falls short.

Defendant has provided no account of how it determines when noncompliance is sufficient to

warrant issuing a revenue-deficiency assessment.  Its internal guidance as to issuing revenue

deficiencies for noncompliance is dismayingly vague.  USPS's Management Instruction — the

official regulatory document outlining revenue-deficiency procedures — provides no explanation

whatsoever as to 1) the criteria for determining "[o]perational impact deficiencies"; 2) the period

of time permitted for mailers to bring nonconforming practices into compliance; or 3) whether it

was appropriate to assess a revenue deficiency in light of communications stating the mailer's

practices were in compliance with relevant requirements.  See Management Instruction at 1-11

(JA0226-JA0236).  The Court waded through the 252-page joint appendix, Plaintiff's 3,358

pages of supplemental appendices (including a supplement to the supplemental appendix), and

Defendant's 103-page supplemental appendix.  Nowhere in these documents did it find a

reasoned account of the how USPS identifies mailers who may be in noncompliance with Move

Update requirements, how it assesses such noncompliance, and how it determines revenue

deficiencies related to such noncompliance.  Nor is there any mention of potential mitigating

factors, such as when agents of USPS have previously advised mailers that their noncompliance

with the Move Update standard is permissible — as appears to have been the case here.

    The deferential reasoned-decisionmaking standard requires more: the Court "will not

uphold an agency adjudication where the agency's judgment . . . was neither adequately

explained in its decision nor supported by agency precedent."  Fox v. Clinton, 684 F.3d 67, 75

(D.C. Cir. 2012) (internal quotation marks omitted).  Further, an agency's "fail[ure] to consider

contradictory record evidence where such evidence is precisely on point" — a persistent problem

the Court has identified above — constitutes a "lapse of reasonable and fair decisionmaking."

Morall v. Drug Enforcement Admin., 412 F.3d 165, 167 (D.C. Cir. 2005).  "In failing to articulate a comprehensible principle governing" how it identifies, assesses, or calculates revenue deficiencies, Siegel v. SEC, 592 F.3d 147, 162 (D.C. Cir. 2010), USPS attempts to retain unfettered discretion to single out any form of noncompliance, no matter the extent, significance, or reason.  As the Siegel court described, the "'evil of a decision' of this sort is that it 'prevent[s] both consistent application of the law by subordinate agency personnel . . . and effective review of the law by the courts.'"  Id. (quoting Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 522 U.S. 359, 375 (1998)).  If the PCSC's Final Agency Decision is to be believed, USPS could issue a revenue deficiency against any mailer that receives workshare discounts if it has any noncompliance for any period of time, even if it immediately corrects the error as soon as it is discovered.

Here, such an assertion is particularly vexing in light of Plaintiff's observation that "more than 99.9% of SCE's mail volume was unaffected by the three Move Update issues alleged in the November 2009 Decision."  Am. Appeal at 35 (JA0040).  In order to qualify for workshare discounts, mailers such as SCE must incur significant expenses to comply with the Move Update standard, efforts that save USPS significant time and resources by presorting, prebarcoding, handling, and transporting mail.  See 39 U.S.C. § 3622(e)(1).  USPS's position appears to be that even if a mailer complies with 99% of the requirements and incurs substantial workshare expenses to bring its mailpieces into compliance, a single form of noncompliance — even accidental, even inconsequential — is sufficient to render a revenue-deficiency assessment for 100% of a mailer's discounted rates.  The lack of a comprehensible principle governing decisions to assess revenue deficiencies against mailers is precisely the "evil" that the Supreme Court spoke of, which enables inconsistent application by subordinate agency personnel.

Allentown Mack Sales & Serv. Inc., 522 U.S. at 375.  The Court cannot conclude, then, that

USPS engaged in reasoned decisionmaking because it has failed to establish standards upon

which its decisions may be considered "reasoned."

      In contrast, as Plaintiff notes, in some analogous situations, USPS has established clear

thresholds upon which it will assess a revenue deficiency for noncompliance.  In 2002, it "issued

a rule indicating it would assess . . .  rate differences when a mailer exceeded a five percent

tolerance of mis-sequenced mail in sequenced mailings."  Am. Appeal at 33 (JA0038) (citing

Domestic Mail Manual Change to Revise the Five Percent Error Limit for Sequenced Mailings,

67 Fed. Reg. 63549 (Oct. 15, 2002)) (emphasis added).  Plaintiff also points to an audit report by

the Postal Service's Office of Inspector General, which identifies many of the problems the

Court notes above.  See U.S. Postal Service Office of Inspector General Audit Report, SR-AR-

10-001, Move Update Program and Investigations (May 12, 2010).  Plaintiff sought to

supplement the administrative record with this document, which Defendant has opposed.  The

Court need not resolve this quarrel because the OIG Report only explains in broad strokes what

is inherently apparent from the Court's examination of the Revenue Deficiency Letter, Final

Agency Decision, and the accompanying administrative record in this case: that during the

relevant time period, USPS provided no concrete measures to identify and assess noncompliance

with Move Update standards.  The OIG Report is superfluous given the clear problems with

USPS's practices identifiable from the record alone.

