**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SOUTHERN CALIFORNIA EDISON,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES POSTAL SERVICE,**<br><br>Defendant. | Civil Action No. 14-1041 (JEB) |

**MEMORANDUM OPINION**

When mail recipients decline to accept letters delivered by the United States Postal Service, they can write "return to sender" on the envelope so that USPS will offer the sender an opportunity to revise the destination address. In similar fashion, Defendant USPS here attempts to return this Court's Opinion for revision, seeking a more favorable delivery. More specifically, Defendant moves under Federal Rule of Civil Procedure 59(e) to alter or amend this Court's Memorandum Opinion and separate Order issued September 29, 2015, granting in part and denying in part both parties' cross-motions for summary judgment. See ECF Nos. 46-47. As no clear error of law or manifest injustice is present here to warrant alteration of the judgment, the Court will deny the Motion.

**I.   Background**

The background of this case is set forth in substantial detail in the Court's Opinion, see S. California Edison v. U.S. Postal Serv., No. 14-1041, 2015 WL 5730777 (D.D.C. Sept. 29, 2015), and so only a cursory summary is warranted here. Mailer Southern California Edison is a public utility that, during the period in question, sent monthly bills via the United States Postal Service

1

to most of its approximately 14 million customers. USPS grants "workshare" discounts for mailers who ease its receipt and delivery of bulk mail by presorting, prebarcoding, handling, and transporting mail before it reaches the Postal Service. To qualify for such discounts, however, mailers must comply with USPS's Move Update standard, which compliance reduces the amount of return-to-sender (RTS) and undeliverable-as-addressed (UAA) mail USPS receives from bulk mailers.

In early 2007, USPS's Postal Inspection Service identified high rates of RTS and UAA mailpieces sent by SCE and, in a subsequent investigation, determined that Plaintiff had failed to comply fully with the Move Update standard. In a letter dated November 23, 2009, USPS issued a revenue-deficiency assessment of $7,551,576.28, the difference between the discounted bulk-mail price SCE paid and the undiscounted First-Class rate for 82,452,608 mailpieces SCE sent between May 14, 2007, and November 26, 2008. See Revenue Deficiency Letter (Nov. 23, 2009) (JA0047). SCE opposed this assessment and appealed it to the Service's Pricing & Classification Service Center (PCSC) – the designated USPS appeals body for such an assessment – raising several issues, two of which are relevant to USPS's Motion for Reconsideration. See Amended Appeal of Southern California Edison from Decision of Santa Ana District (Nov. 21, 2011) (JA0005-JA0044).

First, SCE opposed assessment of the First Class rate for all of its mail, as USPS had identified only a small fraction of SCE's total mailpieces sent (at most 1.4%) that were returned UAA. While SCE acknowledged that it had mistakenly failed to implement several Move Update standard protocols, it strived to do so once notified of the error. Second, SCE also challenged the assessment on the basis that USPS's Management Instruction – USPS's guidance in assessing revenue deficiencies – limited revenue-deficiency assessments to no more than the

2

twelve months <u>preceding</u> the discovery of non-compliance with the Move Update standard. USPS, however, had in this case assessed a revenue deficiency for over 18 months, including for months <u>after</u> the discovery of non-compliance.

The PCSC rejected SCE's appeal and upheld the full revenue-deficiency assessment of $7,551,576.28 for the 18-month period. SCE then filed its lawsuit in this Court, arguing that the Service had acted unreasonably and *ultra vires* by violating the Postal statutes, <u>see</u> Compl., ¶¶ 81-89, and had also violated the Due Process Clause of the Fifth Amendment. <u>Id.</u>, ¶¶ 90-93. In response, USPS amended its initial Answer to include a Counterclaim, seeking judgment on a claim for debt under the Federal Debt Collection Procedure Act, 28 U.S.C. § 3001 *et seq.*, unjust enrichment, and declaratory relief. <u>See</u> Amend. Answer & Countercl., ¶¶ 34-49.

In its Opinion, the Court largely sided with SCE. It concluded that USPS had not applied reasoned decisionmaking in issuing the revenue-deficiency assessment, particularly in reaching beyond the maximum twelve-month retrospective period. The Court remanded the matter to the PCSC for reasoned decisionmaking in calculating the appropriate assessment. USPS now moves for the Court to alter or amend its judgment.