* * *

      Having reviewed USPS's Final Agency Decision imposing the revenue-deficiency

assessment, as well as the scant evidence supporting it, the Court cannot describe USPS's

determination as one of reasoned decisionmaking.  Although this standard is a "limited and far

26

less intrusive" scope of review than is required under the APA, <u>Reese Bros.</u>, 905 F. Supp. 2d at 255, the role of judicial review is to do more than merely rubber-stamp agency decisionmaking regardless of whether it is substantiated, reasonable, or equitable.  Here, the gap between USPS's revenue-deficiency assessment and the reasons, evidence, and clear standards necessary to support that judgment is simply too wide.  As soon as SCE discovered that its Code 91 and 92 address errors were not being rectified, it fixed the practice.  Despite previously being told that its manual-override practices were in compliance with Move Update requirements — and although they likely <u>decreased</u>, rather than increased, the rate of RTS UAA mail — SCE ceased the practice once asked to so do (probably to the ire of its customers).  Behind all of this looms the fact that USPS has provided almost no evidence that <u>any</u> of these practices were the <u>actual cause</u> of SCE's "extensive amounts" of returned mailpieces.  <u>See</u> Revenue Deficiency Letter at 1 (JA0246).  Further, USPS never anywhere offered evidence providing a reasoned explanation of the extension of the twelve-month limit on revenue-deficiency assessments.  Finally, the Service's claim that it can issue a revenue deficiency for <u>any</u> form of noncompliance, no matter how trivial, temporary, or unintentional, would invite unfettered discretion to issue such assessments arbitrarily and capriciously.  The Court cannot enforce such a decision.

      B.  <u>Remand</u>

      Having concluded that the revenue-deficiency assessment here is unfounded, the Court turns to the question of remedy.  USPS argues that the Court cannot remand the Final Agency Decision back to the PCSC because "there is no authority to support SCE's request that the PCSC, which lacks any statutory role in ratemaking, establish an unpublished rate surcharge for SCE without any review by the PRC."  Def. Rep. at 18.  This is too cute by half: not only does it mischaracterize the appropriate remedy — a reconsideration of the amount of the revenue

deficiency — but it also mischaracterizes the PCSC's capacity to grant this relief as the dedicated appeals board that can reassess the revenue-deficiency calculation.  The PCSC itself, in its Final Agency Decision upholding the assessment, states that "[t]he role of the [PCSC] in adjudicating revenue deficiencies is to determine whether or not the deficiency exists and <u>if the amount was calculated correctly</u>."  Final Agency Decision at 2 (JA0002) (emphasis added).  It is thus within the PCSC's capacity to reconsider — and recalculate — the appropriate revenue-deficiency assessment issued against Plaintiff.

The Court is confident that, on remand, the PCSC — this time considering SCE's evidence regarding the source, extent, and significance of its noncompliance with Move Update standards — can correctly determine a reasoned and reduced sum for the proper revenue-deficiency assessment.  After all, Plaintiff repeatedly concedes that it was in violation of the Move Update standard and appears to accept responsibility for, at a minimum, the actual costs imposed on the Postal Service by its noncompliance.  <u>See</u> Am. Appeal at 5 ("[E]ven if . . . some revenue deficiency were warranted, the amount assessed is grossly unreasonable.") (JA0010); Pl. MSJ at 36-37 (asking the Court to "remand the case for a determination by the USPS of a reasonable and equitable rate surcharge that does not exceed the injury actually caused by" specific Move Update process violations).

    C.  <u>Constitutional Claims</u>

One final note: in addition to Plaintiff's Count One allegations that USPS's actions violate the postal statutes, SCE also raises a Fifth Amendment Due Process challenge in Count Two.  Because the Court has resolved Plaintiff's statutory claim, it need not reach the constitutional one.  After all, a court shall "resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue."  <u>U.S. v. Wells Fargo Bank</u>, 485

U.S. 351, 354 (1988); <u>see also</u> <u>Heller v. Dist. of Columbia</u>, 670 F.3d 1244, 1250 (D.C. Cir. 2011)

(same); <u>Resolute Forest Products, Inc. v. U.S. Dep't of Agric.</u>, No. 14-2103, 2015 WL 5501830,

at *19 (D.D.C. Sept. 9, 2015) (same).  The Court, accordingly, does not address the merits of

Plaintiff's argument on this count.

**V.      Conclusion**

In light of USPS's failure to engage in reasoned decisionmaking, the Court will grant in

part and deny in part Plaintiff's Motion for Summary Judgment.  Because it determines that

USPS is owed some portion of the revenue-deficiency assessment, however, it also grants in part

and denies in part Defendant's Motion for Summary Judgment on its Counterclaim.  And the

Court remands to the PCSC to determine a reasonable and reduced revenue-deficiency

assessment consistent with the guidelines set forth in this Opinion.

<u>/s/ James E. Boasberg</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>September 29, 2015</u>