**II.     Legal Standard**

Federal Rule of Civil Procedure 59(e) permits the filing of a motion to alter or amend a judgment when such motion is filed within 28 days after the judgment's entry. The Court must apply a "stringent standard" when evaluating Rule 59(e) motions, <u>see</u> <u>Ciralsky v. CIA</u>, 355 F.3d 661, 673 (D.C. Cir. 2004), for "'[r]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly.'" <u>Mohammadi v. Islamic Republic of Iran</u>, 782 F.3d 9, 17 (D.C. Cir. 2015) (quoting 11 C. Wright & A. Miller, <u>Fed. Prac. & Proc. Civ.</u> § 2810.1 (3d ed. 2012)). "A Rule 59(e) motion is discretionary' and need not be granted unless the district court

finds that there is an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (citation and internal quotation marks omitted); see also 11 Fed. Prac. & Proc. Civ. § 2810.1 ("four basic grounds" for Rule 59(e) motion are "manifest errors of law or fact," "newly discovered or previously unavailable evidence," "to prevent manifest injustice," and "intervening change in controlling law"). Rule 59(e), moreover, "is not a vehicle to present a new legal theory that was available prior to judgment," Patton Boggs LLP v. Chevron Corp., 683 F.3d 397, 403 (D.C. Cir. 2012), or "to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008) (citation and internal quotation marks omitted).

### III.   Analysis

At the outset, the Court notes that USPS has not alleged "newly discovered or previously unavailable evidence," or an "intervening change in controlling law." Instead, it takes direct aim at the Court's reasoning in its judgment, alleging clear errors of law and manifest injustice. Among the issues it raises are four of particular note. First, Defendant believes that the Court incorrectly concluded that it had subject-matter jurisdiction over claims relating to postal rates and rate-related regulations, asserting that SCE's challenge should have been filed before the Postal Regulatory Commission (PRC), not in federal district court. See Mot. at 2. Second, it maintains that the Court "failed to recognize" that the PCSC has only limited authority to determine whether a mailer paid insufficient postage and cannot "create a new rate" for a particular mailer that differs from the full undiscounted rate. Id. at 1-2. Third, it argues that compliance with the Opinion would "effect a manifest injustice" to the Postal Service and the

public. Id. at 14. Finally, if the Court adheres to its prior decision, Plaintiff seeks further guidance upon remand. Id. at 21-22. The Court treats each point in turn.

### A. Jurisdiction

The Service's jurisdictional argument is hardly new, having been addressed in its briefings at summary judgment; indeed, it dedicated substantial pages to the topic. See Def. MTD/MSJ at 18-31; Def. Reply at 21-23. In an attempt to bolster its position, USPS cites to a recent opinion in this District by Judge Rosemary Collyer, in which she found that the PRC had exclusive jurisdiction to hear challenges over rates. See Sears, Roebuck & Co. v. U.S. Postal Serv., No. 14-1031, 2015 WL 5729089, at *11-12 (D.D.C. Sept. 30, 2015). That decision, while of course not binding, is nevertheless not inconsistent with this Court's. Because Judge Collyer held that USPS had engaged in reasoned decisionmaking – in contrast to this Court's holding – she then proceeded to resolve the plaintiff's alternative argument that USPS had acted *ultra vires* in the establishment of the rate in question. Only on that challenge did Judge Collyer find that the PRC had exclusive jurisdiction. See id. at *7-9. She clearly acknowledged, moreover, that "the Postal Service's application of its own regulations and its deficiency assessments are subjected to limited judicial review . . . [*i.e.,*] whether the Postal Service 'engaged in reasoned decision-making.'" Id. at *6 (citation omitted). That form of limited review is precisely what this Court conducted in its Opinion.

While the Court already addressed the Service's jurisdictional arguments in its prior Opinion, it adds here that it could not find a single case before the D.C. Circuit in which a mailer had appealed a revenue-deficiency assessment issued by the PCSC to the PRC, and then later to the Circuit — *viz.*, the route urged here by USPS. Indeed, a review of every relevant case in this Circuit makes manifest that cases appealed from the PRC concern broader, policy-making

decisions, not individual revenue-deficiency assessments against a single mailer.  In fact, in the vast majority of cases in the Circuit involving the PRC, the Commission and the Postal Service are the litigants, and many involve USPS challenges to PRC orders concerning the Service's broad rate-setting and mailing practices.  See, e.g., U.S. Postal Serv. v. Postal Regulatory Comm'n, 785 F.3d 740 (D.C. Cir. 2015) (USPS challenge to PRC rejection of USPS proposal to implement price adjustments to certain market-dominant products); U.S. Postal Serv. v. Postal Regulatory Comm'n, 747 F.3d 906 (D.C. Cir. 2014) (USPS challenge to PRC order equalizing cost of first-class letter and flat DVD rates); U.S. Postal Serv. v. Postal Regulatory Comm'n, 717 F.3d 209 (D.C. Cir. 2013) (USPS challenge to PRC order that USPS revise discount for presorted "workshare discount" mail); U.S. Postal Serv. v. Postal Regulatory Comm'n, 640 F.3d 1263 (D.C. Cir. 2011) (USPS challenge to PRC denial of USPS request to exceed annual cap for postal-rate increases).

Of the handful of cases not falling into this category, not a single one concerns a revenue-deficiency assessment, contradicting USPS's assertion that the Court acted in "clear error."  See, e.g., Mittleman v. Postal Regulatory Comm'n, 757 F.3d 300 (D.C. Cir. 2014) (challenge to proposed post-office closure); GameFly, Inc. v. Postal Regulatory Comm'n, 704 F.3d 145 (D.C. Cir. 2013) (challenge to PRC's remedial order resolving differential treatment by USPS among businesses distributing DVDs by mail); LePage's 2000, Inc. v. Postal Regulatory Comm'n, 674 F.3d 862 (D.C. Cir. 2012) (challenge to PRC's classification of commercial licensing of third-party mailing and shipping supplies as "nonpostal service").

Even more tellingly, the Court could not find a single case listed on the docket of the PRC — past or present — that involved the appeal of a revenue-deficiency assessment against a mailer.  See Docket Search, Postal Regulatory Commission, http://www.prc.gov/dockets/search

(last visited Jan. 13, 2016). Nor does USPS cite to a single case identifying such precedent. In the absence of any cases in which a revenue-deficiency-assessment challenge proceeded first to the PRC – as USPS alleges it must – and given at least one case in this District that reviewed such a challenge on the merits, see Reese Bros., Inc. v. U.S. Postal Serv., 905 F. Supp. 2d 223 (D.D.C. 2012), USPS has not shown that this Court should revisit its jurisdictional determination.

      B.  Tampering with Rates

While Defendant never defines outright what a "rate" is, it apparently implies that any amount a mailer pays that is permitted by any organ of the USPS is a "rate," even in the instance of a remedial revenue-deficiency assessment. See Mot. at 2 ("At all times relevant to this matter, the [Mail Classification Schedule] did not list a rate for a bulk mailing that was partially or even substantially compliant with the Move Update requirements."). The Service thus also objects to the judgment on the ground that it construes the Court's Order as requiring the PCSC to "impose[] a new rate and rule on USPS," Mot. at 13, something Defendant maintains the PCSC may not do. The Service states that "the PCSC may not create a new rate; rather, only the PRC can approve a new rate" because "[t]he PCSC had no authority to create a new rate or waive compliance with Move Update regulations . . . ." Id. at 2. Defendant, however, mischaracterizes the Court's Order as requiring the PCSC "retroactively to apply a rate that has not been approved by the PRC merely because of views on what might be equitable under specific circumstances applicable to a particular mailer . . . ." Id. at 12. Revenue-deficiency assessments are not rates; they are remedial assessments that result from mailer non-compliance, and the PCSC has wide discretion in determining how to make such assessments.

Although the Court has already responded to these arguments in its Memorandum Opinion, it will briefly explain further why USPS problematically elides the distinction between the determination of a revenue-deficiency assessment and the setting of a postal rate.  At its core, USPS's argument hinges on the assumption that if the Postal Service were to issue a revenue-deficiency assessment for any amount other than the full undiscounted rate – for the entirety of the mailing period in question and for all mailpieces sent at the discounted workshare rate – it would "impose[] a new rate and rule on USPS" and would "provide[] SCE with an exemption from the burden of complying with Move Update regulations that apply to all mailers that qualify for lower rates," resulting in "discriminatory pricing."  Id. at 13, 2.  In other words, the Service believes that there can be no discretion whatsoever in the assessment of a revenue deficiency without the implementation of a "new" and "discriminatory" rate.  And such implementation the Court cannot order, for Defendant claims the PCSC lacks "authority to apply rates to a specific mailer other than approved rates or to disregard postal regulations establishing rate-eligibility requirements."  Id. at 15.

Despite such an assertion, both USPS and the PCSC have a well-established history of doing just what USPS claims cannot be done – namely, exercising discretion in the assessment of revenue deficiencies.  Most straightforwardly, the Service's Management Instruction expressly limits revenue-deficiency assessments to "no more than 12 months before the date the deficiency was discovered" – even if the actual period of non-compliance is far greater.  See Management Instruction Assessing and Collecting Deficiencies in Postage or Fees, DM140-2008-1 ["Management Instruction"] at 2 (JA0227).  By the Service's logic, any revenue-deficiency assessment issued by the PCSC that is limited to 12 months when the actual non-compliance lasts for a longer period of time would constitute the application of "rates to a specific mailer

other than approved rates" since some portion of the mailer's non-compliant mailing would skate by at the improperly discounted rate. For this reason alone, USPS's position is fatally flawed in arguing that anything less than a full assessment for the entire period of non-compliance would be an exercise in off-*piste* rate-setting. Issuing a revenue-deficiency assessment is thus not an act of rate-setting, as its own Management Instruction makes clear.

In fact, an abbreviated period was imposed by the PCSC in this case: neither party disputes the fact that some portion of SCE's mailings remained non-compliant with the Move Update standard from at least May 14, 2007, until as late as January 2010. See Def. MTD/MSJ at 8 ("[SCE] failed to stop manually overriding address updates . . . until January 2010."); Compl., ¶ 80 ("SCE stopped manually overriding . . . addresses in January 2010."). And no evidence suggests SCE's non-compliance only began on May 14, 2007. Yet the revenue-deficiency assessment was imposed only for the period between May 14, 2007, and November 26, 2008, see Pl. MSJ at 29, the former date apparently chosen as being twelve months prior to the discovery of non-compliance, and the latter date selected because "SCE took approximately seven months to respond to Inspectors [*sic*] requests for documents." Investigation Memorandum (May 26, 2009) at 5 (JA0112). This latter consideration, of course, is one that bears no relation to the factors identified in the Management Instruction, see Management Instruction at 2 ("Assessment Criteria") (JA0227), and provides further evidence that revenue-deficiency assessments involve discretion, not the rote application of rates. Otherwise, the very assessment USPS here defends would also have to be considered a "new rate" of "discriminatory pricing," something USPS alleges results in "manifest injustice."

Other provisions of the Management Instruction cast further doubt on USPS's elision of revenue deficiencies and rate-setting. The Instruction notes that only "for an amount of $500 or

more" should a revenue deficiency be calculated according to these rules. Id. For lesser amounts, in contrast, each deficiency is to be reported to a manager or postmaster for follow-up. See id. The result is that any mailer whose noncompliance amounts to less than $500 in the difference between the discounted rate and the First Class rate might not have a revenue-deficiency assessment applied, since their deficiencies appear not always to be calculated in accordance with the Management Instruction. This would constitute "discriminatory pricing" if such assessments are, as USPS insists, rate-setting exercises. The Instruction also provides exceptions in the case of "[f]raud or misrepresentation" or where "[m]ailing history discloses evidence of repeated noncompliance with mailing standards." Id. If fraud or misrepresentation can alter the amount of an assessment, then such assessments are not, *contra* USPS's assertion, mere mechanical rate-setting exercises, but rather case-specific, fact-specific, *ex post* judgments. In sum, these stated factors are evidence that the revenue-deficiency assessments are imposed with thought and discretion, suggesting that the act of calculating and imposing a revenue-deficiency assessment is not "impos[ing] a new rate or rule," as USPS contends. See Mot. at 13.

Given the Management Instruction's general mailer-specific limits on revenue-deficiency assessments and permissive view towards the exercise of discretion on the part of the PCSC and the Postal Service's fact-specific actual practices with regard to SCE, USPS's argument that issuing a revenue-deficiency assessment is an act of rate-setting carries no water. The Court, consequently, will not reconsider its Opinion as to this issue.

  C. Manifest Injustice

USPS's own practices, moreover, directly contradict the Service's contentions that "[t]he PCSC had no authority to . . . waive compliance with Move Update regulations . . . ," id. at 2, and that "such a mailer-specific" assessment would "effect a manifest injustice." Id. at 14. The

Management Instruction specifically grants the Manager of the PCSC the ability to waive a revenue-deficiency assessment altogether. See Management Instruction at 9 (JA0234) ("A revenue deficiency may be waived only by the DFM, Manager of Pricing and Classification Service Center, or Manger of Mailing Standards, Headquarters."). Such a waiver would, under USPS's own understanding, be a "new rate or rule," since it would allow one mailer to pay a different rate from another, resulting in "discriminatory pricing" – if such a waiver were considered rate-setting. Yet the Management Instruction envisions the precise "manifest injustice" USPS so strongly condemns, and it expressly allows what USPS here claims is prohibited: the ability of the PCSC to tailor remedies specifically to the deficiency without "setting a new rate" in the process. Such discretion flies in the face of claims that mailer-specific assessments *ipso facto* constitute manifest injustice.

The Management Instruction, moreover, authorizes settlements between mailers and USPS for only "a partial payment." Id. Here, it is helpful to look at how such settlements take place, for they are the precisely the sort of "retroactive exemptions" and "payment of a discounted rate" that USPS claims is inherently not "just and reasonable." Mot. at 14. Because USPS alleges a real-world-effects parade of horribles should Plaintiff prevail, on this limited issue, the Court takes note of the Report issued by the Office of Inspector General for USPS, which states that numerous revenue deficiencies assessed by USPS have in fact "resulted in settlement agreements," presumably leading to only partial payments of assessments. See USPS OIG Audit Report SA-AR-10-001, Move Update Program and Investigations ("OIG Report") at 2 (May 12, 2010), *available at* https://www.uspsoig.gov/sites/default/files/document-library-files/2013/SA-AR-10-001.pdf. More remarkably, USPS management's own position in response to that report was that "good faith effort," "specific facts and circumstances unique to the

11

mailer's operations," and "confidential information" may properly be considered by USPS in reaching settlements with mailers assessed revenue deficiencies. See id., Appendix F: Management's Comments at 32-33. These practices suggest that USPS already encourages and permits the very practices it alleges would wreak havoc and result in manifest injustice were the Court's Order to stand.

Finally, although not germane to the legal outcome of this case, USPS recently proposed a rule in the Federal Register that casts further doubt on its manifest-injustice claims. See Address Quality Measurement Alternative, 79 Fed. Reg. 76,930 (Dec. 23, 2014). That proposed rule seeks to remedy the problem of mailpieces returned UAA due to outdated addresses by assessing fees against noncompliant mailers only for that portion of mail that is returned as UAA, not for all mailpieces sent at the discounted rate. The proposed assessment process, moreover, envisions assessing such fees only on the percentage of mailpieces that exceed a published "error" threshold for incorrect addressing; in other words, USPS now envisions a certain low level of noncompliance to be presumptively permissible. "Once the assessment fee is in place, qualifying mailings will no longer be required to demonstrate or document other USPS-approved Move Update methods that are being used to update their address list." Id. at 76,930. It thus appears that the Service itself seeks to assess fees for UAA mailpieces on a going-forward basis in precisely the manner it states here would lead to manifest injustice – namely, on an individualized basis for only the small portion of actual noncompliant mailpieces. While this proffered approach has no legal bearing on whether the PCSC engaged in reasoned decisionmaking in upholding the revenue-deficiency assessment issued against SCE in 2009, it further undermines Defendant's argument that issuing revenue-deficiency assessments that are

reasonably tailored to the particular circumstances of the mailer in question would necessarily effect a manifest injustice.

D. Remand

Finally, "should the Court decline to reverse its remand ruling, USPS respectfully requests that the Court clarify the specific issues in the FAD that the PCSC's revised decision should further consider . . . ." Mot. at 22. Although the Court's Opinion endeavored to be clear in instructing the PCSC to consider "the source, extent, and significance of [SCE's] noncompliance with Move Update standards . . . [to] correctly determine a reasoned and reduced sum for the proper revenue-deficiency assessment," S. California Edison, 2015 WL 5730777, at *12, the Court hopes that identifying a few factors worthy of consideration will be helpful. On remand, the Court would expect the PCSC to examine the costs incurred by USPS for the RTS and UAA mailpieces sent by SCE during the relevant time period (estimated at $.506 per mailpiece. See Investigation Memorandum at 6 (JA0113)). The PCSC might also consider the differential between the First Class rate appropriate for mailpieces that did not comply with the Move Update standard (estimated at $0.41 per mailpiece, see id. at 5 (JA0112)) and the lower bulk-discount rate SCE actually paid for those mailpieces (a price the Court could not discern from the record). These should provide a reasonable starting point for a proper assessment.

In addition, the Management Instruction permits the Postal Service to "look back no more than 12 months before the date the deficiency was discovered" in assessing a revenue deficiency. See Management Instruction at 2. While USPS has elsewhere claimed that where "[m]ailing history discloses evidence of repeated noncompliance with mailing standards," id., it can bypass the 12-month limit, SCE's taking "approximately seven months to respond to Inspectors['] requests for documents," see Investigative Memorandum at 5 (JA0112), falls far short of

13

"evidence of repeated noncompliance." At most, the PCSC should consider a revised revenue deficiency for only the period looking back up to twelve months from May 2008, when "the deficiency was discovered." Id. at 4 (JA0111).

## IV. Conclusion

As Defendant has fallen short of the high Rule 59(e) standard for altering the judgment, the Court will deny its Motion. An Order to that effect will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: January 14, 2016